UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | |
|---|---|
| **M.B.** and **S.E.** through their next friend Katharyn McIntyre, **V.A.** through his next friend Kathryn Ashburn, **J.M.** through his next friend Ed Bigus, **M.J.** through his next friend Ed Bigus, **R.M.** through his next friend Allan Hazlett, **C.A.** through his next friend Allan Hazlett, **Z.Z.** through her next friend Ashley Thorne, **B.B.** through her next friend Ashley Thorne, and **M.L.** through her next friend Ashley Thorne, for themselves and those similarly situated,<br><br>                        **Plaintiffs,**<br><br>**v.**<br><br>**Jeff Colyer** in his official capacity as Kansas Governor, **Gina Meier-Hummel** in her official capacity as Kansas Department for Children and Families Secretary, **Jeff Andersen** in his official capacity as Kansas Department of Health and Environment Secretary, and **Tim Keck** in his official capacity as Kansas Department for Aging and Disability Services Secretary,<br><br>                        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 18-cv-2617<br><br>  COMPLAINT—CLASS ACTION |

## COMPLAINT

## I. INTRODUCTION

1.     In September of 2018, the media reported the alleged rape of a thirteen-year-old girl sleeping in a child welfare agency office in Johnson County, Kansas. The story of this child – staying overnight in an office because Kansas' broken system lacked any housing for her – exemplified a long known danger. Kansas' child welfare system is, and has been for at least a decade, systematically failing to protect the safety and well-being of vulnerable children and youth

1

in foster care in the custody of the Kansas Department for Children and Families (DCF). This action addresses two fundamental systemic failures creating this danger.

2.      **First**, Defendants – state officials responsible for the operation of the statewide foster care system in Kansas – maintain the dangerous practice of subjecting children in foster care to extreme housing disruption, also known as churning. Children in DCF custody needlessly move from placement to placement more than fifteen or twenty times, and some children even move more than fifty or one hundred times. Alarmingly, DCF frequently subjects children to "night-to-night" or short-term placements. In a repetitive, destabilizing cycle, children are regularly forced to sleep for a night or several nights anywhere a bed, couch, office conference room, shelter or hospital can be found. For days, weeks, or even months at time, they spend their nights in these short-term placements and their days in agency offices waiting to find out where they will sleep next, only to repeat the same cycle again. DCF's practice of extreme housing disruption inherently deprives children of basic shelter and effectively renders them homeless while in state custody.

3.      According to DCF data, as of June 2018, there were 7,687 children in DCF custody. Between April and September of 2018 alone, 1,459 of the children in care were forced to sleep in one-night placements. This figure, while alarming, fails to fully capture the scope of the harm children in DCF custody face. It reflects neither children churning through multiple night-to-night placements nor those housed in short-term transient placements for up to a week or a month at a time.

4.      The Named Plaintiff children in this action have been moved anywhere from ten to over one hundred times while in DCF custody. Much of that churning has occurred in just the past one to two years. Given the fluid nature of the foster care population, Defendants constantly expose

different children to extreme housing disruption, as a child with just one or two placements today can become the child with ten, twenty, or more placements in the near future.

5.     The practice of churning in Kansas causes and presents a risk of emotional, psychological, developmental and neurological harm. Research literature and studies show that churning causes and worsens both attachment and behavioral disorders. Research literature and studies also demonstrate that churning causes direct physical harm to children's normal brain development; a child's brain, central nervous system, and endocrine system are directly harmed by the practice.

6.     **Second,** Defendants fail to provide children in DCF custody with mental health and behavioral health screening, diagnostic services, and treatment, including trauma-related screening and diagnostic services. The failure to provide mental health services mandated by the federal Medicaid statute causes, and risks causing, profound emotional and psychological harm to children in foster care. All children entering foster care in Kansas have suffered the known trauma of removal from their homes, and thousands of children in DCF custody have identified mental health needs and disorders at any given time. Yet, known shortages, delays, and waitlists for mental health services and treatment, including administrative barriers to prompt and sustained service delivery, continue to result in children being deprived of the mental health care they require.

7.     The fundamental problems of churning and mental health service delivery failures are deeply interconnected. In Kansas, churning often delays or disrupts mental health screens, diagnostic services, and treatment, and the trauma of churning itself causes harm and makes the need for prompt mental health services even more urgent. This in turn contributes to more instability because foster families are frequently unable and unprepared to meet children's unidentified and/or untreated mental health needs. For instance, while in foster care, ten-year-old

Named Plaintiff C.A. has been moved among foster homes, group homes, and agency offices more than seventy times. In 2018, he endured a three-month string of continuous night-to-night placements. Treatment for C.A.'s attention deficit disorder (ADD) and post-traumatic stress disorder (PTSD), both diagnosed while C.A. has been in DCF custody, has been disrupted in significant part because he has been moved around so often. Similarly, seventeen-year-old Named Plaintiff M.L. was diagnosed with a mood disorder after being moved over forty times while in DCF custody, bouncing among homes, facilities, offices and other night-to-night placements. Yet she has received inconsistent or negligible mental health treatment, in significant part because she has been moved so frequently.

8.      Named Plaintiffs and their Next Friends bring this federal civil rights class action pursuant to FED. R. CIV. P. 23(a) and (b)(2), as well as 42 U.S.C. § 1983, on behalf of themselves and a statewide general class of children who are or will be placed in foster care in the protective custody of DCF, and a subclass of children who have identified mental health treatment needs.

9.      Defendants include Kansas Governor Jeff Colyer, Kansas DCF Secretary Gina Meier-Hummel, Kansas Department of Health and Environment ("KDHE") Secretary Jeff Andersen, and Kansas Department for Aging and Disability Services ("KDADS") Secretary Tim Keck, all sued in their official capacities.

10.      Plaintiffs seek solely declaratory and injunctive relief compelling Defendants to remedy known dangerous practices and specific structural deficiencies in the Kansas foster care system. Plaintiffs further seek to end violations of their federal rights under the Fourteenth Amendment to the U.S. Constitution, and under the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the federal Medicaid Act, and the resulting harms, and risks of harm, to foster children in DCF custody.

## II. JURISDICTION & VENUE

11.     This class action for declaratory and injunctive relief is brought pursuant to 42 U.S.C. § 1983 to redress the ongoing deprivation of rights guaranteed by the United States Constitution and federal statutory law.

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this district and because Defendants maintain offices in this district.

## III. PARTIES

### A.  THE NAMED PLAINTIFFS AND NEXT FRIENDS

#### M.B. and S.E.

14.     M.B. and S.E. are brothers, aged seven and eight, respectively, who are currently in foster care in DCF custody. M.B. and S.E. have both been in DCF custody for almost eight months. Pursuant to FED. R. CIV. P. 17(c)(2), M.B. and S.E.'s case is brought by their adult Next Friend, Katharyn McIntyre, who resides in Leavenworth County, Kansas. Ms. McIntyre is sufficiently familiar with the facts of M.B. and S.E.'s situation and is dedicated to fairly and adequately representing M.B. and S.E.'s interests in this litigation.

15.     M.B. and S.E. first entered DCF custody together in Doniphan County in March 2018, when they were six and seven years old, respectively.

16.     Prior to entering DCF custody, S.E. was diagnosed with attention deficit hyperactivity disorder (ADHD), and received medication for this condition.

17.     Upon entering DCF custody, M.B. and S.E. were immediately separated from their older sister. Defendants subjected M.B. and S.E. to extreme housing disruption, including night-to-night placements for nearly a week.

18.     M.B. and S.E. did not receive any diagnostic services to assess the trauma they suffered in connection with their removal.

19.     For a period of approximately four months in 2018, DCF placed M.B. and S.E. together in Ms. McIntyre's home. While in this home, M.B. began exhibiting behavioral health issues. Ms. McIntyre requested mental health assessment and treatment for M.B. multiple times. Despite these requests, DCF failed to provide either M.B. or S.E. with the mental health treatment they required. M.B.'s mental health continued to deteriorate, and he required hospitalization twice during this four-month period.

20.     Despite their clear need for mental and behavioral health services, DCF continued to fail to provide adequate mental health services for M.B. and S.E. Without these necessary supports, that foster home was unable to continue caring for them. DCF then separated M.B. and S.E. from each other, again subjecting them to a period of extreme housing disruption, including night-to-night placements. After leaving Ms. McIntyre's home, S.E.'s mental health deteriorated and he required hospitalization.

21.     Upon information and belief, DCF is still separating M.B. and S.E. from each other, and their mental health treatment has been inconsistent, disrupted and inadequate. DCF has moved both M.B. and S.E. at least fifteen times.

22.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate M.B. and S.E.'s substantive due process and federal statutory rights. Defendants have failed to protect M.B. and S.E. from harm and risk of harm by subjecting

them to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for their mental health screening, diagnostic, and/or treatment needs. M.B. and S.E. continue to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**V.A.**

23.     V.A. is a fifteen-year-old boy currently in foster care in DCF custody. V.A. has been in DCF custody for approximately seven months. Pursuant to Fed. R. Civ. P. 17(c)(2), V.A.'s case is brought by his adult Next Friend, Kathryn Ashburn, who resides in Franklin County, Kansas. Ms. Ashburn is sufficiently familiar with the facts of V.A.'s situation and is dedicated to fairly and adequately representing V.A.'s interests in this litigation.

24.     Upon information and belief, V.A. first entered DCF custody in April 2018 in Franklin County.

25.     DCF has already subjected V.A. to extreme housing disruption and has moved him among different placements over ten times in the seven months that V.A. has been in custody. His placements have included over a week of night-to-night placements, two group homes, and a foster home. Although V.A. is originally from Franklin County, DCF has already moved him to Paola County, Sedgwick County, and Wyandotte County. He is presently in a foster home in Shawnee County.

26.     Upon information and belief, V.A. still does not have a stable placement. Since entering DCF custody, V.A. has not received any diagnostic services to assess the trauma he suffered in connection with his removal. Additionally, V.A. has not received any mental health or behavioral health screening, diagnostic services, or treatment.

27.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate V.A.'s substantive due process and federal statutory rights. Defendants have failed to protect V.A. from harm and risk of harm by subjecting him to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for his mental health screening, diagnostic and/or treatment needs. V.A. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**J.M.**

28.     J.M. is a sixteen-year-old boy currently in DCF custody in foster care. J.M. has been in DCF custody since March 2018. Pursuant to FED. R. CIV. P. 17(c)(2), J.M.'s case is brought by his adult Next Friend, Ed Bigus, who resides in Miami County, Kansas. Mr. Bigus is sufficiently familiar with the facts of J.M.'s situation and is dedicated to fairly and adequately representing J.M.'s interests in this litigation.

29.     J.M. first entered DCF custody in Johnson County, Kansas. J.M. has a history of physical abuse, acting out, and depression. J.M. has been assessed with having disruptive mood dysregulation disorder and other specific episodic mood disorders, for which he requires counseling and/or psychotherapy. Despite his mental health needs, DCF did not even conduct an intake mental health assessment until he had been in custody for more than three months. On July 30, 2018, J.M. was found to be suffering from traumatic stress.

30.     DCF has subjected J.M. to extreme housing disruption and has moved him among different placements more than twenty-five times in the few months he has been in DCF custody. J.M. has experienced weeks of short-term and night-to-night placements, spending his days at KVC offices.  He has also spent the night at the KVC office.

31.     Despite his clear need for stability and consistent mental health services, DCF has continued to subject J.M. to extreme housing disruption, worsening J.M's mental and emotional health.

32.     J.M. still does not have a stable placement. He also has not been provided with consistent mental health services to meet his identified mental health treatment needs.  The mental health treatment he has received has been repeatedly disrupted and inadequate.

33.     J.M. has run away from his placements on multiple occasions.

34.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate J.M.'s substantive due process and federal statutory rights. Defendants have failed to protect J.M. from harm and risk of harm by subjecting him to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for his mental health screening, diagnostic, and/or treatment needs. J.M. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**M.J.**

35.     M.J. is a seventeen-year-old boy currently in DCF custody in foster care. M.J. has been in DCF custody for nine years. Pursuant to FED. R. CIV. P. 17(c)(2), M.J.'s case is brought by his adult Next Friend, Ed Bigus, who resides in Miami County, Kansas. Mr. Bigus is sufficiently familiar with the facts of M.J.'s situation and is dedicated to fairly and adequately representing M.J.'s interests in this litigation.

36.     M.J. first entered DCF custody nine years ago in Johnson County, Kansas, when he was eight years old.

37.     M.J. has intense mental health needs, for which he has been prescribed medications. He is currently housed at a youth residential facility.

38.     DCF has subjected M.J. to extreme housing disruption and has moved him more than eighty times among different placements, including group homes, shelters, psychiatric residential treatment facilities ("PRTFs"), and multiple night-to-night placements. For the past five years, M.J. has been repeatedly housed in night-to-night placements, sometimes for weeks at a time. When subjected to night-to-night placements, J.M. would be forced to stay in KVC offices during the day.

39.     Despite his clear need for stability and consistent mental health services, DCF has continued to subject M.J. to extreme housing disruption, worsening M.J.'s mental and emotional health.

40.     DCF has also failed to provide M.J. with mental health services for prolonged periods of time, especially after he has been discharged from residential facilities or moved to different parts of the state. Any mental health services he has received have been inconsistent, disrupted, and inadequate.

41.     The churning DCF has imposed on M.J. has disrupted his access to education. During his numerous night-to-night placements, J.M. was not attending school at all.

42.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate M.J.'s substantive due process and federal statutory rights. Defendants have failed to protect M.J. from harm and risk of harm by subjecting him to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for his mental health screening, diagnostic, and/or treatment and service needs. M.J. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**R.M.**

43.    R.M. is a thirteen-year-old boy currently in DCF custody in foster care. R.M. has been in DCF custody for six years. Pursuant to FED. R. CIV. P. 17(c)(2), R.M.'s case is brought by his adult Next Friend, Allan Hazlett, who resides in Shawnee County, Kansas. Mr. Hazlett is sufficiently familiar with the facts of R.M.'s situation and is dedicated to fairly and adequately representing R.M.'s interests in this litigation.

44.    R.M. first entered DCF custody in 2012 in Shawnee County, Kansas, when he was seven years old. He remained in foster care for three years until 2015 when he became eligible for adoption.

45.    R.M. was moved out of state for a possible adoption with a relative in Iowa. However, DCF failed to take the necessary steps to finalize the adoption. As a result, the placement disrupted and R.M. returned to Kansas.

46.    When he returned to DCF custody, R.M was placed in a PRTF. In or around 2016, R.M. was diagnosed with attention deficit disorder (ADD), oppositional defiance disorder (ODD), post-traumatic stress disorder (PTSD), and a mood disorder, for which he was prescribed psychotropic medications and requires counseling and/or psychotherapy.

47.    DCF has subjected R.M. to extreme housing disruption and has moved him among different placements over 130 times since he has been in DCF custody. R.M.'s placements have included foster homes, group homes, and other facilities, as well as multiple night-to-night and short-term placements. While in DCF custody, R.M. has received inconsistent mental health services. In 2016, at eleven years old, R.M. was so desperate for a stable loving home that he ran away from his DCF placement for several days.

48.     Despite his clear need for stability and consistent mental health services, DCF has continued to subject R.M. to extreme housing disruption, worsening R.M.'s mental and emotional health. Since 2016, R.M. has been hospitalized for mental health related issues on three separate occasions.

49.     The churning DCF has imposed on R.M. has caused him to frequently change schools. During some of his night-to-night and short-term placements, he has not attended school at all. Despite being a competent student, the constant disruption has caused R.M. to fall behind in his education.

50.     R.M. still does not have a stable placement. He also is not receiving mental health services, including counseling and/or psychotherapy, to meet his identified mental health treatment needs. Any mental health services he has received have been inconsistent, disrupted and inadequate.

51.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate R.M.'s substantive due process and federal statutory rights. Defendants have failed to protect R.M. from harm and risk of harm by subjecting him to extreme housing disruption, including repeated night-to-night and short-term placements, and by failing to provide for his mental health screening, diagnostic, and/or treatment needs. R.M. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

## C.A.

52.     C.A. is a ten-year-old boy currently in DCF custody in foster care. C.A. has been in DCF custody for six years. Pursuant to FED. R. CIV. P. 17(c)(2), C.A.'s case is brought by his adult Next Friend, Allan Hazlett, who resides in Shawnee County, Kansas. Mr. Hazlett is

sufficiently familiar with the facts of C.A.'s situation and is dedicated to fairly and adequately representing C.A.'s interests in this litigation.

53.     C.A. first entered DCF custody in 2012 in Shawnee County, Kansas, when he was four years old. C.A. entered DCF custody with his sister. However, C.A. was soon separated from his sister when she was placed with her biological father.

54.     DCF has subjected C.A. to extreme housing disruption and has moved C.A. among different placements over seventy times since he has been in DCF custody. C.A.'s placements have included foster homes and group homes, as well as multiple night-to-night and short-term placements. DCF has forced C.A. to sleep overnight at child welfare offices on multiple occasions. From approximately March through May of 2018, DCF subjected C.A. to a near continuous three-month string of night-to-night placements in different settings. During this time, ten-year-old C.A. never knew where he would sleep each night.

55.     While in DCF custody, C.A. has been diagnosed with ADD and PTSD. He has been prescribed psychotropic medications for ADD and requires counseling and/or psychotherapy. He has an individual education plan (IEP) at school for behavioral health issues relating to his mental health conditions. The churning DCF has imposed on C.A. has caused him to frequently change schools, and during some of his night-to-night and short-term placements he has not attended school at all.

56.     C.A. still does not have a stable placement. He is also not receiving mental health services, including counseling and/or psychotherapy, to meet his identified mental health treatment needs. Any services he has received have been inconsistent, disrupted and inadequate.

57.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate C.A.'s substantive due process and federal statutory rights.

Defendants have failed to protect C.A. from harm and risk of harm by subjecting him to extreme housing disruption, including repeated night-to-night and short-term placements, and by failing to provide for his mental health screening, diagnostic, and/or treatment needs. C.A. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**Z.Z.**

58.     Z.Z. is an eleven-year-old girl currently in DCF custody in foster care. Z.Z. has been in DCF custody for six years. Pursuant to FED. R. CIV. P. 17(c)(2), Z.Z.'s case is brought by her adult Next Friend, Ashley Thorne, who resides in Sedgwick County, Kansas. Ms. Thorne is sufficiently familiar with the facts of Z.Z.'s situation and is dedicated to fairly and adequately representing Z.Z.'s interests in this litigation.

59.     Z.Z. first entered DCF custody in 2012 in Butler County, Kansas, when she was five years old. Z.Z. was initially placed with an elderly foster mother. Due to the foster mother's health, she was unable to adequately care for Z.Z., and Z.Z. was moved from this home.

60.     After her initial placement disrupted, Z.Z. started to exhibit behavioral health problems. DCF placed Z.Z. in a PRTF in Topeka, across the state from her home community.

61.     While Z.Z. was living in the PRTF for several months, her mental health began to improve, but, upon information and belief, her treatment was artificially cut short. Despite Z.Z.'s continued need for mental health treatment, she left the PRTF prematurely and without access to any "step down" placements to meet her ongoing treatment needs. Instead, Z.Z. was moved from the PRTF to a string of night-to-night and short-term placements, including being forced to sleep overnight in child welfare offices.

62.     DCF has subjected Z.Z. to extreme housing disruption and has moved Z.Z. among different foster homes, group homes, and other facilities over twenty-five times since she has been in DCF custody. Z.Z.'s placements have included multiple night-to-night and short-term placements.

63.     After a desperate and tragic episode where she placed her own life and her foster mother's life at risk, Z.Z. languished for months on a waiting list for a second PRTF placement. She did not receive a diagnostic brain scan or alternative treatment despite an identified need and requests for this treatment.

64.     Even while Z.Z. was on the PRTF waiting list due to her identified need for mental health services, DCF continued to subject her to continued extreme housing disruption. Z.Z. was moved among ten different placements between May 2017 and June 2018.

65.     Z.Z. still does not have a stable placement. She has not received mental health services, including counseling and/or psychotherapy, that are necessary to meet her identified mental health treatment needs. Any services she has received have been inconsistent, disrupted and inadequate.

66.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Z.Z.'s substantive due process and federal statutory rights. Defendants have failed to protect Z.Z. from harm and risk of harm by subjecting her to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for her mental health screening, diagnostic, and/or treatment needs. Z.Z. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**B.B.**

67.     B.B. is a sixteen-year-old girl currently in DCF custody in foster care. B.B. has been in DCF custody for six years. Pursuant to FED. R. CIV. P. 17(c)(2), B.B.'s case is brought by her adult Next Friend, Ashley Thorne, who resides in Sedgwick County, Kansas. Ms. Thorne is sufficiently familiar with the facts of B.B.'s situation and is dedicated to fairly and adequately representing B.B.'s interests in this litigation.

68.     B.B. first entered DCF custody in 2012 in Butler County. B.B. was adopted shortly after she entered DCF custody, but the adoption disrupted and she returned to DCF custody. B.B.'s mental health and behavior deteriorated after the adoption disrupted.

69.     DCF has subjected B.B. to extreme housing disruption and has moved B.B. among different placements numerous times since she has been in DCF custody. B.B.'s placements have included foster homes, group homes, and other facilities, as well as multiple night-to-night and short-term placements. B.B. has been placed in a PRTF several times. She has also been placed in juvenile justice facilities.

70.     B.B. still does not have a stable placement. She also is not receiving mental health services, including counseling and/or psychotherapy, to meet her identified mental health treatment needs. Any services she has received have been inconsistent, disrupted and inadequate. Upon information and belief, for the last several months DCF has subjected B.B. to a string of night-to-night and short-term placements, and B.B. has run away from them on multiple occasions.

71.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate B.B.'s substantive due process and federal statutory rights. Defendants have failed to protect B.B. from harm and risk of harm by subjecting her to extreme housing disruption, including repeated night-to-night placements and by failing to provide for her

mental health screening, diagnostic, and/or treatment needs. B.B. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**M.L.**

72.     M.L. is a seventeen-year-old girl currently in DCF custody in foster care. Pursuant to FED. R. CIV. P. 17(c)(2), M.L.'s case is brought by her adult Next Friend, Ashley Thorne, who resides in Sedgwick County, Kansas. Ms. Thorne is sufficiently familiar with the facts of M.L.'s situation, and she is dedicated to fairly and adequately representing M.L.'s interests in this litigation.

73.     M.L. first entered DCF custody in 2007, in Sedgwick County, when she was approximately six years old. She entered care with two biological siblings, her then approximately seven-year-old sister and her infant brother.

74.     After the three siblings' adoption in 2010, their adoptive father and adoptive brother repeatedly sexually assaulted and sodomized M.L. and her sister. Upon information and belief, the sisters remained in this home for three years despite multiple calls to Child Protective Services reporting the abuse.

75.     In 2013, DCF finally removed M.L. and her siblings from their adoptive father's home and they reentered foster care. M.L. was immediately separated from both of her biological siblings.

76.     Since M.L. returned to DCF custody in 2013, DCF has subjected her to extreme housing disruption and has moved her among different placements more than forty-two times. M.L.'s placements have included foster homes, group homes, PRTFs, and other facilities, as well as multiple night-to-night and short-term placements. In one of her placements, M.L. was sexually exploited and a victim of sex trafficking. On several occasions, DCF cycled M.L. through night-

to-night placements for weeks at a time. At other times, DCF forced M.L. to sleep overnight in child welfare agency offices – once for an entire week. During one of M.L.'s overnight office stays, a DCF contract agency staff member physically assaulted M.L. Despite this assault, DCF continued to house M.L. in the agency office.

77.     Following years of trauma and extreme housing disruption in DCF custody, M.L. developed a mood disorder. In 2017, she was diagnosed with PTSD and bipolar disorder. She was also prescribed psychotropic medications. Since her diagnosis, however, she has not received consistent medically necessary mental health treatment. Instead, her frequent placement changes and changes in service providers have repeatedly disrupted and delayed treatment.

78.     Beginning in 2017, DCF placed M.L. in a PRTF for more than twelve months. M.L.'s documented mental health needs did not require restrictive residential treatment, but no less restrictive placement existed to meet her needs.

79.     On at least two occasions in 2018, M.L. has run away from DCF care in an effort to escape the churning and further abuse. M.L. still does not have a stable placement. She is also not receiving mental health services to meet her identified mental health treatment needs. Any services she has received have been inconsistent, disrupted, and inadequate. During periods when DCF housed M.L. in night-to-night and short-term placements, she often did not attend school.

80.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate M.L.'s substantive due process and federal statutory rights. Defendants have failed to protect M.L. from harm and risk of harm by subjecting her to extreme housing disruption, including repeated night-to-night placements, and by failing to provide for her mental health screening, diagnostic, and/or treatment needs. M.L. continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

## B.  DEFENDANTS

81.    Jeff Colyer, Governor of Kansas, is sued in his official capacity. Under Article I, Section 3 of the Kansas Constitution, the governor holds supreme executive power and is responsible for the enforcement of the laws of the state. He is therefore responsible for ensuring all Kansas executive agencies comply with all applicable laws. Governor Colyer has the authority to issue executive reorganization orders "transferring, abolishing, consolidating or coordinating the whole or any part of any [executive] state agency, or the functions thereof" and to significantly reshape the functions and coordination of defendant agencies DCF, KDHE, and KDADS. Governor Colyer is also responsible for appointing, and has the power to remove, the Secretaries of DCF, KDHE, and KDADS. The governor has used his executive authority to manage the work of defendant agencies DCF, KDHE, and KDADS, including child welfare and Medicaid. Governor Colyer's office is located in this District.

82.    Gina Meier-Hummel, Secretary of DCF, is sued in her official capacity. DCF serves as the executive agency responsible for the safety and well-being of children in need of care. DCF is the agency with overall direct non-delegable custodial responsibility for investigating allegations of abuse and neglect, placing children in foster care in placements that meet their needs, ensuring children's safety and well-being, and ensuring that children in foster care receive appropriate mental health screening and treatment. Secretary Meier-Hummel has "the power and duty to determine the general policies relating to all forms of social welfare which are administered or supervised by the secretary and to adopt the rules and regulations therefor." Secretary Meier-Hummel is responsible for developing and administering or supervising program activities including the care and protection of children in need of care. Secretary Meier-Hummel is ultimately responsible for ensuring that DCF finds suitable homes for children in need of care and

supervises those children in such homes. Secretary Meier-Hummel maintains her principal office in this District.

83.     Jeff Andersen, Secretary of KDHE, is sued in his official capacity. KDHE is the single state Medicaid agency pursuant to 42 U.S.C. § 1396a(a)(5). KDHE is the executive agency responsible for financial management and contract oversight of Kansas' Medicaid program, KanCare. Secretary Andersen is responsible for ensuring that Kansas' Medicaid and mental health services are administered in a manner consistent with federal and state law. Secretary Andersen maintains his principal office in this District.

84.     Tim Keck, Secretary of KDADS, is sued in his official capacity. KDADS is the executive agency responsible for operating hospitals and institutions in Kansas and for administering Medicaid waiver programs for disability services, mental health, and substance abuse. KDADS is also responsible by statute and holds the authority and responsibility to coordinate and provide mental health services in Kansas. KDADS also oversees the Home and Community Based Services (HCBS) program in Kansas. Secretary Keck is responsible for ensuring that Kansas' Medicaid and mental health services are administered in a manner consistent with federal and state law. Secretary Keck maintains his principal office in this District.

## IV. CLASS ACTION ALLEGATIONS

85.     Plaintiffs M.B., S.E., V.A., J.M., M.J., R.M., C.A., Z.Z., B.B., and M.L. bring this action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated children.

**General Class**

86.     All Plaintiffs seek to represent a statewide General Class defined as all children who are now, or in the future will be, in the protective custody of DCF pursuant to KAN. STAT. ANN. § 38-2242(c)(1).

87.     The General Class is sufficiently numerous to make joinder of all members impracticable. According to DCF data, as of September 2018, there were 7,530 children in DCF's protective custody in foster care. Upon information and belief, a similar number of children are currently in DCF's protective custody in foster care.

88.     The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the General Class whom they seek to represent. Each Named Plaintiff and putative General Class member relies on Defendants for their safety and well-being, and has been subjected to significant harms, and/or risks of harm, as a result of the known dangers and structural deficiencies alleged in this Complaint.

89.     Defendants have acted or failed to act on grounds generally applicable to all members of the General Class, necessitating class-wide declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the General Class.

90.     The common questions of fact shared by the Named Plaintiffs and the members of the General Class they seek to represent include: (1) whether Defendants have a pattern, custom, policy, and/or practice of extreme housing disruption, exposing the General Class to psychological, emotional, and physical harm and/or an ongoing immediate risk of such harm; and (2) whether Defendants have a pattern, custom, policy, and/or practice of failing to provide children in foster care with required screening and diagnostic services, including trauma-related screening and diagnostic services.

91.     The common questions of law shared by the Named Plaintiffs and members of the General Class they seek to represent include: (1) whether Defendants' pattern, custom, policy, and/or practice of extreme housing disruption, and the structural deficiencies contributing to that known danger, subject the General Class to continuing risk of deprivation of their substantive due process rights conferred by the Fourteenth Amendment to the United States Constitution; and (2) whether Defendants' pattern, custom, policy and/or practice of failing to provide the General Class with screening and diagnostic services, including trauma-related screening and diagnostic services, violates their rights under the EPSDT provisions of the Medicaid Act.

92.     The Named Plaintiffs will fairly and adequately represent the interests of the General Class they seek to represent.

93.     Defendants' patterns, customs, policies and/or practices harm and/or present an ongoing imminent risk of harm to all members of the General Class. Accordingly, final injunctive and declaratory relief is appropriate for the class as a whole.

**Mental Health Treatment Subclass**

94.     Plaintiffs M.B., S.E., J.M., M.J., R.M., C.A., Z.Z., B.B., and M.L. seek to represent a Mental Health Treatment Subclass of all children in the General Class who have or will have an identified mental health or behavioral health treatment need pursuant to the EPSDT provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r). Children with identified mental health or behavioral health treatment needs include: children eligible for the Serious Emotional Disturbance ("SED") Waiver Program; children prescribed psychotropic medications; and/or children who have received a DSM-III, DSM-IV, or DSM-5 diagnosis.

95.     The Mental Health Treatment Subclass is sufficiently numerous to make joinder impracticable. According to Kansas data reported to the federal government in 2016, there were over 3,000 children identified as emotionally disturbed in out of home care at any point during federal fiscal year 2016. Upon information and belief, a similar number of children in foster care in DCF protective custody are currently identified as having a serious emotional disturbance.

96.     The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the Mental Health Treatment Subclass they seek to represent. Each Named Plaintiff and putative Mental Health Treatment Subclass member relies on Defendants for his or her safety and well-being, and has been subjected to known harms, and risks of harm, as a result of the known patterns, customs, policies, practices, and structural deficiencies alleged in this Complaint.

97.     Defendants have acted or refused to act on grounds generally applicable to all members of the Mental Health Treatment Subclass, necessitating class-wide declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the Mental Health Treatment Subclass.

98.     The common question of fact shared by the Named Plaintiffs and the members of the Mental Health Treatment Subclass they seek to represent is whether Defendants have a pattern, custom, policy and/or practice of failing to provide children in DCF foster care custody with access to timely medically necessary mental and behavioral health treatment, as required by law.

99.     The common question of law shared by the Named Plaintiffs and the members of the Mental Health Treatment Subclass they seek to represent is whether Defendants' patterns, customs, policies and/or practices, noted above, violate the rights of children in the Mental Health Treatment Subclass under the EPSDT provisions of the Medicaid Act.

100.    The Named Plaintiffs will fairly and adequately protect the interests of the Mental Health Treatment Subclass they seek to represent.

101.    Defendants' patterns, customs, policies and/or practices harm and/or present an ongoing imminent risk of harm to all members of the Mental Health Treatment Subclass. Accordingly, final injunctive and declaratory relief is appropriate for the subclass as a whole.

### Next Friends

102.    Each Named Plaintiff appears by a Next Friend. Each Next Friend has sufficient familiarity with the facts of the respective Named Plaintiff and is dedicated to fairly and adequately representing that Named Plaintiff's interests in this litigation. Each Next Friend is also dedicated to representing the best interests of the putative General Class and/or Mental Health Treatment Subclass they seek to represent.

### Plaintiffs' Representatives

103.    Plaintiffs, the General Class, and the Mental Health Treatment Subclass are represented by:

a.  Attorneys from Kansas Appleseed Center for Law & Justice, Inc., a nonprofit, nonpartisan advocacy organization dedicated to vulnerable and excluded Kansans, who investigate social, economic, and political injustice in Kansas and work toward systemic solutions, and who serve as a voice for the public at large and for individuals and groups who are without effective legal representation;

b.  Loretta Burns-Bucklew, J.D., Child Welfare Law Specialist, an attorney in Kansas City, Missouri, who has experience in complex federal child welfare class actions and impact litigation, the individual representation of children in child welfare proceedings, and the child welfare service delivery structure in Missouri and Kansas;

c. Attorneys from the National Center for Youth Law, a national nonprofit organization specializing in representing children and adolescents in child welfare, mental health, education, and juvenile justice reform class actions and impact litigation; and

d. Attorneys from Children's Rights, a national nonprofit organization, who have experience in complex federal class actions in child welfare, mental health, education, and juvenile justice.

104. These attorneys and organizations have investigated all claims in this action and committed sufficient resources to represent the General Class and the Mental Health Treatment Subclass.

105. Plaintiffs' counsel are well-suited to fairly and adequately represent the interests of the General Class and the Mental Health Treatment Subclass.

## V. FACTUAL ALLEGATIONS

### A. Foster Care Housing and Mental Health Delivery and Oversight Structure in Kansas

### Kansas' Foster Care Delivery and Oversight Structure

106. Kansas began the process of privatizing its child welfare system in 1996. Kansas DCF continued to investigate allegations of abuse and neglect, but awarded contracts to three nonprofits covering five regions of the state to assist in the provision of foster care services, including placements and the delivery of mental health and behavioral health services.

107. Kansas' most recent foster care contracts started on July 1, 2013. Currently, Kansas contracts with two lead agencies, KVC Behavioral HealthCare Kansas ("KVC") and St. Francis Community Services ("SFCS"), to provide family preservation, foster care, adoptive, and reintegration services throughout the state. KVC provides services to children in the East and Kansas City regions and SFCS provides services to children in the West and Wichita regions.

These two lead agencies subcontract with a variety of other placement and service providers and agencies.

108.     When children enter foster care, they are placed in DCF's protective custody pursuant to KAN. STAT. ANN. § 38-2242(c)(1). DCF engages contractors and subcontractors to perform some functions, but it always retains the direct legal duty and responsibility for the safety and well-being of children in foster care. As stated in a July 2016 audit, DCF "has a primary role in recommending whether a child should be removed from their home," remains responsible for placement, and has the authority to place children. Additionally, DCF is responsible for licensing foster homes.

### Kansas' Children's Mental Health Delivery and Oversight Structure

109.     Medicaid is a cooperative federal and state funded program authorized and regulated pursuant to Title XIX of the Social Security Act, providing for medically necessary health and mental health care for low-income children and families, among others. State participation is voluntary, but states including Kansas that choose to accept federal funding and participate in Medicaid must adhere to its statutory and regulatory requirements. 42 U.S.C. § 1396 *et seq.* States receive federal matching funds for their own programs in the form of reimbursements by the federal government for a portion of the cost of providing Medicaid benefits.

110.     As a participant in the Medicaid program, Kansas must provide all Medicaid-eligible children and youth under the age of twenty-one with EPSDT screenings that include "a comprehensive health and developmental history (including assessment of both physical and mental health development)." 42 U.S.C. § 1396d(r)(1)(B). Periodic screening must occur at regular age intervals as laid out on a periodicity schedule. 42 U.S.C. § 1396d(r)(1)(A)(i). Kansas adopted

the Bright Futures periodicity schedule, which requires a psychosocial/behavioral health assessment at every periodic screening.

111.    In addition, Kansas must provide EPSDT screening at other intervals indicated as medically necessary to determine the existence of certain physical or mental illnesses or conditions. 42 U.S.C. § 1396d(r)(1)(A)(ii). For children entering foster care, all of whom have known exposure to trauma, such medically necessary screening includes screening to assess their trauma-related needs.

112.    Kansas must also provide and arrange for such other health care, diagnostic services, treatment, and other measures necessary to correct or ameliorate a psychiatric, behavioral, or emotional condition discovered by the screening services. 42 U.S.C. § 1396d(r)(5). For children entering foster care, such diagnostic and treatment services must address their known trauma history and any trauma-related treatment needs. Among the intensive home and community-based treatment services that Kansas is obligated to provide are: home health care services, 42 U.S.C. § 1396d(a)(7), recommended medical and remedial services, 42 U.S.C. § 1396d(a)(13), case management services, 42 U.S.C. §§ 1396d(a)(19), 1396n(g), and personal care services, 42 U.S.C. § 1396d(a)(24).

113.    All children in DCF protective custody in foster care are entitled to Medicaid services, including these mandated EPDST screenings, diagnostic services and treatment. Such medical assistance, including EPSDT services, must be provided with reasonable promptness. 42 U.S.C. §§ 1396a(a)(8), 1396d(a)(4)(B).

114.    States, including Kansas, may adopt managed care models for required services, contract with other entities concerning the delivery of services, and arrange services through provider networks. Nonetheless, all the states, including Kansas, remain responsible for ensuring

compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program. 42 U.S.C. §§ 1396a(a)(5), 1396a(a)(43), 1396u-2. States, including Kansas, must ensure that the managed care entity has the capacity to offer the full range of necessary and appropriate preventative and primary services for all enrolled beneficiaries. 42 U.S.C. § 1396u-2(b)(5).

115.    All Defendants share responsibility for delivering mental health and behavioral health services to children in foster care in Kansas. KDHE and KDADS jointly administer KanCare, which is the program through which Kansas has administered Medicaid since 2013. KDHE maintains financial management and contract oversight of the KanCare program, while KDADS administers Medicaid waiver programs for disability services, mental health, and substance abuse, while also operating state hospitals and institutions. KanCare provides services to consumers through three health plans, Sunflower Health Plan, United Healthcare Community Plan of Kansas, and Amerigroup Kansas (to be replaced by Aetna Better Health of Kansas effective in January 2019). Each of these entities is responsible for coordinating all care, including preventive services, screenings, diagnostic services, and ongoing treatment, for its members. DCF, as the agency charged with the protection of children in need of care (including all foster children in DCF custody), has a legal responsibility to protect children's well-being by ensuring that they have access to and are provided with the mental and behavioral health services they need, and that these services are provided with reasonable promptness.

## B. Defendants' Known Practice of Extreme Placement Instability, Including "Night-to-Night" Placements, Harms Children and Imposes an Unreasonable Risk of Harm.

116.    Defendants have a known dangerous policy, custom, pattern or practice of subjecting children in foster care to extreme housing disruption, also known as churning. It is not uncommon for children in DCF custody to move between placements more than fifteen or twenty

times, and even more than thirty, forty, or fifty times. This practice also includes a "high frequency of one-night placements," also known as short-term and "night-to-night" placements, in which children are forced to sleep for a night or a short-term period anywhere a bed, couch, office conference room, shelter or hospital bed can be found. The next morning, children are collected at an agency office to wait for their next placement, in a loop that can repeat for days, weeks or even months at a time. For example, when Named Plaintiff M.L. has been subjected to night-to-night and short-term placements, DCF and/or a placement or service provider under contract with DCF drop her off at a foster home in the late afternoon or early evening with barely more than the clothes on her back. After a one-night, or perhaps several-night stay, she is picked up again, restarting the cycle. On several occasions, DCF has subjected M.L. to night-to-night placements for weeks at a time. More than once, DCF has forced M.L. to sleep overnight in a child welfare agency office.

### The Practice of Placement Instability Has Steadily Worsened to its Current Crisis.

117.     The known practice of churning in the Kansas foster care system dates back almost twenty years. Since 2001, the Federal Children's Bureau, part of the Administration of Children Youth and Families in the Department of Health and Human Services, has reviewed state child and family services programs through the Child and Family Services Reviews ("CFSR"). These reviews determine whether such programs are in substantial conformity with federal requirements for federal funding purposes.

118.     Kansas has significantly failed to meet the National Standard for "stability of foster care placements" in all three rounds of the CFSR, going back to 2001. In the first round of the CFSR in 2001, the national standard for "stability of foster care placements" was established at 86.7% or more of "children who entered foster care during a twelve-month-period that had two or

fewer placements," but Kansas' percentage was only 64.2%. In the second round of the CFSR in 2007, the national standard for placement stability was a composite score of three measures together totaling 101.5 or higher, but Kansas' composite score was only 77.5. In the third round of the CFSR in 2015, the measure was a maximum of 4.12 moves per 1,000 days in foster care for all children who enter care in a twelve-month period, but Kansas' performance was 5.28 moves.

119.    Housing instability for Kansas children in foster care has continued to escalate after the third round of the CFSR. In State Fiscal Year ("SFY") 2016, Kansas' Observed Performance for placement instability increased to 6.6 moves per 1,000 days in foster care, and in SFY 2017 it climbed to 7.1. Even worse, data for SFY 2018 was reported at 8.6 moves per 1000 days, more than double the federal CFSR standard and a *thirty percent increase* in instability from 2016. Kansas' most recent data report to the federal government on the actual frequency and number of moves of foster children, completed in 2016, reveals that 696 children had experienced more than ten placements; of those, 247 children experienced more than twenty placements, and 105 children experienced more than thirty placements. This 2016 data does not account for the thirty percent increase in the average number of moves experienced by children entering DCF foster care from 2016 to 2018. Accordingly, upon information and belief, the current number of moves actually experienced by large numbers of foster children is significantly higher.

120.    The current housing disruption crisis in Kansas' foster care system is reflected in the experiences of the Named Plaintiffs. DCF has moved each of these children anywhere from ten to over one hundred times while in DCF custody, with much of that extreme movement occurring in the last one to two years. For example, Named Plaintiffs V.A. and J.M. both entered DCF custody in 2018 and have already been moved more than ten and twenty times, respectively. DCF has moved Plaintiff R.M. between different placements over 130 times.

**The Current Crisis of "Night-to-Night" Placements in Kansas**

121.    A Report of the Child Welfare System Task Force to the State Legislature in January 2018, identified "increasing numbers of children and youth who are forced to sleep overnight in child placement agency offices because there is nowhere else for them to go after being removed from their homes." The Task Force specifically referred to both "one-night placements" and "overnight stays in contractor offices." Such placements may be literally for one night or may occur for several nights at a time. Whether the overnight setting is an office, foster home, or facility, it is part of the same ongoing dangerous practice and cycle. Instead of providing optimal or even appropriately matched housing to meet children's needs, Defendants often have nowhere to house a foster child in DCF custody. As a result, children spend their days at contractor agency offices, and then are either forced to sleep in the office or dropped off in the evening at any foster home or facility willing to provide a bed just for the night. The same process then repeats over and over again.

122.    Kansas' Child Welfare System Task Force received testimony in April 2018 that many foster children "without permanent placement do not know from night-to-night where they will be staying. They are literally packing a suitcase and moving every morning," and "they frequently have no idea where they will be sleeping that night." This practice amounts to an inherent deprivation of shelter and is de facto homelessness.

123.    According to testimony by Defendant Meier-Hummel to the Child Welfare System Task Force, SFCS, one of the two DCF lead contractor agencies in Kansas, subjected 764 children to one-night placements from April to September of 2018. In the same testimony, Defendant Meier-Hummel stated that during that same period, KVC, the other lead DCF contractor agency, subjected 695 children to one-night placements. Thus, combined, according to DCF data, 1,459

children were forced to sleep in one-night placements just from April to September of 2018. This data does not identify children who were subjected to multiple night-to-night placements or include all children sent to "short-term" transient placements where they stayed more than one night.

124.   The "night-to-night" practice is not limited to children just removed from their homes or older teens; the practice also affects children who have already been in DCF custody for months or years, and children of varying ages. For example, eleven-year-old Named Plaintiff Z.Z., who first entered DCF custody in 2012, was moved ten times in 2017 and 2018 alone.

125.   Additionally, the "night-to-night" practice is not limited to a day or even a few days; it is sometimes forced on children for weeks or even months at a time, resulting in an almost incomprehensible level of chaos and instability and literally dozens of placement moves in a short period of time. For example, ten-year-old Named Plaintiff C.A. was subjected to three months of near continuous night-to-night placements in 2018.

126.   The "night-to-night" crisis has even expanded to state-sanctioned "couch surfing," whereby DCF contractors pay a foster parent additional funds to house a child for one night on their couch or to add a child to an already full bedroom. Inadequate sleeping space for children in foster care in DCF custody was noted in a January 2016 audit report, which found that "during a 15-month period, DCF granted 98% of the approximately 1,100 requests by child placing agencies to waive the capacity or sleeping space requirements." The report "saw no evidence of DCF scrutiny or review of the requests that were approved." Further, the report noted that "[f]our of the 12 foster homes in our targeted review did not have sufficient sleeping space." In one example, one home had ten children (regulations allowed for six), including seven foster children, and "five of the foster children shared a room with only 25 square feet per child—well below the state's minimum requirement."

127.    Additionally, upon information and belief, since 2017, DCF has no longer required provider agencies to even request an exception to placement regulations when a foster home is at full capacity, as long as the child does not return to the home multiple times in a seven-day period. Accordingly, for this category of transient placements, DCF fails to consider or track any capacity conditions. For example, in information provided to the Child Welfare Task Force, KVC stated that it "did not request or require any exceptions for one-night placements during FY17." Similarly, SFCS indicated only one capacity exception in FY 2017.

128.    Additionally, upon information and belief, DCF's private contractors pay a premium to homes that will take a "night-to-night" drop-off at late hours of the night, such as after 9:00 PM.

129.    Whether or not they actually sleep there, children may also stay in contractor offices for extended periods without DCF oversight. DCF's contracts with its private providers do not stipulate how long children can be in contractors' offices. According to a May 2017 news article, a DCF official stated that DCF "doesn't require private contractors to report [] data" on "overnight [or] long-term stays at [contractor] facilities." Reflecting how routine the pattern of office stays has become, the DCF official stated: "[c]hildren . . . waiting to be placed with a foster family . . . spend most of their time in rooms equipped with couches, televisions, toys and games."

**Extreme Housing Disruption in Kansas Harms Children and Places Children at Risk of Emotional, Psychological and Physical Harm.**

130.    According to a February 2018 Task Force update, one of the two lead contractor agencies, KVC, explained that "if [a] youth is in a short-term placement overnight, the youth is in the office with staff during the day. We have anywhere from 30-50 kids in our offices daily, which makes it difficult for workers to complete their daily tasks, and has caused several severely unsafe scenarios." Also in February of 2018, according to a news article, Defendant DCF Secretary Meier-

Hummel stated that the use of "night-to-night" placements in agency offices is "not an acceptable practice."

131.    However, the "severely unsafe scenarios" referenced in the DCF report in February of 2018 were not corrected. In September of 2018, the media reported that authorities charged an older youth with raping a thirteen-year old girl in foster care in DCF custody at an Olathe child welfare office where they were both forced to sleep overnight. According to a news report, the sexual assault was reported in May of 2018. The news report quoted the Johnson County District Attorney as stating: "This is not an isolated incident involving criminal conduct at the KVC offices involving children."

132.    The risk that children subjected to extreme housing disruption will be harmed in their placements is not limited to children housed in agency offices. The chaos of an ever-changing transient population moving among different placements, overcrowded homes beyond their capacity, and the lack of monitoring and oversight by DCF exposes children to a risk of harm in their placements. As set forth in Section V.D. of this Complaint, DCF maintains the practice of subjecting caseworkers to excessive caseloads and turnover, resulting in the failure of caseworkers to visit children in DCF custody as required. Caseworkers simply cannot identify dangers to children's safety or well-being in placements they do not visit. This danger is greatly heightened when children are exposed to churning.

133.    Kansas' churning crisis also disrupts children's educational stability and contributes to poor educational outcomes. A 2016 audit found that the majority of Kansas foster children in out of home placements – over 85% – do not attend their school of origin, violating a federal standard.

134.    When youth bounce from placement to placement, they often bounce from school to school, too. DCF is aware of the problems associated with frequent school changes. For instance, it reported in 2015 that former Kansas foster youth complain of "the difficulty in keeping up with school when placement changes occur." More recently, in 2018, a Kansas educator testified to the Child Welfare System Task Force that the "growing segment of [] children in the custody of DCF and/or their contractors . . . that have no permanent placement . . . frequently have no idea where they will be sleeping that night, only that it will likely be in a different and more distant town from where they are asked to attend school." Further, "due to frequent placement changes, these children do not have the educational stability required for successful learning," and "are not ready to learn at the level of performance expected of them and their typically-developing peers." As a result, they are "much more likely to receive special education services," and are "significantly behind academically and exhibit high social, emotional, and behavioral needs that require extensive interventions."

135.    The churning crisis in Kansas not only disrupts children's education but also precludes access to education itself. Kansas foster children do not consistently attend school while subjected to churning. Children shuffled among numerous placements are often picked up by caseworkers in the morning and dropped off at an office, rather than being dropped off at school. Inexplicably, school-age children often sit around an office during the day instead of sitting in a classroom. According to testimony to the Child Welfare Task Force in 2018, "[i]n some circumstances, DCF and/or their contractors who have physical custody of these children, wait days or weeks before enrolling them in school." For instance, "a student had been spending their days at the contractor's office for two weeks, and was only enrolled after [an educator] sought them out and alerted the county truancy officer." A KVC official stated in a 2017 news article that

"[i]f you have a child that's grade school aged, they should be in school [] during the day and not in the office," yet she acknowledged that children may remain in offices for more than twenty-four-hour periods. The article reported that "according to a Facebook forum devoted to foster and adoptive parents, it isn't uncommon for children, especially those who frequently 'bounce' in and out of homes, to miss days or weeks of school." For example, Named Plaintiffs M.J., R.M., C.A., and M.L. all missed school during periods of night-to-night placements.

136.    The educational instability tied to churning contributes to poor educational outcomes for Kansas foster youth. DCF self-reported in 2016 that 58.2% of Kansas youth in out-of-home placements for at least a year do not progress to the next grade level, which violates a federal standard.

137.    Faced with churning, some Kansas foster youth turn to escaping the system itself in the hopes of a better life: they run away. For instance, Named Plaintiff M.L. has been so desperate for a stable, permanent, safe placement that she has run away several times. Named Plaintiff R.M., who has been moved more than 130 times since he entered DCF custody in 2012, also tried to run away, at the age of eleven in 2016.

138.    According to DCF data, as of June 2017, seventy-eight foster youth were runaways. As of February 2018, DCF data showed an average of eighty-five foster children on "runaway" status each month since July 2017. As of August 31, 2018, DCF reported that there were sixty-three missing or runaway youth, and in October 2018, DCF reported that "the number of youth who have run away from placement continues to fluctuate daily." Additionally, DCF's oversight and tracking of youth is inadequate, such that when foster youth do run away, DCF sometimes fails to even notice.

139.    Additionally, the risk of children becoming victims of sex trafficking is prevalent among vulnerable foster youth generally, and is a known risk for foster youth subjected to churning in Kansas. A February 2018 news article referred to Kansas as a "known . . . crossroads for human trafficking." Dr. Karen Countryman-Roswurm, Executive Director of the Center for Combating Human Trafficking at Wichita State University, explained in a February 2018 news article that the Kansas foster care to human trafficking pipeline is well-known. She noted that foster youth experience trauma that places them at a greater risk of trafficking; and "the [foster] system [] exacerbates a disconnect between children and a community, putting them further in jeopardy." Dr. Countryman-Roswurm further stated that the risk of trafficking is "of particular concern when there were 71 foster care children in Kansas who have run away[.]"

140.    According to a 2018 news article, DCF reported that it conducted 285 assessments on possible survivors of trafficking since 2014. But, as the Kansas Attorney General's Office stated in the same article, concrete data on trafficking "is elusive" because of the crime's underground nature. Named Plaintiff M.L. has been victimized multiple times by trafficking while in DCF custody.

141.    Kansas' extreme housing disruption crisis further threatens children's health by systematically denying them access to mental health care. For example, the very nature of churning creates barriers to actually receiving mental health treatment. Many of the Named Plaintiffs experienced delay or disruption in their mental health treatment, including counseling and/or psychotherapy, as a result of the extreme housing disruption that they suffered in DCF custody. The short-term nature of placements makes it difficult for a child's temporary placement even to obtain and schedule an appointment with a mental health care provider for the child. The frequency of placement changes makes it difficult for children to attend appointments and receive consistent

care. According to an April 2017 audit of DCF, eight of eleven children's files in a random sampling indicated "mental health services . . . were delayed or infrequent," and tellingly, one child with "extreme, trauma-related emotional and behavioral issues" was denied treatment *because Defendants' frequent placement moves* caused her providers to "doubt[] that she would be able to make progress before [she] moved again [emphasis added]."

142.   In addition to the above dangers created by extreme housing disruption, churning *itself* is widely recognized as inherently detrimental to children in the child welfare system. As Lori Ross, President and CEO of Kansas City's FosterAdopt Connect, explained in a May 2017 news article, removal from one's home is traumatic for any child, especially for those who have been repeatedly removed from homes, and long-term use of temporary placements simply adds to the burden. She stated that "[w]hat this does is create more trauma for the child," whereby "each time they need to move, they hear in their head, 'You're not part of this family, you're not valuable, you're being moved like an animal, not a human.'"

143.   On the issue of whether frequent moves cause trauma for children, Defendant Meier-Hummel stated in a media interview on October 31, 2018: "absolutely trauma [is] associated with that. I mean you know if [] you are unsure about where you are sleeping, if you are unsure about what where you're going to go to school, if you're concerned about having to move the next day, I mean all of those things create uncertainty and, and then ultimately lead to, you know, mental health issues and perhaps bad outcomes for kids. So we certainly yeah have to do better than that[.]"

144.   It is widely recognized that churning causes both immediate and long-term emotional, psychological, physical developmental and neurological harm.[1] Studies show that

---

[1] Rae R. Newton et al., *Children and Youth in Foster Care: Disentangling the Relationship Between Problem Behaviors and Number of Placements*, 24 CHILD ABUSE & NEGLECT 1363, 1363-4, 1371-3 (2000).

extreme housing disruption negatively affects a child's ability to form secure attachments, or enduring emotional bonds, with caregivers.[2] These attachment disorders are connected to behavioral and mental health problems and contribute to foster children's disproportionately high risk for poor developmental, social, emotional, behavioral, cognitive, and mental health outcomes.[3]

145.   Specifically, children who experience extreme housing disruption are at an increased risk of mood disorders, such as depression, anxiety disorders, and behavior problems, such as substance use and disruptive behavior disorders.[4] Studies show that children with multiple placements experience a sixty-three percent increase in behavior problems compared to children who achieved any stability in foster care.[5] Churning may also compound other problems, including aggression, low self-image, and academic under-achievement.[6]

146.   In addition to causing emotional and psychological harm, extreme housing disruption causes physical harm to children's normal brain development as well as their central nervous and endocrine systems. It is a well-accepted principle that childhood experiences can affect brain development. For children in foster care, multiple moves and a "lack of predictability" are "chronic adverse experiences" early in life. These experiences can "fundamentally and permanently alter the functioning of key neural systems involved in learning, memory, and self-regulation and the complex networks of neuronal connectivity among these systems."[7] This is

[2] Sonya J. Leathers, *Foster Children's Behavioral Disturbances and Detachment from Caregivers and Community Institutions*, 24 CHILDREN AND YOUTH SERVICES REVIEW 239, 259 (2002); Yvonne A. Unrau et al., *Former Foster Youth Remember Multiple Placement Moves: A Journey of Loss and Hope*, 30 CHILDREN AND YOUTH SERVICES REVIEW 1256, 1261 (2008).
[3] B.J. Harden, *Safety and Stability for Foster Children: A Developmental Perspective*, 14 FUTURE CHILD 31, 32-3, 38-9 (2004).
[4] David M. Rubin, *The Impact Of Placement Stability on Behavioral Well-being For Children in Foster Care*, 119 PEDIATRICS 336, 341-42 (2007); Newton, *supra* note 1; Joseph P. Ryan & Mark F. Testa, *Child Maltreatment and Juvenile Delinquency: Investigating the Role Of Placement and Placement Instability*, 27 CHILDREN AND YOUTH SERVICES REVIEW 227, 230, 244-5 (2005).
[5] Rubin, *supra* note 4, at 337, 341.
[6] Harden, *supra* note 3, at 38-39; Newton, *supra* note 1.
[7] Philip A. Fisher et al., *A Translational Neuroscience Perspective on the Importance Of Reducing Placement Instability Among Foster Children*, 92 CHILD WELFARE 9, 11 (2015).

especially true for young children whose brains are at an intense stage of development.[8] For these children, extreme housing disruption has been associated with executive functioning deficits,[9] which are connected to serious conditions including: Post Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, disruptive behavior disorders, and substance abuse.[10]

147.    Extreme housing disruption has also been associated with harm to children's central stress response system, the hypothalamic-pituitary-adrenal (HPA) axis, which involves both the central nervous system and the endocrine system.[11] The HPA axis plays a major role in regulating an individual's response to stressful events.[12] Disruption of HPA axis activity has been linked to anxiety disorders, affective disorders, and disruptive behavior disorders.[13]

148.    Published national practice standards also acknowledge the extreme trauma imposed by instability in foster care. The Child Welfare League of America, Standards of Excellence provide that "[p]roactive efforts should continually promote stability and avoid disruptions in foster care, recognizing that a disruption can be another loss, rejection, and possible trauma for the child." Consistently, the Council on Accreditation's Standards for Public Agencies notes that "[s]ignificant research has demonstrated the correlation between placement instability and negative child outcomes including poor academic performance and social and emotional difficulties. Regardless of a child's prior history of maltreatment or behavioral challenges, these negative outcomes increase following placement disruptions."

---

[8] *Id.*
[9] Erin E, Lewis, *The Effect Of Placement Instability on Adopted Children's Inhibitory Control Abilities and Oppositional Behavior*, 43 DEVELOPMENTAL PSYCHOLOGY 1415, 1415-6, 1422-3 (2007).
[10] Fisher, *supra* note 7, at 9, 7.
[11] Philip A. Fisher, *Mitigating HPA Axis Dysregulation Associated With Placement Changes in Foster Care*, 36 PSYCHONEUROENDOCRINOLOGY 531, 532 (2011).
[12] *Id.*
[13] *Id.* at 540.

C. **Defendants' Failure to Provide Mandated Mental Health Screenings, Diagnostic Services, and Treatment Harms Children and Imposes an Unreasonable Risk of Harm.**

149.    Under federal law, Defendants must provide regular health screenings for foster children in DCF protective custody, including a "comprehensive" assessment of each child's mental health development as required under the EPSDT provisions of the Medicaid Act. *See* 42 U.S.C. § 1396d(r)(1)(A)-(B). Kansas has adopted the Bright Futures periodicity schedule as its standard for pediatric preventive services. This periodicity schedule, developed by the American Academy of Pediatrics, calls for a psychosocial/behavioral assessment at every screening interval from infancy through to age twenty-one, and an annual screening for depression beginning at age twelve.

150.    In addition to these periodic screenings, Defendants must provide screenings at other intervals indicated as medically necessary to determine the existence of certain physical and mental illnesses and conditions. *See* 42 U.S.C. § 1396d(r)(1)(A)-(B). Categorically, all children entering foster care are exposed to multiple forms of trauma stemming from their removal from their homes and the abuse, neglect, or abandonment that precipitated their removal. Accordingly, upon entry to the foster care system, they are entitled to screening and diagnostic services that assess their known trauma-related histories and needs. Trauma-related screening must also be repeated periodically thereafter.

151.    The state must also provide "other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services . . . ." 42 U.S.C. § 1396d(r)(5).

152.    The state is responsible for providing or arranging for medical assistance, including screening, diagnostic services, and treatment, in a reasonably prompt manner. *See* 42 U.S.C. § 1396a(a)(8), (10), (43)(B), (C); 42 U.S.C. § 1396d(a)(4)(B); 42 C.F.R. § 435.930(a).

153.    DCF is responsible for the well-being of all children in foster care, and therefore for providing timely screening, diagnostic services, and treatment for their mental health and behavioral health needs. KDHE is the designated single state Medicaid agency pursuant to 42 U.S.C. § 1396a(a)(5), and is therefore responsible for the financial management and contract oversight of Kansas' Medicaid program, KanCare. KDADS has responsibility for operating hospitals and institutions and administers Medicaid waiver programs for disability services, mental health, and substance abuse in Kansas. Together, Defendants all share the legal responsibility for ensuring that Kansas complies with the EPSDT requirements of the Medicaid Act.

154.    Despite these legal obligations, Defendants maintain a known dangerous pattern, policy, custom, or practice of failing to provide these mental health screenings, diagnostic services, and treatment to children in foster care in Kansas. Defendants' failure to implement a system that appropriately screens, diagnoses, and treats children in foster care with mental health needs, including mental health needs related to trauma, causes deterioration of their physical, mental, and behavioral health and compromises children's health, safety, and well-being. In exposing children to these risks, Defendants abdicate their responsibility to serve children in foster care.

### Defendants Fail to Provide Required Initial and Periodic Screening and Trauma-Informed Diagnostic Services.

155.    Although children in foster care in Kansas are entitled to periodic screening for their mental and behavioral health needs, including trauma-related needs, no comprehensive or coordinated system exists to ensure that these screens happen in practice. Indeed, while KanCare's EPSDT form requires providers to complete a developmental screening tool, and refers providers to relevant resources, there is no similar prompt with respect to mental health screening. Instead, the form simply calls for the screener's "emotional observations." There is no reference to trauma-related screening. With no structure in place to ensure that necessary screening takes place,

Defendants frequently fail to promptly and appropriately screen children for mental and behavioral health needs.

156. Specifically, Defendants fail to evaluate children's trauma-related needs upon their entry into DCF custody. All children entering Kansas' foster care system have necessarily experienced traumatic events, in that they were removed from their home and family, and that they were placed in state custody due to the state's own finding of abuse, neglect, or abandonment. The research literature and national standards establish the undisputable known trauma of removal and of abuse or neglect.[14] Indeed, the literature describes "common features" of children in foster care as including "the psychological and neurobiological effects associated with disrupted attachment to biological parents; the specific traumatic experiences (e.g., neglect and/or abuse) that necessitated placement; the emotional disruption of the placement; [and] the need to adjust to a foster care environment."[15]

157. Additionally, medical research conclusively establishes that trauma, including the trauma that all children in DCF custody have experienced due to removal and from child abuse or neglect, carries a high risk of physical, developmental, and emotional harm, including by causing

---

[14] Children's Bureau, U.S. Dept. of Health & Human Servs., *In-Home Services in Child Welfare* 2 (2014), available at https://www.childwelfare.gov/pubPDFs/inhome_services.pdf; Robert Racusin et al., *Psychosocial Treatment of Children in Foster Care: A Review*, 41(2) CMTY. MENTAL HEALTH J. 199 (2005); Child Welfare League of America, *Standards of Excellence for Family Foster Care Services* § 2.37, updated 2017.
[15] Racusin, *supra* note 14, at 200.

or exacerbating mental and behavioral health problems and disorders.[16] Up to eighty percent of children in foster care enter with significant mental health needs.[17]

158.    Because every child entering DCF custody has experienced known trauma, and that trauma is known to carry an extremely high risk of needing mental health treatment, all children entering DCF custody require trauma-related screening and diagnostic services upon entry to the foster care system, in addition to their ongoing periodic trauma-informed screenings.[18] These trauma-informed screening and diagnostic services are essential to effectively identify children in need of trauma-related treatment and to provide that treatment promptly.

159.    However, upon information and belief, Defendants fail to categorically provide all children in DCF custody either (1) an initial trauma screen and diagnostic services upon entry into DCF custody or (2) regular, ongoing, trauma-informed mental and behavioral health screenings while in DCF custody. A report of the Mental Health Task Force to the State Legislature in January 2018 confirmed that mental health care in Kansas is not consistently trauma-informed, and recommended that the state "promote the education of trauma-informed practices" and "develop trauma-based behavioral health services for parents whose children are in the custody of [DCF] or at risk of entering custody."

---

[16] *See, e.g.*, Victor G. Carrion et al., *Can Traumatic Stress Alter the Brain? Understanding the Implications of Early Trauma on Brain Development and Learning*, 51 J. ADOLESC. HEALTH S23-S28 (2012); Alexandra Cook, et al., *Complex Trauma in Children and Adolescents*, 35 PSYCHIATRIC ANNALS 390, 392 (2005); *Effects of Complex Trauma*, Nat'l Child Traumatic Stress Network, https://www.nctsn.org/what-is-child-trauma/trauma-types/complex-trauma/effects (last visited Nov. 14, 2018); Sheryl Kataoka et al., *Responding to Students with PTSD in Schools*, 21 CHILD & ADOLESCENT PSYCHIATRIC CLINICS N. AM. 119 (2012); Bessel A. Van der Kolk, *Psychological Trauma* 18, 96–98 (American Psychiatric Association Publishing) (2003); Ray Wolpow et al., *The Heart of Learning and Teaching: Compassion, Resiliency, and Academic Success* 11 (2016), available at http://www k12.wa.us/compassionateschools/pubdocs/TheHeartofLearningandTeaching.pdf.
[17] Moira Szilagyi, et al., *Health Care Issues for Children and Adolescents in Foster Care and Kinship Care*, 136 PEDIATRICS 1142, 1146 (2015), available at http://pediatrics.aappublications.org/content/pediatrics/early/2015/09/22/peds.2015-2656 full.pdf.
[18] *See* Children's Bureau, U.S. Dep't of Health and Human Servs., *Developing a Trauma-Informed Child Welfare System* 7 (2015), available at https://www.childwelfare.gov/pubPDFs/trauma_informed.pdf.

160.    Without these required screens and diagnostic services, Defendants have no way to timely identify youth with mental and behavioral health needs, and consequently no way to ensure that such children receive prompt treatment.

161.    When Defendants do provide mental and behavioral health screenings, these services often come too late. Notwithstanding Defendants' legal obligation to promptly provide required screening and diagnostic services, in Kansas, screening and diagnostic services are routinely delayed until a child receives a stable or permanent placement. This means that children who are held in temporary placements, sometimes for weeks or months, are denied access to the mental health screening and diagnostic services – and, consequently, the mental health treatment – they desperately need. Defendants' churning practice creates an impenetrable barrier to promptly accessing services mandated under the Medicaid Act.

162.    Underscoring Defendants' systemic failure to meet their obligations under the Medicaid Act, according to the April 2017 state audit, DCF has not even developed the processes or maintained the data necessary to track whether children have or have not received their mandated screens and diagnostic services.

**Defendants Fail to Provide Required Mental Health and Behavioral Health Treatment.**

163.    When foster children are identified as having mental and behavioral health needs, they often do not receive medically necessary mental and behavioral health treatment. And, as indicated in an April 2017 audit, when mental and behavioral health services are provided, they are often "delayed or infrequent." These systemic failures are due to several factors: a shortage of mental health services, the churning problem, and/or administrative barriers.

164.    The Mental Health Task Force recognized in a January 2018 report that "providing crisis intervention and prevention services to children in a natural setting such as school, home, or

community is necessary to effectively treat children and promote healthy development." Yet that same report found "the range of [community-based] options available was limited, restricting the continuum of care."

165.   Additionally, a DCF audit in April 2017 found an insufficient range of services as well as inadequate coordination and communication between case managers, support staff, and foster parents blocking access to these community-based mental health services. Transportation issues, for instance, impede the delivery of mental health services. The January 2018 Kansas Child Welfare System Task Force Report explained that "[w]hile DCF and the contractors are to be credited for being aware of the services that are available, caseload, funding, and transportation issues are keeping the full amount of services needed from being delivered."

166.   In addition, there is often insufficient system capacity to meet the mental health needs of children in foster care. This lack of capacity results in long wait times for services. A representative of DCF contractor SFCS noted in 2015 that it "experienced longer waiting time to engage services in the communities for behavioral health needs," particularly for youth with intellectual and developmental disabilities and/or serious emotional disturbance, "leaving children, youth and families to struggle keeping all parties safe."

167.   A representative of DCF contractor SFCS further stated in October of 2017 that the lack of a standardized protocol governing "the undefined term 'medical necessity' sometimes results in denying mental health treatment to a child."

168.   For children with more acute mental health needs, Defendants often fail to maintain an adequate number of available beds in Psychiatric Residential Treatment Facilities ("PRTFs"). In fact, Defendants decreased their capacity of PRTF beds by 65% between 2011 and the end of 2017; as a result, children wait weeks or months for a needed placement and medically necessary

inpatient mental health treatment. As of February 1, 2018, for example, SFCS and KVC together had a total of twenty-four children who had met the criteria for a PRTF but were placed on a waitlist. The Children's Continuum of Care ("CCC") Task Force acknowledged in December 2017 that there should be an "[i]ncrease in PRTF bed capacity," with waitlists "shorten[ed] or eradicate[d]," and recommended that "KDADS conduct data and trend analysis on PRTF bed utilization and waiting lists to determine the need" and plan "[t]he number of additional beds." Describing the challenges it faced in 2015, a SFCS representative stated that "[i]t is extremely unfortunate to be in a position to not have access to the services needed for the children and youth we serve." Without an increase in capacity, challenges in accessing higher levels of care will continue.

169.   As the CCC Task Force recognized in 2017, while awaiting PRTF placement, children often bounced from one foster care provider to another, including through night-to-night placements. The Task Force further noted that, while they are waiting, untreated and without a stable placement, children's symptoms can escalate, progressing from non-emergent to acute and requiring hospitalization. Additionally, according to the same CCC Task Force report, when a PRTF or hospital bed cannot be accessed, a child may even be kept in a juvenile justice facility for delinquent youth.

170.   At the same time, as noted in the minutes of a Mental Health Medication Advisory Committee meeting in August of 2017, Defendants fail to provide appropriate alternative options to PRTFs, particularly for children with serious emotional, developmental, and/or intellectual needs. In some cases, as stated in an October 2017 report, PRTFs reject children whose behavioral issues they deem too severe. Upon information and belief, no other placements exist to meet the needs of these children in DCF custody.

171.     In other cases, upon information and belief, children whose needs could be met in a therapeutic foster home or other foster home with readily available mental health service supports are sometimes placed or kept in PRTFs because no such housing exists. This results both in the inappropriate placement in PRTFs of youth whose needs could be met in a less restrictive setting and in additional strain on PRTF capacity. For example, beginning in 2017, DCF placed Named Plaintiff M.L. in a PRTF for over twelve months even though her documented mental health needs did not require a restrictive residential treatment, because no less restrictive placement and service environment existed to meet her needs.

172.     As acknowledged in a January 2018 Mental Health Task Force report and the CCC Task Force report of December 2017, when youth are placed in PRTFs, some are pushed out too soon, having received incomplete or inadequate treatment and without appropriate step-down services to support them in their transition. For example, Named Plaintiff Z.Z. was placed in a PRTF but her stay was artificially cut short, and without any appropriate step-down placements, Z.Z. was subjected to a string of night-night placements upon her discharge from the PRTF.

173.     Further, as noted in the January 2018 Mental Health Task Force Report, very few PRTF locations offer case management, therapy, family education and support, and other aftercare services in the immediate community. The failure to properly support youth transitioning from PRTFs compromises their mental health and creates a cycle that sends children into temporary, unstable placements when foster parents are unwilling or unable to care for children with unmet mental health needs, or back to a PRTF, impeding the individual children's treatment and exacerbating the systemic shortage of beds.

174.     Even youth with less intensive mental health needs experience systemic barriers to accessing the mental and behavioral health treatment they need. Upon information and belief,

children in foster care in Kansas often must wait to begin treatment until they are in a stable or non-temporary placement, meaning that their access to care is often denied when they need it the most – shortly after they are separated from their families, or when they are experiencing a period of extended disruption and instability through multiple short-term placements and night-to-night stays.

175.    For example, a legislative audit described a child "with extreme, trauma-related emotional and behavioral issues [who] inconsistently received the therapy she needed because her issues caused her to move to new foster homes frequently." According to contractor staff, "community mental health providers declined to provide her therapy during her short-term placements because they doubted she would be able to make progress before the child moved again. Additionally, she experienced gaps in treatment during each transition between placements, as it took time for providers to send referrals for her, transfer her records, and get her intake sessions scheduled."

176.    In addition, upon information and belief, Defendants' practice of repeatedly moving children among placements across the state often disrupts any mental health care that has begun, and interferes with children's ongoing relationships with their mental health care providers. DCF has acknowledged that "[w]ith placement and school instability, the challenge for case managers is referring to, securing and implementing wrap-around treatment services in a timely manner. For instance, a placement move to a new CMHC catchment area will mean starting the referral process for mental health services over again." Even if individual children are able to continue relationships with their mental health care providers, due to unmanageable caseloads, often no one is available to transport a child to an appointment; this creates yet another barrier between children and the mental health treatment that they need.

177.    For instance, ten-year-old Named Plaintiff C.A. was diagnosed with PTSD and ADD while in DCF custody, yet C.A. has been moved more than seventy times, significantly disrupting necessary mental health treatment. Named Plaintiff M.L., who has a mood disorder, has been moved over forty times while in DCF custody, and has received inconsistent or negligible mental health treatment throughout this churning.

178.    Additionally, instead of ensuring necessary and legally mandated appropriate treatment of foster children's mental and behavioral health needs, Kansas often relies on the overuse of psychotropic medications. These medications are powerful drugs such as antipsychotics and antidepressants that act on the central nervous system and can affect cognition, emotions, and behavior. Although the use of psychotropic medications should always be paired with evidence-based and systemically monitored psychosocial interventions, children in foster care in Kansas are routinely prescribed psychotropic medications by non-specialists in order to manage behavior.

179.    Not only does churning disrupt mental health treatment, but the failure to provide necessary mental health treatment to children in foster care exacerbates Kansas' pervasive problems with extreme housing disruption, because untreated mental health needs may lead to additional placement disruptions.[19] DCF describes "the challenge with caring for the children on the wait list [for services], first and foremost, [as] stability in placement." Foster parents may not be equipped to respond to a child's untreated mental health needs, and may feel that they cannot keep the child and others safe with the behaviors they are displaying. As a result, the child's

---

[19] Shannon Dorsey, et al., Children, Youth, and Family News, Am. Psychological Ass'n (2012), *Trauma-Focused Cognitive Behavioral Therapy with Youth in Foster Care: The Impact of Caregiver Engagement*, available at https://www.apa.org/pi/families/resources/newsletter/2012/01/winter.pdf.

placement may change, often repeatedly. In a recurring cycle, this in turn can lead to further mental health challenges including mood difficulties, aggression, low self-image, and attachment issues.[20]

180.    Research also shows that untreated mental health conditions can cause children to run away from their foster care placements, leaving them vulnerable to homelessness, trafficking, and involvement in the juvenile justice system.[21]

181.    Defendants are aware that they are failing to meet the mental health needs of children in foster care in Kansas. For example, Kansas' own Mental Health and Continuum of Care Task Forces have explicitly identified problems including the need for trauma-informed care, limited array of available services, inadequate PRTF capacity, and unacceptably long waitlists. Meanwhile, DCF's foster care contractors report that service interventions are needed in the area of mental health, noting, for example, particular challenges with accessing higher levels of care when children need them, excessive wait times to receive services, and high usage of medication for foster youth.

182.    As a KVC representative stated in October of 2017, "[t]he greatest area for improvement in the foster care system is that more effective interventions are needed in the mental health area."

183.    Despite such information and notice and despite the relevant legal mandates, Defendants have failed to take adequate actions to correct these broad failings and to provide or arrange for the screenings, diagnostic services, and treatment that children in foster care in Kansas

---

[20] David M. Rubin, Amanda O'Reilly, R., Xianqun Luan, & A. Russel Localio, *The Impact of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336, 336, 341-43 (2007); Rae R. Newton, Alan J. Litrownik & John A. Landsverk, *Children and Youth in Foster Care: Disentangling the Relationship Between Problem Behaviors and Number of Placements*, 24 CHILD ABUSE AND NEGLECT 1363, at 1363-64, 1371-73 (2000); Joseph P. Ryan & Mark F. Testa, *Child Maltreatment and Juvenile Delinquency: Investigating the Role of Placement and Placement Instability*, 27 CHILDREN AND YOUTH SERVICES REVIEW 227, 230, 244-45 (2005).
[21] Theodore P. Cross, et al., *Why Do Children Experience Multiple Placement Changes in Foster Care? Content Analysis on Reasons for Instability*, 7 JOURNAL OF PUBLIC CHILD WELFARE 39, 48, 53 (2013).

need. These failures are harming the children in their care and imposing an unreasonable risk of ongoing harm.

**D.  Three Additional Structural Failures Cross Over, Contribute To, and Exacerbate the Churning and Mental Health Services Failures.**

184.     Three additional structural failures cross over the two fundamental problems addressed in this Complaint, and contribute to and exacerbate the harms and dangers of extreme housing deprivation and the denial of mental health screenings, diagnostic services, and treatment: (1) excessive workloads, turnover and inadequate monitoring of children and their caregivers by frontline case workers; (2) the failure to directly oversee private providers; and (3) the failure to track and maintain accurate and timely data.

**Defendants' Practice of Excessive Caseworker Caseloads, Turnover and Inadequate Monitoring**

185.     DCF maintains a known policy, custom, pattern or practice of excessive workloads of its frontline case manager workforce, which impedes caseworkers' ability to monitor the safety and well-being of the foster children assigned to them, and their ability to provide basic support to foster parents. The excessive workloads and high turnover of caseworkers significantly contribute to and exacerbate the harms and risks of harm to children alleged in this Complaint.

186.     Defendant Meier-Hummel agrees that Kansas caseworkers' ability to accomplish their jobs when forced to juggle so many cases is "an issue for sure." She stated on October 31, 2018, that "[i]f we don't have an adequate workforce and they're asked to do too much, [that] is when children's safety is compromised."

187.     Once in foster care in DCF's protective custody, by definition, children are highly vulnerable and without adequate family protection. Once they enter the State's custody, caseworkers (provided under contract with the two lead provider agencies, KVC and SFCS), are

responsible for ensuring their safety and well-being. As noted in the April 2017 Performance Audit Report, "case management staff develop and oversee children's case plans, refer children for physical and mental health services, supervise visits between parents and children, write court reports and testify in court proceedings." Consistently, caseworkers are required to complete initial and ongoing assessments of children and their families; develop and implement case plans; facilitate and coordinate visits with children and their caregivers; prepare children for placement moves; provide intervention in crisis situations; support resource families to maintain placements; assess ongoing case plan goals and permanency options; and maintain written documentation in the child's and family's case record.

188.    To perform these essential functions, as noted in a state audit report in April 2017, "[i]t is important [that] case management staff have reasonable caseloads, so they can provide each child the quality of services and individual attention they need." Professional standards, as promulgated by the Child Welfare League of America, recommend that foster care caseworkers have workloads that range from twelve to fifteen children per caseworker in order to fulfill their responsibilities. Standards of the Council on Accreditation recommend that caseworkers have workloads between eight and fifteen children, depending on the level of need of the children.

189.    An April 2017 state audit report found that, in Kansas, "[c]ase managers' maximum caseloads frequently exceeded 30 cases during fiscal years 2014-2016." Subsequent reports reveal that workloads have continued to increase. A media report in November 2017 found that caseworkers responsible for as many as forty-three and fifty-seven children found it impossible to complete each monthly visit as well as case plans, court hearings and meetings with families. That same month, a local magistrate judge explained to the Child Welfare System Task Force that "[c]aseworkers are carrying enormous caseloads that prevent the attention these kids require." In

February 2018, a news report found that "[c]aseworkers who have quit the agency and its subcontractor KVC have complained of caseloads of up to seventy at a time."

190.    Numerous press articles describe caseworker turnover, low morale, and all the harm caused to children in DCF care. A March 2017 news article reported that "DCF has cut its social worker positions by 20 percent, despite an additional 33 percent increase in children entering the system during the past five years. Experienced social workers have left in droves." A July 2018 news article reported that DCF still had seventy-six vacant child protection positions in June of 2018.

191.    Additionally, the data likely under-reports the actual caseloads of foster care caseworkers assigned to children. For example, according to the April 2017 state audit, caseworker supervisors, against practice standards, often carry caseloads of children on top of their own supervisory workloads, skewing caseload data.

192.    With frequently excessive workloads, the caseworkers often do not have time to perform essential tasks to protect children's safety and well-being, such as visit with children in their placements, ensure children are adjusting in new placements, ensure children are attending mental health appointments, facilitate follow-up behavioral health services, coordinate visits between children and their parents and siblings, and attend to other issues that may threaten the well-being of a child. As the January 2018 Report of the Child Welfare System taskforce found, "[e]xcessive caseloads and limited funding affect timely response for needed services." Similarly, that same report notes that "mental health services are especially needed" and that "caseload[] issues . . . are keeping the full amount of services needed from being delivered."

193.    Excessive workloads also prevent caseworkers from providing basic support to foster parents. For example, a July 2016 legislative audit report showed that only thirteen percent

of a sample of Kansas foster families had confirmed and completed documented visits from the caseworker assigned to support the foster family. In another example, as noted in the April 2017 legislative audit report, "DCF's case review for the federal CFSR, our targeted file review, and our stakeholder survey all indicated poor communication and coordination between licensed case managers, support staff, and foster parents sometimes prevented children from receiving services they needed." Similarly, in a 2018 Report to the Child Welfare Task Force, "[t]he working group heard and received testimony on lags in communication or misinformation between DCF and stakeholders that negatively affected persons and service providers such as foster parents, grandparents, attorneys and clinicians, to name a few."

194.    According to DCF data, in 2016, 26% of the children who were in foster care for all 12 months had three or more case managers. Upon information and belief, children continue to experience turnover among assigned caseworkers today. Frequent changes in caseworkers, combined with their high workloads, further inhibit caseworkers' ability to do their job monitoring the safety and well-being of foster children and to support foster parents.

195.    Given the critical role caseworkers play in ensuring the safety and well-being of foster children in DCF's protective custody – including visiting children, maximizing placement stability, supporting foster parents, and coordinating the delivery of mental health services – the high caseloads and turnover of caseworkers significantly contribute to and worsen the practice of extreme housing disruption and the denial of mental health screens, diagnostic services, and treatment.

**Defendants Fail to Adequately Oversee Private Contract Providers.**

196.    As an April 2017 state audit report stated, DCF is "ultimately responsible for the state's foster care system" even though Kansas has privatized most of the day-to-day operations.

"The foster care contracts and state law specify the department has ultimate responsibility for the well-being of children, the quality of the services, and the overall success of the foster care system." DCF's lead contractors, KVC and SFCS, provide case management, placement and service coordination for Kansas foster children statewide.

197.    DCF contracts with KVC and SFCS to provide case management services, which include the obligation to "develop and oversee progress on case plans for children in foster care and their families." KVC and SFCS subcontract with child placing agencies to provide placements for foster children in DCF custody. "Child placing agencies recruit and sponsor foster homes. They help the case management contractors find a placement for children placed in DCF custody. Child placing agencies also assist homes with licensing and are charged with regularly visiting foster families." KVC and SFCS monitor children in those placements, and are responsible for "directing clients to appropriate services (such as family preservation and mental health services)."

198.    In fiscal year 2016, "about $154 million was paid [by DCF] to foster care contractors to provide placement (reintegration, foster care, and adoption) and case management services."

199.    DCF's contracts with KVC for "Reintegration/Foster Care/Adoption Services" provide for a "monthly prospective base rate for term July 1, 2017 through June 30, 2018 [of] $810,000.00 per month" for the Kansas City Region and "$920,500.00 per month" for the East Region. The contracts further provide for a "monthly prospective case rate [of] $1,342.00 per out of home placement per month" for the Kansas City Region and "$1,558.00 per out of home placement per month" for the East Region. DCF's current contract with KVC extends through June 2019.

200.    DCF's contracts with SFCS for "Reintegration/Foster Care/Adoption Services" provide for a "monthly prospective base rate for term July 1, 2017 through June 30, 2018 [of] $898,860.00 per month" for the West Region and "$725,000.00 per month" for the Wichita Region. The contracts further provide for a "monthly prospective case rate [of] $1,726.00 per out of home placement per month" for the West Region and "$1,666.00 per out of home placement per month" for the Wichita Region. DCF's current contract with SFCS extends through June 2019.

201.    As an April 2017 state audit makes clear, DCF "must actively oversee the contractors and evaluate their performance. That oversight includes ensuring children are placed in appropriate settings, children's physical and mental health needs are addressed, and permanency is secured for them in a timely manner."

202.    DCF maintains a structural deficiency of a known, dangerous policy, custom, pattern or practice of failing to oversee private contract providers adequately, which significantly contributes to and exacerbates the dangers of churning and failing to ensure children receive mental health screening, diagnostic services, and treatment alleged in this Complaint.

203.    An April 2017 state audit report found that "DCF did not collect and maintain the data it needed to effectively oversee the case management contractors." For example, DCF requires contractors to "place each child in the foster home nearest his or her removal home that provided the best fit, as well as to ensure each child received the physical and mental health screenings, assessments, and referrals he or she needed. However, DCF did not develop the processes or maintain the data necessary to ensure these things happened for all children."

204.    DCF's contracts with KVC and SFCS provide that, if KVC or SFCS "fails to provide all of the goods and services under [the contract] as amended, then DCF may proceed to

institute such corrective action as it deems reasonably appropriate to ensure the requirements of the contract are met."

205.    The contracts further state that if KVC or SFCS fails to provide the required goods and services, "DCF may assess a penalty based on DCF internal audit recommendations, in addition to any damages it may incur as a result of . . . non-performance, including the need to obtain such goods and services for children and families outside the scope of the contract."

206.    The contracts also require that, subsequent to the close of the fiscal year, KVC and SFCS "shall provide to DCF any and all documentation requested by DCF" for the purposes of conducting an annual audit. Under the contracts, "audits performed by DCF may include audits of contract performance, i.e., compliance with terms and conditions of the contract with DCF including accomplishment of federal and state outcomes related to children and families."

207.    Additionally, "[t]he foster care contracts allow DCF to request and approve a performance improvement plan when a contractor does not meet federal outcome requirements or when [DCF] identifies problems through any of its oversight processes." DCF "may assess financial penalties if a contractor fails to meet its goals for two consecutive quarters, and may terminate the contract if the contractor fails to meet them by the end of the state fiscal year in which the plan was implemented."

208.    According to the April 2017 state audit report, "DCF has not been aggressive in addressing the problems it identified with its contractors." The report further noted that "DCF has only required two performance improvement plans since 1997 . . . despite the fact the contractors did not meet federal outcome benchmarks in several years," including federal requirements related to timeliness and stability and including known failures to ensure the provision of mental and behavioral health services.

209.     DCF has directly failed to monitor and oversee its contractors in order to remedy the known problems of churning and the failure to provide mental health screening, diagnostic services, and treatment to Plaintiffs and members of the General Class and Mental Health Subclass.

210.     DCF has failed to pursue effective remedies from its contractors, including specific corrective actions, financial penalties resulting in measurable improvement, or contract termination in response to these known dangers. DCF has effectively ignored these specific foster care system dangers.

211.     In the wake of the alleged rape of a thirteen-year-old girl at KVC's Olathe office, where she was forced to sleep in a conference room overnight in May 2018, a September 19, 2018 news article reported that since Kansas privatized its child welfare system in the mid-1990s, DCF has only penalized a contractor financially once.

212.     DCF has failed and continues to fail to directly monitor and oversee the financial and programmatic operations and outcomes of KVC, SFCS, and the other private organizations that contract to provide housing and other services to children in DCF's care. This failure significantly contributes to and exacerbates the harms and risks of harm to children alleged in this Complaint.

**Defendants' Failure to Accurately Track, Monitor, and Share Data**

213.     Defendants' known failure to accurately track, monitor, and share current data is a structural deficiency that cuts across the systemic problems with placement stability; mental health care; workloads, monitoring, and visits; and contract oversight. As result, data failures significantly contribute to and exacerbate the harms and risks of harm to children alleged in this Complaint. As DCF stated in an October 2018 update to the Child Welfare System Task Force, "[o]ur current system was built 30 years ago, prior to the internet, and it [is] on a mainframe

system. Current IT staff are unable to fix issues that arise within our system because it is so outdated. The current system is a barrier to our staff, and ultimately, puts children in danger."

214.   Data failures contribute to churning. As identified in the Report of the Child Welfare System Task Force to the 2018 Kansas Legislature in January 2018, "[a]n antiquated set of various computer systems within the DCF prevents communication between computers within DCF, as well as between DCF and the two child welfare system contractors[,]" KVC and SFCS. As found in the Legislative Post Audit Performance Audit Report in April 2017, "DCF could not monitor if children were placed in appropriate homes, in part because it did not collect integrated information about foster homes." Moreover, "[t]he case management contractors [KVC and SFCS] may not have information about all potential foster homes when making placement decisions."

215.   Additionally, "DCF did not have a complete dataset it could easily access to show where all children in their custody had been placed." Moreover, "DCF's data on licensed foster homes was outdated and missing important information about the number of open beds" available to place children.

216.   Data failures also contribute to problems of ensuring mental health and behavioral health screenings, diagnostic services, and treatment. For example, an April 2017 audit found that case management contractors failed to consistently document children's mental health needs and services in their files and instead relied heavily on verbal communication.

217.   In addition, data failures also contribute to problems of monitoring monthly visits. As a July 2016 Audit Report found: "For 114 cases (59%), because of poor documentation, [auditors of DCF from the Legislative Division of Post Audit] could not tell whether some monthly visits happened or [they] questioned the quality of the visit." The Report further stated: "Poor documentation makes it difficult for DCF and case management contractors to monitor child

placing agencies and ensure the safety of the children in foster care." It explained that "case management staff may not always be completing or documenting required monthly visits, which puts children at risk of harm while in DCF care."

218.    Finally, data failures contribute to inadequate contract monitoring. As the April 2017 Audit Report found, "DCF's monitoring processes did not capture important management-level information." The Report "showed the department [DCF] expected the contractors to ensure children were placed in appropriate homes and their well-being, but did not maintain data to monitor whether this occurred." Additionally, "DCF could not monitor if children were placed in appropriate homes, in part because it did not collect integrated information [or data] about foster homes."

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Substantive Due Process Under the Fourteenth Amendment
### [Brought by All Named Plaintiffs and the General Class Against Governor Colyer and DCF Secretary Meier-Hummel]

219.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

220.    The state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm and to keep a child reasonably free from harm and risks of harm when it takes that child into foster care custody.

221.    The foregoing actions and inactions of Defendants Colyer and Meier-Hummel, in their official capacities, who directly and indirectly control and are responsible for the policies of DCF, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm and risk of harm all Named Plaintiffs and General Class members. These failures

are a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty interests of the Plaintiffs.

222.   The foregoing actions and inactions of Defendants Colyer and Meier-Hummel, in their official capacities, constitute a pattern, custom, policy and/or practice that are contrary to law and any reasonable professional standards, are substantial departures from accepted professional judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to Plaintiffs' and the General Class's constitutionally protected rights and liberty interests, such that Defendants were plainly placed on notice and chose to ignore the dangers in a manner that shocks the conscience.

223.   As a result of Defendants Colyer and Meier-Hummel's actions and inactions, Plaintiffs have been harmed or are at continuing and imminent risk of harm and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment, including but not limited to the right to be reasonably free from harm while in state custody.

## SECOND CAUSE OF ACTION
### Medicaid Act
### [Brought by All Named Plaintiffs and the General Class Against All Defendants]

224.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

225.   Defendants have failed to promptly provide or otherwise arrange for Plaintiffs and the members of the General Class to receive, upon entry to foster care, early and periodic screening and diagnostic services that would determine the existence of trauma-related physical or mental illnesses or conditions, in violation of 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A), 1396a(a)(43)(B), 1396d(a)(4)(B), 1396a(a)(13), 1396d(r)(1), and 1396d(r)(5).

226.    The foregoing actions and inactions of Defendants, in their official capacity, constitute a pattern, custom, policy and/or practice that deprives Named Plaintiffs and the General Class of the enforceable rights conferred on them by the EPSDT provisions of the federal Medicaid Act to promptly receive trauma-related early and periodic screening and diagnostic services upon entry to foster care.

## THIRD CAUSE OF ACTION
### Medicaid Act
### [Brought by All Named Plaintiffs and the General Class Against All Defendants]

227.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

228.    Defendants have failed to promptly provide or otherwise arrange for Plaintiffs and the members of the General Class to receive early and periodic mental and behavioral health screening that would determine the existence of physical or mental illnesses or conditions, including trauma-related illnesses or conditions, in violation of 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A), 1396a(a)(43)(B), 1396d(a)(4)(B), and 1396d(r)(1).

229.    The foregoing actions and inactions of Defendants, in their official capacity, constitute a pattern, custom, policy and/or practice that deprives Named Plaintiffs and the General Class of the enforceable rights conferred on them by the EPSDT provisions of the federal Medicaid Act to promptly receive ongoing early and periodic mental and behavioral health screening, including trauma-related screening.

**FOURTH CAUSE OF ACTION**
**Medicaid Act**
**[Brought by Named Plaintiffs M.B., S.E., J.M., M.J., R.M., C.A., Z.Z., B.B., and M.L. and the Mental Health Treatment Subclass Against All Defendants]**

230.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

231.    Defendants have failed to provide or otherwise arrange for Plaintiffs and the members of the Mental Health Treatment Subclass to promptly receive medically necessary behavioral and mental health services, including intensive, community, and home-based mental health services, that would correct or ameliorate their mental health illnesses or conditions, in violation of 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5).

232.    The foregoing actions and inactions of Defendants, in their official capacity, constitute a pattern, custom, policy and/or practice that deprive Named Plaintiffs M.B., S.E., J.M., M.J., R.M., C.A., Z.Z., B.B., and M.L. and the Mental Health Treatment Subclass of the enforceable rights conferred on them by the EPSDT provisions of the federal Medicaid Act to medically necessary mental and behavioral health treatment.

**VII. PRAYER FOR RELIEF**

233.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.   Assert jurisdiction over this action;

b.   Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

c.   Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

i. Defendants Colyer and Meier-Hummel's violation of Named Plaintiffs' and the General Class's substantive due process rights to be free from harm and unreasonable risk of harm under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

ii. Defendants' violation of Named Plaintiffs' and the General Class's rights under 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A), 1396a(a)(43)(B), 1396d(a)(4)(B), 1396d(a)(13), 1396d(r)(1), and 1396d(r)(5);

iii. Defendants' violation of Named Plaintiffs' and the Mental Health Treatment Subclass's rights under 42 U.S.C. §§ 1396a(a)8, 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5).

d. Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate their rights and order appropriately tailored remedies directed at Defendants to ensure Defendants' future compliance with their obligations to Plaintiffs, including, but not limited to, the following:

RELIEF REQUESTED FOR GENERAL CLASS:

i. Enter a permanent injunction requiring that Defendants (1) end the practice of subjecting children to extreme housing disruption, including short-term and night-to-night placements, (2) conduct an expert workload study to determine the workload(s) necessary to conduct required visits and monitoring of foster children, coordinate mental health services for children, and support foster parents; (3) implement staff hiring and retention strategies to maintain the workload(s) identified by the workload study; (4) design and implement a plan to

provide direct oversight over the contracts with DCF's private providers concerning placement stability and delivery of mental health services; (5) create a single, cross-system, web-based, integrated case management and data reporting system which can be used by DCF, KDHE and KDADS to efficiently and effectively collect and share information concerning children and their placement and treatment needs, placement availability and matching, and mental health service needs and providers; (6) provide, upon entry to foster care, initial trauma-related screening and diagnostic services to all children in foster care in DCF custody; and (7) provide early and periodic mental and behavioral health screening, including periodic trauma-related screening, to all children in foster care in DCF custody.

RELIEF REQUESTED FOR MENTAL HEALTH TREATMENT SUBCLASS:

ii. Enter a permanent injunction requiring that Defendants establish and implement trauma-informed practices to ensure that all members of the Mental Health Treatment Subclass receive access to the medically necessary mental health treatment services to which they are entitled under the EPSDT provisions of the federal Medicaid Act by taking steps including, but not limited to: (1) conducting a current network adequacy study to identify specific shortages in the number and array of mental health treatment services for children in DCF custody, including providers of such treatment services and facilities such as PRTFs; and (2) filling any identified gaps in the network adequacy study.

FURTHER RELIEF REQUESTED:

  iii. The provisions of the Court order entered pursuant to Federal Rule of Civil Procedure 65(d) shall be monitored by a neutral expert monitor appointed by the Court. In addition, the Court shall have continuing jurisdiction to oversee compliance with that Order;

 e. Award to Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and costs, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

 f. Grant such other equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm while in Defendants' custody and care.

DATED:  November 16, 2018

       /s/ *Larry R. Rute*
       Larry R. Rute
       KS Bar ID No. 8105
       KS District Bar No. 08105
       Benet Magnuson
       TX Bar ID No. 24070203
       KANSAS APPLESEED CENTER FOR LAW & JUSTICE, INC.
       211 East 8th Street, Suite D
       Lawrence, KS 66044
       P: (785) 856-0917
       larry@adrmediate.com
       bmagnuson@kansasappleseed.org

       Loretta Burns-Bucklew
       LAW OFFICE OF LORETTA BURNS-BUCKLEW
       MI Bar ID No. 32053
       401 West 89th Street
       Kansas City, MO 64114
       P: (816) 384-1198
       loribblawkc@gmail.com

Leecia Welch
CA Bar ID No. 208741
Freya Pitts
CA Bar ID No. 295878
NATIONAL CENTER FOR YOUTH LAW
405 14th Street, 15th Floor
Oakland, CA 94612
P: (510) 835-8098
F: (510) 835-8099
lwelch@youthlaw.org
fpitts@youthlaw.org

Ira Lustbader
NY Bar ID No. 2516946
Marissa C. Nardi
NY Bar ID No. 5173265
Jonathan M. King
NY Bar ID No. 5119847
Stephen A. Dixon
LA Bar ID No. 18185
CHILDREN'S RIGHTS, INC.
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
mnardi@childrensrights.org
jking@childrensrights.org
sdixon@childrensrights.org

***Attorneys for Plaintiffs***