**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS**

KATHARYN MCINTYRE, et al.,

               Plaintiffs,

vs.

LAURA KELLY, et al.,

               Defendants.

Case No. 18-CV-02617-DDC-GEB

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS DEFENDANT
<u>GOVERNOR LAURA KELLY</u>**

## I.      INTRODUCTION

Governor Kelly embraces Plaintiffs efforts to characterize her as a strong advocate for the welfare of the children of the State of Kansas, including those served by the State's foster care system.   Dating back to her time in the Kansas Senate, Governor Kelly has demanded improvements to the foster care system, as well as other state-run programs impacting the lives of the youngest Kansans.  In her campaign she called for reform to better the system.  As Governor, she will continue to advocate for Kansas's foster children. She has put in place a committed, experienced team in her administration to tackle the challenge of reforming and improving the foster care system.  She has not and will not deflect her responsibility to fight for better policies to improve the lives of Kansas' children.  These efforts, however, do not make her a proper defendant to this lawsuit.

Building on her advocacy, Governor Kelly and her administration looked forward to the opportunity to work with the Legislature to improve the Kansas foster care system.  Rather than being allowed a chance to govern, the Governor and the Agency Defendants were sued before they even took office, before they had the opportunity to implement a single change.  Plaintiffs wish to usurp the role of the elected Governor of the State of Kansas, and the Agency Secretaries duly

appointed by her and confirmed by the Senate by asking the federal courts to dictate how state agencies should be run.   With all due respect to this Court, the Eleventh Amendment doctrine of sovereign immunity protects state governments from the interference of the federal judiciary.

There is no doubt the state owes foster children safe, nurturing care, and Governor Kelly's administration is steadfastly committed to that goal. But Governor Kelly is also obligated to protect the Office of the Governor from the burdens of unwarranted lawsuits and to assert the constitutional rights enshrined in the Eleventh Amendment.   It is for these reasons that Governor Kelly seeks to be dismissed from this litigation.

The *Ex parte Young* exception to the doctrine of sovereign immunity applies under limited circumstances, where a plaintiff is seeking prospective injunctive relief to correct an alleged violation of Constitutional or federal law.   This exception applies only to those state actors with the power to enforce the act that they challenge, and who have demonstrated an intent to utilize that power.   Here, the Plaintiffs challenge the administration on various aspects of the Kansas foster care system.   While *all* of the Defendants vehemently deny that Plaintiffs will ultimately be entitled to the relief that they seek, the relief Plaintiffs are requesting falls solely within the statutory authority of the Defendant Agency Secretaries.   And to be clear, while Governor Kelly denies that she is a proper defendant in this lawsuit, the Agency Defendants, as the entities of Governor Kelly's administration statutorily empowered to manage the state's foster care system, have not challenged this Court's jurisdiction. Because Plaintiffs' claims against Governor Kelly do not meet the exception to the doctrine of sovereign immunity, she is not subject to this Court's jurisdiction.   Governor Kelly should be dismissed from this lawsuit pursuant to Fed. R. Civ. P. 12(b)(1).

## II.    THE COURT SHOULD DISREGARD THE EXTRANEOUS MATERIALS THAT PLAINTIFFS HAVE PRESENTED IN OPPOSITION TO THE MOTION TO DISMISS

### A.    Governor Kelly's Motion is a Facial Attack on the Sufficiency of the Amended Complaint.

Governor Kelly moved this Court to dismiss her from this case under Federal Rule of Civil Procedure 12(b)(1) because under the Eleventh amendment doctrine of sovereign immunity, the Court lacks subject matter jurisdiction over the office of the Governor.

A Rule 12(b)(1) motion may come in one of two forms: a facial attack or a factual attack. *Holt v. United States,* 46 F.3d 1000, 1002 (10th Cir. 1995); *see Moreno v. Kansas City Steak Co., LLC,* No. 17-cv-02029-DDC-KGS, 2017 WL 2985748, at *5 (D. Kan. July 13, 2017).  Facial attacks go to the sufficiency of the jurisdictional allegations in the plaintiff's Complaint while factual attacks go beyond those allegations and challenge the "facts upon which subject matter jurisdiction depends."  *Moreno,* at *5 (citations omitted).

The Governor's motion is premised on Plaintiffs' failure to articulate in their Amended Complaint any particular statutory or other legal duty that the Kansas Governor holds in enforcing the statutes that govern the management of the Kansas foster care system.  [Doc. 80 at 4, citing Doc. 63, Am. Compl. at ¶ 105].  The Amended Complaint alleges insufficiencies in the administration of the Kansas foster care system.  *See* [Doc. 63].  As the initial motion establishes, Kansas law places the administration of the foster care system in the hands of the Secretaries appointed to lead to the responsible Agencies.  *See* [Doc. 80 at 6-7].  Plaintiffs' response does not challenge this statutory framework.  The Governor's Motion is a facial attack as to the sufficiency of the allegations of the Amended Complaint.  *See Moreno,* 2017 WL 2985748, at *5 (D. Kan. July 13, 2017) ("Because defendant's motion does not rely on any material outside the pleadings, it presents a facial attack.").  The Governor did not "choose to make a factual attack by offering

exhibits in support of [their] motion."  *Cf. Shipley v. I.R.S.*, No. Civ. A. 042573JWL, 2005 WL 1334617, at *1 (D. Kan. June 6, 2005).

Plaintiffs wish to argue this issue both ways - they complain about the Governor's deliberate choice not to submit affidavits or exhibits in support of her motion, and also declare that her motion is unquestionably factual in nature.  Plaintiffs insist, without support, that because Governor Kelly has raised a factual attack, this allows Plaintiffs to supply extrinsic evidence to supplement the allegations in their Amended Complaint in order to demonstrate Governor Kelly's role in the foster care system.  *See* [Doc. 96 at 9]. To support this position, Plaintiffs cite several cases, each of which involve a *moving party* going beyond the Complaint's factual allegations, or submitting affidavits or exhibits to the Court in support of a jurisdictional challenge.  *See Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1291 (10th Cir. 2005) (noting Defendant's submission included a notice of violation and consent order); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995) (challenging jurisdiction where defendant came forward with facts that established governmental immunity); *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 173 (10th Cir. 1992) (defendants submitting affidavits); *Starlight Intern., Inc. v. Herlihy*, 13 F. Supp. 2d 1178, 1182 (D. Kan. 1998) (district court considered defendant's motion on the basis of "affidavits and other written materials"); *Arbogast v. Kansas*, No. 13-CV-4007-JAR/KMH, 2013 WL 5530276, at *1 (D. Kan. Oct. 4, 2013) ("Defendant KDOL attached exhibits in support of its claim for sovereign immunity, which is a jurisdictional issue.").  None of these cases support Plaintiffs' proposition that a plaintiff can ask the Court to consider additional evidentiary materials to establish jurisdiction to supplement a poorly pled Complaint.

Plaintiffs' characterization of Governor Kelly's initial Motion as a factual attack is inaccurate and none of the statements that Plaintiffs point to in making this argument actually support this conclusion.   For instance, the Governor's statements that she "does not manage or run the programs that Plaintiffs now challenge" and "does not enforce the statutes or regulation that control" the systems [Doc. 96 at 9; Doc. 80 at 6, 8-9] simply summarize the statutory authority that places the administration and control of the Kansas foster care system in the hands of the Agency Secretaries.  *See* [Doc. 80 at 8-9 and authorities cited therein].  Likewise, statements in the Governor's initial Memorandum in support of her motion that the Governor has not "threatened or expressed an intention to act" or "expressed any intention to act" to enforce statutes and regulations are matter-of-fact conclusions that mirror the language in the *Ex Parte Young* and the decisions that have followed.  *See* 209 U.S. at 155-56 (requiring that state officials have both "some connection with the enforcement of the act being challenged" and that the official "threaten" or be "about to commence" proceedings to enforce the act); [Doc. 80 at 4, 6, 8-9].  Governor Kelly's Memorandum does not assert extraneous facts; rather, the statements were made to point out the *lack* of factual support offered by Plaintiffs to meet the requirements of the *Ex Parte Young* exceptions.

As this Court recognized in *Moreno*, a 12(b)(1) motion that does not rely on affidavits or exhibits in challenging jurisdictional allegations is a facial attack.  *See Moreno*, 2017 WL 2985748, at *5.  Governor Kelly's Motion goes to and should be decided on the sufficiency of the allegations in Plaintiffs' Amended Complaint.  Accordingly, the Court should treat the motion under the same standards applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the factual allegations in Plaintiffs' Complaint as true but remembering no such presumption attaches to Plaintiffs' incorrect legal conclusions.  *See id*.

**B.**     **Plaintiffs' Extraneous Materials are Inadmissible as Presented and Should Not be Considered by the Court.**

Whether the Court perceives Governor Kelly's challenge to Plaintiffs' Amended Complaint as facial or factual, the Declaration of Teresa Woody ("Woody Declaration") and the materials attached to that Declaration that Plaintiffs present in their opposition cannot form the basis for the Court's decision on the ultimate jurisdictional issue.  Governor Kelly recognizes that the Court has discretion to allow affidavits and other materials upon a factual attack to the Court's jurisdiction.  *See Holt*, 46 F.3d at 1003.  But neither *Holt* nor any other case cited by Plaintiffs would permit this Court to consider or subsequently rely upon affidavits and exhibits that do not meet the most basic and routine evidentiary requirements.

Plaintiffs cite the case of *Federal Deposit Insurance Corporation v. Oaklawn Apartments*, 959 F.2d 170 (10th Cir. 1992) for the proposition that factual disputes must be resolved in the plaintiff's favor where conflicting evidentiary materials are presented.  The Tenth Circuit emphasized that, when external materials are considered, evidentiary rules and standards apply, "[w]hile Rule 56(e) addresses affidavits submitted in support of or in opposition to summary judgment motions, its requirements of personal knowledge, admissible facts, and affirmative showing of competency apply to affidavits in support of or in opposition to motions to dismiss on jurisdictional grounds."  *Oaklawn*, 959 F.2d at 175 n.6.  In a later decision, the Tenth Circuit explained a Court could rely on affidavits "or any other evidence *properly before the court*."  *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995)(emphasis added).  The standard can also be articulated as a requirement of "competent proof."  *See Sapp v. F.D.I.C.*, 876 F. Supp. 249, 251 (D. Kan. 1995) (citations omitted) (reiterating *Oaklawn*'s requirements of personal knowledge, admissibility, and competency to testify to matters stated).

The 19 exhibits attached to the Woody Declaration are almost all news clippings from various sources.  Plaintiffs seek to offer statements, excerpts, and conclusions drawn from these clippings for the truth of the matter asserted.  Under the Federal Rules of Evidence, newspaper articles, press releases, and similar materials admitted to prove the truth of the matter asserted are inadmissible hearsay.  *New England Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989); *see also Good v. B'd of Cnt'y Comm'rs*, 331 F. Supp. 2d 1315, 1326-27 (D. Kan.) (newspaper articles could not be offered on summary judgment to prove the truth of the information contained in them); *Century Colorado Springs P'ship v. Falcon Broadband, Inc.*, No. 05-CV-02295-REB-MJW, 2006 WL 521791 *3 (D. Colo. Mar. 2, 2006) (characterizing newspaper article and a press release offered to demonstrate standing as "pure hearsay and not competent summary judgment proof."); *Weisler v. Community Health Systems, Inc.*, No. CIV-12-0079 MV/CG,  2012 WL 4498919 *3 (D. N.M. Sept. 27, 2012) (refusing to consider unverified newspaper articles to establish facts to confer Court's personal jurisdiction over defendants on a Motion filed under Fed. R. Civ. P. 12 (b)(2)); *Welch v. City of Albuquerque,* No. CIV-11-00700 KG/SCY, 2016 WL 8809479 *3) (refusing to consider newspaper articles attached to oppose summary judgment "newspaper and magazine articles and reports or other media are, generally, inadmissible hearsay.")

Clearly, the Woody Declaration and the materials that Plaintiffs have attached fall short of the "competent proof" standard required to be considered in a factual attack on the issue of subject matter jurisdiction.  The Woody Declaration does not purport to attest to any personal knowledge of any of the issues it claims to relate to, and makes no attempt to establish admissibility of any of the exhibits attached.  Further, the Woody Declaration does not address relevancy issues or explain how the attached exhibits are probative of the Governor's duty to enforce the statues governing

the foster care system as it relates to the issues raised in Plaintiffs' Amended Complaint—indeed, one need only review Kansas law, not a newspaper article, to determine that legal issue. Finally, the Woody Declaration and the attached materials do not adhere to *any* of the standards required by the Federal Rules of Evidence. Therefore, the extrinsic evidence offered by the Plaintiffs cannot be the basis of this Court's decision on the ultimate jurisdictional issue. To put it simply, Plaintiffs have offered no admissible evidence to support their factual attack or to establish that the Court has subject matter jurisdiction over Governor Kelly.

## III. GOVERNOR KELLY DOES NOT FIT WITHIN THE *EX PARTE YOUNG* EXCEPTION TO ELEVENTH AMENDMENT IMMUNITY

### A. The *Ex parte Young* Exception to Sovereign Immunity

The Eleventh Amendment of the United States Constitution establishes a jurisdictional bar against unconsented suits in federal court against a state or arms of a state. *Wagoner Cnty Rural Water Dist. No. 2 v. Grand River Dam Auth.,* 577 F.3d 1255, 1258 (10th Cir. 2009). The Eleventh Amendment is an explicit limitation on the judicial power of the United States over the states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119, 104 S. Ct. 900, 918, 79 L. Ed. 2d 67 (1984). It is because of the fundamental importance of state immunity from the power of the federal courts that Governor Kelly seeks to be dismissed from this lawsuit. Governor Kelly asks this Court to dismiss her as a party in this lawsuit, not because she is not invested in the future of Kansas foster care, but because she is obligated, on behalf of her herself and future Governors of the State, to safeguard the sovereignty of her office.

*Ex parte Young* established a limited exception to the general rule of sovereign immunity for cases where the plaintiff seeks prospective injunctive relief for violations of the United States Constitution or federal law. 209 U.S. 123, 159-60, 28 S. Ct. 441 (1908); *see also Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 76, 116 S. Ct. 114, (1996) (describing *Ex parte Young* as a "narrow

exception" to the general rule of state sovereign immunity).  The *Ex parte Young* exception is limited to cases where the state official has: 1) a connection with the enforcement of the act; **and** 2) has threatened or is about to commence proceedings to enforce the act.  *Id*. at 155-56.  As the *Young* Court explained, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."  209 U.S. at 157.

## B.  The Agency Defendants Hold the Statutory Power to Enforce the Act in Question

Governor Kelly does not fit either of the criteria required by *Ex parte Young*.  As with almost every state government program, the Governor of Kansas does not directly enforce or administer the statutes or regulations that make up the Kansas foster care system.  As the Governor's initial Memorandum explains in great detail, the Kansas Legislature has adopted a statutory scheme that vests the responsibility and direct management of these programs with the Secretaries of each administrative agency.  [Doc. 80 at 6-7 and authorities cited therein.]  The power to alter practices, make policies, establish programs, and subscribe additional services lies with the heads of these agencies.  *See id*.  To fall within the *Ex parte Young* exception, a state official defendant need not have a "special connection" to the alleged unconstitutional act or conduct, but the official must "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty."  *Peterson v. Martinez,* 707 F.3d 1197, 1205 (10th Cir. 2013) (citing *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 828 *(10th Cir. 2007).  As the Tenth Circuit has advised, when state law explicitly places a duty in the hands of one set of officials, a plaintiff cannot sue a different official absent some evidence that the defendant is connected to the enforcement of the challenged law.  *Peterson,* 707 F.3d at 1207.  The

Kansas Legislature has vested the particular duties of managing and administering the Kansas foster care system in the hands of the Defendant Secretaries.   None of the duties of the administration of the system are reserved for the Governor.

That is not to say that the Governor does not have duties or responsibilities as it relates to the Kansas foster care system.  Governor Kelly openly admits, and in fact embraces, that she has a role in overseeing this system and ensuring that the team she has put in place makes needed improvements.  This role, however, is not pertinent to the particular allegations raised, the policies and practices challenged, or, most importantly, the relief sought in this litigation.

As has been stated, Governor Kelly holds general authority over the executive branch of Kansas government.  As it relates to foster care, the Governor's statutory duty is to select and appoint the person(s), with the consent of the Senate, to serve the State of Kansas as the Secretaries of DCF, KDADS, and KDHE.  K.S.A. 75-5301 (Governor shall appoint DCF secretary, subject to confirmation by the Senate); 75-5903 (Governor shall appoint KDADS secretary, subject to confirmation by the Senate); 75-5601 (Governor shall appoint KDHE secretary, subject to Senate confirmation).  These Secretaries serve at the Governor's pleasure (s*ee, e.g.,* K.S.A. 75-5301). There is no allegation in the Amended Complaint or elsewhere in the Plaintiffs' response that Governor Kelly has somehow failed to exercise her authority in this respect, or that she has exercised this power, or threatened to exercise this power in a manner detrimental to Plaintiffs.  To the contrary, Governor Kelly has appointed qualified and capable individuals to fill the roles of Agency Secretaries, whom she has entrusted with the statutory power to manage the foster care system, and who are diligently working to administer and improve it.

The relief that Plaintiffs seek in their Amended Complaint illustrates the reasons why the Defendant Secretaries may be proper parties under *Ex parte Young* while Governor Kelly is not.

Plaintiffs are requesting that this Court issue specific injunctive relief on behalf of a general class of children in the foster care system and a mental health subclass.  The requested relief is a series of changes to the administration of the foster care system, summarized as follows:

- The end to certain placement practices, which Plaintiffs characterize as "extreme housing disruption";

- That an expert study be conducted to monitor workload requirements of the system;

- The implementation of staff hiring and retention strategies;

- The implementation of a plan to provide direct oversight over private providers;

- The implementation of a single web-based data management system;

- That trauma-related screening and services be provided to all children in DCF custody

- That mental and behavioral health screening be provided to all children in DCF custody; and

- The implementation of a "trauma-informed" practice that would identify and fill gaps in mental health services.

[Doc. 63 at 70-72.]

Plaintiffs allege that Governor Kelly has oversight responsibilities over the three agency Defendants and has the power to implement the remedies requested in the lawsuit simply by ordering it so.  This demonstrates a fundamental misunderstanding of how the executive branch of Kansas government works.  The Kansas Governor does not *personally* execute the laws or the actions of the agencies and lacks the authority to directly do so. Instead, the actions are taken by the administrative agencies charged with the responsibility for the subject areas.

Because the Kansas Governor does not have the statutory authority to manage the Kansas foster care system, each of these areas of requested relief would need to be implemented under the power granted by the Kansas Legislature to each of the Defendant Secretaries.  Similarly, none of

the requests would require the exercise of the Governor's limited power of appointment. Because Governor Kelly has no particular authority to provide the injunctive relief Plaintiffs seek, her role here is no more than a representative of the state, and thereby an attempt to make the state a party. *See Ex parte Young,* 209 U.S. at 157. This infringes on the state's sovereign immunity. Indeed, Governor Kelly's presence as a defendant in this lawsuit is ultimately redundant. Any order of injunctive relief against the Agency Defendants is as effective—in fact, more effective—than an order against Governor Kelly.

The case of *D.G. ex rel. Strickline v. Henry,* 591 F. Supp. 2d 1186 (N.D. Ok. 2008), which Plaintiffs cite in their brief, reiterates this point. Like this case, *D.G.* involved a challenge to the administration of the Oklahoma foster care system, alleging constitutional and statutory violations. *Id.* at 1187-88. The *D.G.* plaintiffs sued the Governor, each of the members of the Oklahoma Commission for Human Services and the director of the Department of Human Services. The Oklahoma Governor moved to dismiss on Eleventh Amendment grounds. *Id.* at 1177.

As in this case, the Plaintiffs in *D.G.* pointed to the Governor's responsibility to enforce the laws of the state, the appointment power, the authority to call special legislative sessions, and the Governor's ultimate responsibility for the administration of the agencies. The Court agreed with the Governor that these general executive powers were not enough, finding that the lawsuit was an attack on the administration of the state's foster care system and that the Governor is in "no sense responsible for actually administering the foster care system." *Id.* at 1189. The Court added, "[t]o accept plaintiffs' view that the Governor is a proper defendant here simply because he is the head of the executive branch of Oklahoma would abrogate the Eleventh Amendment bar to suits against states. Applying this approach, the Governor would be subject to inclusion in any and all civil rights action for injunctive relief against state agencies and departments." *Id.* at 1190.

Because of the obvious parallels between *D.G.* and this lawsuit, Plaintiffs attempt to distinguish *D.G.* on its facts. Plaintiffs emphasize that, under Oklahoma law, the policy and rules for DHS are adopted by the OCHS, not the governor, placing another layer between the governor and the administration of the agency. While the *D.G.* Court did mention this split of power, Plaintiffs wholly exaggerate the importance of this distinction, which is meaningless in the context of the *Ex parte Young* analysis. Under Kansas' statutory framework, the agency Secretaries are charged with both the responsibility to develop policies and regulations of their agencies and to administer the agencies. *See, e.g.,* K.S.A. 39-708c(b) (DCF Secretary to determine policies, adopt rules and regulations); K.S.A. 39-1603(j) (KDADS Secretary to establish state policies for disbursement of funds); K.S.A. 39-1603(t) (KDADS Secretary to adopt rules and regulations); K.S.A. 75-7403(a) (KDHE Secretary has authority to establish policies, adopt rules and regulations). None of these powers are vested in the Governor. It does not matter if the power is split between two entities as is the case in Oklahoma, or rests in the hands of a single agency Secretary, like in Kansas. The determining factor is whether the government actor holds the power to implement the relief that the Plaintiffs are requesting. In *D.G.,* the key fact was that it was not the governor but "DHS and its director [who had] direct responsibility for administering the foster care system." 591 F. Supp. 2d at 1190. There is no significant difference here, where the Defendant Agencies—not the Governor—are vested with "the direct responsibility" to develop policies and regulations and administer the foster care system. Therefore, the Governor does not fall within the *Ex parte Young* exception to statutory immunity. *See* 591 F. Supp. 2d at 1191.

Finally, contrary to Plaintiffs' assertions, there is nothing unique about the power of the Kansas Governor that would limit Governor Kelly's sovereign immunity, as suggested in Plaintiff's Response. *See* [Doc. 96 at 14]. Plaintiffs argue that the "supreme power" vested by

Article I, Section 3 of the Kansas Constitution places increased responsibility in the office of the Governor for the enforcement of laws within the state which they argue reaches far beyond the powers discussed in other sovereign immunity cases.  First, this argument is implausible and unworkable, as it would effectively make the Governor a proper defendant in every lawsuit against a Kansas agency.  Second, this Court has already heard and summarily rejected an identical argument in *Day v. Sebelius*, 376 F. Supp. 2d 1022 (D. Kan. 2005).

In *Day,* which was discussed in the Governor's initial Memorandum [Doc. 80 at 8] the plaintiffs brought a suit to challenge a specific Kansas statute, K.S.A. 76-731a, allowing undocumented or illegal immigrants to pay in-state tuition at Kansas universities.  The Governor had no direct role in enforcing the statute and instead the *Day* plaintiffs relied on the Governor's Article I, Section 3 responsibility for the enforcement of state laws, just as Plaintiffs do here.  376 F. Supp. 2d at 1031.  The *Day* Court held that this general enforcement power is not sufficient to confer jurisdiction over the office of the Governor.  *Id.*

## C.   Governor Kelly Has Not Expressed an "Intention to Enforce" the Act in Question.

Although the *Ex parte Young* test requires that a government actor both hold the challenged statutory power *and* express an intention to enforce that power, the Plaintiffs argue that Governor Kelly's expressions of her willingness to exercise certain powers relating the foster care system necessarily subjects her to the Court's jurisdiction.  Again, Plaintiffs are reaching for dots that just do not connect under the law.

The case of *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014), which Plaintiffs rely on extensively, is a nice example of how the second prong of the *Ex parte Young* test can be applied to find subject matter jurisdiction.   *Kitchen* was a challenge by a same sex couple to state laws that prohibited same-sex marriage.  The *Kitchen* plaintiffs sued the Governor, the Attorney

General, and the county clerk for refusal to issue marriage certificates to same-sex couple applicants in light of federal decisions finding that the couples had a constitutional right to be married. *Id.*

The *Kitchen* Court considered whether the Utah Governor and the Attorney General could be sued under the *Ex parte Young* exception or whether they were immune from suit. Utah law vested the responsibility for issuing and recording marriage certificates with county clerks. *Id*. at 1201. The Governor and the Attorney General did not act to issue certificates; however, the officials had taken explicit positions in the litigation that they had "ample authority" to ensure that the county clerks comply with their directive and limit the issuance of marriage licenses only to man-woman couples. *Id*. at 1202. Moreover, the Governor had issued directives to other state agencies to ensure that they complied with the Governor's interpretation of the challenged laws. Collectively, the Governor and the Attorney General had supervisory authority over the clerks and had expressed a willingness to exercises that authority to implement the very policy (limiting certificates to same-sex couples) that the plaintiffs were challenging. *See id.* at 1203.

The *Kitchen* court found that there was a "requisite nexus" between the Governor and Attorney General's authority, their actions to exercise that authority, and the challenged law. *Id.* at 1204. Their actions "clearly have assisted or currently assist in giving effect to the law." *Id.* at 1204 (citing *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 828 (10th Cir. 2007)).

Although Plaintiffs rely on *Kitchen,* it is more helpful to the Governor's position because it highlights the fallacy of their argument. As compared to the clear narrative in *Kitchen,* where the Governor and the Attorney General admitted that they had authority and that they intended to exercise it to compel a certain interpretation of the state's laws, Plaintiffs here rely on a hodge podge of actions that Governor Kelly has allegedly taken with respect to the foster care system,

without establishing any nexus or cause and effect between any of these actions and the challenged law or Plaintiffs' alleged harm.  Governor Kelly's actions do not change the bottom line of her statutory authority.

As discussed earlier, to make this case Plaintiffs have submitted several non-authenticated news articles and press releases as "evidence" of the Governor's intent to effectively administer the foster care system herself.  Notwithstanding that these sound bites are taken out of context from inadmissible hearsay, the Plaintiffs are confusing the Governor's role as the Chief executive—speaking for the administration, setting priorities, and advocating policies and her personal interest in the welfare of Kansas children, including those in the foster care system, with an intent or threat to exercise or usurp control from the agencies who are responsible for the administration of these programs.  None of the "actions" that Plaintiffs allege amount to an intent to exercise control over the duties delegated to the Agency Secretaries by law or by otherwise contributing to the conduct over which Plaintiffs are suing the state

Plaintiffs argue (again through hearsay) that Governor Kelly's announcement of her intent to exercise her power under Article 1, Section 6 of the Kansas constitution to reorganize certain executive branch agencies brings her under the Court's jurisdiction.  Plaintiffs fail to articulate any nexus between a proposed future reorganization and the Constitutional harms that Plaintiffs are alleging in this case.  This connection cannot be identified because it simply does not exist.

Further, as explained in the Governor's initial Memorandum, the Governor's power to reorganize is limited.  [Doc. 80 at 5].  The Governor may suggest reorganization, but any plan must also be approved by the Legislature.  And while the Governor can propose reorganization of the Agencies' structure, she lacks the power to abolish or alter any of the powers that are vested in the Agency Secretaries by the Legislature.  Governor Kelly's suggested reorganization plan cannot

be viewed as an exercise of power over the administration of this program, let alone an exercise of power that has any relationship to Plaintiffs' alleged harm.

Finally, Plaintiffs take liberties with their hearsay sources to assert, again without admissible support, that Governor Kelly "personally froze" contracts with foster care vendors after taking office. [Doc. 96 at 22]. This narrative has been supplied by Plaintiffs' counsel and not by their inadmissible sources, which merely state that the Governor "announced" actions taken *by DCF* to review and cancel certain grants. *See* [Doc. 97 Woody Declaration, Ex. 5]. These sources do not supply pertinent information, such as who is the party to the contracts or which party issued the cancellations and certainly do not support the notion that the Governor unilaterally cancelled contracts between state agencies and private companies. These details were supplied by Plaintiffs' counsel's speculation, not the evidence.

## IV.    CONCLUSION

Plaintiffs' assessment that Governor Kelly holds power to single-handedly effect change is not based in fact and is not based in Kansas law. Even if the Governor of Kansas did hold such sweeping power, keeping the Governor in the lawsuit for the purpose of compelling the state to act in a certain way violates the strongest of public policies. The state government must be allowed to carry out its duties unhampered by judicial intervention except under the narrowest of circumstances.

It is apparent that the Plaintiffs did not add Governor Kelly to this lawsuit because the Governor holds the power to implement the relief they seek. They can get all the relief they seek, and all the relief this Court is able to grant, from the Agency Defendants. Because the Governor's presence in this case is unnecessary to the outcome, she appears to have been included in this lawsuit simply because of the media attention her presence garners. Forcing Governor Kelly to participate in a lawsuit where her presence is not required, and ultimately redundant, burdens her

office and detracts from her ability to serve the citizens of the State of Kansas, including the

Plaintiffs.  Because Governor Kelly is entitled to immunity under the Eleventh Amendment of the

United States Constitution, and because the people of Kansas elected her to focus on the many

pressing issues facing our state, she respectfully requests that this Court grant her motion and

dismiss her from this action.

Respectfully Submitted,

**LATHROP GPM LLP**

By:  _/s/ Jean Paul Bradshaw_
  Jean Paul Bradshaw II, KS Fed. #70010
  Brian Fries, KS #15889
  Grant A. Harse, KS #24666
  Reid K. Day, KS #28319
  2345 Grand Boulevard, Suite 2200
  Kansas City, Missouri 64108
  Telephone: (816) 292-2000
  Telecopier: (816) 292-2001
  jbradshaw@lathropGPM.com
  bfries@lathropGPM.com
  gharse@lathropGPM.com
  rday@lathropGPM.com

  Carrie E. Josserand, KS #18893
  LATHROP GPM LLP
  10851 Mastin Boulevard
  Building 82, Suite 1000
  Overland Park, Kansas 66210-1669
  Telephone: (913) 451-5100
  Telecopier: (913) 451-0875
  cjosserand@lathropGPM.com

**Attorneys for All Defendants**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 12, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Jean Paul Bradshaw
Jean Paul Bradshaw, an Attorney for
All Defendants