# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

M.B. and S.E., through their next friend
KATHARYN MCINTYRE, et al.,

          Plaintiffs,

v.

LAURA HOWARD, et al.,

          Defendants.

Case No. 18-CV-02617-DDC-GEB

## SETTLEMENT AGREEMENT

This Settlement Agreement has been executed on the dates set forth below but made effective as of the Date of Final Approval, by and between Plaintiffs **M.B.** and **S.E.** through their next friend Katharyn McIntyre, **R.M.** through his next friend Allan Hazlett, **C.A.** through his next friend Allan Hazlett, **E.B.** through his next friend Allan Hazlett, **J.P.** through her next friend Allan Hazlett, **Z.Z.** through her next friend Ashley Thorne, and **M.A.** through his next friend Ashley Thorne, for themselves and those similarly situated, by and through Plaintiffs' Counsel (collectively "Plaintiffs"), and Defendants Laura Howard, in her official capacity as Kansas Department for Children and Families ("DCF") Secretary, Laura Howard, in her official capacity as Kansas Department of Aging and Disability Services ("KDADS") Secretary, and Dr. Lee A. Norman, in his official capacity as Kansas Department of Health and Environment ("KDHE") Secretary, by and through Defendants' Counsel (collectively "Defendants"; Plaintiffs and Defendants collectively the "Parties"). This Settlement Agreement is conditioned on approval by the United States District Court for the District of Kansas in this action, as required by Rule 23 of the Federal Rules of Civil Procedure.

## RECITALS

WHEREAS, Plaintiffs filed this action ("the Litigation") (ECF 1 and 63) alleging ongoing federal statutory and constitutional violations and seeking prospective declaratory and injunctive relief concerning the Kansas Child Welfare System; and

WHEREAS, Defendants deny any violations of federal law in the Litigation; and

WHEREAS, since she was appointed, DCF Secretary Howard has made improvement in the Kansas foster care program a top priority; and

WHEREAS, this Agreement was approved by the Kansas State Finance Council on July 8, 2020;

WHEREAS, the Parties wish to amicably resolve this action in a way that addresses the concerns identified in the Litigation and benefits the children and families served by the Kansas Child Welfare System.

NOW, THEREFORE, in consideration of the execution of this Settlement Agreement and the mutual recitals and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SECTION 1: DEFINITIONS AND PRINCIPLES

### Part I: Definitions

1.1     "CFSR" shall mean the Child and Family Services Review Round 3.

1.2     "Class" shall mean the class, authorized by the terms of this Settlement Agreement and approved by the Court, to be certified under Fed. R. Civ. P. 23(a) and (b)(2) and defined as: all children who are now, or in the future will be, in the protective custody of DCF pursuant to Kan. Stat. Ann. § 38-2242(c)(1).

1.3     "Class Counsel" shall mean attorneys of record for Plaintiffs in the Litigation.

1.4     "Class Counsel Fees and Expenses" shall mean reasonable fees and expenses of Class Counsel in an amount determined to be reasonable by the Court.  The Court shall retain jurisdiction to make this determination.  Defendants stipulate that Class Counsel is entitled to Class Counsel Fees and Expenses but reserve the right to dispute the appropriate amount.

1.5     "Crisis Intervention Services" shall mean in-person on-site or virtual face-to-face mental health services provided to a person who is experiencing a behavioral health crisis, designed to interrupt and/or ameliorate a crisis experience.  These services include a preliminary assessment, which may be conducted over the phone to determine the appropriate level of intervention, immediate crisis resolution and de-escalation, crisis intervention and stabilization services, and timely referral and linkage to appropriate community services to avoid more restrictive levels of treatment, based on the individualized needs of the person experiencing the behavioral health crisis.

1.6     "Contract" or "Grant" shall mean any agreement between Defendant(s) and licensed private providers to provide foster care placements or services, including mental and behavioral health services, to Class Members.  This definition includes any agreement or arrangement under which funding is provided in exchange for the provision of foster care placements or services, regardless of its form.

1.7     "Contractor" or "Grantee" shall mean a licensed private provider with whom Defendant(s) contract or otherwise arrange to provide foster care placements or services, including mental and behavioral health services, to Class Members.  This definition applies to such a

provider regardless of the form of the agreement or arrangement under which funding is provided in exchange for the provision of foster care placements or services.

1.8    The "Date of Final Approval" shall mean the date upon which the Judgment and Order is entered by the Court.

1.9    "Defendants" shall mean the defendants in the Litigation (Laura Howard, in her official capacity as Secretary of DCF and KDADS, and Dr. Lee A. Norman, in his official capacity as Secretary of KDHE) and each such agency, and their officers, agents, and elected or appointed officials, past, present, and future.

1.10    "Extraordinary Circumstances" shall mean an immediate or imminent crisis whereby measures must be taken to protect the safety and security of the child.  A lack of safe and/or appropriate placement options does not constitute Extraordinary Circumstances.

1.11    "Initial Mental Health and Trauma Screen" shall mean the Child and Adolescent Functional Assessment Scale (attached hereto as Attachment 1 and available at www2.fasoutcomes.com), the Preschool and Early Childhood Functional Assessment Scale (attached hereto as Attachment 2 and also available at www2.fasoutcomes.com), the Child and Adolescent Needs and Strengths tool (attached hereto as Attachment 3 and available at praedfoundation.org), or their functional equivalents as agreed by the Parties.

1.12    "Judgment and Order" shall mean the Order of the United States District Court for the District of Kansas finally approving the Settlement Agreement.

1.13    The "Litigation" shall mean *M.B. and S.E. through their next friend Katharyn McIntyre, et al., v. Laura Howard, in her official capacity as Kansas DCF Secretary, et al.*, Case No. 18-CV-2617-DDC-GEB, pending in the United States District Court for the District of Kansas, Kansas City Division.

1.14    "Mediator" shall mean the following individual: Karen Baynes-Dunning.

1.15    "Neutral" shall mean the following individual: Judith Meltzer and the Center for the Study of Social Policy.

1.16    "Notice of Settlement" shall mean the notice to the Class in the form approved by the Court in this Litigation in an order granting Preliminary Approval of the Settlement Agreement, setting forth the nature and terms of the Settlement Agreement, the schedule and manner for filing any submissions in objection to or in favor of the Settlement Agreement and/or requests to be heard at the final fairness hearing, and the date, time, location and purpose of a final fairness hearing, and notifying the Class of Class Counsel's request for an award of Class Counsel Fees and Expenses.

1.17    "Night-to-Night Placement" shall mean a one calendar day placement that is not the same residence address for consecutive days.

1.18    "Placement Move" shall mean a change in foster care placement setting, as defined by the Adoption and Foster Care Analysis and Reporting System (AFCARS).

1.19    "Plaintiff Class" or "Class Members" shall mean each member of the Class certified by the Court.

1.20    "Preliminary Approval of the Settlement Agreement" shall mean an Order from the Court granting preliminary approval of the Settlement Agreement; approving the form, manner and timeframe for the publication of the Notice of Settlement (at Defendants' expense); setting forth the schedule and manner for filing any submissions in objection to or in favor of the Settlement Agreement and any requests to be heard at the final fairness hearing, and the Parties' response to any such submissions; the timing and process for Plaintiffs to file a motion for Class Counsel Fees and Expenses for work up through the Date of Final Approval (including opposition and reply briefs); and the date, time, location and purpose of a final fairness hearing.

1.21    A "Qualified Mental Health Professional" shall mean a physician or psychologist, a licensed masters level psychologist, a licensed clinical psychotherapist, a licensed marriage and family therapist, a licensed clinical marriage and family therapist, a licensed professional counselor, a licensed clinical professional counselor, a licensed specialist social worker or a licensed master social worker, or a registered nurse who has a specialty in psychiatric nursing.

1.22    "Released Claims" shall mean all claims for declarative and injunctive relief and causes of action asserted in the Amended Complaint arising or accruing against the Defendants on or before the Date of Final Approval, relating to the Plaintiff Class, activities involving the Plaintiff Class, and any duties, actions or inactions of the Defendants with respect thereto, which were asserted in the Litigation.

1.23    "Respite" shall mean the assumption of daily caregiving responsibilities on a temporary basis, designated as approved twenty-four (24) hour-a-day family-based care, to provide parents or other caregivers with temporary relief from their responsibilities to a child.  Such temporary care shall not be considered a Placement Move if it is requested by the child's current parent/caregiver, and the foster child returns to the same placement upon completion of the Respite care.  The Parties intend this definition to support placement stability and to avoid and deter serial, repeated Respite placements over a short time period.

1.24    "Short-Term Placement" shall mean a placement duration of fourteen (14) calendar days or fewer.

1.25    "Subcontract" shall mean any agreement between a Contractor or Grantee and another licensed private provider to provide foster care placements or services, including mental and behavioral health services, to Class Members.  This definition includes any agreement or arrangement under which funding is provided in exchange for the provision of foster care placements or services, regardless of its form.

1.26    "Subcontractor" shall mean a licensed private provider with whom a Contractor or Grantee contracts or otherwise arranges to provide foster care placements or services, including mental and behavioral health services, to Class Members.  This definition applies to such a provider regardless of the form of the agreement or arrangement under which funding is provided in exchange for the provision of foster care placements or services.

1.27 "Substantial Compliance" shall mean performance with respect to each of the enforceable obligations set forth in this Settlement Agreement in Section 2, that is sufficient to conclude that the specific obligation has been achieved. The Parties reserve the right to argue whether performance with respect to any specific obligation meets this standard.

1.28 The "Kansas Department for Children and Families" is referred to herein as "DCF."

1.29 The "Kansas Department for Aging and Disability Services" is referred to herein as "KDADS."

1.30 The "Kansas Department of Health and Environment" is referred to herein as "KDHE."

## Part II: Principles

1.31 The Agreement shall be governed by the following principles:

1.31.1 Providing community-based preventive and rehabilitative services, to safely avoid and prevent removal and out of home care if possible.

1.31.2 Providing the opportunity for all Class Members to grow up in a safe, nurturing family, preferably their own biological family or with kin.

1.31.3 Promoting and supporting biological family, kin, sibling, and community connections for Class Members.

1.31.4 Ensuring that all aspects of the child welfare system that serve Class Members are trauma-informed.

1.31.5 Recognizing the state's ultimate legal custodial responsibility for the safety and well-being of Class Members.

1.31.6 Promoting the least restrictive, most family-like, most connected and community-based setting possible to meet the needs of Class Members.

1.31.7 Promoting stability for Class Members, including in placements and in educational settings.

1.31.8 Ensuring that Class Members' physical, mental, and emotional needs are identified and met.

## SECTION 2: PERFORMANCE GOALS

### Part I: Accountability, Reporting and Implementation

2.1 With input from Plaintiffs and the Neutral, Defendants shall implement the following:

2.1.1   **Contract Oversight and Accountability.** Within thirty (30) days of entry of the Court's Judgment and Order, Defendants will amend provider grants for foster care case management to include a set of immediate mandates, with the Outcomes and Practice Improvements in Section 2, Parts II and III herein incorporated into the grant agreements. The requirements will address performance-based metrics and applicability of DCF discretionary corrective action for nonperformance or inadequate performance. DCF shall reasonably exercise discretion in taking corrective action.

2.1.2.   **Community Accountability Structure.** Within six (6) months of the entry of the Court's Judgment and Order, Defendants with input from Plaintiffs shall develop an independent advisory group to inform action planning and program improvement and to assist in implementation of this Settlement Agreement. The advisory group shall remain in place until the final termination of this Settlement Agreement. The structure shall include a statewide cross section of stakeholders and may include representation from existing advisory or planning groups for child welfare collaboration including family partners and youth with experience in care.

At least one-third of this group shall be stakeholders who are foster care providers, relative care providers, parents, or youth who are experiencing or have experienced alternative placements within their families. No more than 20% of the members of this group shall be employees of the state of Kansas. At least 50% of the professional members of this group shall be professionals directly working with and providing services to families, or direct supervisors of professionals directly working with and providing services to families.

If this advisory group makes written recommendations to Defendants, Defendants shall respond in writing to this group within thirty (30) days, commenting upon the recommendations and advising as to whether the recommendations will be accepted in whole or in part or will not be accepted.

2.1.3.   **Reporting.** In addition to the reporting requirements specified elsewhere herein, Defendants shall: (a) track and report for each twelve (12) month period, aligned with the four (4) one-year periods specified in Section 2.6, and every twelve (12) months thereafter until settlement termination, validated by the Neutral, all Class Members placed in a jail, correctional facility, detention facility, or other juvenile justice system placement, and the duration of time Class Members were or have been placed in such placements; and (b) track and report for each twelve (12) month period, aligned with the four (4) one-year periods specified in Section 2.6, and every twelve (12) months thereafter until settlement termination, validated by the Neutral, caseloads of all placement caseworkers and placement caseworker supervisors.

## Part II: Practice Improvements

2.2     Defendants shall achieve Substantial Compliance with the following Practice Improvements in Section 2.5 by no later than October 31, 2021.  The period of measurement for Substantial Compliance shall be from November 1, 2020 through October 31, 2021.

2.3     The Neutral shall review Defendants' performance data and information produced pursuant to Section 3.4 and shall validate that information as necessary to neutrally report on performance under each, consistent with the terms of this Settlement Agreement.  Defendants shall track and report timely, reliable, and valid data concerning the Practice Improvements outlined in this Section, in a manner and format determined with input from the Neutral and Plaintiffs.

2.4     Once a Practice Improvement is achieved based on agreement of the Parties or validation by the Neutral, Defendants must maintain Substantial Compliance for one successive twelve (12) month period.  Once Defendants have maintained Substantial Compliance for one successive twelve (12) month period for any of the Practice Improvements, all reporting and monitoring of that Practice Improvement will cease and that Practice Improvement is no longer enforceable under this Settlement Agreement.

2.5     **Practice Improvements.**

2.5.1   **Practice Improvement 1:**  DCF shall end the practice of utilizing any of the following to temporarily house or otherwise maintain Class Members overnight: (a) any public or private provider agency offices or annexes absent Extraordinary Circumstances; or (b) any non-child welfare housing or temporary accommodations, including but not limited to: (i) hotels or motels, (ii) other commercial non-foster care establishments, (iii) cars, (iv) retail establishments, and (v) unlicensed homes of DCF's or its Contractors', Grantees', or Subcontractors' employees.

2.5.2   **Practice Improvement 2:**  DCF shall ensure that no placement exceeds its licensed capacity without an approved exception pursuant to DCF's "Policy: Exception Requests for Foster Homes, 6/20/18, Rev. 10/21/2019" (attached hereto as Attachment 4).

2.5.3   **Practice Improvement 3:**  Defendants shall not delay authorization and provision of medically necessary mental health treatment services until placement stability is achieved or otherwise link access to medically necessary mental health treatment services with placement stability.

2.5.4   **Practice Improvement 4:**  Defendants shall ensure that Crisis Intervention Services are available to Class Members statewide.

2.5.5   **Practice Improvement 5:**  With the exception of (a) emergency care or placements if appropriately time-limited and utilized in true emergency situations and (b) placements deemed appropriate using Item 4 of the Round 3 CFSR Onsite Review Instrument and Instructions (Jan. 2016) (attached hereto as Attachment 5), DCF shall end the practice of Night-to-Night Placements of Class Members by the end of Period 1 and end the practice of Short-Term Placements of Class Members by the end of Period 3, as those periods are specified in Sections 2.6 and 2.9.  The

lack of safe and appropriate placement options cannot justify the use of emergency or Respite care. All Placement Moves, regardless of the reason, must be separately tracked and recorded.

## Part III: Outcomes

2.6     Defendants shall be in Substantial Compliance with the following Outcomes in Section 2.9, which will be phased in over three (3) or four (4) one-year periods as specified in Section 2.9, commencing January 1, 2021, January 1, 2022, January 1, 2023, and, if applicable, January 1, 2024. DCF is alternatively entitled to accelerate the due date on any of the Outcomes in a manner and format set forth and approved by the Neutral.

2.7     The Neutral shall review Defendants' performance data and information produced pursuant to Section 3.4 and shall validate that information as necessary to neutrally report on performance under each, consistent with the terms of this Settlement Agreement. Defendants shall track and report timely, reliable, and valid data concerning the Outcomes outlined in this section, in a manner and format determined with input from the Neutral and Plaintiffs.

2.8     Once a Final Outcome target is achieved based on agreement of the Parties or validation by the Neutral, Defendants must maintain Substantial Compliance for one successive twelve (12) month period. Once Defendants have maintained Substantial Compliance for one successive (12) month period for any of the Outcomes, all reporting and monitoring of that Outcome will cease and that Outcome is no longer enforceable under this Settlement Agreement.

2.9     **Outcomes.**

2.9.1   **Outcome 1**: As independently validated by the Neutral, all Class Members entering DCF custody in a twelve (12) month period shall have a rate of Placement Moves that does not exceed the specified number of moves per 1,000 days in care during their current episode. The rate shall be determined using the definitions and measurements utilized by the CFSR Round 3 Statewide Data Indicator for Placement Stability and its Syntax Revisions (attached hereto as Attachment 6).

> **Period 1 – 7 moves per 1,000 days in care**
> **Period 2 – 6 moves per 1,000 days in care**
> **Period 3 – 5 moves per 1,000 days in care**
> **Period 4 – Final Outcome - 4.44 moves per 1,000 days in care**

2.9.2   **Outcome 2**: At least the following percentages of a statistically significant, representative, random sample of all Class Members in DCF custody during a twelve (12) month period shall have had their mental and behavioral health needs addressed, calculated utilizing the definitions and measurements in Item 18 of the CFSR Onsite Review Instrument and Instructions (Jan. 2016) (attached hereto as Attachment 5). The sample shall be to a 90% confidence interval with a 5% margin of error. The sample selection process and review protocol shall be approved by the Neutral. The results shall be independently validated by the Neutral who will review up to 50% of the cases in the sample.

> **Period 1 – 80%**
> **Period 2 – 85%**
> **Period 3 – Final Outcome - 90%**

2.9.3   **Outcome 3:** At least the following percentages of a statistically significant, representative, random sample of all Class Members in DCF custody during a twelve (12) month period shall be in a placement setting that at the time of the review is stable, utilizing the definitions and measurements in Item 4 of CFSR Onsite Review Instrument and Instructions (Jan. 2016) (attached hereto as Attachment 5).  The sample shall be to a 90% confidence interval with a 5% margin of error.  The sample selection process and review protocol shall be approved by the Neutral.  The results shall be independently validated by the Neutral with the Neutral reviewing up to 50% of the cases in the sample.

> **Period 1 – 80%**
> **Period 2 – 85%**
> **Period 3 – Final Outcome - 90%**

2.9.4   **Outcome 4**: At least the following percentages of all Class Members in DCF custody at any point during the twelve (12) month reporting period shall have one (1) or fewer Placement Moves in the twelve (12) months immediately preceding the last date of that reporting period.  Moves shall be determined using the definitions and measurements utilized by the CFSR Round 3 Statewide Data Indicator for Placement Stability and its Syntax Revisions.  This measure shall include all children in the Class at any point during the twelve (12) month reporting period, whether or not they were still in the Class at the end of the reporting period.  The measure shall be the number of Placement Moves in the twelve (12) months immediately preceding the last date of the reporting period, i.e., only moves occurring during the reporting period will be considered for this measure.

> **Period 1 – 75%**
> **Period 2 – 80%**
> **Period 3 – 85%**
> **Period 4 - Final Outcome - 90%**

2.9.5   **Outcome 5**:  At least the following percentages of a statistically significant, representative, random sample of all Class Members entering DCF custody during a twelve (12) month period shall have received a timely Initial Mental Health and Trauma Screen within thirty (30) days upon each entry into the foster care system.  The Initial Mental Health and Trauma Screen shall be performed by a person who has been trained to reliably administer the Screen, and who is either a Qualified Mental Health Professional or a professional who holds a bachelor's degree in the field of human services or a related field, including but not limited to the following: Community Counseling, Human Development, Child and Family Development, Applied Family and Youth Studies, Public Health,

9

Health Sciences, Trauma Studies, Sociology/Social Services, Substance Abuse/Addictions, Education/Early Childhood, or Psychology. The sample shall be to a 90% confidence interval with a 5% margin of error. The sample selection process and review protocol shall be approved by the Neutral. The results shall be independently validated by the Neutral with the Neutral reviewing up to 50% of the cases in the sample.

**Period 1 – 80%**
**Period 2 – 85%**
**Period 3 – Final Outcome - 90%**

## SECTION 3: SUBSTANTIAL COMPLIANCE AND TERMINATION

3.1     Neutral.  The Parties agree that the Neutral will be Judith Meltzer and the Center for the Study of Social Policy or, if s/he is unable or unwilling to serve, the Parties agree to choose a mutually agreeable alternative Neutral, and if they are unable to agree on the Neutral to invoke the Dispute Resolution process in Section 4.  Neither Party shall have supervisory authority over the Neutral.  Defendants shall engage the Neutral at Defendants' expense.  Defendants will ensure the Neutral has access to the information and data and staff necessary to perform the responsibilities assigned to the Neutral in this Agreement, including direct remote access to Defendants' data systems.  The Parties shall have access to all information utilized by the Neutral consistent with the terms of this Settlement Agreement.  The Neutral shall be bound by the Protective Order governing this action, and all confidential information obtained by the Neutral shall be maintained as such by the Neutral consistent with federal and state law, and shall be returned to Defendants or destroyed upon final exit and termination of jurisdiction over this Settlement Agreement.  The Neutral may retain child welfare professionals solely for the purposes of satisfying his/her responsibilities under this Settlement Agreement.   Any child welfare professionals retained under this provision shall review and sign the Protective Order in this action.

3.2     The Neutral shall be permitted to communicate separately ex parte with all Parties and the Court.

3.3     The Neutral shall convene a confidential meeting of the Parties to discuss progress and performance at least quarterly during the first twelve (12) months following the Judgment and Order and then at least semiannually thereafter.

3.4     The Neutral shall produce reports to the Parties validating Defendants' performance on the obligations in Section 2 of this Settlement Agreement.  Within sixty (60) days of any obligation in Section 2 of this Settlement Agreement coming due, Defendants shall provide to the Neutral all data and other information necessary for the Neutral to validate performance and produce a report to the Parties on performance.  The Neutral's report validating Defendants' performance shall be produced to the Parties as soon as practicable.

3.5     The Neutral shall have continuing access to all data and other information necessary to validate performance on any outstanding obligation in Section 2 of this Settlement Agreement.

3.6     Subsequent to entry of the Judgment and Order, the Neutral shall provide the Parties with consolidated public performance reports on all outstanding obligations in Section 2 of this Settlement Agreement.  These public reports shall be provided on approximately an annual basis or more frequently as the Neutral may determine is efficient.

3.7     For any and all reports issued by the Neutral, the Neutral shall first provide the Parties with a draft report with an opportunity to allow the Parties to provide comments to the Neutral, which comments the Neutral must review and consider prior to finalizing the report.

3.8     If Defendants believe their performance on any obligation in Section 2, Parts II and III, of this Settlement Agreement warrants achievement, dismissal and termination from the Court's jurisdiction under this Settlement Agreement, the Parties shall first negotiate for fourteen (14) days to see if there is agreement to dismissal and termination with respect to the provision.  If there is agreement, the Parties shall promptly and jointly file a proposed Order dismissing and terminating the provision from the Settlement Agreement.  If there is no agreement, unless the Parties consent to extend negotiations, Defendants may trigger the Dispute Resolution process in Section 4.

3.9     With respect to each obligation in Section 2, Parts II and III, of this Settlement Agreement, if Defendants believe they have achieved Substantial Compliance with a "hit" or a "hold," Defendants may invoke Section 3.8.

3.10    Defendants may accelerate the due date for any of the Outcomes if Defendants believe they have achieved the final target for that Outcome.  If Defendants choose to accelerate the due date of the final target for any Outcome, the Neutral shall review and validate the performance for the most recent twelve (12) month period prior to Defendants' assertion of accelerated achievement of the Outcome.  Once the Neutral reports on validated performance for the accelerated final Outcome, and Defendants have achieved both the required "hit" and successive twelve (12) month "hold" period, Defendants may invoke Section 3.8.

3.11    The additional successive twelve (12) month "hold" period only applies to the Practice Improvements and final target Outcomes, not the interim targets.

3.12    Once Defendants have achieved both the "hit" and the "hold" for a Practice Improvement or a final target Outcome – either as agreed upon by the Parties or as determined by the Court – that Practice Improvement or Outcome is no longer enforceable under this Settlement Agreement.

3.13    Once Defendants have achieved termination and dismissal of all of Section 2, Parts II and III, of this Settlement Agreement, Defendants' obligations under this entire Settlement Agreement shall end, and the Parties will file a pleading with the Court requesting that the Court's continuing jurisdiction in the Litigation should be terminated.

## SECTION 4: DISPUTE RESOLUTION

4.1     Mediator.  The Parties agree that the Mediator will be Karen Baynes-Dunning or, if s/he is unable or unwilling to serve, the Parties agree to choose a mutually agreeable alternative Mediator, and if they are unable to agree, the Neutral shall select the Mediator.  Neither Party shall

have supervisory authority over the Mediator. The Parties shall engage the Mediator at Defendants' expense. The Parties shall have access to all information utilized by the Mediator consistent with the terms of this Settlement Agreement. The Mediator shall be bound by the Protective Order governing this action, and all confidential information obtained by the Mediator shall be maintained as such by the Mediator consistent with federal and state law, and shall be returned to Defendants or destroyed upon final exit and termination of jurisdiction over this Settlement Agreement.

4.2     Plaintiffs or Defendants shall invoke the provisions of this Dispute Resolution Section 4 with respect to any disputes pertaining to Substantial Compliance, exit, or any assertion of noncompliance under this Settlement Agreement by delivering written Notice of the dispute(s) or assertions of violation to the other Party and to the Mediator.

4.3     The Notice of dispute shall be accompanied by any written argument and any request for remedies.

4.4     The Parties shall proceed with a confidential mediation process, which shall include the engagement of the Mediator over a sixty (60) day period to arrive at a mutually agreed resolution of the dispute. The time period for confidential mediation may be extended on the consent of the Parties. The Neutral may participate in the confidential mediation process if the Parties agree. If the issue is not resolved within sixty (60) days or as extended on the consent of the Parties, the Party raising the dispute may bring a motion to the Court for enforcement and remedies under applicable federal law.

4.5     The Parties agree that any disputes brought to the Court pertaining to Substantial Compliance, exit, or any assertion of noncompliance, shall only be based on the information contained within the Neutral's validated reports, unless otherwise directed by the Court. The Court may call the Neutral as a witness. The Neutral shall not provide any legal opinions in any report or testimony.

4.6     The Court shall have and shall retain jurisdiction over any enforcement.

4.7     Class Counsel may bypass the sections above and seek immediate relief in Court if they clearly demonstrate that Defendant(s)' action or inaction in material contravention of this Settlement Agreement caused or is likely to cause an immediate and substantial risk of harm to Class Members and there is no time for negotiations. The Court shall have and shall retain jurisdiction over any enforcement under this section.

## SECTION 5: COURT APPROVAL AND DISMISSAL

5.1     As soon as practical after the execution of this Settlement Agreement, the Parties shall file a joint or unopposed motion seeking Preliminary Approval of the Settlement Agreement.

5.2     After the Order of Preliminary Approval is granted, and as instructed by the Court, in advance of the final fairness hearing the Parties shall submit a joint or unopposed motion for a Judgment and Order granting final approval of the Settlement Agreement. The Parties agree that the proposed Judgment and Order shall:

5.2.1   Grant final approval of the Settlement Agreement, without modification of its terms in any respect, unless the Parties have agreed to any modifications, as fair, reasonable, and adequate to the Plaintiff Class as provided in Federal Rule of Civil Procedure 23, and find that the Settlement Agreement resulted from extensive arm's length, good faith negotiations between the Parties through experienced counsel, with the assistance of an independent mediator and subject-matter expert.

5.2.2   Dismiss the Litigation with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2), after compliance with Federal Rule of Civil Procedure 23(e). The Order of dismissal will also comply with the requirements of Federal Rule of Civil Procedure 65(d)(1), and the Court will expressly incorporate the actual terms of this Settlement Agreement and make the Parties' compliance with the terms of this Settlement Agreement part of that dismissal order.

5.2.3   Find that each Class Member shall be deemed to have released the Released Claims against the Defendants.

5.2.4   Bar all Class Members from prosecuting, commencing, or continuing any of the Released Claims against the Defendants.

5.2.5   Include a finding that by agreeing to settle the Litigation, Defendants do not admit, and specifically deny, any and all liability in the Litigation.

5.2.6   Incorporate the entirety of the express terms of the Settlement Agreement and provide that the Court has and shall retain jurisdiction over its Judgment and Order for the purposes stated herein.

5.3     The proposed Judgment and Order may also propose that the Court rule on a motion for Class Counsel Fees and Expenses for work through the Date of Final Approval, or the Parties may propose that such motion be resolved in a separate Order.

## SECTION 6: MISCELLANEOUS

6.1     This Settlement Agreement shall be interpreted under applicable federal law.

6.2     This Settlement Agreement may be executed in counterparts.

6.3     All provisions in this Settlement Agreement are separately and independently enforceable, as set forth herein. Unless otherwise specifically stated in this Settlement Agreement all provisions shall apply to all Class Members.

6.4     If the Court does not grant final approval of the Settlement Agreement as set forth herein, it shall become null and void.

6.5     The obligations of Defendants set forth in this Settlement Agreement are binding whether they are performed, delivered, implemented or managed directly by the Defendant(s)' employees or by provider agencies under Contract, Grant, or Subcontract.

6.6     This Settlement Agreement shall be binding and enforceable against the Parties. For as long as the Settlement Agreement remains in effect, all provisions will be applicable to DCF, KDHE, KDADS, and their successors, and upon any changes to the current organizational structure of DCF, KDHE, or KDADS, will apply with full force and effect to any subsequent agency or agencies with any of the responsibilities of the current DCF, KDHE, and KDADS.

6.7     Each of the Parties to this Settlement Agreement shall use their best efforts to cause the Settlement Agreement to be given final approval.

6.8     This Settlement Agreement and its Attachments constitute the entire agreement between the Parties and no representations, warranties, or inducements have been made to any party concerning this Settlement Agreement other than the representations, warranties, and covenants contained in this Settlement Agreement. No amendment to this Settlement Agreement prior to the final Judgment and Order is effective unless in writing and signed by the Parties and approved by the Court. Subsequent to the final Judgment and Order, any modification of the Settlement Agreement or the final Judgment and Order shall be governed by federal law.

6.9     The Parties and their counsel have mutually contributed to the preparation of this Settlement Agreement. Accordingly, no provision shall be construed against any Party on the grounds that one of the Parties or their counsel drafted the provision.

6.10    The Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties.

6.11    Plaintiffs agree not to seek judicial relief for isolated, technical, or de minimis violations of this Agreement, or for violations relating solely to an individual child. Nothing in this Agreement is intended to prevent any state court with jurisdiction over an individual Class Member's case from issuing specific rulings in such an individual case.

6.12    The operative Stipulated Confidentiality and Protective Order ordered by the Court on February 8, 2019 (ECF 26) shall remain in full force and effect until the Court issues an Order granting final termination of jurisdiction over and exit from the Settlement Agreement and the final Judgment and Order. Any and all communications concerning the negotiation of the Settlement Agreement, including, but not limited to, its content or any details conveyed to or by either Party or the mediator during its negotiation, shall be confidential. However, nothing in this Settlement Agreement shall prohibit or restrict any Party or their representatives from publicly communicating the fact that the Parties are or have been engaged in communications regarding settlement without revealing specific details. The Parties acknowledge that the terms of the Settlement Agreement will be made public upon the filing of the settlement with the Court and that the Parties may comment on specific terms of the Settlement Agreement following its approval by the State Finance Council.

6.13    The Parties anticipate that the Settlement Agreement may be modified, upon the consent of the Parties and approval of the Court, in an ongoing effort to accelerate the successful

achievement of its obligations and final termination of jurisdiction over the Settlement and the final Judgment and Order.

  6.14 The Parties recognize that nothing in this Settlement Agreement obligates the Legislature to appropriate funds in connection with the implementation of this Settlement Agreement or to establish any new programs. Defendants shall make all reasonable efforts to provide funding and other resources necessary to implement and achieve the obligations under the Settlement Agreement, including making requests for State funds or seeking federal/special fund authorization. Defendants' failure to provide and/or Defendants' efforts to provide such adequate funding and resources will not excuse, or limit remedies to address, the failure to implement or achieve any of the obligations set forth in the Settlement Agreement.

  6.15 The undersigned each represents that he or she is fully authorized to execute this Settlement Agreement on behalf of the settling party for which he or she signs.

  IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement in several counterpart originals on the date set forth opposite their names.

## SIGNATURE PAGE

WHEREFORE, the Parties hereto signify their agreement to this Settlement Agreement and to all the terms herein by signing where indicated below.

FOR AND ON BEHALF OF PLAINTIFFS:

Dated: July 8, 2020

Teresa A. Woody
Larry R. Rute
Kansas Appleseed
211 E. 8th St. Ste D
Lawrence, KS 66044
twoody@kansasappleseed.org
larry@adrmediate.com

Loretta E. Burns-Bucklew
401 W. 89th Street
Kansas City, MO 64114
loribblawkc@gmail.com

Leecia Welch
Poonam Juneja
Freya Pitts
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
lwelch@youthlaw.org
pjuneja@youthlaw.org
fpitts@youthlaw.org

Ira Lustbader
Marissa C. Nardi
Jonathan M. King
Stephen A. Dixon
Children's Rights, Inc.
88 Pine Street, 8th Floor
New York, NY 10005
ilustbader@childrensrights.org
mnardi@childrensrights.org

16

jking@childrensrights.org
sdixon@childrensrights.org

Joshua Kane
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
joshua.kane@dlapiper.com

FOR AND ON BEHALF OF DEFENDANTS:

KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES

By: _Laura Howard_____

Title: Secretary Laura Howard_____

Dated: July 8, 2020_____

KANSAS DEPARTMENT OF AGING AND DISABILITY SERVICES

By: _Laura Howard_____

Title: Secretary Laura Howard_____

Dated: July 8, 2020_____

KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT

By: _Lee A. Norman md_____

Title: Secretary Dr. Lee A. Norman_____

Dated: July 8, 2020_____

COUNSEL FOR DEFENDANTS:

_Jill Paul Brown_____
LATHROP GPM LLP

Jean Paul Bradshaw II
Brian Fries
Grant A. Harse
Reid K. Day
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
jeanpaul.bradshaw@lathropgpm.com
brian.fries@lathropgpm.com
grant.harse@lathropgpm.com
reid.day@lathropgpm.com

Carrie E. Josserand
10851 Mastin Boulevard
Building 82, Suite 1000
Overland Park, Kansas 66210-1669
Telephone: (913) 451-5100
Telecopier: (913) 451-0875
carrie.josserand@lathropgpm.com

Corliss Scroggins Lawson
General Counsel
Kansas Department for Children and Families
555 S Kansas Avenue
Topeka KS  66603
Corliss.lawson@ks.gov

# ATTACHMENTS TO SETTLEMENT AGREEMENT

# ATTACHMENT 1

# CHILD AND ADOLESCENT FUNCTIONAL ASSESSMENT SCALE (CAFAS®)

Name _____   Child ID # _____   Sex: ☐ boy  ☐ girl

Today's Date _____/_____/_____   Admission Date _____/_____/_____   Date of Birth _____/_____/_____   Age _____
                                  *(optional)*

Agency/Site ID # ___/___/___/___/___/___/___/___   Rater ID# ___/___/___/___/___/___/___/___

*TIME PERIOD RATED FOR CAFAS:*
☐ Last Month   ☐ Last 3 Months   ☐ Other _____   Rater's Name (print) _____

*YOUTH'S PLACEMENT:*
☐ Family/Relative Home   ☐ Foster Home   ☐ Therapeutic Foster   ☐ Detention/Jail   ☐ Other Residential

*CAFAS ADMINISTRATION:*
☐ 1st Evaluation      ☐ 2nd Evaluation      ☐ 3 Months      ☐ 6 Months      ☐ 9 Months
☐ 12 Months           ☐ 15 Months           ☐ 18 Months     ☐ 21 Months     ☐ 24 Months
☐ Exit from Service   ☐ Change in Intensity of Service   ☐ Unknown   ☐ Other _____

**Rater Signature:** My signature certifies that I have endorsed specific CAFAS items which describe this child's behavior and which support the scores for each of the CAFAS subscales. This CAFAS form with endorsements is being retained in the case file.
Rater Signature: _____   Date: _____

**INSTRUCTIONS:** *Only persons who have established that they are reliable raters should rate the CAFAS®.* Reliability is established by using the CAFAS® Self-Training Manual. Be sure to rate the youth's most SEVERE level of dysfunction for the time period being rated. The CAFAS is designed as a measure of functional status and should not be used as the sole criterion for determining any clinical decision, including need or eligibility for services, intensity of services, or dangerousness to self or others. Note that a list of strengths/goals follows each scale. Each characteristic can be viewed as a strength (i.e., youth has the characteristic currently) or a goal (i.e., youth does not yet have the characteristic but it is a goal in the youth). You may circle as many strengths and goals as you like to assist in developing a treatment plan (see last two pages). These items are separate from the CAFAS and do not affect the scoring of the CAFAS. The rater should sign this form (see above).

## CAFAS SCORING SUMMARY

### SCALE SCORES FOR YOUTH'S FUNCTIONING

SCHOOL/WORK ROLE PERFORMANCE _____

HOME ROLE PERFORMANCE _____

COMMUNITY ROLE PERFORMANCE _____

BEHAVIOR TOWARD OTHERS _____

MOODS/EMOTIONS _____

SELF-HARMFUL BEHAVIOR _____

SUBSTANCE USE _____

THINKING _____

TOTAL FOR YOUTH based on 8 Scales _____

### SCALE SCORES FOR CAREGIVER'S RESOURCES

Primary _____   Other _____

MATERIAL NEEDS _____   _____

FAMILY/SOCIAL SUPPORT _____   _____

### RISK BEHAVIORS:

Youth's Functioning

☐ Has made a serious suicide attempt or is considered to be actively suicidal (119, 142-145) or possibly suicidal (146-148)
☐ Has been or may be harmful to others or self due to:
  ☐ Aggression:
    ☐ at School (3,4)      ☐ in the Community (68)
    ☐ at Home (43)        ☐ in Behavior in general (89)
  ☐ Sexual Behavior (69, 77, 90)
  ☐ Fire Setting (71, 78)
☐ Runaway Behavior (48, 54)
☐ Psychotic or Organic symptoms in the context of severe impairment (182-186)
☐ Severe Substance Use (154-164)

Caregiver Resourcefulness

☐ Youth's needs far exceed caregiver's resources (211-221 or 289-299)

Explanation: _____

### LEVELS OF OVERALL DYSFUNCTION BASED ON YOUTH'S TOTAL SCORE

| 8 Scale Sum | Description |
|---|---|
| 0-10 | Youth exhibits no noteworthy impairment |
| 20-40 | Youth likely can be treated on an outpatient basis, provided that risk behaviors are not present |
| 50-90 | Youth may need additional services beyond outpatient care |
| 100-130 | Youth likely needs care which is more intensive than outpatient and/or which includes multiple sources of supportive care |
| 140 & higher | Youth likely needs intensive treatment, the form of which would be shaped by the presence of risk factors and the resources available within the family and the community |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan 48105 (734) 769-9725; FAX: (734) 769-1434). No part of this work may be altered, copied, or distributed without the written permission of the copyright owner. Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.
x:\masters\documents\fas010\Sample for Trainings

**CAFAS PROFILE: YOUTH'S FUNCTIONING**

| Level of Impairment | School/Work Role Performance | Home Role Performance | Community Role Performance | Behavior Toward Others | Moods/Emotions | Self-Harmful Behavior | Substance Use | Thinking |
|---|---|---|---|---|---|---|---|---|
| SEVERE 30 | 1 2 3 4 5 6 7 8 9 10 11 | 41 42 43 44 45 46 47 48 49 50 | 66 67 68 69 70 71 72 | 88 89 90 91 92 | 116 117 118 119 120 | 142 143 144 145 | 154 155 156 157 158 159 160 161 162 163 164 | 182 183 184 185 186 |
| MODERATE 20 | 12 13 14 15 16 17 18 19 20 21 | 51 52 53 54 55 56 | 73 74 75 76 77 78 79 | 93 94 95 96 97 98 99 100 101 102 | 121 122 123 124 125 126 127 | 146 147 148 | 165 166 167 168 169 170 171 | 187 188 189 190 191 192 |
| MILD 10 | 22 23 24 25 26 27 | 57 58 59 60 61 | 80 81 82 83 | 103 104 105 106 107 108 109 110 | 128 129 130 131 132 133 134 135 | 149 150 | 172 173 174 175 | 193 194 195 196 197 |
| MINIMAL/NO 0 | 28 29 30 31 32 33 34 35 36 37 38 39 | 62 63 64 | 84 85 86 | 111 112 113 114 | 136 137 138 139 140 | 151 152 | 176 177 178 179 180 | 198 199 |
| COULD NOT SCORE | 40 | 65 | 87 | 115 | 141 | 153 | 181 | 200 |

SAMPLE

For each scale: (1) mark the item number(s) which correspond to those marked on the CAFAS form, (2) fill in the circle indicating severity level, (3) connect the circles.

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).   No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

Youth's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption of functioning*<br>(0) |
|---|---|---|---|---|
| **SCHOOL/WORK SUBSCALE**<br><br>Role Performance<br><br>☐ | 001 Out of school or job due to behavior that occurred at school or on job during the rating period (e.g., asked to leave or refuses to attend).<br><br>002 Expelled or equivalent from school due to behavior (e.g., multiple suspensions, removed from community school, placed in an alternative school).<br><br>003 Judged to be a threat to others because of aggressive potential (i.e., resulting from youth's actions or statements); monitoring or supervision needed.<br><br>004 Harmed or made serious threat to hurt a teacher/peer/co-worker/supervisor.<br><br>005 Unable to meet minimum requirements for behavior in classroom (either in specialized classroom or regular classroom with specialized services in public school or equivalent) without special accommodations.<br><br>006 Chronic truancy resulting in negative consequences (e.g., loss of course credit, failing courses or tests, parents notified).<br><br>007 Chronic absences, other than truancy, resulting in negative consequences (e.g., loss of course credit, failing courses or tests, parents notified).<br><br>008 Disruptive behavior, including poor attention or high activity level, persists despite the youth having been placed in a special learning environment or receiving a specialized program or treatment.<br><br>009 Failing all or most classes.<br><br>010 Dropped out of school and holds no job. | 012 Non-compliant behavior which results in persistent or repeated disruption of group functioning or becomes known to authority figures other than classroom teacher (e.g., principal) because of severity and/or chronicity.<br><br>013 Inappropriate behavior which results in persistent or repeated disruption of group functioning or becomes known to authority figures other than classroom teacher (e.g., principal) because of severity and/or chronicity.<br><br>014 Frequently truant (i.e., approximately once every two weeks or for several consecutive days).<br><br>015 Frequent absences from school (i.e., approximately once every two weeks or for several consecutive days) due to impairing behavior and excluding truancy or physical illness.<br><br>016 At work, missed days or tardiness results in reprimand or equivalent.<br><br>017 Disruptive behavior, including poor attention or high activity level, resulting in individualized program or specialized treatment being needed or implemented.<br><br>018 Receiving a reprimand, warning, or equivalent at work.<br><br>019 Grade average is lower than "C" and is not due to lack of ability or any physical disabilities.<br><br>020 Failing at least half of courses and this is not due to lack of ability or any physical disabilities. | 022 Non-compliant behavior results in teacher or immediate supervisor bringing attention to problems or structuring youth's activities so as to avoid predictable difficulties, more than other youth.<br><br>023 Inappropriate behavior results in teacher or immediate supervisor bringing attention to problems or structuring youth's activities so as to avoid predictable difficulties, more than other youth.<br><br>024 Occasionally disobeys school rules, with no harm to others or to property, more than other youth.<br><br>025 Problems in school, including behaviors related to poor attention or high activity level, are present but are not disruptive to the classroom (can be managed in the regular classroom, with the youth able to achieve satisfactorily).<br><br>026 School/work productivity is less than expected for abilities due to failure to execute assignments correctly, complete work, hand in work on time, etc. | 028 Reasonably comfortable and competent in relevant roles.<br><br>029 Minor problems satisfactorily resolved.<br><br>030 Functions satisfactorily even with distractions.<br><br>031 School grades are average or above.<br><br>032 Schoolwork is commensurate with ability and youth is mentally retarded.<br><br>033 Schoolwork is commensurate with ability and youth is learning disabled.<br><br>034 Schoolwork is commensurate with ability and youth is a slow learner.<br><br>035 Schoolwork is commensurate with ability and youth has a learning impairment due to maternal alcohol or drug use.<br><br>036 In a mostly vocational program and doing satisfactorily.<br><br>037 Graduated from high school or received GED.<br><br>038 Dropped out of school and is working at a job or is actively looking for a job. |
| | 011 EXCEPTION | 021 EXCEPTION | 027 EXCEPTION | 039 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 040 |

**Strengths(S)/Goals (G) for School/Work Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| S1 | G1 | Is permitted to attend school |
|---|---|---|
| S2 | G2 | Attends more days than not |
| S3 | G3 | Attends regularly |
| S4 | G4 | Likes going to school |
| S5 | G5 | Behavior at school is devoid of aggressive acts or threats |
| S6 | G6 | Sent to school disciplinarians infrequently |
| S7 | G7 | No incidents of being sent to school disciplinarians |
| S8 | G8 | Teacher in specialized classroom can manage behavior |
| S9 | G9 | Regular classroom teacher can manage behavior |
| S10 | G10 | Good behavior in classroom (not a problem) |
| S11 | G11 | Good behavior on the school bus |
| S12 | G12 | Gets along okay with teachers |
| S13 | G13 | Enjoys praise from teachers |
| S14 | G14 | Easily follows adult guidance |
| S15 | G15 | Benefits from assistance when problems arise |

| S16 | G16 | Completes schoolwork |
|---|---|---|
| S17 | G17 | School grades are average or above |
| S18 | G18 | Feels good about school work |
| S19 | G19 | Appreciates importance of learning academic skills |
| S20 | G20 | Likes to read |
| S21 | G21 | Can transition from one activity to another |
| S22 | G22 | Stays on task (appropriate to age) |
| S23 | G23 | Participates in after-school activities, clubs, or sports |
| S24 | G24 | Is enthusiastic about favorite activities |
| S25 | G25 | Graduated or received GED |
| S26 | G26 | Maintains steady employment |
| S27 | G27 | Satisfactory performance in job/vocation |
| S28 | G28 | For teenage parent, is continuing education |
| S29 | G29 | Other _____ |
| S30 | G30 | Other _____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan 48105 (734) 769-9725; FAX: (734) 769-1434). No part of this work may be altered, copied, or distributed without the written permission of the copyright owner. Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.     x:\masters\documnts\fas010\Sample for Trainings     Page 3

Youth's Name _____ ID# _____

| | Severe Impairment *Severe disruption or incapacitation* (30) | Moderate Impairment *Major or persistent disruption* (20) | Mild Impairment *Significant problems or distress* (10) | Minimal or No Impairment *No disruption of functioning* (0) |
|---|---|---|---|---|
| **HOME SUBSCALE**<br><br>Role Performance<br><br>(Home=place of residence; see Scoring Instructions.)<br><br>☐ | 041 Not in the home due to behavior that occurred in the home during the rating period.<br><br>042 Extensive management by others required in order to be maintained in the home.<br><br>043 Deliberate and serious threats of physical harm to household members.<br><br>044 Repeated acts of intimidation toward household members.<br><br>045 Behavior and activities are beyond caregiver's influence almost all of the time (i.e., serious and repeated violations of expectations and rules, such as curfew).<br><br>046 Behavior and activities have to be constantly monitored in order to ensure safety in the home.<br><br>047 Supervision of youth required, which does or would interfere with caregiver's ability to work or carry out other roles.<br><br>048 Run away from home overnight more than once, or once for an extended time, and whereabouts unknown to caregiver.<br><br>049 Deliberate and severe damage to property in the home (e.g., home structure, grounds, furnishings). | 051 Persistent failure to comply with reasonable rules and expectations within the home (e.g., bedtime, curfew); active defiance much of the time (OR, if youth is not in the home, youth fails to comply with rules and expectations unless close monitoring/supervision is maintained).<br><br>052 Frequent use of profane, vulgar, or curse words to household members.<br><br>053 Repeated irresponsible behavior in the home is potentially dangerous (e.g., leaves stove on).<br><br>054 Run away from home overnight and likely whereabouts are known to caregivers, such as friend's home.<br><br>055 Deliberate damage to the home. | 057 Frequently fails to comply with reasonable rules and expectations within the home.<br><br>058 Has to be "watched" or prodded in order to get him/her to do chores or comply with requests.<br><br>059 Frequently "balks" or resists routines, chores, or following instructions, but will comply if caregiver insists.<br><br>060 Frequently engages in behaviors which are intentionally frustrating or annoying to caregiver (e.g., taunting siblings, purposeful dawdling). | 062 Typically complies with reasonable rules and expectations within the home.<br><br>063 Minor problems satisfactorily resolved. |
| | 050 EXCEPTION | 056 EXCEPTION | 061 EXCEPTION | 064 EXCEPTION |
| | Explanation: | | COULD NOT SCORE: 065 | |

**Strengths(S)/Goals (G) for Home Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S31 | G31 | Behavior at home is devoid of aggressive acts or threats | S45 | G45 | Informs parents of activities ahead of time |
| S32 | G32 | Good behavior on home visits | S46 | G46 | Obeys curfew |
| S33 | G33 | Reacts non-impulsively over disagreements | S47 | G47 | Obeys rules routinely |
| S34 | G34 | Does not use profanity toward others in home | S48 | G48 | Night time routine (getting ready for bed) goes well |
| S35 | G35 | Respectful of property in the home | S49 | G49 | Manages changes and transitions satisfactorily |
| S36 | G36 | Can be managed in the home with assistance | S50 | G50 | Will help do household "chores" when asked |
| S37 | G37 | Can be managed in the home without assistance | S51 | G51 | Shares responsibilities within the home (e.g., caring for younger children, grandparents) |
| S38 | G38 | Safe behavior even without close supervision | | | |
| S39 | G39 | Acknowledges the need for parental supervision | S52 | G52 | Participates in family-oriented activities (gatherings, vacation, traditions) |
| S40 | G40 | Seeks help from caregiver when needed | | | |
| S41 | G41 | Willing to take help offered by caregiver | S53 | G53 | Takes pride in being able to do some activities independently |
| S42 | G42 | Accepts direction from caregiver | | | |
| S43 | G43 | Can be soothed and calmed when difficulties arise | S54 | G54 | Other_____ |
| S44 | G44 | Accepts consequences for undesirable behavior | S55 | G55 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan 48105 (734) 769-9725; FAX: (734) 769-1434). No part of this work may be altered, copied, or distributed without the written permission of the copyright owner. Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.

Youth's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption of functioning*<br>(0) |
|---|---|---|---|---|
| **COMMUNITY SUBSCALE**<br><br>Role Performance<br><br>☐ | 066  Confined related to behavior which seriously violated the law (e.g., stealing involving confrontation of a victim, auto theft, robbery, mugging, purse snatching, fraud, dealing or carrying drugs, break-ins, rape, murder, drive-by shooting, prostitution).<br><br>067  Substantial evidence of, or convicted of, serious violation of the law (e.g., stealing involving confrontation of a victim, auto theft, robbery, mugging, purse snatching, fraud, dealing or carrying drugs, break-ins, rape, murder, drive-by shooting, prostitution).<br><br>068  Involvement with the legal system or diversion to mental health or social services (for purpose of avoiding legal system) because of physically assaultive behavior or threatening with a weapon.<br><br>069  Involvement with the legal system or diversion to mental health or social services (for purpose of avoiding legal system) because of sexually assaultive behavior or inappropriate sexual behavior.<br><br>070  Deliberate and severe damage of property outside the home (e.g., school, cars, buildings).<br><br>071  Deliberate firesetting with malicious intent. | 073  Serious and/or repeated delinquent behavior (e.g., stealing without confronting a victim as in shoplifting, vandalism, defacing property, taking a car for a joyride).<br><br>074  On probation or under court supervision for an offense which occurred during the last 3 months.<br><br>075  On probation or under court supervision for an offense which occurred prior to the most recent 3 month period.<br><br>076  Currently at risk of confinement because of frequent or serious violations of the law.<br><br>077  Has been sexually inappropriate such that adults have concern about the welfare of other children who may be around the youth unsupervised.<br><br>078  Repeatedly and intentionally plays with fire such that damage to property or person could result. | 080  Minor legal violations (e.g., minor driving violations, unruly conduct such that complaint was made, trespassing onto neighbor's property, or harassing neighbor).<br><br>081  Single incidents (e.g., defacing property, vandalism, shoplifting).<br><br>082  Plays with fire (and child is aware of the dangers). | 084  Youth does not negatively impact on the community.<br><br>085  Typically able to resolve minor problems. |
| | 072 EXCEPTION | 079  EXCEPTION | 083  EXCEPTION | 086  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 087 |

**Strengths(S)/Goals (G) for Community Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S56 | G56 | No new arrests | S70 | G70 | Shows respect to others |
| S57 | G57 | No new illegal activity | S71 | G71 | Has supportive relationships (outside of family) |
| S58 | G58 | No sexually inappropriate behavior | S72 | G72 | Hangs out with prosocial peers |
| S59 | G59 | No incidents of firesetting | S73 | G73 | Is a member of a prosocial club |
| S60 | G60 | Doesn't carry weapons | S74 | G74 | Has leisure activities which are alternatives to antisocial behavior |
| S61 | G61 | Avoids gang activities | | | |
| S62 | G62 | Is trying to disengage from friends who get into trouble | S75 | G75 | Volunteers |
| S63 | G63 | Keeps out of trouble (i.e., is "street smart"). | S76 | G76 | Respectful of own cultural heritage/elders |
| S64 | G64 | Is motivated to stay out of trouble | S77 | G77 | Positively identifies with own cultural heritage |
| S65 | G65 | Is not known in community for troublesome behaviors | S78 | G78 | Participates in activities related to own cultural heritage |
| S66 | G66 | Fulfills responsibilities related to juvenile justice, court, etc. | S79 | G79 | Participates in religious/spiritual activities (e.g., attends church) |
| S67 | G67 | Accepts responsibility for misbehavior | | | |
| S68 | G68 | Follows established laws, rules | S80 | G80 | Other_____ |
| S69 | G69 | Genuinely acknowledges how own behavior has hurt or negatively impacted others | S81 | G81 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.                     x:\masters\documnts\fas010\Sample for Trainings                                                              Page 5

Youth's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption of functioning*<br>(0) |
|---|---|---|---|---|
| **BEHAVIOR TOWARD OTHERS**<br><br>☐ | 088  Behavior consistently bizarre or extremely odd.<br><br>089  Behavior so disruptive or dangerous that harm to others is likely (e.g., hurts or tries to hurt others, such as hitting, biting, throwing things at others, using or threatening to use a weapon or dangerous object).<br><br>090  Attempted or accomplished sexual assault or abuse of another person (e.g., used force, verbal threats, or, toward younger youth, intimidation or persuasion).<br><br>091  Deliberately and severely cruel to animals. | 093  Behavior frequently/ typically inappropriate and causes problems for self or others (e.g., fighting, belligerence, promiscuity).<br><br>094  Inappropriate sexual behavior in the presence of others or directed toward others.<br><br>095  Spiteful and/or vindictive (e.g., deliberately and persistently annoying to others, intentionally damaging personal belongings of others).<br><br>096  Poor judgment or impulsive behavior resulting in dangerous or risky activities that could lead to injury or getting into trouble, more than other youths.<br><br>097  Frequent display of anger toward others; angry outbursts.<br><br>098  Frequently mean to other people or animals.<br><br>099  Predominantly relates to others in an exploitative or manipulative manner (e.g., uses/ cons others).<br><br>100  Involved in gang-like activities in which others are harassed, bullied, intimidated, etc.<br><br>101  Persistent problems/ difficulties in relating to peers due to antagonizing behaviors (e.g., threatens, shoves). | 103  Unusually quarrelsome, argumentative, or annoying to others.<br><br>104  Poor judgment or impulsive behavior that is age-inappropriate and causes inconvenience to others.<br><br>105  Upset (e.g., temper tantrum) if cannot have or do something immediately, if frustrated, or if criticized.<br><br>106  Easily annoyed by others and responds more strongly than other children; quick-tempered.<br><br>107  Does not engage in typical peer recreational activities because of tendency to be ignored or rejected by peers.<br><br>108  Difficulties in peer interactions or in making friends due to negative behavior (e.g., teasing, ridiculing, picking on others).<br><br>109  Immature behavior leads to poor relations with same-age peers or to having friends who are predominantly younger. | 111  Relates satisfactorily to others.<br><br>112  Is able to establish and sustain a normal range of age-appropriate relationships.<br><br>113  Occasional disagreements are resolved reasonably. |
| | 092 EXCEPTION | 102 EXCEPTION | 110 EXCEPTION | 114 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 115 |

**Strengths(S)/Goals (G) for Behavior Toward Others Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S82 | G82 | Actively uses coping strategies to deal with difficult situations | S95 | G95 | Participates in positive peer activities (e.g., sports) |
| S83 | G83 | Is able to control impulses | S96 | G96 | Belongs to community clubs (e.g., scouts, drill corps, musical or dance groups, church fellowship) |
| S84 | G84 | Expresses anger through appropriate verbalizations or healthy physical outlets | S97 | G97 | Behaves appropriately in public places |
| | | | S98 | G98 | Is respectful to others |
| S85 | G85 | Can quickly "get back to normal" after difficulties have been "smoothed over" | S99 | G99 | Shows empathy towards others |
| | | | S100 | G100 | Is gentle and caring with animals |
| S86 | G86 | Asserts self in healthy ways | S101 | G101 | Has a good relationship with at least one caregiver |
| S87 | G87 | Is aware of problems related to social skills and is working on improving them | S102 | G102 | Feels loved by at least one adult caregiver/parent figure (e.g. grandmother, aunt) |
| S88 | G88 | Is motivated to have more/better friends | S103 | G103 | Has a good relationship with at least one sibling |
| S89 | G89 | Has good/close peer friendships which are age appropriate | S104 | G104 | Views home as nurturant/supportive |
| | | | S105 | G105 | For teenage parents, has responsible parenting behavior |
| S90 | G90 | Is friendly and outgoing | | | |
| S91 | G91 | Can be fun to be with (e.g., jokes, witty, sense of humor) | S106 | G106 | Responsible sexual behavior (e.g., abstains or is monogamous) |
| S92 | G92 | Plays well with other children | | | |
| S93 | G93 | Can play independently | S107 | G107 | Other_____ |
| S94 | G94 | Shares well with others | S108 | G108 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.

Youth's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>**(30)** | Moderate Impairment<br>*Major or persistent disruption*<br>**(20)** | Mild Impairment<br>*Significant problems or distress*<br>**(10)** | Minimal or No Impairment<br>*No disruption of functioning*<br>**(0)** |
|---|---|---|---|---|
| **MOODS/ EMOTIONS SUBSCALE**<br><br>(Emotions = anxiety, depression, moodiness, fear, worry, irritability, tenseness, panic, anhedonia)<br><br>☐ | 116  Viewed as odd or strange because emotional responses are incongruous (unreasonable, excessive) most of the time.<br><br>117  Fears, worries, or anxieties result in poor attendance at school (i.e., absent for at least one day per week on average) or marked social withdrawal (will not leave the home to visit with friends).<br><br>118  Depression is associated with academic incapacitation (i.e., absent at least one day a week on average, or if unable to attend school, does not do work ) or social incapacitation (i.e., isolates self from friends).<br><br>119  Depression is accompanied by suicidal intent (i.e., really wants to die). | 121  Marked changes in moods that are generally intense and abrupt.<br><br>122  Depressed mood or sadness is persistent (i.e., at least half of the time), with disturbance in functioning in at least one of the following areas:  sleeping, eating, concentration, energy level, or normal activities.  If only irritability or anhedonia (i.e., marked diminished interest or pleasure in typical activities) is present, there should be disturbance in two or more areas.<br><br>123  Youth worries excessively (i.e., out of proportion) and persistently (i.e., at least half of the time), with disturbance in functioning manifested by at least one of the following:  sleep problems, tiredness, poor concentration, irritability, muscle tension, or feeling "on edge."<br><br>124  Fears, worries, or anxieties result in the youth expressing marked distress upon being away from the home or parent figures; however, the youth is able to go to school or engage in some social activities.<br><br>125  School-age children require special accommodations because of worries or anxieties (e.g., sleeping near parents, calling home).<br><br>126  Emotional blunting (i.e., no or few signs of emotional expression; emotional expression is markedly flat). | 128  Often anxious, fearful, or sad, with some related symptom present (e.g., nightmares, stomachaches).<br><br>129  Disproportionate expression of irritability, fear, or worries.<br><br>130  Very self-critical, low self-esteem, feelings of worthlessness.<br><br>131  Easily distressed if makes mistakes.<br><br>132  Sad, withdrawn, hurt, or anxious if criticized.<br><br>133  Sad (or depressed or anhedonic) or anxious in at least one setting for up to a few days at a time.<br><br>134  Notable emotional restriction (e.g., has difficulty expressing strong emotions such as fear, hate, love). | 136  Feels normal distress, but daily life is not disrupted.<br><br>137  Considers self to be an "OK" person.<br><br>138  Can express strong emotions appropriately.<br><br>139  Experience of sadness and anxiety are age-appropriate. |
| | 120 EXCEPTION | 127  EXCEPTION | 135  EXCEPTION | 140  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 141 |

**Strengths(S)/Goals (G) for Moods/Emotions Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | |
|---|---|---|
| S109 | G109 | No suicidal wish or intent |
| S110 | G110 | Has self-awareness of emotional state/emotions |
| S111 | G111 | Shows a range of emotions (e.g., not flat affect) |
| S112 | G112 | Can express strong emotions appropriately |
| S113 | G113 | Emotional reactions are consistent with "provoking" circumstances |
| S114 | G114 | Is able to express emotional needs appropriately |
| S115 | G115 | Has healthy outlets for emotional feelings (consistent with culture) |
| S116 | G116 | Talks about concerns to determine if they are warranted |
| S117 | G117 | Talks with an adult or others to help keep emotional reactions reasonable |
| S118 | G118 | Uses "self-talk" to manage mood/anxiety |
| S119 | G119 | Uses distraction to manage mood/anxiety |
| S120 | G120 | Has an appropriate understanding of "blame"; does not blame self too much |
| S121 | G121 | Feels good about self |
| S122 | G122 | Has a positive self-perception |
| S123 | G123 | Self-nurturing |
| S124 | G124 | Has a good/pleasant temperament |
| S125 | G125 | Has fun, enjoys self |
| S126 | G126 | Attends school despite feelings |
| S127 | G127 | Participates in peer activities despite feelings |
| S128 | G128 | Shows interest in friends and activities |
| S129 | G129 | Can be away from caregivers without undue distress |
| S130 | G130 | Easily separates from caregiver when taken to school/daycare |
| S131 | G131 | Sleeps well at night |
| S132 | G132 | No somatic complaints |
| S133 | G133 | Other_____ |
| S134 | G134 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.           x:\masters\documnts\fas010\Sample for Trainings

Youth's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption of functioning*<br>(0) |
|---|---|---|---|---|
| **SELF-HARMFUL BEHAVIOR SUBSCALE**<br><br>☐ | 142  Non-accidental self-destructive behavior has resulted in or could result in serious self-injury or self-harm (e.g., suicide attempt with intent to die, self-starvation).<br><br>143  Seemingly non-intentional self-destructive behavior has resulted in or could likely result in serious self-injury (e.g., runs out in the path of a car, opens car door in moving vehicle), and youth is aware of the danger.<br><br>144  Has a clear plan to hurt self, or genuine desire to die. | 146  Non-accidental self-harm, mutilation, or injury which is not life-threatening but not trivial (e.g., suicidal gestures or behavior without intent to die, superficial razor cuts).<br><br>147  Talks or repeatedly thinks about harming self, killing self, or wanting to die. | 149  Repeated non-accidental behavior suggesting self-harm, yet the behavior is very unlikely to cause any serious injury (e.g., repeatedly pinching self or scratching skin with a dull object). | 151  Behavior is not indicative of tendencies toward self-harm. |
| | 145 EXCEPTION | 148 EXCEPTION | 150 EXCEPTION | 152 EXCEPTION |
| | Explanation: | | COULD NOT SCORE: 153 | |

**Strengths(S)/Goals (G) for Self-Harmful Behavior Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S135 | G135 | No self-destructive actions | S143 | G143 | Resists being abused |
| S136 | G136 | No self-destructive talk | S144 | G144 | Avoids being sexually exploited |
| S137 | G137 | No suspicious "accidents" | S145 | G145 | Practices safe sex (e.g., uses condom) or abstinence |
| S138 | G138 | Does not knowingly engage in dangerous behavior | S146 | G146 | Eats at regular intervals; intakes at least minimum daily calories |
| S139 | G139 | Seeks help if experiences self-destructive urges | S147 | G147 | Maintains adequate weight without supervision |
| S140 | G140 | Uses coping strategies other than self-harm (e.g., "tuning out") | S148 | G148 | Other_____ |
| S141 | G141 | Uses appropriate outlets (e.g., walks) | S149 | G149 | Other_____ |
| S142 | G142 | Respects his/her body (e.g., not cutting) | | | |

Copyright 2000 by Kay Hodges, Ph.D., and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.
x:\masters\documnts\fas010\Sample for Trainings
Page 8

Youth's Name _____   ID# _____

|  | Severe Impairment<br>*Severe disruption or incapacitation*<br>**(30)** | Moderate Impairment<br>*Major or persistent disruption*<br>**(20)** | Mild Impairment<br>*Significant problems or distress*<br>**(10)** | Minimal or No Impairment<br>*No disruption of functioning*<br>**(0)** |
|---|---|---|---|---|
| | THESE ITEMS APPLY TO YOUTH OF ALL AGES | | | |
| **SUBSTANCE USE**<br><br>(Substances = alcohol or drugs)<br><br>☐ | 154 Lifestyle centers on acquisition and use (e.g., preoccupied with thoughts or urges to use substances, cravings for substances, uses in the morning).<br><br>155 Dependent on continuing use to maintain functioning (e.g., likely to experience withdrawal symptoms such as feeling sick, headaches, nausea, vomiting, shaking, etc.).<br><br>156 Failing or expelled from school related to effects of usage.<br><br>157 Fired or losing job related to effects of usage.<br><br>158 Frequently intoxicated or high (e.g., more than two times a week).<br><br>159 Use of substances is associated with serious negative consequences (e.g., injured, in accident, doing illegal acts, failing classes, experiencing physical health problems).<br><br>160 Is pregnant or is a parent and is a drug user.<br><br>161 Is pregnant or is a parent and gets drunk or routinely uses alcohol.<br><br>162 Has blackouts, drinks alone, or cannot stop drinking once started. | 165 Uses in such a way as to interfere with functioning (e.g., job, school, driving) in spite of potential serious consequences (e.g., traffic violations, work or school absences or tardiness, misses out on activities, uses on school days or before work/school).<br><br>166 Getting into trouble is related to usage (e.g., argues, fights with family or friends, trouble with teachers, trouble with police, breaks rules, misses curfew).<br><br>167 Behavior potentially endangering self or others is related to usage (e.g., vulnerable to injury or date rape).<br><br>168 Friendships change to mostly substance users.<br><br>169 High or intoxicated once or twice a week. | 172 Infrequent excess and only without serious consequences.<br><br>173 Regular usage (e.g., once a week) but without intoxication or being obviously high.<br><br>SAMPLE | 176 No use of substances.<br><br>177 Substance use is denied; unable to confirm.<br><br>178 Has only "tried" them; does not use them.<br><br>179 Occasional use with no negative consequences. |
| | IF YOUTH IS **12** OR YOUNGER, USE THESE ADDITIONAL ITEMS | | | |
| | 163 For 12 years or younger, uses regularly (once a week or more). | 170 For 12 years or younger, occasional use without intoxication and without becoming obviously high. | 174 For 12 years or younger, has used substances more than once. | |
| | 164 EXCEPTION | 171 EXCEPTION | 175 EXCEPTION | 180 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 181 |

**Strengths(S)/Goals (G) for Substance Use Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S150 | G150 | Acknowledges substance use | S157 | G157 | No use of substances |
| S151 | G151 | Acknowledges the negative effects of substance use on own behavior | S158 | G158 | Perceives no need to use |
| S152 | G152 | Acknowledges that own substance use impacts others negatively | S159 | G159 | Is trying to disengage from friends who use (to develop non-using social network) |
| S153 | G153 | Has strategies for coping with factors that trigger | S160 | G160 | Friends don't use |
| S154 | G154 | Is participating in treatment for substance use | S161 | G161 | Intentionally selects friends who are non-users |
| S155 | G155 | Complies with requests for drug tests | S162 | G162 | Is involved in alternative pro-social activities |
| S156 | G156 | Occasional use without excess | S163 | G163 | Parents don't use and do educate youth about drugs |
| | | | S164 | G164 | Other_____ |
| | | | S165 | G165 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan 48105 (734) 769-9725; FAX; (734) 769-1434). No part of this work may be altered, copied, or distributed without the written permission of the copyright owner. Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.                    x:\masters\documents\fas010\Sample for Trainings                                                                                   Page 9

Youth's Name _____   ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption of functioning*<br>(0) |
|---|---|---|---|---|
| **THINKING**<br><br>☐ | CANNOT ATTEND A NORMAL SCHOOL CLASSROOM, DOES NOT HAVE NORMAL FRIENDSHIPS, AND CANNOT INTERACT ADEQUATELY IN THE COMMUNITY DUE TO ANY OF THE FOLLOWING:<br><br>182 Communications which are impossible or extremely difficult to understand due to incoherent thought or language (e.g., loosening of associations, flight of ideas).<br><br>183 Speech or nonverbal behavior is extremely odd and is noncommunicative (e.g., echolalia, idiosyncratic language).<br><br>184 Strange or bizarre behavior due to frequent and/or disruptive delusions or hallucinations; can't distinguish fantasy from reality.<br><br>185 Pattern of short-term memory loss/disorientation to time or place most of the time. | FREQUENT DIFFICULTY IN COMMUNICATION OR BEHAVIOR, OR SPECIALIZED SETTING OR SUPERVISION NEEDED DUE TO ANY OF THE FOLLOWING:<br><br>187 Communications do not "flow," are irrelevant, or disorganized (i.e., more than other children of the same age).<br><br>188 Frequent distortion of thinking (obsessions, suspicions).<br><br>189 Intermittent hallucinations that interfere with normal functioning.<br><br>190 Frequent, marked confusion or evidence of short term memory loss.<br><br>191 Preoccupying cognitions or fantasies with bizarre, odd, or gross themes. | OCCASIONAL DIFFICULTY IN COMMUNICATIONS, IN BEHAVIOR, OR IN INTERACTIONS WITH OTHERS DUE TO ANY OF THE FOLLOWING:<br><br>193 Eccentric or odd speech (e.g., impoverished, digressive, vague).<br><br>194 Thought distortions (e.g., obsessions, suspicions).<br><br>195 Expression of odd beliefs or, if older than eight years old, magical thinking.<br><br>196 Unusual perceptual experiences not qualifying as pathological hallucinations. | 198 Thought, as reflected by communication, is not disordered or eccentric. |
| | 186 EXCEPTION | 192 EXCEPTION | 197 EXCEPTION | 199 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 200 |

**Strengths(S)/Goals (G) for Thinking Subscale**
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S166 | G166 | Despite communication difficulties, tries to relate to others | S174 | G174 | Has good understanding of personal circumstances |
| S167 | G167 | Can communicate needs to others | S175 | G175 | Good problem solving ability |
| S168 | G168 | Can express self adequately and clearly | S176 | G176 | Thinks logically |
| S169 | G169 | Talks to others at an age-appropriate level | S177 | G177 | Can envision long-term goals |
| S170 | G170 | Tries to control inappropriate thoughts, feelings, and impulses | S178 | G178 | Behavior related to hygiene is age-appropriate |
| S171 | G171 | No hallucinations or delusions | S179 | G179 | Has age-appropriate self-care behaviors |
| S172 | G172 | Fantasies are "within normal limits" for age | S180 | G180 | Understands the need for medication |
| S173 | G173 | Understands that thoughts cannot directly cause events to happen | S181 | G181 | Other_____ |
| | | | S182 | G182 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan 48105 (734) 769-9725; FAX: (734) 769-1434). No part of this work may be altered, copied, or distributed without the written permission of the copyright owner. Unauthorized copying of this material is against the law and subject to civil and criminal penalties. CAFAS® is a registered trademark of Kay Hodges.

CAREGIVER BEING RATED:  PRIMARY FAMILY       Youth's Name _____       ID# _____

| Caregiver Being Rated | Relationship to Child | Informant | Youth Placement | Rater | Date | Adm # |
|---|---|---|---|---|---|---|

| CAREGIVER RESOURCES<br><br>Material Needs Subscale<br><br>☐ | **Severe Impairment**<br>*Severe disruption or incapacitation*<br>**(30)** | **Moderate Impairment**<br>*Major or persistent disruption*<br>**(20)** | **Mild Impairment**<br>*Significant problems or distress*<br>**(10)** | **Minimal or No Impairment**<br>*No disruption of functioning*<br>**(0)** |
|---|---|---|---|---|
| | 201  Youth's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of youth is likely. | 203  Frequent negative impact on youth's functioning OR a major disruption in the youth's functioning due to youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 205  Occasional negative impact on the youth's functioning due to the youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 207  Basic material needs are arranged for or adequately met so that there is no disruption in the youth's functioning.<br><br>208  Able to use community resources as needed. |
| | 202  EXCEPTION | 204  EXCEPTION | 206  EXCEPTION | 209  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 210 |

| CAREGIVER RESOURCES<br><br>Family/Social Support Subscale<br><br>☐ | 211  Sociofamilial setting is potentially dangerous to the youth due to lack of family resources required to meet the youth's needs/demands.<br><br>212  Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.).<br><br>213  Caregiver is frankly hostile, rejecting, or does not want youth to return to the home.<br><br>214  Youth is subjected to sexual abuse in the home by a caregiver.<br><br>215  Youth is subjected to physical abuse or neglect in the home by a caregiver.<br><br>216  Caregiver "kicks" youth out of the home, without trying to make other living arrangements.<br><br>217  Youth currently removed from the home due to sexual abuse, physical abuse, or neglect.<br><br>218  Failure of caregivers to provide an environment safe from possible abuse to a youth previously abused or traumatized.<br><br>219  Severe or frequent domestic violence takes place in the home.<br><br>220  Caregiver is openly involved in unlawful behavior or contributes to or approves of youth being involved in potentially unlawful behavior. | 222  Youth's developmental needs cannot be adequately met because youth's needs/developmental demands exceed family resources.<br><br>223  Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition).<br><br>224  Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.).<br><br>225  Family members are insensitive, angry and/or resentful to the youth.<br><br>226  Marked lack of parental supervision or consistency in care (e.g., frequently does not know whereabouts of youth; does not know youth's friends).<br><br>227  Failure of caregiver to provide emotional support to youth who has been traumatized or abused.<br><br>228  Domestic violence or serious threat of domestic violence, takes place in the youth's home. | 230  Family not able to provide adequate warmth, security or sensitivity relative to the youth's needs.  Support from other sources outside the immediate family are unable to compensate for this inadequacy.<br><br>231  Frequent family arguments and/or misunderstandings resulting in bad feelings.<br><br>232  Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity.<br><br>233  Family not able to provide adequate supervision, firmness, or consistency in care over time relative to the youth's needs; no other supports compensate for this deficit. | 235  Family is sufficiently warm, secure, and sensitive to the youth's major needs.<br><br>236  Parental supervision is adequate.<br><br>237  Even though there are temporary problems in providing adequate support to the youth, there is compensation from the wider social support system. |
|---|---|---|---|---|
| | 221  EXCEPTION | 229  EXCEPTION | 234  EXCEPTION | 238  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 239 |

**Strengths(S)/Goals (G) for Primary Family - See page 14**

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.          x:\masters\documnts\fas010\Sample for Trainings          Page 11

CAREGIVER BEING RATED:  NON-CUSTODIAL FAMILY OR PARENT NOT LIVING IN YOUTH'S HOME

Youth's Name _____  ID# _____

| Caregiver Being Rated | Relationship to Child | Informant | Youth Placement | Rater | Date | Adm # |

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>**(30)** | Moderate Impairment<br>*Major or persistent disruption*<br>**(20)** | Mild Impairment<br>*Significant problems or distress*<br>**(10)** | Minimal or No Impairment<br>*No disruption of functioning*<br>**(0)** |
|---|---|---|---|---|
| **CAREGIVER RESOURCES**<br><br>Material Needs Subscale<br><br>☐ | 240  Youth's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of youth is likely. | 242  Frequent negative impact on youth's functioning OR a major disruption in the youth's functioning due to youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 244  Occasional negative impact on the youth's functioning due to the youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 246  Basic material needs are arranged for or adequately met so that there is no disruption in the youth's functioning.<br><br>247  Able to use community resources as needed. |
| | 241  EXCEPTION | 243  EXCEPTION | 245  EXCEPTION | 248  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 249 |
| **CAREGIVER RESOURCES**<br><br>Family/Social Support Subscale<br><br>☐ | 250  Sociofamilial setting is potentially dangerous to the youth due to lack of family resources required to meet the youth's needs/demands.<br><br>251  Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.).<br><br>252  Caregiver is frankly hostile, rejecting, or does not want youth to return to the home.<br><br>253  Youth is subjected to sexual abuse in the home by a caregiver.<br><br>254  Youth is subjected to physical abuse or neglect in the home by a caregiver.<br><br>255  Caregiver "kicks" youth out of the home, without trying to make other living arrangements.<br><br>256  Youth currently removed from the home due to sexual abuse, physical abuse, or neglect.<br><br>257  Failure of caregivers to provide an environment safe from possible abuse to a youth previously abused or traumatized.<br><br>258  Severe or frequent domestic violence takes place in the home.<br><br>259  Caregiver is openly involved in unlawful behavior or contributes to or approves of youth being involved in potentially unlawful behavior. | 261  Youth's developmental needs cannot be adequately met because youth's needs/developmental demands exceed family resources.<br><br>262  Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition).<br><br>263  Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.).<br><br>264  Family members are insensitive, angry and/or resentful to the youth.<br><br>265  Marked lack of parental supervision or consistency in care (e.g., frequently does not know whereabouts of youth; does not know youth's friends).<br><br>266  Failure of caregiver to provide emotional support to youth who has been traumatized or abused.<br><br>267  Domestic violence, serious threat of domestic violence, takes place in the youth's home. | 269  Family not able to provide adequate warmth, security or sensitivity relative to the youth's needs.  Support from other sources outside the immediate family are unable to compensate for this inadequacy.<br><br>270  Frequent family arguments and/or misunderstandings resulting in bad feelings.<br><br>271  Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity.<br><br>272  Family not able to provide adequate supervision, firmness, or consistency in care over time relative to the youth's needs; no other supports compensate for this deficit. | 274  Family is sufficiently warm, secure, and sensitive to the youth's major needs.<br><br>275  Parental supervision is adequate.<br><br>276  Even though there are temporary problems in providing adequate support to the youth, there is compensation from the wider social support system. |
| | 260  EXCEPTION | 268  EXCEPTION | 273  EXCEPTION | 277  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 278 |

Strengths(S)/Goals (G) for Non-Custodial Family or Parent Not Living in Youth's Home - See page 14

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

CAREGIVER BEING RATED:  SURROGATE CAREGIVER

Youth's Name _____   ID# _____

| Caregiver Being Rated | Relationship to Child | Informant | Youth Placement | Rater | Date | Adm # |
|---|---|---|---|---|---|---|

| CAREGIVER RESOURCES | **Severe Impairment** *Severe disruption or incapacitation* **(30)** | **Moderate Impairment** *Major or persistent disruption* **(20)** | **Mild Impairment** *Significant problems or distress* **(10)** | **Minimal or No Impairment** *No disruption of functioning* **(0)** |
|---|---|---|---|---|
| Material Needs Subscale ▢ | 279  Youth's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of youth is likely. | 281  Frequent negative impact on youth's functioning OR a major disruption in the youth's functioning due to youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 283  Occasional negative impact on the youth's functioning due to the youth's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 285  Basic material needs are arranged for or adequately met so that there is no disruption in the youth's functioning.  286  Able to use community resources as needed. |
| | 280 EXCEPTION | 282  EXCEPTION | 284  EXCEPTION | 287  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 288 |

| CAREGIVER RESOURCES | | | | |
|---|---|---|---|---|
| Family/Social Support Subscale ▢ | 289  Sociofamilial setting is potentially dangerous to the youth due to lack of family resources required to meet the youth's needs/demands.  290  Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.).  291  Caregiver is frankly hostile, rejecting, or does not want youth to return to the home.  292  Youth is subjected to sexual abuse in the home by a caregiver.  293  Youth is subjected to physical abuse or neglect in the home by a caregiver.  294  Caregiver "kicks" youth out of the home, without trying to make other living arrangements.  295  Youth currently removed from the home due to sexual abuse, physical abuse, or neglect.  296  Failure of caregivers to provide an environment safe from possible abuse to a youth previously abused or traumatized.  297  Severe or frequent domestic violence takes place in the home.  298  Caregiver is openly involved in unlawful behavior or contributes to or approves of youth being involved in potentially unlawful behavior. | 300  Youth's developmental needs cannot be adequately met because youth's needs/developmental demands exceed family resources.  301  Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition).  302  Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.).  303  Family members are insensitive, angry and/or resentful to the youth.  304  Marked lack of parental supervision or consistency in care (e.g., frequently does not know whereabouts of youth; does not know youth's friends).  305  Failure of caregiver to provide emotional support to youth who has been traumatized or abused.  306  Domestic violence, or serious threat of domestic violence, takes place in the youth's home. | 308  Family not able to provide adequate warmth, security or sensitivity relative to the youth's needs.  Support from other sources outside the immediate family are unable to compensate for this inadequacy.  309  Frequent family arguments and/or misunderstandings resulting in bad feelings.  310  Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity.  311  Family not able to provide adequate supervision, firmness, or consistency in care over time relative to the youth's needs; no other supports compensate for this deficit. | 313  Family is sufficiently warm, secure, and sensitive to the youth's major needs.  314  Parental supervision is adequate.  315  Even though there are temporary problems in providing adequate support to the youth, there is compensation from the wider social support system. |
| | 299 EXCEPTION | 307  EXCEPTION | 312  EXCEPTION | 316  EXCEPTION |
| | Explanation: | | | COULD NOT SCORE:  317 |

**Strengths(S)/Goals (G) for Surrogate Caregiver - See page 14**

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

## Strengths(S)/Goals (G) for Primary Family
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S183 | G183 | Caregiver provides stable environment | S196 | G196 | Caregiver tries to minimize negative impact of other family members on youth (e.g., an abusing parent) |
| S184 | G184 | Caregiver adheres to a daily routine | | | |
| S185 | G185 | Caregiver is consistent and predictable in behavior toward youth | S197 | G197 | Caregiver is caring in the face of difficult behavior from youth |
| S186 | G186 | Caregiver arranges for appropriate supervision/care of child when working or away from youth | S198 | G198 | Caregiver exercises good control when provoked |
| | | | S199 | G199 | Caregiver models prosocial behavior and talk |
| S187 | G187 | Caregiver is aware of when he/she needs help | S200 | G200 | Caregiver models verbal problem solving skills |
| S188 | G188 | Caregiver seeks help when his/her problem solving skills break down | S201 | G201 | Caregiver communicates clearly |
| | | | S202 | G202 | Caregiver is clear about behavioral expectations/values |
| S189 | G189 | Caregiver seeks services for own concerns/problems | S203 | G203 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors |
| S190 | G190 | Substance using caregiver is seeking services to deal with his/her own substance use | S204 | G204 | Caregiver sets realistic and age-appropriate goals for youth |
| S191 | G191 | Caregiver cooperates with agencies providing services to youth | S205 | G205 | Caregiver encourages positive identification with cultural heritage |
| S192 | G192 | Caregiver provides nurturing/soothing/comforting home environment | S206 | G206 | Family eats dinner together |
| | | | S207 | G207 | Family talks about problems |
| S193 | G193 | Emotional support and physical protection is given to a youth previously abused | S208 | G208 | Youth has adults outside the family who provide direction and guidance |
| S194 | G194 | Domestic abuse does not takes place | S209 | G209 | Other_____ |
| S195 | G195 | Caregiver tries to minimize negative impact of their own limitations | S210 | G210 | Other_____ |

## Strengths(S)/Goals (G) for Non-Custodial Family or Parent Not Living in Youth's Home
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S211 | G211 | Caregiver provides stable environment | S224 | G224 | Caregiver tries to minimize negative impact of other family members on youth (e.g., an abusing parent) |
| S212 | G212 | Caregiver adheres to a daily routine | | | |
| S213 | G213 | Caregiver is consistent and predictable in behavior toward youth | S225 | G225 | Caregiver is caring in the face of difficult behavior from youth |
| S214 | G214 | Caregiver arranges for appropriate supervision/care of child when working or away from youth | S226 | G226 | Caregiver exercises good control when provoked |
| | | | S227 | G227 | Caregiver models prosocial behavior and talk |
| S215 | G215 | Caregiver is aware of when he/she needs help | S228 | G228 | Caregiver models verbal problem solving skills |
| S216 | G216 | Caregiver seeks help when his/her problem solving skills break down | S229 | G229 | Caregiver communicates clearly |
| | | | S230 | G230 | Caregiver is clear about behavioral expectations/values |
| S217 | G217 | Caregiver seeks services for own concerns/problems | S231 | G231 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors |
| S218 | G218 | Substance using caregiver is seeking services to deal with his/her own substance use | S232 | G232 | Caregiver sets realistic and age-appropriate goals for youth |
| S219 | G219 | Caregiver cooperates with agencies providing services to youth | S233 | G233 | Caregiver encourages positive identification with cultural heritage |
| S220 | G220 | Caregiver provides nurturing/soothing/comforting home environment | S234 | G234 | Family eats dinner together |
| | | | S235 | G235 | Family talks about problems |
| S221 | G221 | Emotional support and physical protection is given to a youth previously abused | S236 | G236 | Youth has adults outside the family who provide direction and guidance |
| S222 | G222 | Domestic abuse does not takes place | S237 | G237 | Other_____ |
| S223 | G223 | Caregiver tries to minimize negative impact of their own limitations | S238 | G238 | Other_____ |

## Strengths(S)/Goals (G) for Surrogate Caregiver
*(OPTIONAL: UNNECESSARY FOR CAFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S239 | G239 | Caregiver provides stable environment | S252 | G252 | Caregiver tries to minimize negative impact of other family members on youth (e.g., an abusing parent) |
| S240 | G240 | Caregiver adheres to a daily routine | | | |
| S241 | G241 | Caregiver is consistent and predictable in behavior toward youth | S253 | G253 | Caregiver is caring in the face of difficult behavior from youth |
| S242 | G242 | Caregiver arranges for appropriate supervision/care of child when working or away from youth | S254 | G254 | Caregiver exercises good control when provoked |
| | | | S255 | G255 | Caregiver models prosocial behavior and talk |
| S243 | G243 | Caregiver is aware of when he/she needs help | S256 | G256 | Caregiver models verbal problem solving skills |
| S244 | G244 | Caregiver seeks help when his/her problem solving skills break down | S257 | G257 | Caregiver communicates clearly |
| | | | S258 | G258 | Caregiver is clear about behavioral expectations/values |
| S245 | G245 | Caregiver seeks services for own concerns/problems | S259 | G259 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors |
| S246 | G246 | Substance using caregiver is seeking services to deal with his/her own substance use | S260 | G260 | Caregiver sets realistic and age-appropriate goals for youth |
| S247 | G247 | Caregiver cooperates with agencies providing services to youth | S261 | G261 | Caregiver encourages positive identification with cultural heritage |
| S248 | G248 | Caregiver provides nurturing/soothing/comforting home environment | S262 | G262 | Family eats dinner together |
| | | | S263 | G263 | Family talks about problems |
| S249 | G249 | Emotional support and physical protection is given to a youth previously abused | S264 | G264 | Youth has adults outside the family who provide direction and guidance |
| S250 | G250 | Domestic abuse does not takes place | S265 | G265 | Other_____ |
| S251 | G251 | Caregiver tries to minimize negative impact of their own limitations | S266 | G266 | Other_____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

### *OPTIONAL:* TREATMENT PLAN

INSTRUCTIONS:  Write in scale name.  For the PROBLEM(S), GOALS(S), and STRENGTH(S), provide the CAFAS item number and the item description.  For the PROBLEM(S), you may want to elaborate on the details (e.g., expelled for taking a butter knife to school on January 5, 1999).  Under PLAN, you can provide details for accomplishing the specified goal.

**Scale** _____

|  | Item #(s) | Description |
|---|---|---|
| Problems |  |  |
| Goals |  |  |
| Strengths |  |  |
| Plan |  |  |

**Scale** _____

|  | Item #(s) | Description |
|---|---|---|
| Problems |  |  |
| Goals |  |  |
| Strengths |  |  |
| Plan |  | SAMPLE |

**Scale** _____

|  | Item #(s) | Description |
|---|---|---|
| Problems |  |  |
| Goals |  |  |
| Strengths |  |  |
| Plan |  |  |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

**Scale**_____

| | Item #(s) | Description |
|---|---|---|
| Problems | | |
| Goals | | |
| Strengths | | |
| Plan | | |

**Scale**_____

| | Item #(s) | Description |
|---|---|---|
| Problems | | |
| Goals | | |
| Strengths | | |
| Plan | | SAMPLE |

**Scale**_____

| | Item #(s) | Description |
|---|---|---|
| Problems | | |
| Goals | | |
| Strengths | | |
| Plan | | |

| Date | Signature | Title |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Copyright 2000 by Kay Hodges, Ph.D. and distributed by Functional Assessment Systems, L.L.C. (2140 Old Earhart Road, Ann Arbor, Michigan  48105  (734) 769-9725; FAX:  (734) 769-1434).  No part of this work may be altered, copied, or distributed without the written permission of the copyright owner.  Unauthorized copying of this material is against the law and subject to civil and criminal penalties.  CAFAS® is a registered trademark of Kay Hodges.

# ATTACHMENT 2

## PECFAS: PRESCHOOL AND EARLY CHILDHOOD FUNCTIONAL ASSESSMENT SCALE

Name _____  Child ID # _____  Sex: ☐ boy  ☐ girl

Today's Date _____ / _____ /_____   Admission Date _____ / _____ / _____   Date of Birth ____ / ____ / ____   Age _____
*(optional)*

Agency/Site ID # ___ / ___ / ___ / ___ / ___ / ___ / ___ / ___   Rater ID# ___ / ___ / ___ / ___ / ___ / ___ / ___ / ___

*TIME PERIOD RATED:*
☐ Last Month
☐ Last 3 Months
☐ Other _____

*IN SCHOOL/DAYCARE:*
☐ Yes
☐ No

*SOURCES OF INFORMATION (check all that apply):*
*In-Person Contact with:*
☐ Parent
☐ Child
☐ School/Daycare Personnel
☐ Foster (or surrogate) Parent
☐ Juvenile Justice, Police
☐ Social Welfare (Services)
☐ Mental Health Worker
☐ Public Health Worker
☐ Other _____

*RATER:*
Name
☐ Case Manager (or team leader)
☐ Treating Therapist
☐ Intake Worker
☐ Non-Treating Clinician
☐ Lay Interviewer/Researcher
☐ Other _____

*Telephone Contact with:*
☐ Parent
☐ Child
☐ School/Daycare Personnel
☐ Foster (or surrogate) Parent
☐ Juvenile Justice, Police
☐ Social Welfare (Services)
☐ Mental Health Worker
☐ Public Health Worker
☐ Other _____

*ASSESSMENT:*
☐ Intake/Screening
☐ 3 mo  ☐ 15 mo
☐ 6 mo  ☐ 18 mo
☐ 9 mo  ☐ 21 mo
☐ 12 mo  ☐ 24 mo
☐ Exit from Services
☐ Change in Intensity of Service
☐ Other _____

*Review of Documents:*
☐ School/Daycare
☐ Juvenile Justice, Police
☐ Social Welfare (Services)
☐ Mental Health
☐ Public Health
☐ Other _____

*CHILD'S LIVING ARRANGEMENT and/or
RESIDENTIAL PLACEMENT (check all that apply):*
☐ Family Home (with parent or legal guardian)
☐ Private Home with Other Relatives
☐ Private Home with Non-Relatives
☐ Out of Home
☐ Regular Foster Care
☐ Therapeutic Foster Care
☐ Group Home
☐ Psychiatric Group Home
☐ Psychiatric Inpatient
☐ Residential Treatment Center
☐ Drug and/or Alcohol Program
☐ Juvenile Detention/Jail/Correctional
☐ Youth Crisis Residential
☐ Other Residential Setting _____
☐ Other _____
☐ Unknown _____

**Rater Signature:** My signature certifies that I have endorsed specific PECFAS items which describe this child's behavior and which support the scores for each of the PECFAS subscales. This PECFAS form with endorsements is being retained in the case file.
Rater Signature: _____   Date: _____

**INSTRUCTIONS:** *Only persons who have established that they are reliable raters should rate the PECFAS*. Be sure to rate the child's most *SEVERE* level of dysfunction for the time period being rated. The PECFAS is designed as a measure of functional status and should not be used as the sole criterion for determining any clinical decision, including need or eligibility for services, intensity of services, or dangerousness to self or others. Note that a list of strengths/goals follows each scale. Each characteristic can be viewed as a strength (i.e., child has the characteristic currently) or a goal (i.e., child does not yet have the characteristic but it is a goal in the child's individualized service plan). You may circle as many strengths and goals as you like to assist in developing a treatment plan. These items are separate from the PECFAS and do not affect the scoring of the PECFAS. The rater should sign this form (see above).

## PECFAS SCORING SUMMARY

### SCALE SCORES FOR CHILD'S FUNCTIONING

SCHOOL/DAYCARE ROLE PERFORMANCE _____

HOME ROLE PERFORMANCE _____

COMMUNITY ROLE PERFORMANCE _____

BEHAVIOR TOWARD OTHERS _____

MOODS/EMOTIONS _____

SELF-HARMFUL BEHAVIOR _____

THINKING/COMMUNICATION _____

TOTAL FOR CHILD based on 7 Scales _____

### SCALE SCORES FOR CAREGIVER'S RESOURCES

Primary _____   Other _____

MATERIAL NEEDS _____  _____

FAMILY/SOCIAL SUPPORT _____  _____

**RISK BEHAVIORS:**

Child's Functioning

☐ Has made a serious suicide attempt or is considered to be actively suicidal (118, 150-153) or possibly suicidal (154-156)

☐ Has been or may be harmful to others or self due to:
☐ Aggression:
☐ at School (3,4)  ☐ in the Community (63)
☐ at Home (33)  ☐ in Behavior in general (81)
☐ Sexual Behavior (62, 69, 82)
☐ Fire Setting (65, 70)

☐ Runaway Behavior (36)

☐ Psychotic or Organic symptoms in the context of severe impairment (162-169)

Caregiver Resourcefulness

☐ Child's needs far exceed caregiver's resources (195-205 or 234-244)

Explanation: _____

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.      Form FAS115      Rev. 6.09

PECFAS PROFILE: CHILD'S FUNCTIONING

Child's Name _____   ID# _____   Rater _____   Date __/__/__   Site _____

| Level of Impairment | School/Daycare Role Performance | Home Role Performance | Community Role Performance | Behavior Toward Others | Moods/ Emotions | Self-Harmful Behavior | Thinking/ Communication |
|---|---|---|---|---|---|---|---|
| SEVERE 30 | 1 2 3 4 5 6 7 8 9 ○ | 31 32 33 34 35 36 37 38 ○ | 59 60 61 62 63 64 65 66 ○ | 80 81 82 83 84 85 ○ | 114 115 116 117 118 119 120 121 122 ○ | 150 151 152 153 ○ | 162 163 164 165 166 167 168 169 ○ |
| MODERATE 20 | 10 11 12 13 14 15 16 ○ | 39 40 41 42 43 44 45 ○ | 67 68 69 70 71 ○ | 86 87 88 89 90 91 92 93 94 ○ | 123 124 125 126 127 128 129 130 ○ | 154 155 156 ○ | 170 171 172 173 174 175 176 ○ |
| MILD 10 | 17 18 19 20 21 22 ○ | 46 47 48 49 50 51 52 53 ○ | 72 73 74 75 ○ | 95 96 97 98 99 100 101 102 103 104 105 106 107 108 ○ | 131 132 133 134 135 136 137 138 139 140 141 ○ | 157 158 ○ | 177 178 179 180 181 ○ |
| MINIMAL/NO 0 | 23 24 25 26 27 28 29 ○ | 54 55 56 57 ○ | 76 77 78 ○ | 109 110 111 112 ○ | 142 143 144 145 146 147 148 ○ | 159 160 ○ | 182 183 ○ |
| COULD NOT SCORE | 30 ○ | 58 ○ | 79 ○ | 113 ○ | 149 ○ | 161 ○ | 184 ○ |

Sample

For each scale: (1) mark the item number(s) which correspond to those marked on the PECFAS form. (2) fill in the circle indicating severity level. (3) connect the circles.

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.   Form FAS115   Rev. 6.09   2

Child's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption in functioning*<br>(0) |
|---|---|---|---|---|
| **SCHOOL/ DAYCARE**<br><br>Role Performance<br><br>☐ | 001  Asked to leave school/ daycare program due to behavior in school/daycare occurring during the rating period.<br><br>002  Refuses to attend school/ daycare program or has excessive absences.<br><br>003  Child viewed as potentially harmful to others because of child's actions or statements.<br><br>004  Harmed or made threat to hurt a teacher/peer/staff.<br><br>005  Unable to meet even minimum requirements for behavior in group settings in school/daycare.<br><br>006  Disruptive behavior (including poor attention or high activity level) persists despite special accommodations at school/daycare (e.g., special program, classroom or school).<br><br>007  Learning is notably below other children (i.e., at least one year behind), related to poor attention or high activity level, with the situation persisting despite special accommodations at school/daycare.<br><br>008  Learning is markedly below other children (i.e., at least one year behind), and is not due to an established learning problem (e.g., mental retardation). | 010  Disobedience which results in repeated disruption to other children's activities or becomes known to supervisory staff because of severity and/or chronicity.<br><br>011  Inappropriate behavior resulting in disruption to others or becoming known to supervisory staff.<br><br>012  Frequently misses school/ daycare secondary to behavioral/ emotional problems (i.e., approximately once every two weeks or for several consecutive days).<br><br>013  Behavior is disruptive to the activities of other children and special accommodations are recommended or implemented (includes behavior due to poor attention or high activity level).<br><br>014  Does not achieve satisfactorily due to poor attention or high activity level; special accommodations are needed or implemented.<br><br>015  Learning is below average and is not due to an established learning problem (e.g., mental retardation). | 017  Disobedience results in staff frequently bringing attention to problems or structuring child's activities so as to avoid predictable difficulties.<br><br>018  Inappropriate behavior results in staff frequently bringing attention to problems or structuring child's activities so as to avoid predictable difficulties.<br><br>019  Occasionally disobeys school/daycare rules, with no harm to others or to property.<br><br>020  Problems in school/ daycare with poor attention or high activity level are present but are not disruptive to other children's activities (can be managed O.K., with the child able to achieve satisfactorily).<br><br>021  Fails to listen, to follow instructions or routines, or to do activities/tasks. | 023  Reasonably comfortable and competent at school.<br><br>024  Minor problems satisfactorily resolved.<br><br>025  Learning is average or above.<br><br>026  Learning is commensurate with ability and child is mentally retarded.<br><br>027  Learning is commensurate with ability and child has a known handicap (e.g., vision, hearing, speech, physical, etc.).<br><br>028  Behaves age-appropriately even though there are occasional temporary regressions due to the child's developmental stage or specific family circumstances. |
| | 009 EXCEPTION | 016 EXCEPTION | 022 EXCEPTION | 029 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 030 |

Sample

Comments:

**Strengths(S)/Goals (G) for School/Daycare Scale**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| S1 | G1 | Is permitted to attend school/daycare | S11 | G11 | Benefits from assistance when problems arise |
|---|---|---|---|---|---|
| S2 | G2 | Attends school/daycare regularly | S12 | G12 | Learning skills appropriate to age level |
| S3 | G3 | Likes going to school/daycare | S13 | G13 | Stays on task (appropriate to age) |
| S4 | G4 | Behavior at school is devoid of aggressive acts or threats | S14 | G14 | Feels good about performance in learning activities |
| S5 | G5 | Good behavior in classroom (not a problem) | S15 | G15 | Can transition from one activity to another |
| S6 | G6 | Teacher in specialized classroom can manage behavior | S16 | G16 | Is enthusiastic about favorite activities |
| S7 | G7 | Regular classroom teacher can manage behavior | S17 | G17 | Actively participates in learning activities |
| S8 | G8 | Gets along okay with teachers | S18 | G18 | Likes to read or to be read to |
| S9 | G9 | Enjoys praise from teachers | S19 | G19 | Takes nap or rest as expected |
| S10 | G10 | Easily follows adult guidance | S20 | G20 | Other _____ |

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.        Form FAS115                   Rev. 6.09                                                                                    3

Child's Name _____   ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption in functioning*<br>(0) |
|---|---|---|---|---|
| HOME<br><br>Role Performance<br><br>☐ | 031 Child was placed outside of the home due to child's unmanageable or dangerous behavior in the home which occurred during the rating period.<br><br>032 Extensive management by others required in order for child to be maintained in the home.<br><br>033 High degree of supervision needed due to potentially dangerous behavior (e.g., head-banging, tries to hurt younger children, "plays" with electricity).<br><br>034 Child's behavior, while not necessarily dangerous, demands constant attention, and efforts to reduce the behavior have not been successful (e.g., destroys things, wanders away, extreme temper tantrums, screaming, crying).<br><br>035 Constantly clings to caregiver to the extent that caregiver's ability to work or carry out other roles is interfered with.<br><br>036 Leaves home with the intent to "run away."<br><br>037 At mealtimes, does not eat or refuses to eat so that child has to be fed. | 039 Persistently uncooperative or disobedient, which interferes with doing routine care tasks for the child (e.g., getting dressed, taking a bath, brushing teeth, age-appropriate bowel and urine habits).<br><br>040 Persistently fails to do as told or to follow instructions.<br><br>041 Persistently refuses to carry out age-appropriate expectations (e.g., pick up toys, put things away).<br><br>042 Behavior is often adequate but there are periods, lasting several days, in which child is markedly disobedient or uncooperative.<br><br>043 Behavior is consistently demanding (i.e, child always on the go, child reacts very strongly if something happens that he/she does not like or if frustrated).<br><br>044 At mealtimes, does not eat or does not want to eat so that child has to be coaxed. | 046 Frequently (but not always) won't follow reasonable rules and expectations within the home (e.g., going to bed on time), more than other children the same age.<br><br>047 Has to be "watched" or prodded in order to get him/her to do chores or comply with requests.<br><br>048 Often engages in behaviors which are frustrating to caregiver (e.g., purposeful dawdling, follows caregiver around).<br><br>049 Insists that caregiver do things for him/her that the child could do without help.<br><br>050 "Balks" or resists routines or taking instruction, but will comply if caregiver insists.<br><br>051 Upset if an adult is not paying attention or interacting with him/her.<br><br>052 Very finicky eater. | 054 Typically cooperative in following reasonable rules and expectations within the home.<br><br>055 Minor problems satisfactorily resolved.<br><br>056 Behaves age-appropriately even though there are occasional temporary regressions due to the child's developmental stage or specific family circumstances. |
| | 038 EXCEPTION | 045 EXCEPTION | 053 EXCEPTION | 057 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 058 |

Comments:

*Sample*

Strengths(S)/Goals (G) for Home Scale
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S21 | G21 | Behavior at home is devoid of aggressive acts or threats | S33 | G33 | Obeys rules routinely |
| S22 | G22 | Does not use profanity toward others in home | S34 | G34 | Will accept routines (e.g., around bedtime, meals) |
| S23 | G23 | Respectful of property in the home | S35 | G35 | Night time routine (getting ready for bed) goes well |
| S24 | G24 | Can be managed in the home with assistance | S36 | G36 | Easily relaxes and goes to sleep for nap or at night |
| S25 | G25 | Can be managed in the home without assistance | S37 | G37 | Can be soothed and calmed when difficulties arise |
| S26 | G26 | Safe behavior even without close supervision | S38 | G38 | Has a good appetite |
| S27 | G27 | Accepts consequences for undesirable behavior | S39 | G39 | Participates in family activities |
| S28 | G28 | Reacts non-impulsively over disagreements | S40 | G40 | Manages changes and transitions satisfactorily |
| S29 | G29 | Seeks help from caregiver when needed | S41 | G41 | Takes pride in being able to do some activities independently |
| S30 | G30 | Willing to take help offered by caregiver | S42 | G42 | Good behavior on home visits |
| S31 | G31 | Accepts direction from caregiver | S43 | G43 | Other_____ |
| S32 | G32 | Will help do household "chores" when asked | | | |

PECFAS™ Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: hodges@provide.net. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.          Form FAS115          Rev. 6.09                                                                                4

Child's Name _____   ID# _____

| | Severe Impairment *Severe disruption or incapacitation* (30) | Moderate Impairment *Major or persistent disruption* (20) | Mild Impairment *Significant problems or distress* (10) | Minimal or No Impairment *No disruption in functioning* (0) |
|---|---|---|---|---|
| COMMUNITY<br><br>Role Performance<br><br>☐ | 059  Associates or hangs around with older children who are likely involved with illegal activities or gang activities.<br><br>060  Does favors or tasks for older children who are likely involved with illegal activities or gang activities.<br><br>061  Has repeatedly stolen property or money outside the home and is aware that it is considered wrong to steal.<br><br>062  Does or attempts inappropriate sexual acts with children (i.e., as a perpetrator, not as a victim).<br><br>063  Committed acts that would likely result in confinement if child were older.<br><br>064  Deliberate and severe damage of property outside the home (e.g., school/daycare, car, building).<br><br>065  Deliberate firesetting with malicious intent. | 067  On more than one occasion, committed acts that would be considered delinquent if child were older (e.g., vandalism, defacing property, threatening aggression, shoplifting other than minor items such as candy).<br><br>068  Often chooses to play with children who get into delinquent-like trouble.<br><br>069  Has been sexually inappropriate such that adults have concern about the welfare of other children who may be around the child unsupervised.<br><br>070  Repeatedly and intentionally plays with fire such that damage to property or person could result. | 072  Minor problems not satisfactorily resolved (e.g., takes candy from store after having been previously corrected for doing so).<br><br>073  Sometimes plays with children who get into serious trouble.<br><br>074  Plays with fire on more than one occasion. | 076  Does not negatively impact on the community.<br><br>077  Minor problems satisfactorily resolved. |
| | 066  EXCEPTION | 071  EXCEPTION | 075  EXCEPTION | 078  EXCEPTION |
| | Explanation: | | COULD NOT SCORE: 079 | |

Comments:

**Strengths(S)/Goals (G) for Community Scale**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S44 | G44 | No new illegal activity | S56 | G56 | Genuinely acknowledges how own behavior has hurt or negatively impacted others |
| S45 | G45 | No incidents of firesetting | | | |
| S46 | G46 | No sexually inappropriate behavior | S57 | G57 | Follows established laws and rules |
| S47 | G47 | Avoids gang members and gang activities | S58 | G58 | Shows respect to others |
| S48 | G48 | Is trying to stay away from others who get into trouble | S59 | G59 | Is a member of a prosocial club/group/educational program/athletic program |
| S49 | G49 | Plays with good kids | S60 | G60 | Has play activities which are alternatives to antisocial behavior |
| S50 | G50 | Wants to be a "good kid" | | | |
| S51 | G51 | Is motivated to stay out of trouble | S61 | G61 | Has supportive relationships (outside of family) |
| S52 | G52 | Keeps out of trouble (i.e., is "street smart"). | S62 | G62 | Helps others willingly |
| S53 | G53 | Is not known in community for troublesome behaviors | S63 | G63 | Respectful of own cultural heritage/elders |
| | | | S64 | G64 | Positively identifies with own cultural heritage |
| S54 | G54 | Fulfills responsibilities related to juvenile justice, court, etc. | S65 | G65 | Participates in activities related to own cultural heritage |
| | | | S66 | G66 | Participates in religious/spiritual activities (e.g., attends church) |
| S55 | G55 | Accepts responsibility for misbehavior | | | |
| | | | S67 | G67 | Other _____ |

PECFAS® Self-Training Manual.  ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105  [734] 769-9725; FAX [734] 769-1434).  E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author.  Unauthorized copying of this material is against the law and subject to criminal penalties.        Form FAS115              Rev. 6.09

Child's Name _____   ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption in functioning*<br>(0) |
|---|---|---|---|---|
| BEHAVIOR TOWARD OTHERS ☐ | 080 Behavior consistently inappropriate or bizarre.<br><br>081 Behavior so disruptive or dangerous that harm to others is likely (e.g., hurts or tries to hurt others, such as hitting, biting, throwing things at others, using or threatening to use a weapon or dangerous object).<br><br>082 Intentional inappropriate behavior of a sexual nature toward another child (as a perpetrator), and the behavior persists despite the child having been made aware of the inappropriateness.<br><br>083 Deliberately cruel to animals despite having been previously reprimanded for cruelty.<br><br>084 No age-appropriate peer interactions due to deficit in ability to relate to others; always plays alone; avoids interacting with other children. | 086 Behavior frequently or typically inappropriate and causes problems for self or others (e.g., starts fights or arguments, is belligerent).<br><br>087 Inappropriate sexual behavior in the presence of others or directed toward others (e.g., deliberately displays or plays with sex parts), and behavior persists despite the child having been made aware of the inappropriateness.<br><br>088 Deliberately and persistently annoying to others; provokes conflict/problems.<br><br>089 Displays of anger or temper; angry outbursts (i.e., more than once a day).<br><br>090 Often mean or nasty to other people or animals.<br><br>091 Associates with other children who engage in activities in which others are harassed, bullied, etc.<br><br>092 Persistently antagonizes other children (e.g., grabs others' toys, purposefully knocks over or damages others' toys, bullies, teases, shoves).<br><br>093 Often plays alone even when there are opportunities for peer play; would rather be alone. | 095 Unusually willful, quarrelsome, argumentative, or annoying to others.<br><br>096 Temper tantrums or outbursts if cannot get his/her own way, if frustrated, or if criticized.<br><br>097 Easily annoyed by others and responds more strongly than other children; quick-tempered.<br><br>098 Difficulties in peer interactions due to negative behavior (e.g., teasing, picks on others).<br><br>099 Immature behavior leads to poor interaction with peers.<br><br>100 Stays upset or overreacts to other children's teasing, etc.<br><br>101 Pouts, sulks, or acts stubborn a lot.<br><br>102 Has trouble sharing toys.<br><br>103 Very bossy in play with other children.<br><br>104 Excessive "rough and tumble" play.<br><br>105 Stays upset for unusually long periods after not getting his/her way.<br><br>106 Does not engage in typical recreational activities because of a tendency to be ignored or rejected by peers.<br><br>107 Does not engage in typical peer recreational activities because of being withdrawn or overly timid. | 109 Relates age-appropriately to others.<br><br>110 Occasional problems are reasonably resolved.<br><br>111 Behaves age-appropriately even though there are occasional temporary regressions due to the child's developmental stage or specific family circumstances. |
| | 085 EXCEPTION | 094 EXCEPTION | 108 EXCEPTION | 112 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 113 |

Strengths(S)/Goals (G) for Behavior Toward Others Scale

| | | | | | |
|---|---|---|---|---|---|
| S68 | G68 | Is aware of behavior problems with other children and is working on this | | | |
| S69 | G69 | Is motivated to have more/better friends | S80 | G80 | Is able to control impulses |
| S70 | G70 | Has peer friendships which are age appropriate | S81 | G81 | Expresses anger through appropriate verbalizations or healthy physical or play activities |
| S71 | G71 | Can be fun to be with (e.g., jokes, witty, sense of humor) | S82 | G82 | Behaves appropriately in public places and at community events |
| S72 | G72 | Plays well with other children | | | |
| S73 | G73 | Can share toys | S83 | G83 | Shows respect to others |
| S74 | G74 | Can play by him/herself | S84 | G84 | Shows empathy towards others |
| S75 | G75 | Belongs to community clubs (e.g., scouts, drill corps, musical or dance groups, church fellowship) | S85 | G85 | Shows kindness to others |
| | | | S86 | G86 | Is gentle and caring with animals |
| S76 | G76 | Can quickly "get back to normal" after difficulties have been "smoothed over" | S87 | G87 | Has a good relationship with at least one caregiver |
| | | | S88 | G88 | Feels loved by at least one adult caregiver/parent figure (e.g. grandmother, aunt) |
| S77 | G77 | Is friendly and outgoing | | | |
| S78 | G78 | Asserts self in healthy ways | S89 | G89 | Has a good relationship with at least one sibling |
| S79 | G79 | Actively uses coping strategies to deal with difficult situations | S90 | G90 | Views home as nurturant/supportive |
| | | | S91 | G91 | Other _____ |

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.   Form FAS115   Rev. 6.09

Child's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption in functioning*<br>(0) |
|---|---|---|---|---|
| **MOODS/EMOTIONS**<br><br>(Emotions = anxiety, depression, moodiness, fear, worry, irritability, tenseness, panic, anhedonia)<br><br>☐ | 114  Viewed as odd or strange because emotional responses are incongruous or inappropriate (unreasonable, excessive) most of the time.<br><br>115  Expresses marked distress upon being away from caregiver and cannot be consoled (stays highly upset).<br><br>116  If school-age, child has poor attendance (i.e., absent for at least one day per week on average) due to desire to be with caregiver, fearfulness, or anxieties.<br><br>117  Sadness or lack of usual expressiveness is associated with failure to do tasks or activities at school/daycare, OR marked disinterest in other kids, OR refusal/disinterest in eating.<br><br>118  Sadness or unhappiness is accompanied by suicidal wish.<br><br>119  Looks unhappy, sad, or very anxious most of the time; nothing seems to please or comfort the child.<br><br>120  Cries a lot and cannot be consoled, and with no physical explanation.<br><br>121  Emotional blunting (i.e., no or few signs of emotional expression; emotional expression is markedly flat). | 123  Overreacts to being away from caregiver, but can eventually be consoled.<br><br>124  Extremely tense or fearful (e.g., overreacts to sounds or noises).<br><br>125  Worries excessively and persistently with disturbance in functioning manifested by at least one of the following:  sleep problems, tiredness, poor concentration, irritability, muscle tension, or feeling "keyed up."<br><br>126  Sadness or unhappiness is persistent over time with disturbance in functioning in at least one of the following areas:  sleeping, eating, concentration, energy level, or normal activities.  If *only* irritability or anhedonia (i.e., marked diminished interest or pleasure in typical activities) is present, there should be disturbance in two or more areas.<br><br>127  Persistent self-criticism or feelings of worthlessness.<br><br>128  Has emotional flare-ups frequently, but not most of the time (e.g., sobbing uncontrollably, outbursts that are difficult to control or deflect).<br><br>129  Notable emotional restriction (e.g., has difficulty expressing strong emotions such as fear, hate, love). | 131  Tends to be anxious, fearful, tense, or sad, with some related symptom present (e.g., nightmares, stomachaches, nailbiting, wakes up at night, has trouble getting to sleep).<br><br>132  Overreacts compared to other children; disproportionate expression of irritability, fear, or worries.<br><br>133  Easily distressed if makes mistakes (more than other children the same age).<br><br>134  Sad, withdrawn, hurt, or anxious if criticized; feelings are too easily hurt.<br><br>135  Sad (or depressed or anhedonic) or anxious in at least one setting for up to a few days at a time.<br><br>136  Never plays energetically or expresses joy or delight.<br><br>137  Too worried about neatness, cleanliness.<br><br>138  Child has nervous habits (e.g., scratching or twitching).<br><br>139  Frequent nightmares or awakenings (i.e., at least two times a week).<br><br>140  Overreacts to changes in schedule or routine. | 142  Feels normal distress, but daily life is not disrupted.<br><br>143  Considers self to be an "OK" person.<br><br>144  Can express strong emotions appropriately.<br><br>145  Behaves age-appropriately even though there are occasional temporary regressions due to the child's developmental stage or specific family circumstances.<br><br>146  Child is generally happy.<br><br>147  Experiences of sadness and anxiety are age-appropriate. |
| | 122 EXCEPTION | 130 EXCEPTION | 141 EXCEPTION | 148 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 149 |

Sample

**Strengths(S)/Goals (G) for Moods/Emotions Scale**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S92 | G92 | Can express strong emotions appropriately | S106 | G106 | Sleeps well at night |
| S93 | G93 | Is able to express emotional needs appropriately | S107 | G107 | Shares feelings |
| S94 | G94 | Shows a range of emotions (e.g., not flat affect) | S108 | G108 | Talks with an adult or older youth about nightmares, worries, or sadness |
| S95 | G95 | Has self-awareness of emotional state/emotions | | | |
| S96 | G96 | Shows interest in friends and activities | S109 | G109 | Uses distraction or play to manage mood/anxiety |
| S97 | G97 | Has an appropriate understanding of "blame"; does not place too much blame on self | S110 | G110 | Emotional reactions are consistent with "provoking" circumstances |
| S98 | G98 | Feels good about self | S111 | G111 | No somatic complaints (e.g., stomachaches, headaches) |
| S99 | G99 | Has a positive self-perception | S112 | G112 | Attends school despite feelings |
| S100 | G100 | Has a good sense of humor | S113 | G113 | Participates in peer activities despite feelings |
| S101 | G101 | Has a good/pleasant temperament | S114 | G114 | Can be away from caregivers without undue distress |
| S102 | G102 | Has fun, enjoys self | S115 | G115 | Easily separates from caregiver when taken to school/daycare |
| S103 | G103 | Has healthy outlets for emotional feelings (consistent with culture) | | | |
| S104 | G104 | Self-nurturing | S116 | G116 | No suicidal wish or intent |
| S105 | G105 | Uses "self-talk" to manage mood/anxiety | S117 | G117 | Other _____ |

PECFAS: Self-Training Manual.  ©Copyright 1999-2009 by Kay Hodges, Ph.D.  (3600 Green Court, Suite 110, Ann Arbor, MI  48105  [734] 769-9725; FAX [734] 769-1434).  E-mail:  FAS@fasoutcomes.com.  No part of this work may be altered, copied, or distributed without the written permission of the author.  Unauthorized copying of this material is against the law and subject to criminal penalties.     **Form FAS115**          Rev. 6.09          7

Child's Name _____ ID# _____

| | Severe Impairment<br>*Severe disruption or incapacitation*<br>(30) | Moderate Impairment<br>*Major or persistent disruption*<br>(20) | Mild Impairment<br>*Significant problems or distress*<br>(10) | Minimal or No Impairment<br>*No disruption in functioning*<br>(0) |
|---|---|---|---|---|
| SELF-HARMFUL BEHAVIOR<br><br>☐ | 150  Non-accidental self-destructive behavior has resulted in or is likely to result in serious self-injury or self-harm (e.g., suicide attempt).<br><br>151  Seemingly accidental self-destructive behavior has resulted in or could likely result in serious self-injury (e.g., runs out in the path of a car, opens car door in moving vehicle), and child is aware of the danger.<br><br>152  Has a plan to hurt self, even if impractical or nonlethal. | 154  Non-accidental self-harm, mutilation, or injury which is not life-threatening but not trivial (e.g., suicidal gestures or behavior without intent to die, cuts self).<br><br>155  Talks or repeatedly thinks about harming self, killing self, or wanting to die. | 157  Repeated non-accidental behavior suggesting self-harm, yet the behavior is very unlikely to cause any serious injury (e.g., repeatedly pinching self or scratching skin with a dull object). | 159  Behavior is not indicative of tendencies toward self-harm. |
| | 153 EXCEPTION | 156 EXCEPTION | 158 EXCEPTION | 160 EXCEPTION |
| | Explanation: | | COULD NOT SCORE: 161 | |

Comments:

Sample

Strengths(S)/Goals (G) for Self-Harmful Behavior Scale
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | | |
|---|---|---|---|---|---|---|
| S118 | G118 | No self-destructive actions | | S125 | G125 | Respects his/her body (e.g., no pinching, scratching purposefully) |
| S119 | G119 | No suspicious "accidents" | | | | |
| S120 | G120 | Does not knowingly engage in dangerous behavior | | S126 | G126 | Resists being abused/hurt |
| S121 | G121 | No self-destructive talk | | S127 | G127 | Avoids being sexually exploited |
| S122 | G122 | Shares feelings when experiences self-destructive urges or sad feelings | | S128 | G128 | Eats well |
| | | | | S129 | G129 | Maintains adequate weight |
| S123 | G123 | Uses coping strategies other than self-harm (e.g., "tuning out") | | S130 | G130 | Other_____ |
| S124 | G124 | Uses appropriate outlets (e.g., pounding sand in sandbox) | | | | |

PECFAS° Self-Training Manual.  ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.     Form FAS115          Rev. 6.09                                                                                                  8

Child's Name _____ ID# _____

| | Severe Impairment *Severe disruption or incapacitation* (30) | Moderate Impairment *Major or persistent disruption* (20) | Mild Impairment *Significant problems or distress* (10) | Minimal or No Impairment *No disruption in functioning* (0) |
|---|---|---|---|---|
| THINKING/ COMMUNICATION □ | CANNOT ATTEND A NORMAL SCHOOL OR DAYCARE SITUATION, DOES NOT HAVE NORMAL PEER INTERACTIONS, OR CANNOT INTERACT ADEQUATELY IN THE COMMUNITY DUE TO ANY OF THE FOLLOWING:<br><br>162 Communications which are impossible or extremely difficult to understand due to incoherent thought or language.<br><br>163 Speech or nonverbal behavior is extremely odd and is noncommunicative (e.g., echolalia, idiosyncratic language).<br><br>164 Strange or bizarre behavior indicating an inability to distinguish fantasy from reality.<br><br>165 Most of the time is involved in aimless, nonpurposeful activity.<br><br>166 Refuses to talk or is selectively mute and this is not due to any known physical or sensory disability, speech impediment, or lack of familiarity with English.<br><br>167 Does not respond when spoken to and this is not due to any known physical or sensory disability, speech impediment, or lack of familiarity with English.<br><br>168 Repeats an idea, thought, or action over and over (e.g., repeatedly rocks body or head). | FREQUENT PROBLEMATIC BEHAVIOR OR DIFFICULTY IN INTERACTIONS WITH OTHERS; OR SPECIALIZED SETTING OR SUPERVISION NEEDED DUE TO ANY OF THE FOLLOWING:<br><br>170 Communications do not "flow," are irrelevant, or disorganized (i.e., more than other children of the same age).<br><br>171 Frequent and strange or odd behavior (e.g., eats non-food items, smears feces).<br><br>172 Apparent intermittent hallucinations that interfere with normal functioning.<br><br>173 Frequently involved in aimless, non-purposeful activity.<br><br>174 Preoccupying cognitions or fantasies with bizarre, odd, or gross themes.<br><br>175 Extremely limited in expressing self verbally and this is not due to any known physical or sensory disability, speech impediment, or lack of familiarity with English. | OCCASIONAL PROBLEMATIC BEHAVIOR, OR DIFFICULTY IN INTERACTIONS WITH OTHERS DUE TO ANY OF THE FOLLOWING:<br><br>177 Communications which are eccentric or use odd speech (i.e., more than other children of the same age).<br><br>178 Often expresses unnatural or strange ideas for his/her age.<br><br>179 Unusual perceptual experiences not qualifying as pathological hallucinations.<br><br>180 Limited in ability to express self verbally (i.e., more than other children of the same age), and this is not due to any known physical or sensory disability, speech impediment, or lack of familiarity with English. | 182 Thought, as reflected by communication, is not disordered or eccentric when compared to other children of the same age. |
| | 169 EXCEPTION | 176 EXCEPTION | 181 EXCEPTION | 183 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 184 |

Comments:

**Strengths(S)/Goals (G) for Thinking Scale**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S131 | G131 | Can communicate needs to others | S141 | G141 | Fantasies are "within normal limits" for age |
| S132 | G132 | Can express self adequately and clearly | S142 | G142 | Understands that thoughts cannot directly cause events to happen |
| S133 | G133 | Despite communication difficulties, tries to relate to others | S143 | G143 | Tries to control inappropriate thoughts, feelings, and impulses |
| S134 | G134 | Talks to others at an age-appropriate level | S144 | G144 | Has age-appropriate self-care behaviors |
| S135 | G135 | Responds socially to others at an age-appropriate level | S145 | G145 | Bathroom behavior and hygiene are age appropriate |
| S136 | G136 | General behavior is age appropriate | S146 | G146 | Understands the need for medication |
| S137 | G137 | Good problem solving ability | S147 | G147 | Other_____ |
| S138 | G138 | Thinks logically | | | |
| S139 | G139 | Has good understanding of personal circumstances | | | |
| S140 | G140 | No hallucinations or delusions | | | |

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties. **Form FAS115** Rev. 6.09 9

CAREGIVER BEING RATED: <u>PRIMARY FAMILY</u>

Child's Name _____     ID# _____

| Caregiver Being Rater | Relationship to Child | Informant | | Child Placement |
|---|---|---|---|---|
| | **Severe Impairment** *Severe disruption or incapacitation* **(30)** | **Moderate Impairment** *Major or persistent disruption* **(20)** | **Mild Impairment** *Significant problems or distress* **(10)** | **Minimal or No Impairment** *No disruption in functioning* **(0)** |
| **CAREGIVER RESOURCES** Material Needs ☐ | 185 Child's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of child is likely. | 187 Frequent negative impact on child's functioning OR a major disruption in the child's functioning due to child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 189 Occasional negative impact on the child's functioning due to the child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 191 Material needs are arranged for or adequately met so that there is no disruption in the child's functioning. 192 Able to use community resources as needed. |
| | 186 EXCEPTION | 188 EXCEPTION | 190 EXCEPTION | 193 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 194 |
| **CAREGIVER RESOURCES** Family/ Social Support ☐ | 195 Sociofamilial setting is potentially dangerous to the child due to lack of family resources required to meet the child's needs/demands. 196 Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.). 197 Caregiver is frankly hostile and/or rejecting OR does not want child to return to the home. 198 Child is subjected to sexual abuse in the home by a caregiver. 199 Child is subjected to physical abuse or neglect in the home by a caregiver. 200 Child currently removed from the home for possible sexual abuse, physical abuse, or neglect. 201 Failure of caregivers to provide an environment safe from possible abuse to a child previously abused or traumatized. 202 Severe or frequent domestic violence takes place in the home. 203 Caregiver contributes to delinquency of child by being involved in unlawful behavior, approving of child being involved in potentially unlawful behavior. 204 Marked lack of parental supervision or consistency in care relative to the child's developmental age. | 206 Child's developmental needs cannot be adequately met because child's needs/developmental demands exceed family resources. 207 Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition). 208 Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.). 209 Family members are insensitive, angry and/or resentful to the child. 210 Failure of caregiver to provide emotional support to child who has been traumatized or abused. 211 Domestic violence, or serious threat of domestic violence, takes place in the child's home. 212 Family not able to provide adequate supervision or consistency in care over time relative to the child's needs; no other supports compensate for this deficit. | 214 Family not able to provide adequate warmth, security or sensitivity relative to the child's needs. Support from other sources outside the immediate family are unable to compensate for this inadequacy. 215 Frequent family arguments and/or misunderstandings resulting in bad feelings. 216 Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity. 217 Family not able to provide adequate firmness relative to the child's needs; no other supports compensate for this deficit. | 219 Family is sufficiently warm, secure, and sensitive to the child's major needs. 220 Parental supervision is adequate. 221 Even though there are temporary problems in providing adequate support to the child, there is compensation from the wider social support system. |
| | 205 EXCEPTION | 213 EXCEPTION | 218 EXCEPTION | 222 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 223 |

Comments:

Strengths(S)/Goals (G) for Primary Family - See page 13

PECFAS Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.      **Form FAS115**      Rev. 6.09

10

CAREGIVER BEING RATED:  NON-CUSTODIAL FAMILY OR PARENT NOT LIVING IN CHILD'S HOME

Child's Name _____   ID# _____

| Caregiver Being Rater | Relationship to Child | Informant | Child Placement |
|---|---|---|---|

| | Severe Impairment *Severe disruption or incapacitation* (30) | Moderate Impairment *Major or persistent disruption* (20) | Mild Impairment *Significant problems or distress* (10) | Minimal or No Impairment *No disruption in functioning* (0) |
|---|---|---|---|---|
| **CAREGIVER RESOURCES**<br><br>Material Needs | 224 Child's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of child is likely. | 226 Frequent negative impact on child's functioning OR a major disruption in the child's functioning due to child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 228 Occasional negative impact on the child's functioning due to the child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 230 Material needs are arranged for or adequately met so that there is no disruption in the child's functioning.<br><br>231 Able to use community resources as needed. |
| | 225 EXCEPTION | 227 EXCEPTION | 229 EXCEPTION | 232 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 233 |

| | | | | |
|---|---|---|---|---|
| **CAREGIVER RESOURCES**<br><br>Family/ Social Support | 234 Sociofamilial setting is potentially dangerous to the child due to lack of family resources required to meet the child's needs/demands.<br><br>235 Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.).<br><br>236 Caregiver is frankly hostile and/ or rejecting OR does not want child to return to the home.<br><br>237 Child is subjected to sexual abuse in the home by a caregiver.<br><br>238 Child is subjected to physical abuse or neglect in the home by a caregiver.<br><br>239 Child currently removed from the home for possible sexual abuse, physical abuse, or neglect.<br><br>240 Failure of caregivers to provide an environment safe from possible abuse to a child previously abused or traumatized.<br><br>241 Severe or frequent domestic violence takes place in the home.<br><br>242 Caregiver contributes to delinquency of child by being involved in unlawful behavior or approving of child being involved in potentially unlawful behavior.<br><br>243 Marked lack of parental supervision or consistency in care relative to the child's developmental age. | 245 Child's developmental needs cannot be adequately met because child's needs/developmental demands exceed family resources.<br><br>246 Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition).<br><br>247 Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.).<br><br>248 Family members are insensitive, angry and/or resentful to the child.<br><br>249 Failure of caregiver to provide emotional support to child who has been traumatized or abused.<br><br>250 Domestic violence, or serious threat of domestic violence, takes place in the child's home.<br><br>251 Family not able to provide adequate supervision or consistency in care over time relative to the child's needs; no other supports compensate for this deficit. | 253 Family not able to provide adequate warmth, security or sensitivity relative to the child's needs. Support from other sources outside the immediate family are unable to compensate for this inadequacy.<br><br>254 Frequent family arguments and/or misunderstandings resulting in bad feelings.<br><br>255 Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity.<br><br>256 Family not able to provide adequate firmness relative to the child's needs; no other supports compensate for this deficit. | 258 Family is sufficiently warm, secure, and sensitive to the child's major needs.<br><br>259 Parental supervision is adequate.<br><br>260 Even though there are temporary problems in providing adequate support to the child, there is compensation from the wider social support system. |
| | 244 EXCEPTION | 252 EXCEPTION | 257 EXCEPTION | 261 EXCEPTION |
| | Explanation: | | | COULD NOT SCORE: 262 |

Comments:

Strengths(S)/Goals (G) for Non-Custodial Family or Parent Not Living in Youth's Home - See page 13

PECFAS® Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI  48105  [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com.  No part of this work may be altered, copied, or distributed without the written permission of the author.  Unauthorized copying of this material is against the law and subject to criminal penalties.        Form FAS115        Rev. 6.09                                11

CAREGIVER BEING RATED: <u>SURROGATE CAREGIVER</u>

Child's Name _____     ID# _____

| Caregiver Being Rater | Relationship to Child | Informant | Child Placement |

| CAREGIVER RESOURCES | Severe Impairment *Severe disruption or incapacitation* (30) | Moderate Impairment *Major or persistent disruption* (20) | Mild Impairment *Significant problems or distress* (10) | Minimal or No Impairment *No disruption in functioning* (0) |
|---|---|---|---|---|
| Material Needs ☐ | 263 Child's needs for food, clothing, housing, medical attention, or neighborhood safety are not being met such that severe risk to health or welfare of child is likely. | 265 Frequent negative impact on child's functioning OR a major disruption in the child's functioning due to child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 267 Occasional negative impact on the child's functioning due to the child's needs for food, housing, clothing, medical attention, or neighborhood safety not being met. | 269 Material needs are arranged for or adequately met so that there is no disruption in the child's functioning.\n\n270 Able to use community resources as needed. |
|  | 264 EXCEPTION | 266 EXCEPTION | 268 EXCEPTION | 271 EXCEPTION |
|  | Explanation: | | | COULD NOT SCORE: 272 |

| CAREGIVER RESOURCES Family/ Social Support ☐ | 273 Sociofamilial setting is potentially dangerous to the child due to lack of family resources required to meet the child's needs/demands.\n\n274 Gross impairment in parental judgment or functioning (may be related to psychosis, substance abuse, severe personality disorder, mental retardation, etc.).\n\n275 Caregiver is frankly hostile and/or rejecting OR does not want child to return to the home.\n\n276 Child is subjected to sexual abuse in the home by a caregiver.\n\n277 Child is subjected to physical abuse or neglect in the home by a caregiver.\n\n278 Child currently removed from the home for possible sexual abuse, physical abuse, or neglect.\n\n279 Failure of caregivers to provide an environment safe from possible abuse to a child previously abused or traumatized.\n\n280 Severe or frequent domestic violence takes place in the home.\n\n281 Caregiver contributes to delinquency of child by being involved in unlawful behavior, approving of child being involved in potentially unlawful behavior.\n\n282 Marked lack of parental supervision or consistency in care relative to the child's developmental age. | 284 Child's developmental needs cannot be adequately met because child's needs/developmental demands exceed family resources.\n\n285 Marked impairment in parental judgment or functioning (may be related to emotional instability, psychiatric illness, substance use, physical illness, criminal activities, or other impairing condition).\n\n286 Family conflict is pervasive and continual (characterized by hostility, tension, and/or scapegoating, etc.).\n\n287 Family members are insensitive, angry and/or resentful to the child.\n\n288 Failure of caregiver to provide emotional support to child who has been traumatized or abused.\n\n289 Domestic violence, or serious threat of domestic violence, takes place in the child's home.\n\n290 Family not able to provide adequate supervision or consistency in care over time relative to the child's needs; no other supports compensate for this deficit. | 292 Family not able to provide adequate warmth, security or sensitivity relative to the child's needs. Support from other sources outside the immediate family are unable to compensate for this inadequacy.\n\n293 Frequent family arguments and/or misunderstandings resulting in bad feelings.\n\n294 Family relations are characterized by poor problem solving, poor communication, or emotional insensitivity.\n\n295 Family not able to provide adequate firmness relative to the child's needs; no other supports compensate for this deficit. | 297 Family is sufficiently warm, secure, and sensitive to the child's major needs.\n\n298 Parental supervision is adequate.\n\n299 Even though there are temporary problems in providing adequate support to the child, there is compensation from the wider social support system. |
|  | 283 EXCEPTION | 291 EXCEPTION | 296 EXCEPTION | 300 EXCEPTION |
|  | Explanation: | | | COULD NOT SCORE: 301 |

Comments:

Strengths(S)/Goals (G) for Surrogate Caregiver - See page 13

PECFAS© Self-Training Manual.  ©Copyright 1999-2009 by Kay Hodges, Ph.D.  (3600 Green Court, Suite 110, Ann Arbor, MI 48105  [734] 769-9725; FAX [734] 769-1434).  E-mail FAS@fasoutcomes.com.  No part of this work may be altered, copied, or distributed without the written permission of the author.  Unauthorized copying of this material is against the law; subject to criminal penalties.      Form FAS115          Rev. 6.09

**Strengths(S)/Goals (G) for Primary Family**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S148 | G148 | Caregiver provides stable environment | S163 | G163 | Caregiver is aware of when he/she needs help |
| S149 | G149 | Caregiver communicates clearly | S164 | G164 | Caregiver seeks help when his/her problem solving skills break down |
| S150 | G150 | Caregiver cooperates with agencies providing services to child | S165 | G165 | Caregiver is caring in the face of difficult behavior from youth |
| S151 | G151 | Caregiver encourages positive identification with cultural heritage | S166 | G166 | Caregiver exercises good control when provoked |
| S152 | G152 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors | S167 | G167 | Caregiver tries to minimize negative impact of their own limitations |
| S153 | G153 | Caregiver is clear about behavioral expectations/values | S168 | G168 | Caregiver tries to minimize negative impact of other family members on child (e.g., an abusing parent) |
| S154 | G154 | Caregiver adheres to a daily routine | S169 | G169 | Caregiver is consistent and predictable in behavior toward child |
| S155 | G155 | Caregiver sets realistic and age-appropriate goals for child | | | |
| S156 | G156 | Family eats dinner together | S170 | G170 | Domestic abuse does not takes place |
| S157 | G157 | Family talks about problems | S171 | G171 | Caregiver seeks services for own concerns/problems |
| S158 | G158 | Caregiver models prosocial behavior and talk | S172 | G172 | Child has extended family support |
| S159 | G159 | Caregiver models verbal problem solving skills | S173 | G173 | Child has adults outside the family who provide direction and guidance |
| S160 | G160 | Caregiver provides nurturing/soothing/comforting home environment | S174 | G174 | Substance using caregiver is seeking services to deal with his/her own substance use |
| S161 | G161 | Emotional support and physical protection is given to a child previously abused | S175 | G175 | Other_____ |
| S162 | G162 | Caregiver arranges for appropriate supervision/care of child when working or away from child | | | |

**Strengths(S)/Goals (G) for Non-Custodial Family or Parent Not Living in Youth's Home**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S176 | G176 | Caregiver provides stable environment | S191 | G191 | Caregiver is aware of when he/she needs help |
| S177 | G177 | Caregiver communicates clearly | S192 | G192 | Caregiver seeks help when his/her problem solving skills break down |
| S178 | G178 | Caregiver cooperates with agencies providing services to child | S193 | G193 | Caregiver is caring in the face of difficult behavior from child |
| S179 | G179 | Caregiver encourages positive identification with cultural heritage | S194 | G194 | Caregiver exercises good control when provoked |
| S180 | G180 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors | S195 | G195 | Caregiver tries to minimize negative impact of their own limitations |
| S181 | G181 | Caregiver is clear about behavioral expectations/values | S196 | G196 | Caregiver tries to minimize negative impact of other family members on child (e.g., an abusing parent) |
| S182 | G182 | Caregiver adheres to a daily routine | S197 | G197 | Caregiver is consistent and predictable in behavior toward child |
| S183 | G183 | Caregiver sets realistic and age-appropriate goals for child | | | |
| S184 | G184 | Family eats dinner together | S198 | G198 | Domestic abuse does not takes place |
| S185 | G185 | Family talks about problems | S199 | G199 | Caregiver seeks services for own concerns/problems |
| S186 | G186 | Caregiver models prosocial behavior and talk | S200 | G200 | Child has extended family support |
| S187 | G187 | Caregiver models verbal problem solving skills | S201 | G201 | Child has adults outside the family who provide direction and guidance |
| S188 | G188 | Caregiver provides nurturing/soothing/comforting home environment | S202 | G202 | Substance using caregiver is seeking services to deal with his/her own substance use |
| S189 | G189 | Emotional support and physical protection is given to a child previously abused | S203 | G203 | Other_____ |
| S190 | G190 | Caregiver arranges for appropriate supervision/care of child when working or away from child | | | |

**Strengths(S)/Goals (G) for Surrogate Caregiver**
*(OPTIONAL: UNNECESSARY FOR PECFAS RATING)*

| | | | | | |
|---|---|---|---|---|---|
| S204 | G204 | Caregiver provides stable environment | S219 | G219 | Caregiver is aware of when he/she needs help |
| S205 | G205 | Caregiver communicates clearly | S220 | G220 | Caregiver seeks help when his/her problem solving skills break down |
| S206 | G206 | Caregiver cooperates with agencies providing services to child | S221 | G221 | Caregiver is caring in the face of difficult behavior from child |
| S207 | G207 | Caregiver encourages positive identification with cultural heritage | S222 | G222 | Caregiver exercises good control when provoked |
| S208 | G208 | Caregiver reinforces desirable behaviors and ignores or gives consequences for undesirable behaviors | S223 | G223 | Caregiver tries to minimize negative impact of their own limitations |
| S209 | G209 | Caregiver is clear about behavioral expectations/values | S224 | G224 | Caregiver tries to minimize negative impact of other family members on child (e.g., an abusing parent) |
| S210 | G210 | Caregiver adheres to a daily routine | S225 | G225 | Caregiver is consistent and predictable in behavior toward child |
| S211 | G211 | Caregiver sets realistic and age-appropriate goals for child | | | |
| S212 | G212 | Family eats dinner together | S226 | G226 | Domestic abuse does not takes place |
| S213 | G213 | Family talks about problems | S227 | G227 | Caregiver seeks services for own concerns/problems |
| S214 | G214 | Caregiver models prosocial behavior and talk | S228 | G228 | Child has extended family support |
| S215 | G215 | Caregiver models verbal problem solving skills | S229 | G229 | Child has adults outside the family who provide direction and guidance |
| S216 | G216 | Caregiver provides nurturing/soothing/comforting home environment | S230 | G230 | Substance using caregiver is seeking services to deal with his/her own substance use |
| S217 | G217 | Emotional support and physical protection is given to a child previously abused | S231 | G231 | Other_____ |
| S218 | G218 | Caregiver arranges for appropriate supervision/care of child when working or away from child | | | |

PECFAS Self-Training Manual. ©Copyright 1999-2009 by Kay Hodges, Ph.D. (3600 Green Court, Suite 110, Ann Arbor, MI 48105 [734] 769-9725; FAX [734] 769-1434). E-mail: FAS@fasoutcomes.com. No part of this work may be altered, copied, or distributed without the written permission of the author. Unauthorized copying of this material is against the law and subject to criminal penalties.    **Form FAS115**    Rev. 6.09    13

# ATTACHMENT 3

# *Scoring Sheet for the NCTSN CANS-Trauma Comprehensive*

> **KEY for Traumatic / Adverse Childhood Experience Domain:**
>
> 0 = No evidence of any trauma of this type
> 1 = "Mild" exposure, a single incident or suspicion of this trauma or ACE.
> 2 = Child experienced multiple incidents or a moderate degree of this trauma or ACE.
> 3 = Child experienced repeated and severe incidents of this trauma or ACE.

## TRAUMATIC / ADVERSE CHILDHOOD EXPERIENCES

| | 0 | 1 | 2 | 3 | | | 0 | 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Sexual Abuse | ○ | ○ | ○ | ○ | 8. | School Violence | ○ | ○ | ○ | ○ |
| 2. Physical Abuse | ○ | ○ | ○ | ○ | 9. | Natural or Manmade Disasters | ○ | ○ | ○ | ○ |
| 3. Emotional Abuse | ○ | ○ | ○ | ○ | 10. | War Affected | ○ | ○ | ○ | ○ |
| 4. Neglect | ○ | ○ | ○ | ○ | 11. | Terrorism Affected | ○ | ○ | ○ | ○ |
| 5. Medical Trauma | ○ | ○ | ○ | ○ | 12. | Witness to Criminal Activity | ○ | ○ | ○ | ○ |
| 6. Family Violence | ○ | ○ | ○ | ○ | 13. | Parental Criminal Behavior | ○ | ○ | ○ | ○ |
| 7. Community Violence | ○ | ○ | ○ | ○ | 14. | Disruption in Caregiving | ○ | ○ | ○ | ○ |

> **KEY for Symptoms Related to Traumatic / Adverse Childhood Experiences Domain:**
>
> 0 = No evidence of a need / no reason to believe that the rated item requires any action.
> 1 = A need for watchful waiting, monitoring or possibly preventive action.
> 2 = A need for action.  Some strategy is needed to address the problem/need.
> 3 = A need for immediate or intensive action.  This level indicates an immediate safety concern or a priority for intervention.

## TRAUMATIC STRESS SYMPTOMS

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 15. Adjustment to Trauma | ○ | ○ | ○ | ○ |
| 16. Traumatic Grief | ○ | ○ | ○ | ○ |
| 17. Re-experiencing | ○ | ○ | ○ | ○ |
| 18. Hyperarousal | ○ | ○ | ○ | ○ |
| 19. Avoidance | ○ | ○ | ○ | ○ |
| 20. Numbing | ○ | ○ | ○ | ○ |
| 21. Dissociation | ○ | ○ | ○ | ○ |
| 22. Affective/Physiological Dys. | ○ | ○ | ○ | ○ |

## CHILD STRENGTHS

> **KEY for Strengths Domain:**
>
> 0 = Centerpiece strength
> 1 = Useful strength
> 2 = Identified strength
> 3 = Not yet identified strength / NO information about a strength in this area

| | 0 | 1 | 2 | 3 | N/A | | 0 | 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 23. Family | ○ | ○ | ○ | ○ | | 29. Talents/Interests | ○ | ○ | ○ | ○ |
| 24. Interpersonal | ○ | ○ | ○ | ○ | | 30. Spiritual/Religious | ○ | ○ | ○ | ○ |
| 25. Educational | ○ | ○ | ○ | ○ | ○ | 31. Community Life | ○ | ○ | ○ | ○ |
| 26. Vocational | ○ | ○ | ○ | ○ | ○ | 32. Relationship Permanence | ○ | ○ | ○ | ○ |
| 27. Coping and Savoring Skills | ○ | ○ | ○ | ○ | | 33. Resilience | ○ | ○ | ○ | ○ |
| 28. Optimism | ○ | ○ | ○ | ○ | | | | | | |

# *Scoring Sheet for the NCTSN CANS-Trauma Comprehensive*

**KEY for Other Need Domains:**

0 = No evidence of a need / no reason to believe that the rated item requires any action.
1 = A need for watchful waiting, monitoring or possibly preventive action.
2 = A need for action.  Some strategy is needed to address the problem/need.
3 = A need for immediate or intensive action.  This level indicates an immediate safety concern or a priority for intervention.

## LIFE DOMAIN FUNCTIONING

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 34. Family | ○ | ○ | ○ | ○ |
| 35. Living Situation | ○ | ○ | ○ | ○ |
| 36. Social Functioning | ○ | ○ | ○ | ○ |
| 37. Developmental | ○ | ○ | ○ | ○ |
| 38. Recreational | ○ | ○ | ○ | ○ |
| 39. Legal | ○ | ○ | ○ | ○ |
| 40. Medical | ○ | ○ | ○ | ○ |

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 41. Physical | ○ | ○ | ○ | ○ |
| 42. Sleep | ○ | ○ | ○ | ○ |
| 43. Sexual Development | ○ | ○ | ○ | ○ |
| 44. School Behavior | ○ | ○ | ○ | ○ |
| 45. School Achievement | ○ | ○ | ○ | ○ |
| 46. School Attendance | ○ | ○ | ○ | ○ |

## ACCULTURATION

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 47. Language | ○ | ○ | ○ | ○ |
| 48. Identity | ○ | ○ | ○ | ○ |
| 49. Ritual | ○ | ○ | ○ | ○ |
| 50. Cultural Stress | ○ | ○ | ○ | ○ |

## CHILD BEHAVIORAL/EMOTIONAL NEEDS

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 51. Psychosis | ○ | ○ | ○ | ○ |
| 52. Attention/Concentration | ○ | ○ | ○ | ○ |
| 53. Impulsivity | ○ | ○ | ○ | ○ |
| 54. Depression | ○ | ○ | ○ | ○ |
| 55. Anxiety | ○ | ○ | ○ | ○ |
| 56. Oppositional | ○ | ○ | ○ | ○ |
| 57. Conduct | ○ | ○ | ○ | ○ |
| 58. Substance Use | ○ | ○ | ○ | ○ |
| 59. Attachment | ○ | ○ | ○ | ○ |
| 60. Eating Disturbance | ○ | ○ | ○ | ○ |
| 61. Behavioral Regression | ○ | ○ | ○ | ○ |
| 62. Somatization | ○ | ○ | ○ | ○ |
| 63. Anger Control | ○ | ○ | ○ | ○ |

## CHILD RISK BEHAVIORS

| | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 64. Suicide Risk | ○ | ○ | ○ | ○ |
| 65. Non-Suicidal Self-Injury | ○ | ○ | ○ | ○ |
| 66. Other Self Harm | ○ | ○ | ○ | ○ |
| 67. Danger to Others | ○ | ○ | ○ | ○ |
| 68. Sexual Aggression | ○ | ○ | ○ | ○ |
| 69. Runaway | ○ | ○ | ○ | ○ |
| 70. Delinquency | ○ | ○ | ○ | ○ |
| 71. Judgment | ○ | ○ | ○ | ○ |
| 72. Fire Setting | ○ | ○ | ○ | ○ |
| 73. Intentional Misbehavior | ○ | ○ | ○ | ○ |
| 74. Sexually Reactive Behavior | ○ | ○ | ○ | ○ |

# *Scoring Sheet for the NCTSN CANS-Trauma Comprehensive*

**RATINGS OF CHILDREN 5 YEARS and YOUNGER – <u>OPTIONAL DOMAIN</u>**

**This domain is also meant for use developmentally delayed children of any age, and can be used with any child/youth if these are areas of relevant needs regardless of child's age.**

| | 0 | 1 | 2 | 3 | NA | U | | | 0 | 1 | 2 | 3 | NA | U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75. Motor | ○ | ○ | ○ | ○ | ○ | | 83. Labor & Delivery | | ○ | ○ | ○ | ○ | ○ | ○ |
| 76. Sensory | ○ | ○ | ○ | ○ | ○ | | 84. Parent/Sibling Problems | | ○ | ○ | ○ | ○ | ○ | ○ |
| 77. Communication | ○ | ○ | ○ | ○ | ○ | | 85. Availability of Caregiver | | ○ | ○ | ○ | ○ | ○ | ○ |
| 78. Failure to Thrive | ○ | ○ | ○ | ○ | ○ | | 86. Curiosity | | ○ | ○ | ○ | ○ | ○ | |
| 79. Feeding/Elimination | ○ | ○ | ○ | ○ | ○ | | 87. Playfulness | | ○ | ○ | ○ | ○ | ○ | |
| 80. Birth Weight | ○ | ○ | ○ | ○ | ○ | ○ | 88. Temperament | | ○ | ○ | ○ | ○ | ○ | |
| 81. Prenatal Care | ○ | ○ | ○ | ○ | ○ | ○ | 89. Day Care Preschool | | ○ | ○ | ○ | ○ | ○ | |
| 82. Substance Exposure | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | |

**TRANSITION TO ADULTHOOD – <u>OPTIONAL DOMAIN</u>**

**This domain is meant primarily for youth 14 and ½ years or older, but can be used with any child/youth if these are areas of relevant needs regardless of child's age.**

| | 0 | 1 | 2 | 3 | NA | | | 0 | 1 | 2 | 3 | NA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90. Independent Living Skills | ○ | ○ | ○ | ○ | ○ | | 94. Medication Compliance | ○ | ○ | ○ | ○ | ○ |
| 91. Transportation | ○ | ○ | ○ | ○ | ○ | | 95. Education Attainment | ○ | ○ | ○ | ○ | ○ |
| 92. Parenting Roles | ○ | ○ | ○ | ○ | ○ | | 96. Victimization | ○ | ○ | ○ | ○ | ○ |
| 93. Intimate Relationships | ○ | ○ | ○ | ○ | ○ | | 97. Job Functioning | ○ | ○ | ○ | ○ | ○ |

**CAREGIVER(S) NEEDS AND STRENGTHS**

Title/Role of **Caregiver #1** (relation to child):

_____

| | 0 | 1 | 2 | 3 | NA |
|---|---|---|---|---|---|
| 98. Physical | ○ | ○ | ○ | ○ | ○ |
| 99. Mental Health | ○ | ○ | ○ | ○ | ○ |
| 100. Substance Use | ○ | ○ | ○ | ○ | ○ |
| 101. Developmental | ○ | ○ | ○ | ○ | ○ |
| 102. Supervision | ○ | ○ | ○ | ○ | ○ |
| 103. Involvement | ○ | ○ | ○ | ○ | ○ |
| 104. Knowledge | ○ | ○ | ○ | ○ | ○ |
| 105. Organization | ○ | ○ | ○ | ○ | ○ |
| 106. Resources | ○ | ○ | ○ | ○ | ○ |
| 107. Residential Stability | ○ | ○ | ○ | ○ | ○ |
| 108. Safety | ○ | ○ | ○ | ○ | ○ |
| 109. Marital/Partner Violence | ○ | ○ | ○ | ○ | ○ |
| 110. Posttraumatic Reactions | ○ | ○ | ○ | ○ | ○ |

**CAREGIVER(S) NEEDS AND STRENGTHS**

Title/Role of **Caregiver #2** (relation to child):

_____

| | 0 | 1 | 2 | 3 | NA |
|---|---|---|---|---|---|
| 98. Physical | ○ | ○ | ○ | ○ | ○ |
| 99. Mental Health | ○ | ○ | ○ | ○ | ○ |
| 100. Substance Use | ○ | ○ | ○ | ○ | ○ |
| 101. Developmental | ○ | ○ | ○ | ○ | ○ |
| 102. Supervision | ○ | ○ | ○ | ○ | ○ |
| 103. Involvement | ○ | ○ | ○ | ○ | ○ |
| 104. Knowledge | ○ | ○ | ○ | ○ | ○ |
| 105. Organization | ○ | ○ | ○ | ○ | ○ |
| 106. Resources | ○ | ○ | ○ | ○ | ○ |
| 107. Residential Stability | ○ | ○ | ○ | ○ | ○ |
| 108. Safety | ○ | ○ | ○ | ○ | ○ |
| 109. Marital/Partner Violence | ○ | ○ | ○ | ○ | ○ |
| 110. Posttraumatic Reactions | ○ | ○ | ○ | ○ | ○ |

# ATTACHMENT 4



Foster Care Licensing
and Background Checks Division
PO Box 1424
Topeka, KS 66601-1424

**Kansas**
Department for Children
and Families

Fax: (785) 296-8609
dcf.fcl@ks.gov
www.dcf.ks.gov

Laura Howard, Secretary

Laura Kelly, Governor

Policy: Exception Requests for Foster Homes
6/20/2018
Rev. 10/21/2019

### Exceptions to Regulations for Licensed Family Foster Homes

#### I. Policy
The Division may grant an exception to a specific regulation or any portion of a specific regulation per KAR 28-4-804(e).

*Rationale:* An exception to a regulation may be approved if it is determined that the exception is in the best interest of a child(ren) and does not violate any statutory requirements and meets the requirements of the Family First Prevention Services Act.

#### Procedure
1) To request an exception to a regulation, the foster home's sponsoring agency must complete a "Request for Exception" form
   (http://www.dcf.ks.gov/Agency/GC/FCRFL/Documents/FCL_forms/FCL_408_FFHExceptio nWorksheet.pdf
   ), which should be submitted by email to DCF.FCLExceptions@ks.gov

2) Common reasons for exception requests include, *but are not limited to*:

   a) The number of foster children cared for in a Family Foster Home may be exceeded for any of the following reasons:
      1) To allow a parenting youth in foster care to remain with the child of the parenting youth;
      2) To allow siblings to remain together;
      3) To allow a child with an established meaningful relationship with the family to remain with the family; and
      4) To allow a family with special training or skills to provide care to a child who has a severe disability.
   b) Placement of child(ren) causes the home to go over its licensed capacity; as required by section
   c) Square footage less than required for the period of the exception, due to over capacity
   d) Age of child(ren) being placed is outside of the licensed age range
   e) Placement of child(ren) results in more than 6 children total in the home under age 16 and meets the requirements of subsection (a).
   f) Child(ren) sharing bedroom(s) who are not age-mates
   g) Child(ren) over 12 months of age still needing to sleep in licensees' bedroom
   h) Child(ren) over 18 months of age still sleeping in a crib
   i) Home has 6 children of their own under age 16 and wants to initiate or maintain licensure

3) Complete exception requests will be processed and determined to be approved or denied. Complete exception requests include, at a minimum: (Other documents may be needed.)

# EXCEPTION WORKSHEET

**To facilitate timely review and consideration, submit this worksheet to DCF with any Request for Exception (FCL 408). Complete all application information. Please type or print.**

1.  Within the last year, have there been exceptions to license capacity and/or age range for this family foster home? ☐ YES ☐ NO

If yes, how many _____   If yes, are any still in effect or still needed ☐ YES ☐ NO   Specify: _____

2.  Has the family ever been under a Partnership Development Plan or a Corrective Action Plan? ☐ YES ☐ NO

If yes, explain the circumstances and attach a copy: _____

Was the PDP or CAP successfully completed? ☐ YES ☐ NO   Date Completed: _____

3.  Reason(s) this request is in the best interest of the children (Check all that apply and include full explanation in #13):
    ☐ To keep siblings together
    ☐ To keep a teen parent and his/her own child together
    ☐ Child(ren) and foster parent(s) have a prior relationship
    ☐ Foster home is in child(ren)'s home or contiguous county
    ☐ To preserve relative connections for the child(ren)
    ☐ To preserve school & community connections for the child (ren)
    ☐ To facilitate permanency goals, such as reunification
    ☐ Family is a cultural match for the child(ren)   Explain: _____
    ☐ Child has special needs and the foster parent(s) have expertise in the needed area
    ☐ Other, specify: _____

4.  For each bedroom, list ALL household members and child(ren) for whom placement is requested:

| Name (First & Last) | Age | Gender | Relationship to foster parent(s) | If applicable, length of placement in this home |
|---|---|---|---|---|
| **BEDROOM #1 (Corresponding to bedroom numbers on floor plan)** | | | | |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| **BEDROOM #2** | | | | |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| **BEDROOM #3** | | | | |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| **Name (First & Last)** | | | | |
| **BEDROOM #4** | | | | |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |
| _____ | ___ | _____ | _____ | _____ |

Note: Foster Home is to retain this form in their licensure file on the premises. Exceptions are approved for specific children only. If the exception is for increase in capacity, it is valid through the approval date or until any child leaves care, whichever occurs sooner.

**BEDROOM #5**

_____   \_\_\_\_   _____   _____   _____

_____   \_\_\_\_   _____   _____   _____

_____   \_\_\_\_   _____   _____   _____

_____   \_\_\_\_   _____   _____   _____

If applicable, anticipated date of departure for any child listed above: _____

Are any of the above-listed children siblings? ☐ YES   ☐ NO

If yes, which children? _____

5. Are there sufficient beds available? ☐ YES   ☐ NO

   If no, explain: _____

6. Are there sufficient cribs available?   ☐ YES   ☐ NO   ☐ NA

   If no, explain: _____

7. Is there sufficient seating with appropriate restraints in the available vehicles to provide for necessary transportation? ☐ YES   ☐ NO

   If no, explain: _____

8. Are there sufficient child safety seats and/or booster seats available?   ☐ YES   ☐ NO   ☐ NA

   If no, explain: _____

9. If the request is for the family to provide care outside of the licensed age range, has it been verified that the home is in compliance with the regulations applicable to that age group?  (Refer to FCL 403 *Family Foster Home Survey Instrument* regarding regulations specific to age groups) ☐ YES   ☐ NO   ☐ NA   Verified by (Name of staff):_____

   If no, explain: _____

10. Identify any special needs of any child currently in placement and/or any child for whom care is addressed by this Request. _____

    _____

11. Identify any additional supports the sponsoring Child Placing Agency will provide to enable the family to care for these children.

    _____

12. If the children are not known to the family, how many other local family foster homes were contacted within your agency? _____

    What other child-placing agencies were contacted?  (List or attach a list) _____

13. Explain how this exception request is in the best interest of each child, any additional information related to the request regarding the specific circumstances of the child(ren) in foster care and/or the foster family. If this exception is granted, how will you assure the health, safety and well-being of children in care?

Note: Foster Home is to retain this form in their licensure file on the premises. Exceptions are approved for specific children only. If the exception is for increase in capacity, it is valid through the approval date or until any child leaves care, whichever occurs sooner.

Page 3 of 3

3/14/19

FFPSA – MODEL LICENSING STANDARDS

**DCF Foster Care Licensing Compliance Plan**

pgs 19-20

| FFPSA – MODEL LICENSING STANDARDS | | compliant |
|---|---|---|
| | (2) The water in each wading pool shall be emptied daily. | |
| | (d) Hot tubs on the premises. | |
| | (1) Each hot tub shall be covered when not in use with an insulated, rigid cover secured by locks or surrounded by a fence that meets the requirements of paragraph (b)(1). | |
| | (2) The chlorine and pH levels shall be tested and maintained as required by the manufacturer's specifications for use. | |
| | (3) Each licensee shall ensure that no child in foster care less than four years of age uses a hot tub. Each licensee shall ensure that each child in foster care four years of age and older is permitted to use the hot tub only in accordance with the manufacturer's specifications and recommendations for use. | |
| C. Foster Family Home Capacity. The total number of children in foster care in a foster family home must not | KAR 28-4-804 (a) Terms of license.  (1) A temporary permit or a license may be granted to an | |

3/14/19

DCF Foster Care Licensing Compliance Plan

FFPSA – MODEL LICENSING STANDARDS

exceed six consistent with section 472(c)(1)(A)(ii)(II) of the Act. Per section 472(c)(1)(B) of the Act, the number of foster children cared for in a foster family home may exceed this numerical limitation at the option of the title IV-E agency for any of the following reasons:

a.    To allow a parenting youth in foster care to remain with the child of the parenting youth;

b.    To allow siblings to remain together;

c.    To allow a child with an established meaningful relationship with the family to remain with the family; and

d.    To allow a family with special training or skills to provide care to a child who has a severe disability.

applicant for a maximum of four children in foster care, with a maximum total of six children in the home, including the applicant's or licensee's own children under 16 years of age. There shall be no more than two children in the home under 18 months of age.

28-4-804 (e) Exceptions.

(1) Any applicant or licensee may request an exception from the secretary. Any request for an exception may be granted if the secretary determines that the exception is in the best interest of a child in foster care and the exception does not violate statutory requirements.

(2) Written notice from the secretary stating the nature of the exception and its duration shall be kept on file in the family foster home and shall be readily accessible to the department, the child-placing agent, the sponsoring child-placing agency, the Kansas department of social and rehabilitation services, and the Kansas juvenile justice authority.

# ATTACHMENT 5



# Child and Family Services Reviews

# Onsite Review Instrument and Instructions

## January 2016



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR
CHILDREN & FAMILIES
Administration on Children, Youth and Families
Children's Bureau

This page intentionally left blank.

# Table of Contents

**Face Sheet** ............................................................................................................................ **2**

**SAFETY OUTCOME 1: CHILDREN ARE, FIRST AND FOREMOST, PROTECTED FROM ABUSE AND NEGLECT.** ................................................................................................................. **7**

Item 1: Timeliness of Initiating Investigations of Reports of Child Maltreatment ................................... 7

Item 1 Applicable Cases:.......................................................................................................................7

**SAFETY OUTCOME 2: CHILDREN ARE SAFELY MAINTAINED IN THEIR HOMES WHENEVER POSSIBLE AND APPROPRIATE.** ............................................................................................ **12**

Item 2: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry Into Foster Care ............................................................................................................................................. 12

Item 3: Risk and Safety Assessment and Management ........................................................................ 15

**PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY IN THEIR LIVING SITUATIONS.** ......................................................................................................................... **21**

Item 4: Stability of Foster Care Placement .......................................................................................... 21

Item 5: Permanency Goal for Child ...................................................................................................... 26

Item 6: Achieving Reunification, Guardianship, Adoption, or Other Planned Permanent Living Arrangement .... 32

**PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.** ................................................................................. **38**

Item 7: Placement With Siblings .......................................................................................................... 38

Item 8: Visiting With Parents and Siblings in Foster Care .................................................................... 40

Item 9: Preserving Connections............................................................................................................ 45

Item 10: Relative Placement ................................................................................................................ 48

Item 11: Relationship of Child in Care With Parents ............................................................................ 51

**WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.** ............................................................................................................... **55**

Item 12: Needs and Services of Child, Parents, and Foster Parents..................................................... 55

Item 13: Child and Family Involvement in Case Planning ..................................................................... 64

Item 14: Caseworker Visits With Child ................................................................................................. 68

Item 15: Caseworker Visits With Parents ............................................................................................. 71

**WELL-BEING OUTCOME 2: CHILDREN RECEIVE APPROPRIATE SERVICES TO MEET THEIR EDUCATIONAL NEEDS.** ............................................................................................................ **76**

Item 16: Educational Needs of the Child .............................................................................................. 76

**WELL-BEING OUTCOME 3: CHILDREN RECEIVE ADEQUATE SERVICES TO MEET THEIR PHYSICAL AND MENTAL HEALTH NEEDS.** ............................................................................. **80**

Item 17: Physical Health of the Child ................................................................................................... 80

Item 18: Mental/Behavioral Health of the Child ................................................................................... 85

This page intentionally left blank.

*OMB Control Number: 0970-0214*
*Expiration Date: 1/31/2021*

# Children's Bureau
# Child and Family Services Reviews
# Onsite Review Instrument and Instructions
## GENERAL INSTRUCTIONS

The Onsite Review Instrument and Instructions is used to review both foster care and in-home services cases during the onsite review component of the Child and Family Services Reviews. In completing the instrument, reviewers conduct case file reviews and case-related interviews with children, parents, foster parents, caseworkers, and other professionals involved with the child.

The instrument is organized into a Face Sheet and three sections.  On the Face Sheet, reviewers document general information about a case, such as the type of case.  The three sections focus on the outcome domains that form the basis of the Child and Family Services Reviews: safety, permanency, and child and family well-being. For each outcome, reviewers collect information on a number of "items" related to that outcome.

Although reviewers use the instrument to review both foster care and in-home services cases, they should complete the permanency section only if the case under review is a foster care case. If reviewing an in-home services case, reviewers should select Not Applicable as the rating for the permanency items.

For children in foster care, reviewers should consider the safety items (1 through 3) for all children in the family, but complete the permanency items (4 through 11) and the child and family well-being items (12 through 18) only as they apply to the specific child whose case is under review. For children receiving in-home services, reviewers should consider the safety items (1 through 3) for all children in the family home and complete the well-being items (12 through 18) for all children in the family unless reviewers determine that only specific children should be receiving services and, based on case circumstances, the other children in the family home do not need to be considered in these items.

## Reviewing the Case

Reviewers must respond to all the questions for each applicable item. Reviewers should use their professional judgment to determine how best to gather all the relevant information needed to respond to questions.  The instrument provides some instructions on where to find information, such as the case record or court orders.  Information gathered through case-related interviews should be considered when responding to questions.

Reviewers must indicate the case participants who have been included in the assessment of certain items, in order to identify which children in an in-home services case were included in the assessment of various items and in order to determine who was being considered as "mother" and "father" in various items. Participants should be selected from the case participants listed in the child and case participant tables in the face sheet.

Further instructions for answering the questions relating to the individual items, along with definitions for key terms, are provided below the relevant question. Reviewers should read all instructions and definitions carefully before responding to questions.

## CHILD AND FAMILY SERVICES REVIEWS ONSITE REVIEW INSTRUMENT
### Face Sheet

### Case Information

---

**Definition and Instructions for Questions A Through E Below:**

- For the local area, use the name that is used by the state for the review. This may be a region rather than a county, or may be multiple counties.
- Enter the case name that is the official name on the case file.
- The period under review is the time frame used for making decisions about the case. It begins with the sampling period start date and ends with the date the case review was completed.

---

A.    Name of state and county (or local area):

B.    Case name:

C.    Period under review begins on:

D.    Reviewer name(s):

       Initial QA completed by (name):

       Second Level QA completed by (name):

       Secondary Oversight completed by (name):

E.    Date case review was completed:

F.    What is the type of case reviewed?  Select one type only:

Foster Care ❑      In-Home Services ❑      In-Home Services—Differential/Alternative Response ❑

---

**Question F Instructions:**

- The case is a foster care case if the target child was in foster care at any time during the period under review. A child is considered to be in foster care if the state child welfare agency or another public agency with whom the agency has a title IV-E agreement (hereafter "the agency") has placement and care responsibility for the child.  This includes a child who is placed by the agency with relatives or in other kin-type placements, but the agency maintains placement and care responsibility. It does not include a child who is living with relatives (or caregivers other than parents) but who is not under the placement and care responsibility of the agency.
- The case is an in-home services case if no child in the family was in foster care at any time during the period under review, and the case was open for at least 45 days.
- The case is an in-home services differential/alternative response case if the state has some form of differential/alternative response program during the period under review and the in-home services case was served through that program.

---

## G1. **Child Table**

| Target Child | Child's Name | Race(s) | Ethnicity | Date of Birth (MM/DD/YYYY) | Gender | Interviewed (Yes/No) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**Table G1 Instructions:**

- For both foster care cases and in-home services cases, enter the first and last names (first name first) of all children in the family as identified in the case file. If the case is a foster care case, indicate "Yes" in the first column of the table next to the name of the target child. It is essential that the target child be clearly identified for all foster care cases.
- Enter the race and ethnicity information as provided in the case file.  If the child is of two or more races, list all that are provided in the case file (for example, White and Asian, or White and American Indian).  If you learn during the course of the interviews that a child is of a different race or ethnicity than is noted in the file or is of two or more races and only one is noted in the file (for example, Non-Hispanic instead of Hispanic, or both White **and** American Indian), please change the race or ethnicity identification information presented to reflect the accurate information.
- Select from the following options for ethnicity:  "Hispanic," "Non-Hispanic," "Unknown," and "Unable to Determine."
- Select from the following options for race:
  - American Indian or Alaska Native
  - Asian
  - Black or African American
  - Native Hawaiian or Other Pacific Islander
  - White
  - Unknown or Unable to Determine
- Provide the date of birth for every child in the family, even if this is a foster care case.
- If the child is abandoned or the date of birth is otherwise unknown, enter an approximate date of birth. Use the 15th as the day of birth.

## G2. Case Participant Table

| Name | Role | Relationship to Child | Interviewed (Yes/No) |
|------|------|----------------------|---------------------|
|      |      |                      |                     |
|      |      |                      |                     |
|      |      |                      |                     |
|      |      |                      |                     |

**Table G2 Instructions:**

- In the Name column, for both foster care and in-home services cases, enter the first and last names (first name first) of the key case participants whose participation in this case will be assessed in the instrument and other persons who were interviewed to provide relevant information.

- In the Role column, list one of the following options for each participant listed: Mother, Father, Caregiver, Foster Parent, Caseworker, Caseworker's Supervisor, Other.  The same role may be indicated for more than one person (for example, a biological father may have the role of Father, and a stepfather may have the role of Father).

- In the Relationship to Child column, indicate how the person is involved in the case and/or related to the child. Indicate whether the person is/was living with the child and/or in a caregiving role. For example: boyfriend of (child name)'s mother, lives in the home; biological mother of (children's names) not living in the home, not a caregiver; legal father of (child's name), not living in the home.

- In the Interviewed column, note whether the person has been interviewed regarding the case.

H.    Was this case opened for reasons other than child abuse and neglect?

Yes ☐            No ☐

**Question H Instruction:**

Examples of cases opened for reasons other than child abuse or neglect include: (1) cases opened because of the child's behavior, including juvenile delinquency, substance abuse, or "child in need of supervision," and there were no maltreatment concerns in the family; or (2) cases opened because parents requested mental/behavioral health services for their child(ren).

I.    What is the date of the first case opening, of the cases open for services during the period under review?

------/-------/---------------

*Onsite Review Instrument: Face Sheet*

---

**Question I Instructions:**

- Using the MM/DD/YYYY format, enter the date on which the case was actually opened within the agency. Consider all cases that were open for services during the period under review, if there were multiple case openings.  If the first case that was open during the period under review was opened before the period under review began, include it as the first case opening date for the period.
- If a child was on a trial home visit and returned to a foster care placement, the return to foster care is not considered a "case opening" unless the trial home visit was longer than 6 months and there was no court order extending the trial home visit beyond 6 months.
- If the family received in-home services before the removal of a child and placement of the child in foster care, and the case was not closed before placement, enter the date on which the case was opened for in-home services.  The date of the child's removal from home will be captured in the next question.

---

J.   What is the date of the child's most recent entry into foster care?

------/-------/---------------         NA ☐

---

**Question J Definition:**

"Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the placement and care responsibility of the state or local title IV-B/IV-E agency. Children are considered to have entered foster care if the child has been in substitute  care for 24 hours or more.

**Question J Instructions:**

- Using the MM/DD/YYYY format, enter the date of the child's most recent entry into foster care.
- If a child was on a trial home visit and returned to a foster care placement, the return is not considered an "entry into foster care" unless the trial home visit was longer than 6 months and there was no court order extending the trial home visit beyond 6 months.
- If the case is an in-home services case, J is Not Applicable.

---

K.   What is the date of discharge from foster care for the most recent foster care episode?

------/-------/---------------         NA ☐         Not Yet Discharged ☐

---

**Question K Definition:**

"Discharge from foster care" is defined as the point when the child is no longer in foster care under the placement and care responsibility or supervision of the agency.

**Question K Instructions:**

- Using the MM/DD/YYYY format, enter the date of discharge from foster care for the most recent foster care episode.
- If a child returns home on a trial home visit and the agency retains responsibility or supervision of the child, the child should be considered discharged from foster care only if the trial home visit was longer than 6 months, and there was no court order extending the trial home visit beyond 6 months.
- If the child is in foster care but has not yet been discharged, select Not Yet Discharged.
- If the case is an in-home services case, K is Not Applicable.

---

*Onsite Review Instrument: Face Sheet*

L.   What is the date of the most recent case closure during the period under review?

------/-------/---------------        Case not closed by time of review ❑

---

**Question L Instructions:**

- Using the MM/DD/YYYY format, enter the date on which the agency officially closed the case. For foster care cases, this may or may not be the same as the discharge date.
- If there were multiple case openings and closures during the period under review, indicate the date of the last case closure that occurred during the period.
- If the case is still open at the time of review, select "Case not closed by time of review."

---

M.   Why was/were the case(s) opened for services?

❑ Physical abuse
❑ Sexual abuse
❑ Emotional maltreatment
❑ Neglect (not including medical neglect)
❑ Medical neglect

❑ Abandonment
❑ Mental/physical health of parent
❑ Mental/physical health of child
❑ Substance abuse by parent(s)
❑ Child's behavior
❑ Substance abuse by child

❑ Domestic violence in child's home
❑ Child in juvenile justice system
❑ Other (specify)

---

**Question M Instructions:**

Indicate the reason(s) for case opening(s) by selecting all that apply. Consider all cases open during the period under review. The reason for case opening should be based on whatever information is available in the case record and from interviews that identifies why the agency opened the case. This would include the maltreatment type that was substantiated or resulted in case opening and it could also include other information that informed the agency's decision to open the case. If "other" was checked as a reason the case was opened for services, the circumstances and reason must be very clearly documented in the narrative.

---

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104–13)
Public reporting burden for this collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, reading case files and conducting interviews, and reviewing the collection of information.  An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

## SECTION I: SAFETY

## SAFETY OUTCOME 1: CHILDREN ARE, FIRST AND FOREMOST, PROTECTED FROM ABUSE AND NEGLECT.

### Item 1: Timeliness of Initiating Investigations of Reports of Child Maltreatment

**Purpose of Assessment:** To determine whether responses to all accepted child maltreatment reports received during the period under review were initiated, and face-to-face contact with the child(ren) made, within the time frames established by agency policies or state statutes.

### Item 1 Applicable Cases:

- Cases are applicable for an assessment of this item if an accepted child maltreatment report on any child in the family was received during the period under review. "Accepted" means that the report  was assigned to the agency to conduct an assessment or investigation.  This includes reports  assigned for an "alternative response" assessment. Reports that are screened out are not  considered "accepted."   "Alternative response" refers to an agency's approach to addressing child  maltreatment reports that meet agency criteria for acceptance but at the initial screening do not meet  the agency's requirements for a mandated investigation. For example, the agency's policy may be  that reports that appear to present low to moderate risk to the child may be referred for a family  assessment, rather than an investigation.  Under such a response, no determination of child  maltreatment is made.  The alternative response may include an assessment to determine the safety  of the child(ren), the risk of maltreatment, and the family's strengths and needs.  The assessment  may lead the state agency to provide services to eliminate or lessen the safety concerns and  maltreatment risks.
- Cases are Not Applicable for an assessment of this item if, during the period under review, there were no child maltreatment reports on any child in the family, or if a report was received on a child in the family but it was "screened out"; that is, not  referred for an assessment or investigation.

### Is this case applicable?
Select the appropriate response below. If the response is No, rate the case as Not Applicable in the ratings section and continue to item 2.

Yes ☐            No ☐

Optional: Provide comments in the narrative field below:

## A1. **Reports Table**

| Report Date | Name of Child | Allegation | Priority Level, If Applicable | Assessment or Investigation | Date Assigned for an Investigation or Assessment | Date Investigation or Assessment Initiated | Date of Face-to-Face Contact With Child | Relationship of Alleged Perpetrator to Child | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Table 1A1 Instructions:**

- Complete the table for all accepted reports received during the period under review.
- Reviewers should list reports by date, per child, and per allegation (for each perpetrator). If the same child had multiple allegations that resulted in separate dispositions, each allegation should be indicated in a separate row in the table so that the disposition can be noted for each allegation. If multiple allegations received the same disposition, all allegations may be indicated in the same row.
- If the state has policies outlining different priority levels for reports, indicate the priority level that was assigned.
- Indicate whether the report was assigned for an investigation or referred for an assessment.
- The date assigned for an investigation or assessment is the date the report is assigned to a specific worker to conduct the investigation or assessment. If the report was not assigned, the reviewer documents the date assigned as "Did not occur."
- The date the investigation or assessment was initiated is the date on which the agency made the first attempt to contact the family. Reviewers should include the date on which the investigation/assessment was initiated per state policy, or if no state policy exists, reviewers should include the date when contact with the family was first attempted. If the investigation or assessment was not initiated or face-to-face contact with the child did not occur, the reviewer documents these dates as "Did not occur."
- In the last column, report the disposition of the case. If the case was investigated, indicate whether the report was "Substantiated" or "Not Substantiated" (this may be documented in the record as "founded" or "unfounded," or "indicated" or "not indicated").  If the investigation has not been completed as of the time of review, indicate "Investigation Pending."  If the case was referred for an assessment, indicate whether it was "opened for services" or "not opened for services."  If the assessment has not yet been completed,  indicate "Assessment  Still Pending."

---

> **Question 1A and B Instructions**
> - When tallying the number of reports in responding to questions A and B, reviewers should not count each allegation or child as a separate report, but rather consider the date of the report as a distinct report made to the agency.

A.      In how many of the reports listed in the table was the investigation or assessment NOT initiated in accordance with the state's time frames and requirements for a report of that priority?

_____

B.      In how many of the reports in the table was face-to-face contact with the child(ren) who is (are) the subject of the report NOT made in accordance with the state's time frames and requirements for a report of that priority?

_____

C.      For all reports identified in A and B, were the reasons for the delays due to circumstances beyond the control of the agency?

Yes ☐        No ☐            NA ☐

Explain the reason for any delays related to reports identified in A and B in the narrative field below.

---

> **Question 1C Instructions:**
> - If the answers to both questions A and B are zero, the answer to question C should be Not Applicable.
> - Delays in services provided by organizations or agencies under contract with the agency would not be considered to be beyond the control of the agency. However, where services are provided by another public state or local agency, such as law enforcement, the actions of these agencies may be beyond the control of the child welfare agency.

### Item 1 Rating Criteria:

**Item 1 should be rated as a Strength if either of the following applies:**
- **The answers to A and B are zero.**
- **The answers to A or B are greater than zero, but the answer to C is Yes.**

**Item 1 should be rated as an Area Needing Improvement if the following applies:**

- **The answer to A or B is greater than zero, and the answer to C is No.**

**Item 1 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 1 Rating (select one):**

Strength ☐                    Area Needing Improvement ☐                    NA ☐

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

---

Override this rating? ☐

Overridden rating:
Strength ☐                    Area Needing Improvement ☐                    NA ☐

Override reason:

---

# RATING SAFETY OUTCOME 1

## SAFETY OUTCOME 1: CHILDREN ARE, FIRST AND FOREMOST, PROTECTED FROM ABUSE AND NEGLECT.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the rating for Item 1?

**Instructions:**

Safety Outcome 1 should be rated as Substantially Achieved if the following applies:

- Item 1 is rated as a Strength.

Safety Outcome 1 should be rated as Not Achieved if the following applies:

- Item 1 is rated as an Area Needing Improvement.

Safety Outcome 1 should be rated as Not Applicable if the following applies:

- Item 1 is rated as Not Applicable.

Select the appropriate response:

Substantially Achieved ☐            Not Achieved ☐            NA ☐

## SAFETY OUTCOME 2: CHILDREN ARE SAFELY MAINTAINED IN THEIR HOMES WHENEVER POSSIBLE AND APPROPRIATE.

### Item 2: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry Into Foster Care

**Purpose of Assessment:** To determine whether, during the period under review, the agency made concerted efforts to provide services to the family to prevent children's entry into foster care or re-entry after a reunification.

**Item 2 Applicable Cases:** In the list of criteria below, check Yes for any that apply and No for any that do not apply. A case is applicable for an assessment of this item if it meets at least one of the following criteria:

- It is an in-home services case and the reviewer determines that there are concerns regarding the safety of at least one child in the family during the period under review. Yes ❑   No ❑
- It is an in-home services case and services were provided for children at risk of foster care placement to remain safely in their homes. Yes ❑   No ❑
- It is a foster care case and the child entered foster care during the period under review due to safety concerns. Yes ❑   No ❑
- It is a foster care case and the child was reunified during the period under review or was returned home on a trial basis, and the reviewer determines that there are concerns regarding the safety of that child in the home. Yes ❑   No ❑
- It is a foster care case, and although the target child entered foster care before the period under review and remained in care for the entire period under review, there are other children in the home and the reviewer determines that there are concerns regarding the safety of those children during the period under review. Yes ❑   No ❑

However, a case is not applicable for an assessment of this item if it meets the following criterion, even if the case is applicable based on the criteria above:

- Only a safety plan was needed to ensure the child(ren)'s safety and no safety-related services were necessary based on the circumstances of the case. (In this situation, Item 2 would be Not Applicable and the safety plan would be assessed in Item 3.) Yes ❑   No ❑

### Is this case applicable?
Select the appropriate response below. If the response is No, rate the case as Not Applicable in the ratings section and continue to Item 3.

Yes ❑          No ❑

Optional: Provide comments in the narrative field below:

_____

A.    For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect the children and prevent their entry into foster care or re-entry into foster care after a reunification?  (Be sure to assess the entire period under review.)

Yes ❑          No ❑

If No, explain circumstances in the narrative field below.

_____

**Question 2A Definitions**:

- "Appropriate services," for the purposes of Item 2, are those that are provided to, or arranged for, the family  with the explicit goal of ensuring the child's safety. Examples include: (1) if there are safety issues in the  home due to environmental hazards, homemaking services could be an appropriate safety-related service; (2) if there are safety concerns related to the parent's ability to manage specific child needs or child  behaviors, intensive in-home services could be an appropriate safety-related service; (3) child care services  could be a safety-related service in cases where the child was being cared for in an unsafe setting or by an  inappropriate caregiver; and (4) if there are safety concerns related to parental substance abuse, substance  abuse treatment could be an appropriate safety-related service. In most cases a child's need for mental  health services, education-related services, or services to address health issues, would not be considered  relevant to the child's safety if the child remained in the home.  The agency's efforts to meet those service  needs are assessed in other items.
- "Concerted efforts," for the purposes of Item 2, refers to facilitating a family's access to needed services and   working to engage the family in those services.

**Question 2A Instructions**:

- In answering question A, focus only on whether the agency made concerted efforts to provide appropriate  and relevant services to the family to address the safety issues in the family so that the child could  remain safely in the home or would not re-enter foster care after reunification. Concerns about monitoring service participation and safety planning and assessment of progress made will be captured in Item 3.
- If the agency removed the child from the home without making concerted efforts to provide services, the answer to question A should be No, even if the agency determined that it was necessary to remove the child for safety reasons.  This issue will be addressed in question B.

B.    If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety?

Yes ☐          No ☐          NA ☐

If No, explain any concerns in the narrative field below.

**Question 2B Instructions:**

- If the answer to question A is Yes, but, after making efforts to provide services, the child was removed from the home during the period under review due to unmanageable safety concerns, the answer to question B should be Not Applicable.

- If the child was not removed from the home during the period under review, the answer to question B should be Not Applicable.

- Focus on whether the circumstances of the case and of the removal suggest that services would not have been able to ensure the child's safety if the child remained in the home.  If the information indicates that it was necessary to remove the child immediately to ensure the child's safety, the answer to question B should be Yes. If the information indicates that services could have been provided to prevent removal but the child was removed without providing those services, this question should be answered No.

- If services should have been offered to protect the child, but were not because those services were not available in the community, the answer to question B should be No.

**Item 2 Rating Criteria:**

**This item should be rated as a Strength if either of the following applies:**

- **The answer to question A is Yes, and the answer to question B is Not Applicable.**

- **The answer to question A is No, and the answer to question B is Yes.**

**This item should be rated as an Area Needing Improvement if either of the following applies:**

- **The answer to question A is No, and the answer to question B is No.**

- **The answer to question A is No, and the answer to question B is Not Applicable.**

**Item 2 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 2 Rating (select one):**

Strength ❑          Area Needing Improvement ❑          NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:



Override this rating? ❑

Overridden rating:
Strength ❑          Area Needing Improvement ❑          NA ❑

Override reason:

## SAFETY OUTCOME 2: CHILDREN ARE SAFELY MAINTAINED IN THEIR HOMES  WHENEVER POSSIBLE AND APPROPRIATE.

### Item 3: Risk and Safety Assessment and Management

**Purpose of Assessment:** To determine whether, during the period under review, the agency made concerted efforts to assess and address the risk and safety concerns relating to the child(ren) in their own homes or while in foster care.

### Item 3 Applicable Cases: All cases are applicable for an assessment of this item.

A1.  Did any of the following concerns exist during the period under review?

- There were maltreatment allegations about the family but they were never formally reported or formally investigated/assessed. Yes ☐   No ☐
- There were maltreatment allegations that were not substantiated despite evidence that would support substantiation. Yes ☐    No ☐

A.    If the case was opened during the period under review, did the agency conduct an initial assessment that accurately assessed all risk and safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home?

Yes ☐          No ☐        NA ☐

If No, explain any concerns in the narrative field below.

```
                                                                                
```

---

**Questions 3A and 3B Definitions:**

- "Risk" is defined as the likelihood that a child will be maltreated in the future.

- An assessment of safety is made to determine whether a child is in a safe environment. A safe environment is one in which there are no threats that pose a danger or, if there are threats, there is a responsible adult in a caregiving role who demonstrates sufficient capacity to protect the child.

- "Target child" is defined as the child in a foster care case who is the subject of the case.

**Questions 3A and 3B Instructions:**

- For foster care cases, questions A and B should be answered for the target child in foster care and any children remaining in the home.
- For in-home services cases, questions A and B should be answered for all children in the home.
- In responding to questions A and B, consider any concerns selected in 3A1.
- Question A should be answered Not Applicable if the case was opened before the period under review, unless the initial assessment related to the case opening was pending or completed during the period under review.

---

B.    During the period under review, did the agency conduct ongoing assessments that accurately assessed all of the risk and safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home?

Yes ☐        No ☐        NA ☐

If No, explain any concerns in the narrative field below.

<br>

---

**Question 3B Instructions:**

- In responding to question B, determine whether ongoing assessments (formal or informal) were conducted during the period under review. If the agency conducted an initial assessment of risk and safety at the onset of the case, but did not assess for risk and safety concerns on an ongoing basis and at critical times in the case (for example, when there were new allegations of abuse or neglect, changing family conditions, new people coming into the family home or having access to the children, changes to visitation, upon reunification, or at case closure) then the answer to question B should be No.

- Note that in some cases that were opened during the period under review, the issue of ongoing assessments may not be relevant because the case was opened for a very short period of time (for example, if the case was opened shortly before the end of the period under review and during the initial assessment the agency determined that there were no risk or safety concerns, then it may be reasonable to conclude that the agency would not have conducted a second risk and safety assessment during the period under review). If the case was opened during the period under review and you believe that ongoing assessments were not necessary given the time frame and circumstances of the case, question B may be answered Not Applicable.

- If a case was closed during the period under review, determine whether the agency conducted a risk and safety assessment before closing the case. If not, the answer to question B should be No.

---

C.    During the period under review, if safety concerns were present, did the agency: (1) develop an appropriate safety plan with the family and (2) continually monitor and update the safety plan as needed, including monitoring family engagement in any safety-related services?

Yes ☐        No ☐        NA ☐

If No, explain any concerns in the narrative field below.

<br>

---

**Question 3C Definition:**

"Safety plan" refers to a plan that describes strategies developed by the agency and family to ensure that the child(ren) is (are) safe. Safety plans should address (1) safety threats and how those will be managed and addressed by the caregiver, (2) caregiver capacity to implement the plan and report safety issues to the agency, and (3) family involvement in implementation of the plan. Safety plans may be separate from or integrated into the case plan.

**Question 3C Instructions:**

- Question C is applicable to all in-home services cases and to foster care cases in which there are other children remaining in the family home, and/or the target child in foster care returned home during the period under review. For in-home cases in which children are placed temporarily with alternative caregivers to ensure safety, reviewers should consider that as a safety plan to be assessed in question C.

- Question C should be answered Not Applicable if the reviewer determines that during the period under review there were no apparent safety concerns for any child in the family home.

---

**D1.**   Indicate whether any safety-related incidents occurred during the period under review. Select all that apply:

❒ Recurring maltreatment: There was at least one substantiated or indicated maltreatment report on any child in the family during the period under review AND there was another substantiated report within a 6-month period before or after that report **that involved the same or similar circumstances**.  In determining the similarity of the circumstances, consider the perpetrator of the maltreatment and other individuals involved in the incident.

❒ Recurring safety concerns: There was at least one maltreatment report involving any child in the family during the period under review that was handled by an alternative response and resulted in opening the case for services to address safety concerns (this decision may have been made by the agency or by a private provider under contract with the agency) AND there was at least one additional maltreatment report  within a 6-month period before or after that report that was handled by an alternative response and resulted  in a decision to open the case for services **to address the same or similar safety concerns** (the case  may have been opened for services by the agency or by a private provider under contract with the agency).  In determining the similarity of the concerns, consider the perpetrator of the maltreatment, other individuals  involved in the incident, and the type of safety issues that existed.

❒ The case was closed while significant safety concerns that were not adequately addressed still existed in the home.

❒ Other (describe any other safety-related incidents that were not adequately addressed by the agency):

    _____

❒ NA (no safety issues were present during the period under review).

❒ No safety-related incidents occurred that were not adequately addressed by the agency.


**D.**   During the period under review, were there safety concerns pertaining to the target child in foster care and/or any child(ren) in the family  remaining in the home that were not adequately or appropriately addressed by the agency?

Yes ❒       No ❒       NA ❒

---

**Question 3D Instructions:**

- Question D is applicable to all cases.
- Answer Yes if any safety-related incidents in D1 are selected.
- Answer No if no safety-related incidents occurred that were not adequately addressed by the agency.
- Answer NA if no safety issues were present during the period under review.

---

**E1.**   For foster care cases only, indicate whether any safety concerns related to visitation were present during the period under review. Select all that apply:

❒ NA (this is an in-home services case, or the target child did not have any visitation).

❒ No unmitigated safety concerns related to visitation were present.

❒ Sufficient monitoring of visitation by parents/caretakers or other family members was not ensured.

❒ Unsupervised visitation was allowed when it was not appropriate.

❒ Visitation was court-ordered despite safety concerns that could not be controlled with supervision.

❒ Other (describe the safety concerns that existed with visitation): _____

E.    During the period under review, was there a safety concern related to the target child in foster care during visitation with parents/caretakers or other family members?

Yes ❑          No ❑          NA ❑

---

**Question 3E Instructions:**
- Select Not Applicable if this is not a foster care case.
- Answer Yes if any safety concerns in E1 are selected.
- If no safety concerns were identified in E1, answer No.
- If the child does not have visits with parents/caretakers or with other family members, select  Not Applicable.

---

F1.  For foster care cases only, indicate whether any concerns existed for the child in at least one foster care placement during the period under review. Select all that apply:

❑ NA (this is an in-home services case).

❑ No safety concerns existed for the target child while in foster care placement that were not adequately addressed.

❑ There was a substantiated allegation of maltreatment of the child by a foster parent (including a relative foster parent) or facility staff member that could have been prevented if the agency had taken appropriate actions.

❑ There was a critical incident report or other major issue relevant to noncompliance by foster parents or facility staff that could potentially make the child unsafe, and the agency could have prevented it or did not provide an adequate response after it occurred.

❑ The child's placement during the period under review presented other risks to the child that are not being addressed, even though no allegation was made and no critical incident reports were filed.

❑ You discover that there are safety concerns related to the child in the foster home of which the agency is unaware because of inadequate monitoring.

❑ Other (describe any other safety concerns that existed with the child's foster placement):_____

---

**Questions 3F1 and 3F Definition:**

Foster parents are defined as related or non-related caregivers who have been given responsibility for care of the child by the agency while the child is under the placement and care responsibility and supervision of the agency. This includes pre-adoptive parents if the adoption has not been finalized.

---

F.    For foster care cases only, during the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members, that was not adequately or appropriately addressed by the agency?

Yes ❑          No ❑          NA ❑

**Question 3F Instructions:**

- Answer Not Applicable if this is not a foster care case.
- Answer No if no unaddressed concerns were noted in F1.
- Answer Yes if you determine that, during the period under review, the child was in at least one foster care placement in which he or she was unsafe, and appropriate action was not taken (such as providing closer monitoring of the placement, placing fewer children in the home, providing services to address potential problems or existing problems, or finding a more appropriate placement).  If any concerns are selected in F1, question F should be answered Yes.

## Item 3 Rating Criteria

**Item 3 should be rated as a Strength if the following applies:**

- **Questions A and  B are both answered Yes, or**
- **The answer to either A or B is Yes and the other is Not Applicable, and**
- **The answer to question C is either Yes or Not Applicable, and**
- **The answers to questions D, E, and F are either No or Not Applicable.**

**Item 3 should be rated as an Area Needing Improvement if the following applies:**

- **The answer to any one of questions A, B, or C is No, and/or**
- **The answer to any one of questions D, E, or F is Yes.**

**There are no circumstances under which Item 3 could be rated as Not Applicable.**

**Item 3 Rating (select one):**

Strength ❑        Area Needing Improvement ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

| |
|---|
| |

**Override this rating?** ❑

Overridden rating:
Strength ❑        Area Needing Improvement ❑

Override reason:

| |
|---|
| |

# RATING SAFETY OUTCOME 2

## SAFETY OUTCOME 2: CHILDREN ARE SAFELY MAINTAINED IN THEIR HOMES WHENEVER POSSIBLE AND APPROPRIATE.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the ratings for Items 2 and 3?

**Instructions:**

Safety Outcome 2 should be rated as Substantially Achieved if either of the following applies:

A. Items 2 and 3 are rated as Strengths.

B. Item 2 is rated as Not Applicable and Item 3 is rated as a Strength. Safety

Outcome 2 should be rated as Partially Achieved if the following applies:

C. One of the two items is rated as a Strength and the other as an Area Needing Improvement.

Safety Outcome 2 should be rated as Not Achieved if either of the following applies:

D. Items 2 and 3 are rated as Areas Needing Improvement.

E. Item 2 is rated as Not Applicable and Item 3 is rated as an Area Needing Improvement.

Select the appropriate response:

Substantially Achieved ❑          Partially Achieved ❑          Not Achieved ❑

# SECTION II: PERMANENCY

## PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY IN THEIR LIVING SITUATIONS.

### Item 4: Stability of Foster Care Placement

**Purpose of Assessment:** To determine whether the child in foster care is in a stable placement at the time of the onsite review and that any changes in placement that occurred during the period under review were in the best interests of the child and consistent with achieving the child's permanency goal(s).

**Item 4 Applicable Cases:** All foster care cases are applicable for an assessment of this item.

A1. **Placement Table**

| Placement Date | Placement Type | Reason for Change in Placement Setting |
|----------------|----------------|----------------------------------------|
|                |                |                                        |
|                |                |                                        |
|                |                |                                        |
|                |                |                                        |
|                |                |                                        |

**Table 4A1 Definitions and Instructions:**

Complete the placement table. Begin with the child's placement setting at the onset of the period under review, or if the child entered foster care during the period under review, begin with the first placement setting at entry into foster care.  If there was only one placement setting, complete only the first two columns of the first row.

Select from the following options for placement type. Definitions for each placement type are provided:

- Pre-Adoptive Home—A home in which the family intends to adopt the child.  The family may or may not be receiving a foster care payment or an adoption subsidy on behalf of the child.
- Foster Family Home (Relative)—A licensed or unlicensed home of the child's relatives regarded by the title IV-E agency as a foster care living arrangement for the child.
- Foster Family Home (Non-Relative)—A licensed foster family home regarded by the title IV-E agency as a foster care living arrangement.
- Group Home—A licensed or approved home providing 24-hour care for children in a small group setting that generally has from seven to twelve children.
- Institution—A child care facility operated by a public or private agency and providing 24-hour care and/or treatment for children who require separation from their own homes and group living experience. These facilities may include child care institutions, residential treatment facilities, maternity homes, etc.
- Supervised Independent Living—An alternative transitional living arrangement where the child is under the supervision of the agency but without 24-hour adult supervision, is receiving financial support from the child welfare agency, and is in a setting that provides the opportunity for increased responsibility for self-care.
- Other—A licensed or unlicensed placement setting that is not included in the list of placement types considered for this item AND is not one of the placement settings that should not be counted as a placement per Table 4A1 Instructions, such as runaway or respite care. Examples include a child's placement in a hotel or agency office.

Select from the following options for reason for change in placement setting:
- NA. This is the current placement.
- Move to an adoptive or permanent guardian's home
- Move from a more restrictive to a less restrictive placement
- Move from a less restrictive to a more restrictive placement
- Move to a relative placement
- Move that brings the child closer to family or other important connections
- Move to a temporary placement while awaiting a more appropriate placement
- Move due to foster parent's request
- Other (describe)_____

A.  How many placement settings did the child experience during the period under review?

_____

---

**Question 4A Definitions:**

- "Placement setting" refers to a physical setting in which a child resides while in foster care under the placement and care responsibility of the agency.  A new placement setting would result, for example, when a child moves from one foster family home to another or to a group home or institution.  If, however, a foster family with whom a child is placed moves and the child moves with them, this does not constitute a change in placement.

- "Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the placement and care responsibility of the state or local title IV-B/IV-E agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more.

- "Current episode of foster care" refers to a child's current stay in foster care based on the most recent removal of the child from his or her normal place of residence, resulting in his or her placement in a foster care setting and ending upon the child's discharge from foster care.

**Question 4A Instructions:**

- If there were multiple episodes of foster care during the period under review, add up the placement settings within each episode. If there is a re-entry into foster care and the child is placed in a different placement setting at the time of re-entry, then it would count as a new placement setting.  If the child returns to the placement setting he or she was in before the return home, then it would not count as a new placement setting.

- Do not consider the following as placement settings: (1) a trial home visit; (2) a runaway episode; (3) temporary absences from the child's ongoing foster care placement, including visitation with a sibling, relative, or other caretaker (for example, pre-placement visits with a subsequent foster care provider or pre-adoptive parents); (4) hospitalization for medical treatment, acute psychiatric episodes, or diagnosis; (5) respite care; (6) day or summer camps; and (7) locked facilities (for example, when a youth is held in detention).

---

B.    Were all placement changes during the period under review planned by the agency in an effort to achieve the child's case goals or to meet the needs of the child?

Yes ❑          No ❑          NA ❑

---

**Question 4B Instructions**:

- If the response to question A is one (1), then the response to question B should be Not Applicable. If the single placement is not stable, that information will be collected in question C.
- Placement changes that reflect agency efforts to achieve case goals include moves from a foster home to an adoptive home, moves from a more restrictive to a less restrictive placement, moves from non-relative foster care to relative foster care, and moves that bring the child closer to family or community.
- Placement changes that do not reflect agency efforts to achieve case goals include moves due to unexpected and undesired placement disruptions; moves due to placing the child in an inappropriate placement (that is, moves based on mere availability rather than on appropriateness); moves to more restrictive placements when this is not essential to achieving a child's permanency goal or meeting a child's needs; temporary placements while awaiting a more appropriate placement; and practices of routinely placing children in a particular placement type, such as shelter care, upon initial entry into foster care regardless of individual needs.
- If ALL placement changes during the period under review reflect planned agency efforts to achieve the child's case goals or meet the needs of the child, then the answer to question B should be Yes.
- If any single placement change that occurred during the period under review was for a reason other than agency efforts to achieve case goals or to meet the child's needs, the answer to question B should be No.
- Placement changes that occur as a result of unexpected circumstances that are out of the control of the agency (such as the death of a foster parent or foster parents moving to another state) can be considered similar to those that reflect agency efforts to achieve case goals for purposes of question B.

C1. Indicate whether any of the circumstances below apply to the child's current placement. Select all that apply:

❒ None apply, placement is stable.

❒ The child's current placement is in a temporary shelter or other temporary setting.

❒ There is information indicating that the child's current substitute care provider may not be able to continue to care for the child.

❒ There are problems in the current placement threatening its stability that the agency is not addressing.

❒ The child has run away from this placement more than once in the past, or is in runaway status at the time of the review.

❒ Other (describe reasons why the current placement is not stable): _____

C.   Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable?

Yes ❒         No ❒

---

**Question 4C Instruction:**

If any of the circumstances in C1 apply to the child's current placement, the answer to question C should be No.

---

**Item 4 Rating Criteria:**

**Item 4 should be rated as a Strength if either of the following applies:**

- **The answer to question A is one (1), the answer to question B is Not Applicable, and the answer to question C is Yes.**
- **The answer to question A is greater than one (1), but the answers to questions B and C are Yes.**

**Item 4 should be rated as an Area Needing Improvement if either of the following applies:**

- **The answer to question A is one (1), but the answer to question C is No.**
- **The answer to question A is greater than one (1), and the answer to question B and/or C is No**.

**Item 4 Rating (select one):**

Strength ❏        Area Needing Improvement ❏

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

<br>

**Override this rating? ❏**

Overridden rating:
Strength ❏        Area Needing Improvement ❏

Override reason:

<br>

**PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY  IN THEIR LIVING SITUATIONS.**

## Item 5: Permanency Goal for Child

**Purpose of Assessment:** To determine whether appropriate permanency goals were established for the child in a timely manner.

**Item 5 Applicable Cases:** All foster care cases are applicable for assessment of this item, unless the child has not been in foster care long enough (at least 60 days) for the agency to have developed a case plan and established a permanency goal.  If the child has been in foster care for less than 60 days, but a permanency goal has been established, the case is applicable for assessment.

### Is this case applicable?
Select the appropriate response.  If the response is No, rate the item as Not Applicable in the rating section and continue to Item 6.

Yes ❑          No ❑

Optional: Provide comments in the narrative field below:

```



```

A1.  **Permanency Goal Table**

| Permanency Goal | Date Estab- lished | Time in Foster Care Before Goal Established | Date Goal Changed | Reason for Goal Change |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Table 5A1 Definitions**:

Permanency goals are defined as follows:

- A goal of reunification is defined as a plan for the child to be discharged from foster care to his or her parents or primary caretaker.
- A goal of guardianship is defined as a plan for the child to be discharged from foster care to a legally established custody arrangement with an individual that is intended to be permanent. This could include permanent placement with a relative.
- A goal of adoption is defined as a plan for the child to be discharged from foster care to the care and custody of adoptive parents through a legal adoption.
- A goal of other planned permanent living arrangement refers to a situation in which the agency maintains placement and care responsibility for, and supervision of, the child, and places the child in a setting in which the child is expected to remain until adulthood. Examples of these "permanent" living arrangements include situations where foster parents have made a formal commitment to care for the child until adulthood, the child is with relatives who plan to care for the child until adulthood, the child is in a long-term care facility to meet special needs and will be transferred to an adult facility at the appropriate time, the child is an older adolescent in a stable group home and both the group home directors and the child have agreed that it will be the child's placement until adulthood, or the child is in agency-supervised transitional living.

**Table 5A1 Instructions**:

Complete the table for each of the permanency goals in place during the period under review. Begin with the child's first permanency goal in place during the period under review, and end with the current or latest permanency goal or goals. If no permanency goal is specified in the case file, but the caseworker indicates that a permanency goal has been established reviewers should consider that goal. If two concurrent permanency goals have been established and are identified in the case plan, identify both goals in the table.

A2. What is (are) the child's current permanency goal(s)? (If concurrent permanency goals have been established in the case plan, identify both goals.) Or, if the case was closed during the period under review, what was the permanency goal before the case was closed?

Permanency Goal 1:_____

Permanency Goal 2 (if applicable): _____

A3. Is (are) the child's permanency goal(s) specified in the case file?

Yes ❑        No ❑        NA ❑

**Question 5A3 Instructions:**

- If the child has been in foster care less than 60 days and the goal is not specified in the case file, A3 should be answered NA.
- If the permanency goal(s) is (are) not specified anywhere in the case file, such as in the case plan or in a court order, then the answer to question A3 should be No.

*Section II: Permanency Outcome 1*

**B.**    Were all the permanency goals that were in effect during the period under review established in a timely manner?

Yes ☐        No ☐        NA ☐

If No, explain any concerns in the narrative field below.

```
[                                                                              ]
```

---

**Question 5B Instructions:**

- If the child has been in foster care less than 60 days, question B should be answered NA.

- Answer this question based on your professional judgment regarding the timeliness of establishing the goal, particularly with regard to changing a goal.  For children who recently entered care, expect the first permanency goal to have been established no later than 60 days from the date of the child's entry into foster care, consistent with the federal requirement. For children whose goal was changed from reunification to adoption, consider the guidelines established by the federal Adoption and Safe Families Act regarding seeking termination of parental rights, which might affect the timeliness of changing a goal from reunification to adoption.

- Answer this question for all permanency goals in effect during the period under review. If there are concurrent goals, the answer should apply to both goals. For example, if there are concurrent goals of reunification and adoption, and you believe that the reunification goal was established in a timely manner, but the adoption goal was not, the answer to question B should be No.

---

**C.**    Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case?

Yes ☐        No ☐

If No, explain any concerns in the narrative field below.

```
[                                                                              ]
```

---

**Question 5C Instructions:**

- Answer this question based on your professional judgment regarding the appropriateness of the permanency goal.

- Consider the factors that the agency considered in deciding on the permanency goal and whether all of the relevant factors were evaluated.

- If one of the goals is other planned permanent living arrangement and the reviewer determines that the goal was established without a thorough consideration of other permanency goals, then the answer to question C should be No.

---

D.   Has the child been in foster care for at least 15 of the most recent 22 months?

Yes ☐          No ☐

---

**Question 5D Instruction:**

- In answering question D, begin the "count" with the date of the judicial finding of child abuse and neglect (usually the adjudicatory hearing) or 60 days after the child's entry into foster care, whichever is earlier. If the child had multiple episodes in care over the past 22 months, the determination of whether the child had been in care for at least 15 months should be calculated cumulatively over the episodes in foster care during the past 22 months from the review date.

- Trial home visits and runaway episodes are not included when calculating 15 out of 22 months in foster care.

- Question 5D applies to all children in foster care regardless of adjudication type.

---

E.   Does the child meet other Adoption and Safe Families Act criteria for termination of parental rights?

Yes ☐          No ☐          NA ☐

---

**Question 5E Definitions:**

The Adoption and Safe Families Act requires an agency to seek termination of parental rights when the child has been in care for at least 15 of the most recent 22 months, or a court of competent jurisdiction has determined that:

- The child is an abandoned infant, or
- The child's parents have been convicted of one of the felonies designated in Section 475(5)(E) of the Social Security Act: (1) committed murder of another child of the parent; (2) committed voluntary manslaughter of another child of the parent; (3) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter; or (4) committed a felony assault that resulted in serious bodily injury to the child or another child of the parent.

**Question 5E Instructions:**

- If the answer to question D is Yes, the answer to question E should be Not Applicable.
- Question E must be answered if the answer to question D is No.
- If any of the conditions noted above apply to the case under review, question E should be answered Yes.

---

F.   Did the agency file or join a termination of parental rights petition before the period under review or in a timely manner during the period under review?

Yes ☐          No ☐          NA ☐

**Question 5F Instructions:**

- If the answers to both questions D and E are No, the answer to question F should be Not Applicable.
- Review the case file for evidence of petitioning for termination of parental rights.  If there is no evidence of this in the file, then ask the caseworker for documentation regarding petitioning for termination of parental rights. If there is no evidence in the file or other documentation, then question F should be answered No.
- Answer 5F as Not Applicable if both parents were either deceased or relinquished parental rights prior to the 15/22-month time frame.

G1.  Indicate whether any of the following exceptions to the termination of parental rights requirement apply.

NA ☐

(1) At the option of the state, the child is being cared for by a relative at the 15/22-month time frame.

Yes ☐        No☐

(2) The agency documented in the case plan a compelling reason for determining that termination of parental rights would not be in the best interests of the child.

Yes ☐        No☐

(3) The state has not provided to the family the services that the state deemed necessary for the safe return of the child to the child's home.

Yes ☐        No☐

**Question 5G1 Instruction:**

If the answer to question F is Yes or Not Applicable, then question G1 should be answered Not Applicable.

G.   Did an exception to the requirement to file or join a termination of parental rights petition exist?

Yes ☐        No ☐        NA ☐

---

**Question 5G Instructions:**

- If the answer to question F is Yes or Not Applicable, then question G should be answered Not Applicable.
- If any answers to G1 are yes, question G should be answered Yes.
- If, during an interview, the caseworker provides a compelling reason for not seeking termination of parental rights, but cannot provide any documentation, then question G should be answered No.

---

## Item 5 Rating Criteria:

**Item 5 should be rated as a Strength if any one of the following criteria apply:**

- **The answers to questions A3, B, and C are Yes or NA, and the answers to questions D and E are No.**
- **The answers to questions A3, B, and C are Yes or NA, and D and F are Yes.**
- **The answers to questions A3, B, and C are Yes or NA, the answer to question D is No, and the answers to questions E and F are Yes.**
- **The answers to questions A3, B, and C are Yes or NA, the answer to question D or E is Yes, the answer to question F is No, and the answer to question G is Yes.**

**Item 5 should be rated as an Area Needing Improvement if any of the following apply:**

- **The answer to question A3, B, or C is No.**
- **The answers to questions A3, B, and C are Yes or NA, but the answer to question D or E is Yes, and the answers to questions F and G are No.**

**Item 5 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 5 Rating (select one):**

Strength ☐         Area Needing Improvement ☐         NA ☐

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

Override this rating?  ☐

Overridden rating:
Strength ☐         Area Needing Improvement ☐         NA ☐

Override reason:

---

## PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY IN THEIR LIVING SITUATIONS.

### Item 6: Achieving Reunification, Guardianship, Adoption, or Other Planned Permanent Living Arrangement

**Purpose of Assessment:** To determine whether concerted efforts were made, or are being made, during the period under review to achieve reunification, guardianship, adoption, or other planned permanent living arrangement.

### Item 6 Applicable Cases: All foster care cases are applicable for this item.

A1.  What is the date of the child's most recent entry into foster care?

------/-------/----------------

---

**Question 6A1 Definition and Instruction:**

- "Entry into foster care" refers to a child's removal from his or her normal place of residence and placement in a substitute care setting under the placement and care responsibility of the state or local title IV-B/IV-E agency. Children are considered to have entered foster care if the child has been in substitute care for 24 hours or more.
- Using the MM/DD/YYYY format, enter the date of the child's most recent entry into foster care. This date should be the same as the date provided in section J on the Face Sheet.

---

A2.  What is the time in care (in months) at the time of the onsite review?

---

**Question 6A2 Instruction:**

Enter the number of months that the child was in foster care, from (1) the date of the most recent entry into foster care to the date the case is being reviewed, or (2) from the date of the most recent entry into foster care to the time of discharge.

---

A3.  What is the date the child discharged from foster care?

❐ NA        ------/-------/----------------

---

**Question 6A3 Definition and Instruction:**

- "Discharge from foster care" is defined as the point when the child is no longer in foster care under the placement and care responsibility or supervision of the agency. If a child returns home on a trial home visit and the agency retains responsibility or supervision of the child, the child is not considered discharged from foster care unless the trial home visit is longer than 6 months and there was no court order extending the trial home visit beyond 6 months.

- Using the MM/DD/YYYY format, enter the date the child discharged from foster care. This date should be the same as the date provided in section K on the Face Sheet. If the child was not discharged, select Not Applicable.

---

A4. What is (are) the child's current permanency goal(s)? (If concurrent permanency goals have been established in the case plan, identify both goals.) Or, if the case was closed during the period under review, what was the permanency goal before the case was closed?

Reunification ☐          Guardianship ☐          Adoption ☐          Other planned permanent living arrangement ☐

---

**Question 6A4 Instructions:**

If item 5 was completed, select the same goal or goals identified in question 5A2. If item 5 was not applicable, refer to the definitions and instructions provided for the table in item 5A1 in order to determine the child's permanency goal(s). For cases in which the child has been in foster care less than 60 days and no goal is documented, inquire with the caseworker about what the goal is (in most cases it should be reunification).

---

B. During the period under review, did the agency and court make concerted efforts to achieve permanency in a timely manner?

Yes ☐          No ☐          NA ☐

If No, explain any concerns in the narrative field below:

---

**Questions 6B and 6C Instructions:**

- If concurrent goals are in place and one of the goals has been, or will likely be, achieved in a timely manner, answer question B OR C based on the goal that has been or will be achieved.

- If concurrent goals are in place (neither of which is other planned permanent living arrangement) but permanency will not be achieved in a timely manner, answer question B No and indicate in the documentation specific barriers to implementing concurrent planning.

- If concurrent goals are in place and one of the goals is other planned permanent living arrangement but neither goal will be achieved in a timely manner, answer questions B and C No and indicate in the documentation specific barriers to implementing concurrent planning.

**Question 6B Instructions:**

- If the current or most recent goal for the child during the period under review was other planned permanent living  arrangement, and no other concurrent goals were in place, select Not Applicable.

- In determining a response to question B, consider the time the child has been in foster care as well as agency and court efforts.  The following time frames for achievement should be considered for each  goal:
  - Reunification: 12 months
  - Guardianship: 18 months
  - Adoption: 24 months

- If the child has been in foster care for more than the suggested time frame (12, 18, or 24 months, depending on the goal) and the goal has not yet been achieved, then the answer to question B should be No, unless there are particular circumstances that justify the delay. For example:
  - The permanency goal of reunification has been in place for longer than 12 months, but the child was physically returned to the parents during or before the 12th month and remained at home on a trial home visit beyond the 12th month. If you determine that the length of time that the child spent in out-of-home care and on the trial home visit was reasonable given the child and family circumstances, then the item may be rated as a Strength even though the child was not discharged from foster care until after the 12th month.
  - The permanency goal of adoption has been in place for longer than 24 months but there is evidence that the agency has made concerted efforts to find an adoptive home for a child with special needs although an appropriate family has not yet been found, or a pre-adoptive placement disrupted despite concerted efforts on the part of the agency to support it.

- If you determine that the agency and court could have achieved the permanency goal before the suggested time frame, but there was a delay due to lack of concerted efforts on the part of the agency or court during the period under review, then the answer to question B should be No even if the child achieved the goal within the suggested time frame.

C1.  If the child's current (or most recent) permanency goal is (was) other planned permanent living arrangement, what is (was) the child's permanent living arrangement?

❏ NA

❏ Placement with a non-relative foster parent until age of majority or extended age

❏ Placement with a specified relative in foster care until age of majority or extended age

❏ Placement in a longer-term facility until transition to an adult care facility

❏ Placement in an independent living program/supervised independent living until age of majority or extended age

❏ Other _____

**Question 6C1 Instructions:**

- If the child's current (or most recent) permanency goal was not other planned permanent living arrangement, select Not Applicable.
- If the child's current (or most recent) permanency plan is other planned permanent living arrangement, select the response that describes the permanent living arrangement for the child.
- If the child does not have a permanent living arrangement specified, indicate that in "Other."
- If the child has an arrangement that does not fit any of the options noted in C1, describe it in "Other."
- If the goal for the child is noted as "emancipation/independent living" without a permanent placement specified, indicate that in "Other."

C2.  For a child with a goal of other planned permanent living arrangement during the period under review, what is the date of documentation regarding "permanency" of the child's living arrangements?

NA ❑        No Date ❑        ------/-------/---------------

**Question 6C2 Definition and Instructions:**

- If the child's permanency goal is not other planned permanent living arrangement, select Not Applicable.
- The date of documentation regarding "permanency" is the date on which there was a court order, signed agreement, or other method to formalize that the caretaker or a particular facility would provide care for this child until the child reaches adulthood.
- If there is no documentation regarding "permanency" of the child's living arrangement, select "No Date."
- Using the MM/DD/YYYY format, enter the date of documentation regarding "permanency."

C.  For a child with a goal of other planned permanent living arrangement during the period under review, did the agency and court make concerted efforts to place the child in a living arrangement that can be considered permanent until discharge from foster care?

Yes ❑        No ❑        NA ❑

If No, explain any concerns in the narrative field below:

**Question 6C Instructions:**

- If the child's only goal during the period under review was reunification, guardianship, or adoption, select Not Applicable.
- Consider the child's current living arrangement and whether formal steps were completed to make this arrangement permanent.
- This might include the agency asking foster parents or relatives to agree to and sign a long-term care commitment, or ensuring that a child who is in a long-term care facility to meet special needs will be transferred to an adult facility at the appropriate time.
- If the child is no longer in foster care, then the answer to question C should be based on the child's last placement before leaving foster care.

**Item 6 Rating Criteria:**
**Item 6 should be rated as a Strength if the answer to either question B or C is Yes.**
**Item 6 should be rated as an Area Needing Improvement if the answer to question B and/or C is No.**

**Item 6 Rating (select one):**

Strength ❑        Area Needing Improvement ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

<div style="border:1px solid black; height:50px;"></div>

**Override this rating?** ❑

Overridden rating:

Strength ❑        Area Needing Improvement ❑

Override reason:

<div style="border:1px solid black; height:120px;"></div>

# RATING PERMANENCY OUTCOME 1

## PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY IN THEIR LIVING SITUATIONS.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the ratings for Items 4, 5, and 6?

**Instructions**:

Permanency Outcome 1 should be rated as Substantially Achieved if either of the following applies:

- Items 4, 5, and 6 are rated as Strengths

- Items 4 and 6 are rated as Strengths and Item 5 is rated as Not Applicable

Permanency Outcome 1 should be rated as Partially Achieved if the following applies:

- At least one of Items 4, 5, or 6 is rated as a Strength.

Permanency Outcome 1 should be rated as Not Achieved if either of the following applies:

- All of Items 4, 5, and 6 are rated as Areas Needing Improvement.

- Items 4 and 6 are rated as Areas Needing Improvement and Item 5 is rated as Not Applicable.

Select the appropriate response:

Substantially Achieved ❑          Partially Achieved ❑          Not Achieved ❑

## PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.

### Item 7: Placement With Siblings

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to ensure that siblings in foster care are placed together unless a separation was necessary to meet the needs of one of the siblings.

### Item 7 Applicable Cases

Cases applicable for an assessment of this item include all foster care cases in which the child has one or more siblings who are (or were) also in foster care during the period under review. If the child has no siblings in foster care during the period under review, the case is Not Applicable for an assessment of this item. For example, if the child in foster care has an older sibling who was in foster care at one time, but not during the period under review, this case would be Not Applicable.

### Is this case applicable?

Select the appropriate response.  If the response is No, rate the item as Not Applicable in the ratings section and continue to Item 8.

Yes ☐          No ☐

Optional: Provide comments in the narrative field below:

|  |
|--|
|  |

A.  During the entire period under review, was the child placed with all siblings who also were in foster care?

Yes ☐          No ☐

| |
|--|
| **Question 7A Definition and Instruction:** <br><br> • Siblings are children who have one or more parents in common either biologically, through adoption, or through the marriage of their parents, and with whom the child lived before his or her foster care placement, or with whom the child would be expected to live if the child were not in foster care. <br> • In answering question A, consider only the location of each of the siblings, not the reason for their location. If the child was placed with siblings for a portion of the period under review, or if the child was placed with one but not all siblings during the period under review, answer question A No. |

B.  If the answer to question A is No, was there a valid reason for the child's separation from the siblings?

Yes ☐      No ☐      NA ☐

If No, explain any concerns in the narrative field below:

|  |
|--|
|  |

**Question 7B Instructions:**

- If question A was answered Yes, then question B is NA.

- Consider the circumstances of the placement of siblings, focusing on whether separation was necessary to meet the child's needs. For example, were siblings separated temporarily because one sibling needed a specialized treatment or to be in a treatment foster home, or because one sibling was abusive to the other, or because siblings with different biological parents were placed with different relatives?

- If the separation of siblings is attributed by the agency to a lack of foster homes willing to take sibling groups, question B should be answered No.

- In cases of large sibling groups, reviewers should determine if concerted efforts were made to place the child with any of his or her siblings who were also in foster care, even if he or she was not placed with all siblings. If, for example, the agency was able to split a large sibling group into two placements so that the target child was in fact placed with some of his or her siblings, it could be determined that the agency made concerted efforts to place siblings together, and that would be reflected in the response to question B.

- If siblings were separated for a valid reason, consider the entire period under review and determine whether that valid reason existed during the whole period of separation. For example, the siblings were separated because one sibling needed temporary treatment services. However, during the period under review, the sibling's treatment services ended. In this situation, determine whether concerted efforts were made to reunite the siblings after the treatment service was completed. If the need for separation no longer existed and no efforts were made to reunite the siblings, then the answer to question B should be No.

**Item 7 Rating Criteria:**

**Item 7 should be rated as a Strength if either of the following applies:**

- **The answer to question A is Yes.**

- **The answer to question A is No, but the answer to question B is Yes.**

**Item 7 should be rated as an Area Needing Improvement if the answers to questions A and B are No.**

**Item 7 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 7 Rating (select one):**

Strength ❑          Area Needing Improvement ❑          NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

```

```

**Override this rating?** ❑
Overridden rating:
Strength ❑          Area Needing Improvement ❑          NA ❑
Override reason:

```

```

**PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.**

## Item 8: Visiting With Parents and Siblings in Foster Care

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to ensure that visitation between a child in foster care and his or her mother, father, and siblings is of sufficient frequency and quality to promote continuity in the child's relationship with these close family members.

---

**Definitions:**

- "Mother" and "Father" in items 8 and 11 are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.

- Because the focus of item 8 is to promote continuity in the child's relationships, do not include in this item a parent who did not have a relationship with the child prior to the child's entry in foster care, even if the goal is to reunify with that parent. Visitation for a parent in that circumstance may be assessed as a service need in item 12 (see item 12 instructions).

---

**Item 8 Applicable Cases:** Cases are applicable for an assessment of this item if the following applies:

- The child has at least one sibling in foster care who is in a different placement setting. Yes ☐  No ☐

Cases are Not Applicable for assessment if the child has no siblings placed separately in foster care, AND any of the following apply (check Yes for any that apply and No for any that do not apply):

- There is documentation in the case file indicating that contact between the child and both of his or her parents is not in the child's best interests. Yes ☐   No ☐

- The whereabouts of both parents are unknown despite documented concerted agency efforts to locate the parents. Yes ☐   No ☐

- Both parents were deceased during the entire period under review. Yes ☐     No ☐

- The parental rights of both parents remained terminated during the entire period under review. Yes ☐ No ☐

- The only parent(s) being assessed in this item does not meet the definition of Mother/Father for this item.

    Yes ☐    No ☐

## Is this case applicable?

Select the appropriate response.  If the response is No, rate the case as Not Applicable in the ratings section and continue to Item 9.

Yes ☐    No ☐

Indicate the case participants who are included in this item as Mother and Father:

---

Optional: Provide comments in the narrative field below:

---

A1.  What was the usual frequency of visits between the mother and the child during the period under review? Select the box next to the statement that best describes the typical frequency of visits during the period under review.

- ❏ NA
- ❏ More than once a week
- ❏ Once a week
- ❏ Less than once a week, but at least twice a month
- ❏ Less than twice a month, but at least once a month
- ❏ Less than once a month
- ❏ Never

A.   During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her mother was of sufficient frequency to maintain or promote the continuity of the relationship?

Yes ❏          No ❏          NA ❏

---

**Questions 8A1 and 8B1 Instruction:**

Answer Not Applicable if (1) contact between the child and the mother or father was not in the child's best interests and this was documented in the case file or court order, (2) the whereabouts of the mother or father was not known during the entire period under review, despite documented concerted efforts to locate her or him, (3) the mother's or father's parental rights remained terminated during the entire period under review, or (4) the mother or father was deceased during the entire period under review.

---

B1.  What was the usual frequency of visits between the father and the child during the period under review? Select the box next to the statement that best describes the typical frequency of visits during the period under review.

- ❏ NA
- ❏ More than once a week
- ❏ Once a week
- ❏ Less than once a week, but at least twice a month
- ❏ Less than twice a month, but at least once a month
- ❏ Less than once a month
- ❏ Never

B.   During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her father was of sufficient frequency to maintain or promote the continuity of the relationship?

Yes ❏          No ❏          NA ❏

---

**Questions 8A and 8B Instructions:**

- If A1 is NA, question A is answered Not Applicable.
- If B1 is NA, question B is answered Not Applicable.
- Determine whether the frequency of visitation during the period under review was sufficient to maintain the continuity of the relationship between the child and the mother or father, depending on the circumstances of the case. For example, frequency may need to be greater for infants and young children who are still forming attachments. Frequency also may need to be greater if reunification is imminent. Visitation should be as frequent as possible, unless safety concerns cannot be appropriately managed with supervision.  The opportunity for visitation should not be used as a consequence or reward for parents or for children.
- If, during the period under review, frequent visitation with the mother or father was not possible (for example, due to incarceration in a facility where visitation is not feasible, or if the parent lives in another state), determine whether there are documented concerted efforts to promote other forms of contact between the child and the mother or father, such as telephone calls or letters, in addition to facilitating visits when possible and appropriate.
- Address the question of appropriate frequency based on the circumstances of the child and the family, rather than on state policy.

C.    During the period under review, were concerted efforts made to ensure that the quality of visitation (or other forms of  contact if visitation was not possible)  between the child and the mother was sufficient to maintain or promote the continuity of the relationship?

Yes ❑        No ❑          NA ❑

---

**Questions 8C and 8D Instructions:**

- If A1 is NA or Never, question C is answered NA
- If B1 is NA or Never, question D is answered NA.
- Determine whether concerted efforts were made to ensure that the quality of parent-child visitation, and/or other forms of contact, was  sufficient to maintain the continuity of the relationship. For example, did visits take place in a  comfortable atmosphere and were they of an appropriate length?  Did visitation allow for sufficient  interaction between mother or father and child?  If siblings were involved, did visits allow mother or  father to interact with each child individually?  If appropriate, were unsupervised visits and visits in the  mother's or father's home in preparation for reunification allowed?

D.    During the period under review, were concerted efforts made to ensure that the quality of visitation (or other forms of  contact if visitation was not possible)  between the child and the father was sufficient to maintain or promote the continuity of the relationship?

Yes ❑        No ❑          NA ❑

---

**E1.**  What was the usual frequency of visits between the child and his or her siblings during the period under review? Select the box next to the statement that best describes the usual frequency of visits between the siblings and the child during the period under review.

❐ NA

❐ More than once a week

❐ Once a week

❐ Less than once a week, but at least twice a month

❐ Less than twice a month, but at least once a month

❐ Less than once a month

❐ Never

---

**Question 8E1 Instruction:**

Answer E1 Not Applicable if the child has no siblings in foster care or if contact with all siblings who are in foster care was not considered to be in the best interests of the child for the entire period under review (for example, one sibling is a physical threat to the other sibling or has a history of physical or sexual abuse of the other sibling and this concern remained throughout the period under review).

---

**E.**  During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her sibling(s) was of sufficient frequency to maintain or promote the continuity of the relationship?

Yes ❐       No ❐         NA ❐

---

**Question 8E Instructions:**

- If E1 is NA, E should be answered NA.
- If E1 is Never, E should be answered No.
- Consider whether the frequency of visits during the period under review was sufficient to maintain the continuity of the sibling relationships.
- If, during the period under review, frequent visitation with the sibling(s) was not possible (for example, siblings were placed far apart), determine whether there were concerted efforts to promote other forms of contact  between the child and sibling(s), such as telephone calls or letters, in addition to facilitating visits when possible.

---

**F.**  During the period under review, were concerted efforts made to ensure that the quality of visitation (or other forms of  contact if visitation was not possible)  between the child and his or her sibling(s) was sufficient to promote the continuity of their relationships?

Yes ❐       No ❐         NA ❐

---

**Question 8F Instructions:**

- If E1 is NA or Never, question F should be answered NA.
- Determine whether concerted efforts were made to ensure that the quality of sibling visitation, and/or other forms of contact, were  sufficient to maintain the continuity of the relationship. For example, were visits long enough to permit  quality interaction?  Did sibling visits only occur in the context of parent visitations?  Did visits occur  in a comfortable atmosphere?

---

**Item 8 Rating Criteria:**

**Item 8 should be rated as a Strength if at least one of the questions A through F is answered Yes and the other questions are answered Not Applicable.**

**Item 8 should be rated as an Area Needing Improvement if any one of the questions A through F is answered No.**

**Item 8 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 8 Rating (select one):**

Strength ❏          Area Needing Improvement ❏          NA ❏

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

|  |
|--|
|  |

Override this rating? ❏
Overridden rating:

Strength ❏          Area Needing Improvement ❏          NA ❏

Override reason:

**PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.**

## Item 9: Preserving Connections

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to maintain the child's connections to his or her neighborhood, community, faith, extended family, Tribe, school, and friends.

## Item 9 Applicable Cases:

Almost all foster care cases are applicable for an assessment of this item. A possible exception may be the situation of an abandoned infant where the agency has no information about the child's extended family or connections.

## Is this case applicable?

Select the appropriate response. If the response is No, rate the item as Not Applicable in the ratings section and continue to Item 10.

Yes ☐          No ☐

Optional: Provide comments in the narrative field below:

|  |
|--|
|  |

A.     During the period under review, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, Tribe, school, and/or friends)?

Yes ☐          No ☐

---

**Question 9A Instructions:**

- Determine what the important connections were for the child prior to their placement in foster care and then determine whether concerted efforts were made to maintain those connections during the period under review.

- For a child enrolled in school, consider whether efforts were made to maintain the child in the same school the child was in before placement in foster care, if remaining in the same school was in the child's best interests.

- Do not rate this item based on connections to parents/caregivers from whom the child was removed and/or with whom the child will be reunified, or to siblings who are in foster care. Information about sustaining those connections is captured in other items. However, this item may be rated based on connections with siblings who are not in foster care and other extended family members, such as grandparents, uncles, aunts, or cousins.

- Connections to caregivers from whom the child was removed may also be included in this item if the goal is not to reunify the child with those caregivers and it is in the child's best interest to preserve those relationships.

- If, prior to placement in foster care, the child had a relationship with a biological parent who was not the caregiver the child was removed from or that they are being reunified with (the parent is not part of the case plan), that connection may be included in this item if it is in the child's best interest to preserve that relationship.

---

B.    Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, a federally recognized Indian Tribe?

Yes ☐        No ☐

---

**Question 9B Instructions:**

- This question is for data collection purposes only and does not affect the rating for this item.
- If there is no information in the case file that indicates the child is a member of, or eligible for membership in, an Indian Tribe, but you learn through interviews that the child has Native American heritage and no apparent efforts were made to determine this, then the answer to question B is No.
- If the child entered foster care during the period under review, determine whether timely and appropriate action was taken to determine whether the child is a member of, or eligible for membership in, an Indian Tribe. This may include exploring this with the parents and/or other persons with a relationship to the child, contacting Tribes, and contacting the Bureau of Indian Affairs.
- If the child entered foster care before the period under review, the answer to question B can be Yes if by the beginning of the period under review an informed determination was made about the child's membership, or eligibility for membership, in an Indian Tribe and all appropriate steps were taken to determine whether the child is Native American.

---

C.    If the child may be a member of, or eligible for membership in, a federally recognized Indian Tribe, during the period under review, was the Tribe provided timely notification of its right to intervene in any state court proceedings seeking an involuntary foster care placement or termination of parental rights?

Yes ☐        No ☐        NA ☐

---

**Question 9C Instructions:**

- Answer question C Yes or No if the child is a member of, or eligible for  membership in, an Indian Tribe, or you learn through interviews that the child has Native American  heritage.
- If the child is not a member of, or eligible for membership in, an Indian Tribe, and there is no information through interviews that the child has Native American heritage, answer question C  Not Applicable.
- If the child entered care during the period under review or had a termination of parental rights hearing during the period under review, determine whether timely notice was provided to the Tribe.  Timely notice is notice that was received no later than 10 days before the proceeding.  If timely notice was not provided, the answer to question C is No.
- If the child entered care before the period under review and did not have a termination of parental rights hearing during the period under review, the answer to question C is Yes, if, by the beginning of the period under review, all appropriate steps were taken to notify the Tribe.

---

D.    If the child is a member of, or eligible for membership in, a federally recognized Indian Tribe, was the child placed in foster care in accordance with Indian Child Welfare Act placement preferences or were concerted efforts made to place the child in accordance with the Act's placement preferences?

Yes ☐        No ☐        NA ☐

---

**Question 9D Instructions:**

- Answer question D Yes or No if the child is a member of, or eligible for membership in, an Indian Tribe, or you learn through interviews that the child has Native American heritage.

- If the child is not a member of, or eligible for membership in, an Indian Tribe, and there is no information through interviews that the child has Native American heritage, answer question D Not Applicable.

- Determine whether, during the period under review, the child was placed (1) with a member of the child's extended family, (2) in a foster home licensed, approved, or specified by the Native American child's Tribe, (3) in another Native American foster home placement, or (4) in an institution approved by a Tribe or operated by a Native American organization. Placement preference is in this order unless another order is specified by Tribal resolution.

- If the child's placement was not made in accordance with Indian Child Welfare Act placement preferences, determine whether, during the period under review, there were documented concerted efforts to meet the Act's placement preferences.

---

## Item 9 Rating Criteria:

**Item 9 should be rated as a Strength if the answer to question A is Yes and the answers to questions C and D are either Yes or Not Applicable.**

**Item 9 should be rated as an Area Needing Improvement if either of the following applies:**

- **The answer to question A is Yes, but the answer to question C and/or D is No.**

- **The answer to question A is No, regardless of the answers to questions C and D.**

**The answer to question B is not considered in rating this item.**

**Item 9 should be rated as Not Applicable if the response to the question of applicability is No.**

## Item 9 Rating (select one):

Strength ❑        Area Needing Improvement ❑        NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

| |
|---|
| |

Override this rating? ❑

Overridden rating:

 Strength ❑          Area Needing Improvement ❑          NA ❑

Override reason:

| |
|---|
| |

---

## PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.

### Item 10: Relative Placement

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to place the child with relatives when appropriate.

### Item 10 Applicable Cases:
All foster care cases are applicable for assessment of this item except those in which (1) the agency determined upon the child's initial entry into care that his or her needs required a specialized placement (such as residential treatment services) and that they will continue to require such specialized treatment the entire time the child is in care and a relative placement would be inappropriate, or (2) situations such as abandonment in which the identity of both parents and all relatives remains unknown despite documented concerted efforts to identify them.

### Is this case applicable?
Select the appropriate response. If the response is No, rate the case as Not Applicable in the ratings section and continue to Item 11.

Yes ❑          No ❑

Optional: Provide comments in the narrative field below:

| |
|---|
| |

A1.  During the period under review, was the child's current or most recent placement with a relative?
Yes ❑          No ❑

A2.  If the child's current or most recent placement is with a relative, is (or was) this placement stable and appropriate to the child's needs?

Yes ❑          No ❑          NA ❑

---

**Questions 10A1 and 10A2 Definition:**

"Relative" is defined as a person related to the child by blood, marriage, or adoption.

**Questions 10A1 and 10A12 Instructions:**

- If the answer to question A1 is No, the answer to question A2 should be Not Applicable.
- If the answer to question A2 is Yes, you may rate the item as a Strength, and answer Not Applicable to the remaining questions for the item.
- If the answer to question A1 or A2 is No, answer the remaining questions for this item.

---

B.    Did the agency, during the period under review, make concerted efforts to identify, locate, inform, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as placement resources (due to fit, relative's unwillingness, or child's best interests) during the period under review?

Yes ❑          No ❑          NA ❑

If No, specify the area in which concerns existed:

Identify ❑     Locate ❑     Inform ❑     Evaluate ❑

---

**Questions 10B and 10C Instructions:**

- The answers to questions B and C are NA if the answers to both questions A1 and A2 are Yes.
- If a child entered foster care during the period under review, determine whether the state followed the requirements of the title IV-E provision that requires states to consider giving preference to placing the child with relatives, and determine whether the state considered such a placement and how (for example, identifying, seeking out, and informing and evaluating the child's relatives).
- If the parent's whereabouts were not known during the entire period under review despite agency efforts to locate the parent, and as a result relatives could not be identified, the answer to question B and/or C should be NA.
- If a child entered foster care before the period under review and the answer to either question A1 or A2 is No, determine whether, during the period under review, the agency made concerted efforts to search for and assess relatives as placement resources, if appropriate.  If all maternal and/or paternal relatives had already been appropriately considered and permanently ruled out before the period under review, the answer to question B and/or C can be Not Applicable. If, however, you determine that, during the period under review, the agency should have reconsidered relatives who had previously been ruled out and they did not, the answer to question B and/or C should be No.

---

C.     Did the agency, during the period under review, make concerted efforts to identify, locate, inform, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as placement resources (due to fit, relative's unwillingness, or child's best interests) during the period under review?

Yes ❑     No ❑     NA ❑

If No, specify the area in which concerns existed:

Identify ❑     Locate ❑     Inform ❑     Evaluate ❑

**Item 10 Rating Criteria:**

**Item 10 should be rated as a Strength if either of the following applies:**

- **The answers to both questions A1 and A2 are Yes.**
- **The answer to either question A1 or A2 is No, but the answers to questions B and/or C are Yes or Not Applicable.**

**Item 10 should be rated as an Area Needing Improvement if both of the following apply:**

- **The answer to either question A1 or A2 is No.**
- **The answer to question B and/or C is No.**

 **Item 10 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 10 Rating (select one):**

Strength ❑     Area Needing Improvement ❑     NA ❑

*Section II: Permanency Outcome 2*

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

Override this rating? ☐

Overridden rating:

Strength ☐          Area Needing Improvement ☐          NA ☐

Override reason:

## PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.

### Item 11: Relationship of Child in Care With Parents

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to promote, support, and/or maintain positive relationships between the child in foster care and his or her mother and father or other primary caregiver(s) from whom the child had been removed through activities other than just arranging for visitation.

---

**Item 11 Definitions:**

- "Mother" and "Father" in Items 8 and 11 are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.
- Because the focus of Item 11 is to promote, support, and maintain the child's relationships with the parents/caregivers from whom the child was removed, do not include in this item a parent who did not have a relationship with the child prior to the child's entry into foster care, even if the goal is to reunify with that parent. Services to support a parent in developing a new relationship with a child may be assessed as a service need in item 12 (see Item 12 instructions).

---

**Item 11 Applicable Cases:** All foster care cases are applicable for assessment of this item unless any of the following apply (check Yes for any that apply and No for any that do not apply):

- The parental rights for both parents remained terminated during the entire period under review.
  Yes ❑   No ❑

- The child was abandoned and neither parent could be located. Yes ❑   No ❑

- The whereabouts of both parents were not known during the entire period under review despite documented concerted agency efforts to locate both parents. Yes   ❑No ❑

- Contact with both parents was considered to be not in the child's best interest and this is documented in the case file. Yes ❑   No ❑

- During the entire period under review, both parents were deceased. Yes ❑   No ❑

- The only parent(s) being assessed in this item do not meet the definition for Mother/Father for this item.
  Yes ❑   No ❑

### Is this case applicable?

Select the appropriate response.  If the response is No, rate the item as Not Applicable in the ratings section for this item.

Yes ❑     No ❑

Indicate the case participants who are included in this item as Mother and Father:

|  |
|--|
|  |

Optional: Provide comments in the narrative field below:

|  |
|--|
|  |

A.   During the period under review, were concerted efforts made to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her mother?

Yes ❏         No ❏         NA ❏

---

**Questions 11A and 11B Instructions:**

- Question A or B should be answered Not Applicable if (1) contact between the child and the mother or father was not in the child's best interests and this was documented in the case file or court order, (2) the whereabouts of the mother or father was not known during the entire period under review, despite documented concerted efforts to locate her or him, (3) the mother's or father's parental rights remained terminated during the entire period under review, or (4) the mother or father was deceased during the entire period under review.
- Foster parents' activities are considered for purposes of this question. For example, if the foster parent provided transportation so that the mother or father could attend the child's school event or medical appointment, that would be considered as contributing toward concerted efforts.
- Do not answer this question based on efforts (or lack of efforts) to ensure the frequency or quality of visitation between the mother or father and the child. That information is captured under item 8. This question pertains to additional activities to help support, strengthen, or maintain the parent-child relationship.

---

A1.   What concerted efforts were made to support or strengthen the mother-child relationship?

Select all that apply if question A is Yes.

- ❏ NA
- ❏ Encouraged the mother's participation in school activities and case conferences, attendance at doctors' appointments with the child, or engagement in the child's after-school or sports activities?
- ❏ Provided or arranged for transportation or provided funds for transportation so that the mother could attend the child's special activities and doctors' appointments?
- ❏ Provided opportunities for therapeutic situations to help the mother and child strengthen their relationship?
- ❏ Encouraged the foster parents to provide mentoring or serve as role models to the mother to assist her in appropriate parenting?
- ❏ Encouraged and facilitated contact with a mother not living in close proximity to the child?
- ❏ Other (describe other concerted efforts made):_____

---

**Question 11A1 Instructions:**

- Select NA if the answer to question A is NA.
- Select NA if the answer to question A is No.

---

B.   During the period under review, were concerted efforts made to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her father?

Yes ❏         No ❏         NA ❏

B1.   What concerted efforts were made to support or strengthen the father-child relationship?

Select all that apply if question B is Yes.

- ❑ NA
- ❑ Encouraged the father's participation in school activities and case conferences, attendance at doctors' appointments with the child, or engagement in the child's after-school or sports activities?
- ❑ Provided or arranged for transportation or provided funds for transportation so that the father could attend the child's special activities and doctors' appointments?
- ❑ Provided opportunities for therapeutic situations to help the father and child strengthen their relationship?
- ❑ Encouraged the foster parents to provide mentoring or serve as role models to the father to assist him in appropriate parenting?
- ❑ Encouraged and facilitated contact with a father not living in close proximity to the child?
- ❑ Other (describe other concerted efforts made): _____

---

**Question 11B1 Instructions:**

- Select NA if the answer to question B is NA.
- Select NA if the answer to question B is No.

---

## Item 11 Rating Criteria:

**Item 11 should be rated as a Strength if either of the following applies:**

- **The answers to both questions A and B are Yes.**
- **The answer to either question A or B is Yes and the answer to the other question is Not Applicable.**

**Item 11 should be rated as an Area Needing Improvement if the answer to question A and/or B is No.**

**Item 11 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 11 Rating (select one):**

Strength ❑          Area Needing Improvement ❑          NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

```



```

Override this rating? ❑

Overridden rating:

Strength ❑          Area Needing Improvement ❑          NA ❑

Override reason:

```



```

# RATING PERMANENCY OUTCOME 2

## PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the ratings for Items 7 through 11?

**Instructions**:

Permanency Outcome 2 should be rated as Substantially Achieved if both of the following apply:

- Not more than one of Items 7 through 11 is rated as an Area Needing Improvement.

- At least one item is rated as a Strength.

Permanency Outcome 2 should be rated as Partially Achieved if both of the following apply:

- At least two items, but fewer than all five items, are rated as an Area Needing Improvement.

- At least one item is rated as a Strength.

Permanency Outcome 2 should be rated as Not Achieved if both of the following apply:

- No item is rated as a Strength.

- At least one item is rated as an Area Needing Improvement.

Permanency Outcome 2 should be rated as Not Applicable if the following applies:

- All of Items 7 through 11 are rated as Not Applicable.

Select the appropriate response:

Substantially Achieved ❑       Partially Achieved ❑       Not Achieved ❑       NA ❑

## SECTION III: CHILD AND FAMILY WELL-BEING

## WELL-BEING OUTCOME 1:  FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.

### Item 12: Needs and Services of Child, Parents, and Foster Parents

Item 12 is divided into three sub-items: 12A: Needs assessment and services to children, 12B: Needs assessment and services to parents, and 12C: Needs assessment and services to foster parents.

**Purpose of Assessment:** To determine whether, during the period under review, the agency (1) made concerted efforts to assess the needs of children, parents, and foster parents (both initially, if the child entered foster care or the case was opened during the period under review, and on an ongoing basis) to identify the services necessary to achieve case goals and adequately address the issues relevant to the agency's involvement with the family, and (2) provided the appropriate services.

**Item 12 Applicable Cases:** Most cases are applicable for an assessment of this item because Sub-Item 12A is typically applicable to all cases. Sub-Items 12B and 12C may not be applicable to all cases, and instructions for applicability are provided before each sub-item.

### Sub-Item 12A: Needs Assessment and Services to Children

---

**Sub-Item 12A Instructions:**

- If the case is a foster care case, determine whether the agency assessed the needs of, and provided services for, the target child in the case, even if there are other children in the family in foster care or in the home.

- If the case is an in-home services case, determine whether the agency assessed the needs of, and provided services for, all children in the family unless you determine that based on case circumstances only specific children in the home should be assessed and provided with services.

---

For in-home services cases, indicate the names of the children who were included in the assessment of Sub-Item 12A:

---

A1.  During the period under review, did the agency conduct a formal or informal initial and/or ongoing comprehensive assessment that accurately assessed the children's needs?

Yes ❑       No ❑

If No, explain any concerns in the narrative field below:

---

---

**Question 12A1 Instructions**:

- If the case was opened during the period under review, focus on whether the agency conducted an initial comprehensive assessment as a basis for developing a case plan, and whether ongoing assessment was conducted as appropriate.

- If the case was opened before the period under review, focus on whether the agency conducted periodic comprehensive needs assessments (as appropriate) during the period under review to update information relevant to ongoing case planning.

- Assessment of needs may take different forms.  For example, needs may be assessed through a formal evaluation conducted by another agency or by a contracted provider or through a more informal case planning process involving intensive interviews with the child, family, and service providers. Answer question A1 based on a determination of whether the agency made concerted efforts to achieve an in-depth understanding of the needs of the child, regardless of whether the needs were assessed in a formal or informal manner. Consequently, the evaluation of the assessment should focus on its adequacy in accurately assessing the child's needs in addition to whether one was conducted.

- Answer this question with regard to an assessment of needs other than those related to children's education, physical health, and mental/behavioral health (including substance abuse).  The assessment of the child's needs related to these issues is addressed in later items. Needs that should be assessed in this item include those related to social/emotional development that are not connected to other physical health or mental health issues.  These may include social competencies, attachment  and caregiver relationships, social relationships and connections, social skills, self-esteem, and coping skills.  If the case is a foster care case, and the child is an adolescent, determine whether the child's needs for independent living services are being assessed on an ongoing basis as part of the child's independent living plan.  In making this determination, consider the following:

  – Did the agency assess for independent living skills?

  – Is there an independent living plan in the file? (This is required for all youth age 16 and older.)

A2.  During the period under review, were appropriate services provided to meet the children's identified needs?

Yes ☐            No ☐            NA ☐

If No, explain any concerns in the narrative field below:

**Question 12A2 Instructions:**

- If the answer to question A1 is Yes, but the result of the assessment was that no service needs were identified other than those related to education, physical health, and mental/behavioral health (including substance abuse), and therefore no services were provided other than services to address those needs, the answer to question A2 should be Not Applicable.

- If the agency did not conduct an initial assessment and A1 is answered No, A2 could be answered No or Yes. A2 could be answered Yes only if reviewers can determine through clearly documented evidence in the case file that ALL of the child's needs were met with appropriate services. If there is not enough information for the reviewer to ascertain the child's needs, because an assessment was not conducted and the needs are not clearly articulated in the case file, then A2 should be answered No.

- Focus on the agency's provision of services during the period under review. If services were provided before the period under review, and an assessment conducted during the period under review indicated no further service needs, then the answer to question A2 should be Not Applicable.

- Answer this question with regard to provision of services other than those related to education, physical health, or mental/behavioral health (including substance abuse). The assessment of service provision related to these issues is addressed in later items. Item 2 should address all the safety-related services provided to the family. Do not capture those services in this item.

- Determine whether the services provided matched identified needs. For example, were the services provided simply because those were the services available or were they provided because the assessment revealed a particular need for a particular type of service?

- If the case is a foster care case, independent living services should be provided to all youth age 16 and older and to children of any age with a goal of emancipation/independence or "other planned permanent living arrangement" who are expected to eventually exit foster care to independence. Consider whether concerted efforts were made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, such as post-high school planning, life skills classes, employment training, financial planning skills training, and transitional services.

- Examples of services that are assessed under this item include child care services that are not required for the child's safety (those services would be covered under Item 2), mentoring programs that are not related to the child's education, recreational services, teen parenting education, preparation for adoption and other permanency goals, services that address family relationships that are not mental health in nature (for example, services to assist children in reestablishing or maintaining family ties), and services to assist the child that are recommended by a therapist or other provider but are not mental health-related (such as enrollment in an activity to assist with social skills or to boost self-esteem).

## Sub-Item 12A Rating Criteria:

**Sub-item 12A should be rated as a Strength if either of the following applies:**

- **The answers to both questions A1 and A2 are Yes.**

- **The answer to question A1 is Yes, and the answer to question A2 is Not Applicable.**

**Sub-item 12A should be rated as an Area Needing Improvement if the answer to question A1 and/or A2 is No.**

**There are no circumstances under which Sub-Item 12A could be rated as Not Applicable.**

**Sub-Item 12A Rating (select one):**

Strength ❒          Area Needing Improvement ❒

Override this rating? ❒

Overridden rating:
Strength ❒          Area Needing Improvement ❒          NA ❒

Override reason:

[ ]

## Sub-Item 12B: Needs Assessment and Services to Parents

**Sub-Item 12B Definitions:**

In-home services cases:

- "Mother" and "Father" in Items 12, 13, and 15, are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents).
- If a biological parent does not fall into any of the categories above, determine whether that parent should be included in this item based on the circumstances of the case. Some things to consider in this determination are: the reason for the agency's involvement and the identified perpetrators in the case, the status of the children's relationship with the parent, the nature of the case (court supervised or voluntary) and the length of case opening. If a biological parent indicates a desire during the period under review to be involved with the child and it is in the child's best interests to do so, they should be assessed in this item.

Foster care cases:

- "Mother" and "Father" in Items 12, 13, and 15 are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.
- "Mother" and "Father" in Items 12, 13, and 15 include biological parents who were not the parents from whom the child was removed.
- "Mother" and "Father" include adoptive parents if the adoption has been finalized during the period under review.

Optional: Provide comments in the narrative field below:

[ ]

## Sub-Item 12B Applicable Cases:

- Because multiple case participants can be assessed in these questions, consider applicability for all appropriate case participants before determining that the rating should be Not Applicable.
- Questions in Sub-Item 12B for either parent should be answered Not Applicable if any of the following applies to either the mother or the father being assessed in this item (check Yes for any that apply and No for any that do not apply):
  - Parental rights remained terminated during the entire period under review   Yes ❑          No ❑
  - Parent's whereabouts were not known during the entire period under review despite agency efforts to locate the parent   Yes ❑        No ❑
  - Parent was deceased during the entire period under review   Yes ❑        No ❑
  - During the entire period under review it was documented in the case file that it was not in the child's best interests to involve the parent in case planning   Yes ❑        No ❑
  - During the entire period under review the parent has indicated he/she does not want to be involved in the child's life and this was documented in the case file   Yes ❑          No ❑

**Is Sub-Item 12B applicable for Mother?**

Yes ☐          No ☐

If No, answer questions B1 and B3 Not Applicable.

**Is Sub-Item 12B applicable for Father?**

Yes ☐          No ☐

If No, answer questions B2 and B4 Not Applicable.

Indicate the case participants who are included in this item as Mother and Father:

```

```

If both parents are not applicable for this item, go to Sub-Item 12B rating criteria, select Not Applicable and continue to Sub-Item 12C.

B1.  During the period under review, did the agency conduct a formal or informal initial and/or ongoing comprehensive assessment that accurately assessed the mother's needs?

Yes ☐          No ☐          NA ☐

If No, explain any concerns in the narrative field below:

```

```

---

**Questions 12B1 and 12B2 Instructions:**

- If the case was opened during the period under review, focus on whether the agency conducted an initial comprehensive assessment as a basis for developing a case plan, and whether ongoing assessment was conducted as appropriate.
- If the case was opened before the period under review, focus on whether the agency conducted periodic comprehensive needs assessments (as appropriate) during the period under review to update information relevant to ongoing case planning.
- Determine whether the agency has made concerted efforts to ensure that case planning is based on an in-depth understanding of the needs of the mother and father, regardless of whether the needs were assessed in a formal or informal manner. (Assessment of needs may take different forms. For example, needs may be assessed through a formal psychosocial evaluation conducted by another agency or by a contracted provider or through a more informal case planning process involving intensive interviews with the child, family, and service providers.)
- Assessment of mother's and father's needs refers to a determination of what the mother or father needs to provide appropriate care and supervision and to ensure the well-being of his/her children. This could include mental and physical health needs (as later items do not address these concerns for the parents), if those needs impact the parent's capacity to care for the children. This could also include an assessment of needs related to supporting a biological parent's relationship with the child if they did not have an established relationship prior to the child's entry into foster care.

---

**B2.**  During the period under review, did the agency conduct a formal or informal initial and/or ongoing comprehensive assessment that accurately assessed the father's needs?

Yes ❑            No ❑            NA ❑

If No, explain any concerns in the narrative field below:

<br>

**B3.**  During the period under review, did the agency provide appropriate services to the mother to meet identified needs?

Yes ❑            No ❑            NA ❑

If No is selected, explain any concerns in the following narrative field:

<br>

> **Question 12B3 and 12B4 Instructions:**
> - If an assessment was conducted but no service needs were identified, this question can be answered Not Applicable.
> - Appropriate services are those that enhance the mother's or father's ability to provide care and supervision and support the well-being of his or her child(ren); for example, substance abuse treatment, parenting skills classes, or visitation and/or family counseling services for a biological parent who is establishing a new relationship with the child. Item 2 should address all the safety-related services provided to the family. Do not capture those services in this item. Visitation services would only be included for a biological parent in this item if the parent was not included in item 8.

**B4.**  During the period under review, did the agency provide appropriate services to the father to address identified needs?

Yes ❑            No ❑            NA ❑

If No is selected, explain any concerns in the following narrative section:

<br>

**Sub-Item 12B Rating Criteria:**

**Sub-item 12B should be rated as a Strength if either of the following applies:**
- **The answers to B1, B2, B3, and B4 are Yes.**
- **The answer to at least one question is Yes, and the answer to the other questions is Not Applicable.**

**Sub-item 12B should be rated as an Area Needing Improvement if the answer to any one of the questions is No.**

**Sub-item 12B should be rated as Not Applicable if the answer to the questions of applicability for both Mother and Father is No.**

**Sub-Item 12B Rating (select one):**

Strength ☐          Area Needing Improvement ☐          NA ☐

Override this rating? ☐
Overridden rating:
Strength ☐          Area Needing Improvement ☐          NA ☐

Override reason:

```

```

Sub-Item 12C: Needs Assessment and Services to Foster Parents  Sub-Item 12C  Applicable Cases:

- In-home cases are not applicable for an assessment of this sub-item.
- All foster care cases are applicable for assessment of this sub-item unless, during the entire period under review, the child was in out-of-home care in a residential facility or similar placement, but does not have foster parents.

## Is Sub-Item 12C applicable?

Yes ☐          No ☐

Optional: Provide comments in the narrative field below:

```

```

If No, go to Sub-Item 12C rating criteria and select Not Applicable.

---

**Item 12C Definition:**

Foster parents are defined as related or non-related caregivers who have been given responsibility for care of the child by the agency while the child is under the placement and care responsibility and supervision of the agency.  This includes pre-adoptive parents if the adoption has not been finalized.

---

C1.  During the period under review, did the agency adequately assess the needs of the foster or pre-adoptive parents on an ongoing basis (with respect to services they need to in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)?

Yes ☐          No ☐

If No is selected, explain any concerns in the following narrative section:

```

```

---

**Question 12C1 Instructions:**

- All foster parents who cared for the child during the period under review are included in this assessment.
- Determine whether an assessment was conducted to identify what the foster parents needed to enhance their capacity to provide appropriate care and supervision to the child in their home, such as respite care, assistance with transportation, or counseling to address the child's behavior problems.
- Determine whether assessment of foster parent needs is done on an ongoing basis. If there is no evidence in the case file that the agency assessed the needs of the foster parents at any time during the period under review, and the foster parents (if available for interview) indicate that they have not been assessed, then the answer to question C1 should be No.

---

**C2.** During the period under review, were the foster or pre-adoptive parents provided with appropriate services to address identified needs that pertained to their capacity to provide appropriate care and supervision of the children in their care?

Yes ❑          No ❑          NA ❑

If No is selected, explain any concerns in the following narrative section:

---

**Question 12C2 Instructions:**

- The answer to question C2 should be Not Applicable if needs were assessed but no service needs were identified.
- All foster parents who cared for the child during the period under review are included in this assessment.

---

### Sub-Item 12C Rating Criteria:

**Sub-item 12C should be rated as a Strength if either of the following applies:**

- **The answers to both questions C1 and C2 are Yes.**

- **The answer to question C1 is Yes, and the answer to question C2 is Not Applicable.**

**Sub-item 12C should be rated as an Area Needing Improvement if the answer to question C1 and/or C2 is No.**

**Sub-item 12C should be rated as Not Applicable if the response to the question of applicability is No.**

### Item 12C Rating (select one):

Strength ❑          Area Needing Improvement ❑          NA ❑

Override this rating? ❑
Overridden rating
Strength ❑          Area Needing Improvement ❑          NA ❑

Override reason:

[ ]

## Item 12 Rating Criteria:

**Item 12 should be rated as a Strength if sections A, B, and C are all rated Strength OR at least one of the sections is rated as a Strength and the others are Not Applicable.**

**Item 12 should be rated as an Area Needing Improvement if any one of sections A, B, or C is rated as an Area Needing Improvement.**

**Item 12 Rating (select one):**

Strength ☐          Area Needing Improvement ☐

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

[ ]

Override this rating?   ☐

Overridden rating:

Strength ☐          Area Needing Improvement ☐          NA ☐

Override reason:

[ ]

## WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.

### Item 13: Child and Family Involvement in Case Planning

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made (or are being made) to involve parents and children (if developmentally appropriate) in the case planning process on an ongoing basis.

---

**Item 13 Definitions:**

In-home services cases:

- "Mother" and "Father" in Items 12, 13, and 15, are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents).
- If a biological parent does not fall into any of the categories above, determine whether that parent should be included in this item based on the circumstances of the case. Some things to consider in this determination are: the reason for the agency's involvement and the identified perpetrators in the case, the status of the children's relationship with the parent, the nature of the case (court supervised or voluntary) and the length of case opening. If a biological parent indicates a desire during the period under review to be involved with the child and it is in the child's best interests to do so, they should be assessed in this item.

Foster care cases:

- "Mother" and "Father" in Items 12, 13, and 15 are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.
- "Mother" and "Father" in Items 12, 13, and 15 include biological parents who were not the parents from whom the child was removed.
- "Mother" and "Father" include adoptive parents if the adoption has been finalized during the period under review.

---

### Item 13 Applicable Cases:

Because multiple case participants can be assessed in these questions, consider applicability for all appropriate case participants before determining that the rating should be Not Applicable. All cases are applicable for an assessment of this item except as determined below (check Yes for criteria that apply and No for those that do not).

- Cases involving children for whom participating in planning is not developmentally appropriate
  Yes ☐        No ☐        AND:
- Cases in which **all** parents being assessed as Mother or Father meet **any** of these criteria:
  - Parental rights remained terminated during the entire period under review  Yes ☐        No ☐
  - Parent's whereabouts were not known during the entire period under review despite agency efforts to locate the parent  Yes ☐        No ☐
  - The reviewer has determined that Item 12B is rated as an Area Needing Improvement due to lack of concerted efforts to find applicable parents. Yes ☐        No ☐
  - Parent was deceased during the entire period under review  Yes ☐        No ☐
  - During the entire period under review it was documented in the case file that it was not in the child's best interests to involve the parent in case planning  Yes ☐        No ☐

- During the entire period under review the parent has indicated he/she does not want to be involved in the child's life and this was documented in the case file  Yes ☐        No ☐
- In-home services cases are applicable even in states that do not require a formal case plan to be developed for in-home services cases.  Therefore, the case is applicable even if there is no state requirement for a case plan and there is no case plan in the file.

**Is this case applicable?**
Select the appropriate response.  If the response is No, rate the case as Not Applicable in the ratings section and continue to Item 14.

Yes ☐        No ☐
Indicate the case participants who are included in this item as Mother and Father:

|  |
|--|
|  |

Optional: Provide comments in the narrative field below:

|  |
|--|

A.    During the period under review, did the agency make concerted efforts to actively involve the child in the case planning process?
Yes ☐        No ☐        NA ☐

If No, explain any concerns in the narrative field below:

|  |
|--|
|  |

For in-home services cases, indicate the names of the children who are included in the assessment of Item 13:

|  |
|--|
|  |

**Question 13A Definition:**

"Actively involved" means that the agency consulted with the child (as developmentally appropriate) regarding the child's goals and services, explained the plan and terms used in the plan in language that the child can understand, and included the child in periodic case planning meetings, particularly if any changes are being considered in the plan.

**Question 13A Instructions:**

- Select Not Applicable if the child is not old enough to participate in case planning or is incapacitated. Although the capacity to participate actively in case planning will need to be decided on a case-by-case basis, as a guideline, most children who are elementary school-aged or older may be expected to participate to some extent.

- If the case is a foster care case, Item 13 applies to the target child only. If the case is an in-home services case, Item 13 applies to all children in the family home unless you determine that based on case circumstances only specific children in the home should be engaged in case planning (for example, only children receiving services from the agency).

- If the case is a foster care case, answer No to this question if there is no case plan in the case file.

- If the case is an in-home services case, and there is no case plan in the file (some states require that an identifiable written case plan be included in the file for in-home services cases), identify the extent to which the children (if developmentally appropriate) were involved in determining: (1) their strengths and needs, (2) the type and level of services needed, and (3) their goals and progress toward meeting them. Determine whether this information was documented in the case file in any way.

- Do not assume that a child's knowledge about his or her case plan is an indicator of active involvement.

- If the initial case plan was developed before the period under review, focus on the children's involvement during the period under review in the ongoing case planning process, particularly with regard to evaluating progress and making changes in the type and level of services needed as well as understanding changes made to their permanency goal (in foster care cases).

B.    During the period under review, did the agency make concerted efforts to actively involve the mother in the case planning process?

Yes ☐        No ☐        NA ☐

If No, explain any concerns in the narrative field below:

```


```

**Questions 13B and 13C Definition:**

"Actively involved" means that the agency involved the mother or father in (1) identifying strengths and needs, (2) identifying services and service providers, (3) establishing goals in case plans, (4) evaluating progress toward goals, and (5) discussing the case plan.

**Questions 13B and 13C Instructions:**

- Select Not Applicable if all case participants being assessed as Mother in 13B or as Father in 13C meet the criteria for Not Applicable in the item 13 rating criteria.
- If the initial case plan was developed before the period under review, focus on the mother's or father's involvement during the period under review in the ongoing case planning process, particularly with regard to evaluating progress and making changes in the plan.
- Select NA if the agency did not make concerted efforts to locate a mother or father whose whereabouts were unknown. In Well-Being Outcome 1, concerns about efforts to locate a parent should only be reflected in item 12.

C.     During the period under review, did the agency make concerted efforts to actively involve the father in the case planning process?

Yes ❑          No ❑          NA ❑

If No, explain any concerns in the narrative field below:

| |
|---|
| |

**Item 13 Rating Criteria:**

**Item 13 should be rated as a Strength if either of the following applies:**

- **The answers to A, B, and C are Yes.**
- **The answer to at least one question is Yes, and the answer to the other questions is Not Applicable.**

**Item 13 should be rated as an Area Needing Improvement if the answer to any one of questions A, B, or C is No.**

**Item 13 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 13 Rating (select one):**

Strength ❑          Area Needing Improvement ❑          NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

| |
|---|
| |

Override rating? ❑
Overridden rating:
Strength ❑          Area Needing Improvement ❑          NA ❑

Override reason:

| |
|---|
| |

**WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.**

## Item 14: Caseworker Visits With Child

**Purpose of Assessment:** To determine whether the frequency and quality of visits between caseworkers and the child(ren) in the case are sufficient to ensure the safety, permanency, and well-being of the child(ren) and promote achievement of case goals.

**Item 14 Applicable Cases:** All cases are applicable for an assessment of this item.

A1.   During the period under review, what was the most typical pattern of visitation between the caseworker or other responsible party and the child(ren) in the case?  Select the box that describes the usual pattern of visitation.

❒ More than once a week

❒ Once a week

❒ Less than once a week, but at least twice a month

❒ Less than twice a month, but at least once a month

❒ Less than once a month

❒ Never

---

**Questions 14A1 and 14A Definitions:**

- "Other responsible party" refers to contracted service providers who have full responsibility for case planning and case management (for example, fully or partially privatized child welfare systems where full case management responsibilities are delegated to contract agencies).  It does not refer to contracted service providers that provide services while the agency maintains decision-making and case management responsibilities regarding the case or the child.
- A "visit" is defined as a face-to-face contact between the caseworker or other responsible party and the child.

**Question 14A1 Instructions:**

- If the case is an in-home services case, question A1 should be answered for all children in the family home.
- If the case is a foster care case, question A1 should be answered only for the target child in the case.
- Consider only the pattern of visits during the period under review and not over the life of the case.
- Focus on the visitation frequency of the agency caseworker (or other responsible party) responsible for the case and not on other service providers who may be visiting the children.
- Determine the most typical pattern of visitation during the period under review because the actual frequency may vary in specific time periods.

---

A.   During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals?

Yes ❒          No ❒

**Question 14A Instructions:**

- If A1 is Never, question A is No.
- In responding to question A, consider the frequency of visits selected in question A1.
- Base your determination on the frequency necessary to ensure the child's safety, permanency, and well-being and not on compliance with state policy requirements regarding caseworker contacts or visits with the child. For example, if state policy is that the caseworker should visit the child at least once a month and they complied with that, but you determine that given the circumstances of the case (for example, there are safety concerns), the caseworker should visit more frequently, then the answer to question A should be No.
- If the child is in a placement in another state, you should determine whether a caseworker from the jurisdiction in which the child is placed, or a caseworker from the jurisdiction from which the child was placed, visits with the child in the placement on a schedule that is consistent with the child's needs.
- If the typical pattern of visits is less than once a month, the answer to question A should be No unless you determine that there is a substantial justification for a Yes answer.
- For an in-home services case, any children in the home who were assessed in item 12 should be visited at least monthly unless there is substantial justification for less than monthly visits. Frequency of visitation with other children in the family home should be determined based on the circumstances of the case, such as any risk and safety concerns present during the period under review, the age and vulnerability of the children, the reason for the agency's involvement with the family, etc.

B.     During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals (for example, did the visits between the caseworker or other responsible party and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)?

Yes ☐          No ☐            NA ☐

If No, explain any concerns in the narrative field below:

**Question 14B Instructions:**

- If A1 is Never, question B is Not Applicable.
- Consider both the length of the visit (for example, was it of sufficient duration to address key issues with the child, or was it just a brief visit) and the location of the visit (for example, was it in a place conducive to open and honest conversation, such as a private home, or was it in a more formal or public environment, such as a court house or restaurant?).
- Consider whether the caseworker (or other responsible party) saw the child alone or whether the parent or foster parent was usually present during the caseworker's visits with the child. If the child was older than an infant, and the caseworker did not see the child alone for at least part of each visit, then the answer to question B should be No.
- Also consider the topics that were discussed during the visits, if that information is available in the case file or through interviews. For the answer to question B to be Yes, there must be some evidence that the caseworker and the child addressed issues pertaining to the child's needs, services, and case goals during the visits.

## Item 14 Rating Criteria:

**Item 14 should be rated as a Strength if the answers to both questions A and B are Yes.**

**Item 14 should be rated as an Area Needing Improvement if the answer to question A and/or B is No.**

**There are no circumstances under which Item 14 could be rated as Not Applicable.**

**Item 14 Rating (select one):**

Strength ❑          Area Needing Improvement ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

```

```

Override rating? ❑
Override rating
Strength ❑          Area Needing Improvement ❑

Override reason:

```

```

## WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.

### Item 15: Caseworker Visits With Parents

**Purpose of Assessment:** To determine whether, during the period under review, the frequency and quality of visits between caseworkers and the mothers and fathers of the child(ren) are sufficient to ensure the safety, permanency, and well-being of the child(ren) and promote achievement of case goals.

---

**Item 15 Definitions:**

In-home services cases:

- "Mother" and "Father" in Items 12, 13, and 15, are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents).
- If a biological parent does not fall into any of the categories above, determine whether that parent should be included in this item based on the circumstances of the case. Some things to consider in this determination are: the reason for the agency's involvement and the identified perpetrators in the case, the status of the children's relationship with the parent, the nature of the case (court supervised or voluntary) and the length of case opening. If a biological parent indicates a desire during the period under review to be involved with the child and it is in the child's best interests to do so, they should be assessed in this item.

Foster care cases:

- "Mother" and "Father" in Items 12, 13, and 15 are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.
- "Mother" and "Father" in Items 12, 13, and 15 include biological parents who were not the parents from whom the child was removed.
- "Mother" and "Father" include adoptive parents if the adoption has been finalized during the period under review.

---

### Item 15 Applicable Cases:

Because multiple case participants can be assessed in these questions, consider applicability for all appropriate case participants before determining that the rating should be Not Applicable. All cases are applicable for an assessment of this item except cases in which **all** parents being assessed as Mother and Father meet any of the following criteria (check Yes for any that apply and No for those that do not):

- Parental rights remained terminated during the entire period under review.  Yes ❑     No ❑
- Parent's whereabouts were not known during the entire period under review despite agency efforts to locate the parent. Yes ❑     No ❑
- The reviewer has determined that Item 12B is rated as an Area Needing Improvement due to lack of concerted efforts to find applicable parents. Yes ❑     No ❑
- Parent was deceased during the entire period under review.  Yes ❑     No ❑
- During the entire period under review it was documented in the case file that it was not in the child's best interests to involve the parent in case planning. Yes ❑     No ❑
- During the entire period under review the parent has indicated he/she does not want to be involved in the child's life and this was documented in the case file. Yes ❑     No ❑

### Is this case applicable?

Select the appropriate response.  If the response is No, select Not Applicable in the ratings section and continue to Item 16. Yes ❑     No ❑

---

*Section III: Child and Family Well-Being Outcome 1*

Indicate the case participants who are included in this item as Mother and Father:

[ ]

Optional: Provide comments in the narrative field below:

[ ]

A1. During the period under review, what was the most typical pattern of visitation between the caseworker (or other responsible party) and the mother of the child(ren)?  Select the appropriate response:

❐ More than once a week
❐ Once a week
❐ Less than once a week, but at least twice a month
❐ Less than twice a month, but at least once a month
❐ Less than once a month
❐ Never
❐ NA

---

**Questions 15A1, 15A2, 15B1, and 15B2 Definitions:**

- "Other responsible party" refers to contracted service providers who have full responsibility for case planning and case management (for example, fully or partially privatized child welfare systems where full case management responsibilities are delegated to contract agencies).  It does not refer to contracted service providers who provide services while the agency maintains decision-making and case management responsibilities regarding the case or the child.
- A "visit" is defined as a face-to-face contact between the caseworker or other responsible party and the parent.

**Questions 15A1 and 15B1 Instructions:**

- Select Not Applicable if all case participants being assessed as Mother in 15A1 or as Father in 15B1 meet the criteria for Not Applicable in the item 15 rating criteria above. Consider only the pattern of visits during the period under review and not over the life of the case.
- Determine the most typical pattern of visitation during the period under review because the actual frequency may vary in specific time periods.
- Select NA for questions A1 and B1 if the agency did not make concerted efforts to locate a mother or father whose whereabouts  were unknown. In Well-Being Outcome 1, concerns about efforts to locate a parent should only be reflected in item 12.

---

A2. During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the mother sufficient to (1) address issues pertaining to the safety, permanency, and well-being of the child and (2) promote achievement of case goals?

Yes ❐          No ❐          NA ❐

---

**Questions 15A2 and 15B2 Instructions:**

- If the answer to question A1 or B1 is Not Applicable, the answer to question A2 or B2 for that parent also should be Not Applicable.
- Consider the frequency of visits that is necessary to effectively address: (1) the child's safety, permanency, and well-being, and (2) achievement of case goals. Do not answer the question based on the caseworker visit requirements that may be established by state policy.
- The answers to questions A2 and B2 should be No if the typical pattern of contact is less than once a month, unless you have a substantial justification for answering either question as Yes.

B1.  During the period under review, what was the most typical pattern of visitation between the caseworker (or other responsible party) and the father of the child(ren)?  Select the appropriate response:

- ❐ More than once a week
- ❐ Once a week
- ❐ Less than once a week, but at least twice a month
- ❐ Less than twice a month, but at least once a month
- ❐ Less than once a month
- ❐ Never
- ❐ NA

B2.  During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals?

Yes ❐          No ❐          NA ❐

C.   During the period under review, was the quality of the visits between the caseworker (or other responsible party) and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals?

Yes ❐          No ❐          NA ❐

If No, explain any concerns in the narrative field below:

```

```

---

**Questions 15C and 15D Instructions:**

- Consider both the length of the visit (for example, was it of sufficient duration to address key issues with the mother/father, or was it just a brief visit?) and the location of the visit (for example, was it in a place conducive to open and honest conversation, such as a private home, or was it in a formal or public environment that might be uncomfortable for the parent, such as a court house or restaurant?).
- Consider whether the visits between the caseworker or other responsible party and the father/mother focused on issues pertinent to case planning, service delivery, and goal achievement.
- If the answer to question A1 or B1 is Not Applicable or Never, then the answer to the corresponding question (same parent) C or D should be Not Applicable.

---

D.      During the period under review, was the quality of the visits between the caseworker (or other responsible party) and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals?

Yes ❑            No ❑            NA ❑

If No, explain any concerns in the narrative field below:

```

```

## Item 15 Rating Criteria:

**Item 15 should be rated as a Strength if any of the following apply:**

- **The answers to A2, B2, C, and D are Yes.**
- **The answer to A2 and C is Yes and the answer to B2 and D is NA.**
- **The answer to A2 and C is NA and the answer to B2 and D is Yes.**

**Item 15 should be rated as an Area Needing Improvement if the answer to any one of questions A2, B2, C, or D is No.**

**Item 15 should be rated as Not Applicable if the response to the question of applicability is No.**

## Item 15 Rating (select one):

Strength ❑            Area Needing Improvement ❑            NA ❑

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

```

```

Override rating? ❑
Overridden rating:

Strength ❑            Area Needing Improvement ❑            NA ❑

Override reason:

```

```

# RATING CHILD AND FAMILY WELL-BEING OUTCOME 1

## WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the ratings for Items 12 through 15?

### Instructions:

Well-Being Outcome 1 should be rated as Substantially Achieved if both of the following apply:

- Item 12 is rated as a Strength or NA and

- Only one of Items 13, 14, and 15 is rated as an Area Needing Improvement.

Well-Being Outcome 1 should be rated as Partially Achieved if either of the following applies:

- Item 12 is rated as an Area Needing Improvement, but at least one other item is rated as a Strength.

- Item 12 is rated as a Strength or NA, but at least two of Items 13, 14, and 15 are rated as Areas Needing Improvement.

Well-Being Outcome 1 should be rated as Not Achieved if the following applies:

- All applicable items are rated as Areas Needing Improvement.

Select the appropriate rating:

Substantially Achieved ☐          Partially Achieved ☐          Not Achieved ☐

**WELL-BEING OUTCOME 2: CHILDREN RECEIVE APPROPRIATE SERVICES TO MEET THEIR EDUCATIONAL NEEDS.**

## Item 16: Educational Needs of the Child

**Purpose of Assessment:** To assess whether, during the period under review, the agency made concerted efforts to assess children's educational needs at the initial contact with the child (if the case was opened during the period under review) or on an ongoing basis (if the case was opened before the period under review), and whether identified needs were appropriately addressed in case planning and case management activities.

## Item 16 Applicable Cases:

- All foster care cases involving a school-aged child, including those in pre-school, are applicable for an assessment of this item. If a child is 2 years old or younger and has been identified as having developmental delays, the case may be applicable if the developmental delays need to be addressed through an educational approach rather than through physical therapy or some form of physical health approach.  In these latter cases, the issue of developmental delays would be addressed under Item 17.

- Foster care cases are Not Applicable if the child is age 2 or younger and there are no apparent developmental delays.

- In-home services cases are applicable for an assessment of this item if (1) educational issues are relevant to the reason for the agency's involvement with the family, and/or (2) it is reasonable to expect that the agency would address educational issues given the circumstances of the case. For example, it is reasonable to expect that the agency would address educational issues in a case in which the child is the subject of a substantiated maltreatment report and, during the period under review, the maltreatment appeared to be affecting the child's school performance.

- In-home services cases are Not Applicable for an assessment of this item if the reviewer determines that, during the period under review, there is no reason to expect that the agency would address educational issues for any children in the family, given the reason for agency involvement or the circumstances of the case.  This "non-applicability" applies even if there is evidence in the case file that the agency has learned that the parent/caregiver has obtained educational services for the children.

## Is this case applicable?
Select the appropriate response.  If the answer is No, rate the item as Not Applicable in the ratings section and continue to Item 17.

Yes ☐         No ☐

Optional: Provide comments in the narrative field below:

<div style="border:1px solid black; height:60px;"></div>

A.   During the period under review, did the agency make concerted efforts to accurately assess the children's educational needs?

Yes ☐         No ☐

For in-home services cases, indicate the names of the children who are included in the assessment of Item 16:

<div style="border:1px solid black; height:60px;"></div>

**Question 16A Instructions:**

- If the case is a foster care case, question A should be answered only for the child in foster care, even if the child was reunified during the period under review and there are other children in the home.
- If the case is an in-home services case, question A should be answered for all children in the home who meet the case applicability requirements.
- Question A should be answered Yes if there was evidence of an educational assessment in the case file, such as:
  - An educational assessment included in the comprehensive needs assessment.
  - A separate educational assessment conducted by the school (and made available to the agency) or by the agency.
  - An informal (and documented) educational assessment conducted by the agency.
- Question A should be answered Yes if the reviewer determines through interviews with key individuals that the agency assessed the children's educational needs, even if the case file did not include the documentation identified above.

A1. **Education Table**

| Educational Needs | Services Provided | Services Needed But Not Provided |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Table 16A1 Instruction:**

Document in the table the child(ren)'s educational needs, services provided to meet those needs, and services needed but not provided. Services could include ensuring that children received special education classes; making provisions for children to receive tutoring or educational mentoring; and arranging for children to be enrolled in early intervention preschool classes such as Head Start. Foster care cases could include advocacy on the part of foster parents as well as the caseworker.

B.   During the period under review, did the agency engage in concerted efforts to address the children's educational needs through appropriate services?

Yes ☐          No ☐          NA ☐

**Question 16B Instructions:**

- Question B should be answered Not Applicable if an educational assessment was conducted (i.e., question A is answered Yes) but no needs were identified.
- Review any "services needed but not provided" noted in table A1 when responding to question B. Focus on agency efforts, even if these efforts were not fully successful due to factors beyond the agency's control. For example, if the agency made concerted efforts to advocate for special education classes, but the local school continued to resist, you may answer Yes to question B, although the child did not receive the needed services. Also consider whether the service need was recently identified during the period under review and the agency has not had a reasonable amount of time to arrange for/request the service.

**Item 16 Rating Criteria:**

**Item 16 should be rated as a Strength if either of the following applies:**

- **The answers to questions A and B are Yes.**

- **The answer to question A is Yes, and the answer to question B is Not Applicable.**

**Item 16 should be rated as an Area Needing Improvement if the answer to question A and/or B is No.**

**Item 16 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 16 Rating (select one):**

Strength ❏             Area Needing Improvement ❏          NA ❏

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

```
```

Override rating? ❏
Overridden rating
Strength ❏             Area Needing Improvement ❏          NA❏

```
```

# RATING CHILD AND FAMILY WELL-BEING OUTCOME 2

## WELL-BEING OUTCOME 2: CHILDREN RECEIVE APPROPRIATE SERVICES TO MEET THEIR EDUCATIONAL NEEDS.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the rating for Item 16?

**Instructions:**

Well-Being Outcome 2 should be rated as Substantially Achieved if the following applies:

- Item 16 is rated as a Strength.

Well-Being Outcome 2 should be rated as Partially Achieved if the following applies:

- Item 16 is rated as an Area Needing Improvement, but question A or B is answered Yes.

Well-Being Outcome 2 should be rated as Not Achieved if the following applies:

- Item 16 is rated as an Area Needing Improvement and both questions A and B were answered No.

Well-Being Outcome 2 should be rated as Not Applicable if the following applies:

- Item 16 is rated as Not Applicable.

Select the appropriate rating:

Substantially Achieved ❑        Partially Achieved ❑        Not Achieved ❑        NA ❑

Overridden outcome rating:

Substantially Achieved ❑        Partially Achieved ❑        Not Achieved ❑        NA ❑

Override reason:

_____

## WELL-BEING OUTCOME 3: CHILDREN RECEIVE ADEQUATE SERVICES TO MEET THEIR PHYSICAL AND MENTAL HEALTH NEEDS.

### Item 17: Physical Health of the Child

**Purpose of Assessment:** To determine whether, during the period under review, the agency addressed the physical health needs of the children, including dental health needs.

### Item 17 Applicable Cases:

- All foster care cases are applicable for an assessment of this item.
- In-home services cases are applicable for an assessment of this item if (1) physical/dental health issues were relevant to the reason for the agency's involvement with the family, and/or (2) it is reasonable to expect that the agency would address physical/dental health issues given the circumstances of the case. For example, it is reasonable to expect that the agency would address physical health issues in a case in which a child is the subject of a substantiated maltreatment report of physical neglect and there is reason to suspect that, during the period under review, the neglect may have affected the child's physical health.
- In-home services cases are Not Applicable for an assessment of this item if you determine that there is no reason to expect that the agency would address physical and dental health issues for any children in the family, given the reason for agency involvement or the circumstances of the case. This "non-applicability" applies even if there is evidence in the case file that the agency has learned that the parent is effective in taking care of the children's physical and dental health needs.

### Is this case applicable?

Select the appropriate response.  If the answer is No, rate the case as Not Applicable in the ratings section and continue to Item 18.

Yes ❑          No ❑

Optional: Provide comments in the narrative field below:

|  |
|--|
|  |

A1.  During the period under review, did the agency accurately assess the children's physical health care needs?

Yes ❑          No ❑          NA ❑

For in-home services cases, indicate the names of the children who are included in the assessment of Item 17:

|  |
|--|
|  |

**Questions 17A1 and 17A2 Instructions**:

- For in-home services cases, A1 and A2 should be answered for all children in the home who meet the case applicability requirements. A1 or A2 may be Not Applicable if only one of the issues (physical or dental health) was relevant for assessment in an in-home services case.

- Determine whether there is evidence that, during the period under review, the agency arranged for assessment of the child(ren)'s health care needs, including dental care needs, both initially (if the child entered foster care during the period under review or if an in-home services case was opened during the period under review), and on an ongoing basis through periodic health and dental screening services conducted during the period under review.

- The evidence to consider would include, but is not limited to:
  - Conducting an initial health care screening, such as EPSDT (Early Periodic Screening, Diagnosis, and Treatment) or other comprehensive medical examination upon entry into foster care (if the child entered foster care during the period under review) or when the case first opened (for an in-home services case that opened during the period under review).
  - Ensuring that, during the period under review, the children received ongoing periodic preventive physical and dental health screenings to identify and avoid potential problems. (Preventive health care refers to initial and periodic age-appropriate dental or physical health examinations.)
  - Including an assessment of physical and dental health needs in the initial comprehensive needs assessment (if the child entered foster care during the period under review or if the in-home services case was opened during the period under review), or in ongoing needs assessments conducted to guide case planning.

**A2.**  During the period under review, did the agency accurately assess the children's dental health care needs?

Yes ❑        No ❑        NA ❑

**Question 17A2 Instruction:**

If the children are too young for a dental examination, then question A2 should be answered Not Applicable.

**A3.**  Physical and Dental Health Table

| Identified Physical or Dental Health Needs | Services Provided | Services Needed But Not Provided |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

---

**Table 17A3 Instruction:**

Document in the table each identified physical or dental health need, the services provided to meet those needs, and the services needed but not provided related to each identified need. Needed services could include immunizations, treatment services, and dental services, including orthodontics.

---

A4. For foster care cases only, determine whether, during the period under review, there was evidence that the following case-management criteria required by federal statute were met (select each one that was met).

- ❏ NA (this is an in-home services case).
- ❏ No evidence found.
- ❏ To the extent available and accessible, the child's health records are up to date and included in the case file [Social Security Act § 475(1)(C)].
- ❏ The case plan addresses the issue of health and dental care needs [Social Security Act § 475(1)(C)].
- ❏ To the extent available and accessible, foster parents or foster care providers are provided with the child's health records [Social Security Act § 475(5)(D)].

---

**Question 17A4 Definitions:**

Health records include the names and addresses of the child's health care providers, a record of the child's  immunizations, the child's known medical problems, the child's medications, and any other relevant health  information.

---

B1. For foster care cases only, during the period under review, did the agency provide appropriate oversight of prescription medications for physical health issues?

Yes ❏        No ❏        NA ❏

---

**Question 17B1 Definition:**

- "Appropriate oversight" includes, but is not limited to, the following:
  - Ensuring that a child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or if other treatment options would be more appropriate
  - Regularly following up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects
  - Following any additional state protocols that may be in place related to the appropriate use and monitoring of medications

**Question 17B1 Instructions:**

- Select NA if this is not a foster care case.
- If the child was not prescribed any medications for physical health issues during the period under review, select NA.

---

**B2.** During the period under review, did the agency ensure that appropriate services were provided to the children to address all identified physical health needs?

Yes ❑          No ❑          NA ❑

---

**Questions 17B2 and 17B3 Instructions:**

- If the answers to question(s) A1 and/or A2 are Yes and no needs for services or treatment were identified, then the corresponding question(s) B2, and/or B3 should be answered Not Applicable. If question A2 is Not Applicable because of the child's age, then question B3 also should be Not Applicable.

- If any "services needed but not provided" are noted in the A3 table, question B2 and/or B3 should be No, unless the service was recently identified during the period under review and the agency has not had a reasonable amount of time to arrange for the service. If services were not provided due to excessive waitlists, service providers not being available in the community, or delays by the agency, question B2 and/or B3 should be No.

- Answer No to question B2 or B3 if the case management criteria noted in question A4 were not met and you determine that had or has a negative impact on the agency's ability to meet the child's health and dental care needs. For example, foster parents were unable to effectively address health care needs because they had never seen the child's health records, or the child's health care needs were not being met because there were no health records in the case file and the worker was unaware of the child's health care needs.

- Routine exams can include both evaluations and services (e.g. a teeth cleaning). In cases where initial and/or ongoing assessments were conducted and the child received routine care but no follow-up services were needed, the answer to 17B2 or 17B3 should be Yes. If either routine care or any additional services were needed but not provided, the answer to 17B2 or 17B3 should be No.

---

**B3.** During the period under review, did the agency ensure that appropriate services were provided to the children to address all identified dental health needs?

Yes ❑          No ❑          NA ❑

**Item 17 Rating Criteria:**

**Item 17 should be rated as a Strength if either of the following applies:**

- **The answers to questions A1, A2, B1, B2, and B3 are Yes.**
- **The answer to at least one of questions A1, A2, B1, B2, or B3 is Yes, and the rest are Not Applicable.**

**Item 17 should be rated as an Area Needing Improvement if the answer to any question is No.**

**Item 17 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 17 Rating (select one):**

Strength ❑          Area Needing Improvement ❑          NA ❑

---

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

Override this rating? ❑

Overridden rating:
Strength ❑   Area Needing Improvement ❑

Override reason:

## WELL-BEING OUTCOME 3: CHILDREN RECEIVE ADEQUATE SERVICES TO MEET THEIR PHYSICAL AND MENTAL HEALTH NEEDS.

### Item 18: Mental/Behavioral Health of the Child

**Purpose of Assessment:** To determine whether, during the period under review, the agency addressed the mental/behavioral health needs of the children.

### Item 18 Applicable Cases:

- Foster care cases are applicable for an assessment of this item if the reviewer determines that, during the period under review, the child had existing mental/behavioral health needs, including substance abuse issues. If the child had mental/behavioral health issues before the period under review that were adequately addressed and there are no remaining needs during the period under review, the case should be rated as Not Applicable.

- In-home services cases are applicable for an assessment of this item if (1) mental/behavioral health issues related to any of the children in the family were relevant to the reason for the agency's involvement with the family, and/or (2) it is reasonable to expect that the agency would address mental/behavioral health issues given the circumstances of the case. For example, it is reasonable to expect that the agency would address mental health issues in a case in which a child is the subject of a substantiated maltreatment report and there is reason to suspect that, during the period under review, the maltreatment may have affected the child's mental health.

- In-home services cases are Not Applicable for an assessment of this item if the reviewer determines that there is no reason to expect that, during the period under review, the agency would address mental/behavioral health issues for any children in the family, given the reason for agency involvement or the circumstances of the case.  This "non-applicability" applies even if there is evidence in the case file that the agency has learned that the parent is effective in taking care of the children's mental/behavioral health needs.

### Is this case applicable?

Select the appropriate response. If the answer is No, rate the case as Not Applicable in the rating section.

Yes ❑          No ❑

Optional: Provide comments in the narrative field below:

```
                                                                        
```

A.      During the period under review, did the agency conduct an accurate assessment of the children's mental/behavioral health needs either initially (if the child entered foster care during the period under review or if the in-home services case was opened during the period under review) and on an ongoing basis to inform case planning decisions?

Yes ❑          No ❑

For in-home services cases, indicate the names of the children who are included in the assessment of Item 18:

```
                                                                        
```

**Question 18A Definition:**

"Behavioral health needs" includes needs related to behavioral problems that are not always specified as mental health needs, including substance abuse.

**Question 18A Instructions:**

- An assessment of mental health should include consideration of any trauma that the children may have experienced, including exposure to domestic violence.
- Determine whether, during the period under review, the agency conducted a formal or informal mental/behavioral health assessment on the children initially (if the in-home services case was opened during the period under review) or at entry into foster care (if the child entered foster care during the period under review), and on an ongoing basis.
- If the case is an in-home services case, question A should be answered for all children in the home who meet the case applicability requirements.

**A1. Mental/Behavioral Health Table**

| Identified Mental/Behavioral Health Needs | Services Provided | Services Needed But Not Provided |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Table 18A1 Instruction:**

Identify in the table the identified mental/behavioral health needs, services provided to address those identified needs, and services needed but not provided. Services may include outpatient treatment, inpatient mental health treatment, treatment for substance abuse disorders, individual therapy, group therapy, family therapy, etc.

**B.**    For foster care cases only, during the period under review, did the agency provide appropriate oversight of prescription medications for mental/behavioral health issues?

Yes ❑          No ❑          NA ❑

---

**Question 18B Definition:**

- "Appropriate oversight" includes, but is not limited to, the following:
  - Ensuring that a child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate
  - Regularly following up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects
  - Following any additional state protocols that may be in place related to the appropriate use and monitoring of medications

**Question 18B Instructions:**

- Select NA if this is not a foster care case.

- If the child was not prescribed any medications for mental/behavioral health issues during the period under review, select NA.

---

**C.** During the period under review, did the agency provide appropriate services to address the children's mental/behavioral health needs?

Yes ☐          No ☐          NA ☐

---

**Question 18C Instructions:**

- If question A is answered Yes, but no mental/behavioral health service needs were identified, then the answer to question C should be Not Applicable.

- If you noted any "services needed but not provided" in the A1 table, question C should be No, unless the service was recently identified during the period under review and the agency has not had a reasonable amount of time to arrange for the service. If services were not provided due to excessive waitlists, service providers not being available in the community, or delays by the agency, question C should be answered No.

---

## Item 18 Rating Criteria:

**Item 18 should be rated as a Strength if the answer to question A is Yes, the answer to question B is Yes or Not Applicable, and the answer to question C is Yes or Not Applicable.**

**Item 18 should be rated as an Area Needing Improvement if the answer to any question is No.**

**Item 18 should be rated as Not Applicable if the response to the question of applicability is No.**

**Item 18 Rating (select one):**

Strength ☐          Area Needing Improvement ☐          NA ☐

Provide any additional comments that highlight strengths or challenges related to specific practices, systemic issues, or resources that affected this item in the narrative field below:

<div style="border:1px solid black; height:60px;"></div>

---

*Section III: Child and Family Well-Being Outcome 3*

Override this rating? ☐

Overridden rating:

Strength ☐          Area Needing Improvement ☐          NA ☐

Override reason:

| |
|---|
| |

# RATING CHILD AND FAMILY WELL-BEING OUTCOME 3

## WELL-BEING OUTCOME 3: CHILDREN RECEIVE ADEQUATE SERVICES TO MEET THEIR PHYSICAL AND MENTAL HEALTH NEEDS.

What is the level of outcome achievement that best describes the extent to which this outcome is being or has been achieved, based on the ratings for Items 17 and 18?

**Instructions**:

Well-Being Outcome 3 should be rated as Substantially Achieved if either of the following applies:

- Items 17 and 18 are both rated as Strengths.

- One item is rated as a Strength and the other item is rated as Not Applicable.

Well-Being Outcome 3 should be rated as Partially Achieved if the following applies:

- One of the two items (17 and 18) is rated as a Strength and the other is rated as an Area Needing Improvement.

Well-Being Outcome 3 should be rated as Not Achieved if either of the following applies:

- Both items are rated as Areas Needing Improvement.

- One item is rated as an Area Needing Improvement and the other item is rated as Not Applicable.

Well-Being Outcome 3 should be rated as Not Applicable if the following applies:

- Items 17 and 18 are both rated as Not Applicable.

Select the appropriate rating:

Substantially Achieved ❏          Partially Achieved ❏          Not Achieved ❏          NA ❏

# ATTACHMENT 6

# CFSR Round 3
# Statewide Data Indicator Series

The Children's Bureau conducts Child and Family Services Reviews (CFSRs) in partnership with child welfare systems in all 50 states, the District of Columbia, and Puerto Rico. CFSRs enable the Children's Bureau to assess conformity with federal child welfare requirements, determine the experiences of children and families receiving state child welfare services, and help states identify agency and program strengths and areas for improvement. Statewide data indicators provide important context in the evaluation and improvement of child outcomes related to safety and permanency by comparing national performance to a state's own performance over time. CFSRs also focus on child and family well-being as well as systemic requirements.



## Capacity Building
### CENTER FOR STATES

## CFSR Permanency Outcome 1

Children have permanency and stability in their living situations.

# Placement Stability

This indicator measures whether the agency ensures that children who the agency removes from their homes experience stability while they are in foster care.



## Definition

Of all children who enter foster care in a 12-month period, what is the rate of placement moves per 1,000 days of foster care?

## National Performance

**4.44 MOVES PER 1,000 DAYS IN CARE**

(A lower value is desirable.)

| NUMERATOR | DENOMINATOR |
|---|---|
| Of the children in the denominator, the total number of placement moves during the 12-month period | Among the children who enter foster care in a 12-month period, the total number of days these children were in foster care as of the end of the 12-month period |

## Risk is adjusted on age of child at entry and by state.

Adjusting on age controls for the fact that children of different ages have different likelihoods of experiencing the outcome, regardless of the quality of care that a state provides.

Additionally, every indicator is adjusted based on the particular state. Risk adjustment by state is part of the multilevel statistical modeling approach that accounts for the underlying risk of experiencing the outcome in a state after accounting for a child's specific risk.

### ADDITIONAL ADJUSTMENTS

This measure is expressed as a rate per 1,000 days in care. The result of the numerator divided by the denominator is multiplied by 1,000 to produce larger numbers that are easier to understand.

Per Adoption and Foster Care Analysis and Reporting System (AFCARS)

## Data Quality Checks Performed

- ✓ Dropped records (greater than 10%)
- ✓ AFCARS IDs do not match from one period to the next (greater than 40%)
- ✓ Missing date of birth (greater than 5%)
- ✓ Missing date of latest removal (greater than 5%)
- ✓ Date of birth after date of entry (greater than 5%)
- ✓ Date of birth after date of exit (greater than 5%)
- ✓ Age at entry is greater than 21 (greater than 5%)
- ✓ Age at discharge is greater than 21 (greater than 5%)
- ✓ In foster care more than 21 years (greater than 5%)
- ✓ Enters and exits care the same day (greater than 5%)
- ✓ Exit date is prior to the removal date (greater than 5%)
- ✓ Missing number of placement settings (greater than 5%)
- ✓ Percentage of children on first removal (greater than 95%)

| Data Periods Used to Calculate the National Performance | |
|---|---|
| AFCARS 13B, 14A | |
| **Primary Data Elements Required for Calculation** | |
| AFCARS Foster Care Element #1: | Title IV-E agency |
| AFCARS Foster Care Element #4: | Record number |
| AFCARS Foster Care Element #6: | Child's date of birth |
| AFCARS Foster Care Element #19: | Total number of removals from home to date |
| AFCARS Foster Care Element #20: | Date of discharge from last foster care episode |
| AFCARS Foster Care Element #21: | Reason for discharge |
| AFCARS Foster Care Element #23: | Date of placement in current foster care setting |
| AFCARS Foster Care Element #24: | Number of placement settings during this removal episode |
| AFCARS Foster Care Element #56: | Date of discharge from foster care |
| **Data Elements Required for Risk-Adjusted Analysis** | |
| AFCARS Foster Care Element #6: | Child's date of birth |

## Notes

### INCLUSIONS

Only placement settings that are required to be counted in the AFCARS file are used for this indicator. If the child is moved to a living arrangement or setting that would not result in the state increasing the number of placement settings reported in AFCARS, those moves are not included in this indicator (e.g., trial home visit episodes; runaway episodes; respite care and changes in a single foster family home's status, for example, to reflect a licensing change from a foster care home to a home dually licensed for adoption).

This measure counts only the days in care within the 12-month period. The days in care and moves during the placement episodes are cumulative across episodes reported in the same year.

### EXCLUSIONS

Children in care for less than 8 days are excluded.

Children who enter care at age 18 or older are excluded.

For youth who enter care at age 17 and turn 18 during the period, an adjustment is made for time in foster care beyond the 18th birthday, and placement changes after that date.

The initial removal from the home (and entry into care) is not counted as a placement move.

Days in care for which the AFCARS file does not have placement information are excluded.

**For more information: https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews/round3**

Updated 2019





Children's Bureau

Child and Family Services Review (CFSR)

## List of CFSR Round 3 Statewide Data Indicator Syntax Revisions

## Introduction

This document provides a summary of revisions made to the statistical syntax used to calculate performance on the Child and Family Services Review (CFSR) Round 3 statewide data indicator(s) and data quality checks following the May 2015 Federal Register Notice. These changes were made to correct technical errors in the syntax and strengthen operationalization of the measures and calculations. The first section of this document, "Indicator Syntax Changes" describes changes made to the code used to calculate performance on the seven CFSR statewide data indicators. The second section, "Source Data Creation and Data Quality Syntax Changes," describes changes made to the initial processing of National Child Abuse and Neglect Data System (NCANDS) and Adoption and Foster Care Analysis and Reporting System (AFCARS) data files, and to the Data Quality (DQ) checks. These changes are incorporated into the revised syntax that is pending final verification.

## Indicator Syntax Changes

### Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20)

A significant revision to the syntax pertains to the use of the AFCARS data "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20). The use of this data element provides an ability to accurately calculate the number of days a child was in a prior foster care episode during the 12-month reporting period (two consecutive six-month AFCARS submissions). Due to the structure of the AFCARS file, when a child experiences two foster care episodes during a 12-month reporting period, given certain conditions, the discharge date from the first episode can only be reported using the "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) in a subsequent AFCARS submission. This occurs in a couple of scenarios when the child was already in foster care on the first day of the

reporting period, or entered foster care during the first six-months of the 12-month reporting period, and then the child:

- Discharged from that foster care episode during the first six-month period, and re-entered foster care during the second six-months of the 12-month reporting period and a "Date of Discharge from Foster Care" (AFCARS Data Element #56) was not included in the first six-month AFCARS submission, or
- Discharged and re-entered foster care during the second six-months of the 12-month reporting period.

For these scenarios, when the information reflected below is in the child's AFCARS records for the 12-month reporting period, then, the child's length of stay for the prior foster care episode can be calculated:

- First six-month AFCARS submission:
  - There is a "Date of Latest Removal from Home" (AFCARS Data Element #21), and
  - There is no "Date of Discharge from Foster Care" (AFCARS Data Element #56).
- Second six-month AFCARS submission:
  - "Total Number of Removals from Home to Date" (AFCARS Data Element #19) increased by one removal, and
  - There is a "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20), and
  - "Date of Latest Removal from Home" (AFCARS Data Element #21) changed to represent the start of a new foster care episode.

The number of days in foster care is calculated using the "Date of Latest Removal From Home" (AFCARS Data Element #21) reported in the first six-month AFCARS submission or first day of the 12-month report period (if the child was already in foster care on the first day of the 12-month reporting period), and the "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) from the second six-month AFCARS submission. While the number of days in foster care can be calculated for the scenarios above, the AFCARS reporting structure does not provide a field to report the discharge reason for the initial foster care

episode when the discharge date is reported in the subsequent AFCARS submission. Without a discharge reason for the initial foster care episode, a determination cannot be made if the discharge from foster care qualifies as a discharge to permanency. Therefore, children that fall into that category are excluded from the Permanency in 12 months indicator calculations. Another exclusion occurs when the "Total Number of Removals From Home to Date" (AFCARS Data Element #19) reported in the second six-month AFCARS submission increases by more than one removal as the number of days in foster care for the initial foster care episode cannot be calculated.

Throughout the rest of this document the aforementioned revision is referred to as: Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20). This change impacts multiple indicators.  Indicator-specific descriptions provide additional information, as applicable, regarding how this syntax revision impacts individual indicators and how calculations operated previously.

## Maltreatment in Foster Care

### *Use of additional year of NCANDS data*

Syntax to calculate performance for this indicator was revised to use two consecutive years of NCANDS data to better identify all child victims of substantiated or indicated reports of maltreatment with a report date during the 12-month reporting period. Previously, child victims of abuse and neglect were excluded from the calculation when the report date occurred during the 12-month reporting period and the disposition for that report was documented in the following federal fiscal year NCANDS submission.

### *Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20)*

See description of this syntax revision described on pages 1-3 of this document.

Previously, when a child experienced two foster care episodes during a 12-month reporting period, the syntax calculated the total number of days the child was in foster care by adding together the following values for each foster care episode:

1. Initial foster care episode:  Difference in days between "Date of Latest Removal From Home" (AFCARS Data Element #21) in the first six-month AFCARS submission, or the first day of the 12-month reporting period (if the child was already in foster care on the first day of the 12-month reporting period), and the last day of the 12-month reporting period.

2. Subsequent foster care episode: Difference in days between "Date of Latest Removal From Home" (AFCARS Data Element #21) reported in the second six-month AFCARS submission, and the "Date of Discharge from Foster Care" (AFCARS Data Element #56), or the last day of the 12-month reporting period if a discharge date was not reported.

This methodology resulted in some days in foster care being counted in both foster care episodes which produced an inaccurate number of days in foster care that in some cases exceeded 12-months, and child victims of substantiated or indicated reports of maltreatment being counted when the victimization did not occur while the child was in foster care.

*Correction to date of discharge for children who turn 18 years old in foster care*

Syntax was revised to use the date of the child's 18th birthday if the "Date of Discharge from Foster Care" (AFCARS Data Element #56) was not before that date. Previously, the syntax used the "Date of Discharge from Foster Care" (AFCARS Data Element #56), even when that date occurred after the child's 18th birthday which produced an inaccurate count of the number of days in foster care.

*Exclusion of AFCARS records with conflicting information*

Syntax was revised to retain the child's record from the most recent AFCARS submission for the 12-month reporting period (i.e. second six-month AFCARS submission for the 12-month reporting period) and exclude the child's record from the first six-month AFCARS submission when foster care entry dates overlap or foster care episode discharge dates contradict. Previously, the child's records from the first and second six-month AFCARS submissions were retained regardless of having conflicting information. This sometimes resulted in inaccurate calculations for the total number of days in foster care, and inclusion of some child victims of abuse and neglect being counted when the victimization did not occur while the child was in

foster care. The following examples are the most common instances of conflicting information identified for the same child in consecutive AFCARS submissions comprising the 12-month reporting period:

- The two six-month AFCARS submissions have different values for the "Date of Latest Removal from Home" (AFCARS Data Element #21), and the first six-month AFCARS submission does not have a "Date of Discharge from Foster Care" (AFCARS Data Element #56), and the second six-month AFCARS submission does not have a "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) for the first foster care episode.
- Information contained in the two six-month AFCARS submissions indicates there were two separate foster care episodes during the 12-month reporting period. However, the "Date of Latest Removal from Home" (AFCARS Data Element #21) for the second foster care episode occurred before the "Date of Discharge from Foster Care" (AFCARS Data Element #56) identified for the first foster care episode.

### *Correctly account for leap years*

Revised syntax no longer applies code to overwrite the number of days in foster care greater than the 12-month reporting period to equal 365 days. Syntax revisions described under "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) and "Exclusion of AFCARS records with conflicting information," resolved calculation errors that resulted in length of stays longer than the 12-month reporting period, and therefore, the need for code to overwrite the number of days in foster care to equal 365 days. Previously, children in foster care for the entire 12-month period during a leap year (366 days) were impacted by the prior code and identified as having 365 days in foster care.

### Recurrence of Maltreatment

### *Correction to not exclude applicable substantiated or indicated child maltreatment reports*

Syntax for this indicator excludes substantiated or indicated maltreatment reports for the same child that occurs within 14 days of the initial substantiated or indicated maltreatment report.

Revised syntax checks child abuse victim incident dates when comparing the initial substantiated or indicated maltreatment report with a subsequent substantiated or indicated maltreatment report for the same child to determine whether the subsequent report meets the 14-day exclusion criteria. If the two substantiated or indicated maltreatment reports have the same child abuse victim incident dates, the syntax excludes the subsequent maltreatment report. The syntax then checks to see if there was another subsequent substantiated or indicated maltreatment report for the child within 12 months of the initial victimization, and if those reports have the same child abuse victim incident dates.  Previously, the syntax retained only the first substantiated or indicated maltreatment report greater than 14 days after the initial victimization, and excluded all other substantiated or indicated maltreatment reports for the child received within 12 months of the initial report. If the syntax determined the two retained maltreatment reports had the same child abuse victim incident date (see description of next syntax revision), then the child was identified as not experiencing recurrence of maltreatment despite subsequent substantiated or maltreatment reports being received within 12 months of the initial victimization.

*Correct use of child maltreatment incident dates*

Syntax was revised to require child abuse victimization incident dates be reported for each substantiated or indicated maltreatment report used to determine whether the reports refer to the same incident. The use of maltreatment incident dates is a secondary check performed by the syntax when victimization incident dates are included in the NCANDS file. Child maltreatment reports over 14 days apart with the same maltreatment incident date are not identified as recurrence of maltreatment. When a victimization incident date is not reported in the NCANDS file for both substantiated or indicated maltreatment reports, the syntax relies on the maltreatment report date to determine if the second maltreatment report qualifies as recurrence of child maltreatment. Previously, when a child had two substantiated or indicated reports of child maltreatment more than 14 days apart, and one report had a child abuse incident date and the other report did not, the syntax overwrote the blank incident date with the

incident date from the other maltreatment report. As a result, the second victimization was not counted as recurrence of maltreatment.

*Exclusion of unborn children*

Syntax was revised to exclude unborn children in calculations for this indicator. This change was made based on a number of reasons, including: variation in number of states reporting unborn children in NCANDS submissions, differences in state policy for identifying unborn children as victims, inability to verify child IDs remained the same after the child was born, and overall concerns regarding the validity of being able to adequately assess recurrence of child maltreatment involving unborn children.

## Permanency in 12 Months for Children Entering Foster Care, and Re-entry to Foster Care in 12 Months

*Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20)*

See description of this syntax revision described on pages 1-3 of this document.  When a child experiences two foster care episodes during a 12-month reporting period and the end date of the first foster care episode is reported in the second six-month AFCARS submission using "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) the child's record is excluded from Permanency in 12 months indicator calculations. The AFCARS reporting structure does not provide a field to report the discharge reason for the initial foster care episode when the discharge date is reported in a subsequent AFCARS submission. Without a discharge reason for the initial foster care episode, a determination cannot be made if the discharge from foster care qualifies as a discharge to permanency.  Previously, the syntax did not use the "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) to identify the initial foster care episode ended. As a result, the child was included in the denominator, and counted as not having achieved permanency.

*Exclusion of AFCARS records with conflicting information*

Syntax was revised to retain the child's record from the most recent AFCARS submission for the 12-month reporting period (i.e. second six-month AFCARS submission for the 12-month reporting period) and exclude the child's record from the first six-month AFCARS submission when foster care entry dates overlap or foster care episode discharge dates contradict. Previously, the child's records from the first and second six-month AFCARS submissions were retained regardless of having conflicting information. This sometimes resulted in inaccurate calculations for the total number of days in foster care. The following examples are the most common instances of conflicting information identified for the same child in consecutive AFCARS submissions comprising the 12-month reporting period:

- The two six-month AFCARS submissions have different values for the "Date of Latest Removal from Home" (AFCARS Data Element #21), and the first six-month AFCARS submission does not have a "Date of Discharge from Foster Care" (AFCARS Data Element #56), and the second six-month AFCARS submission does not have a "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) for the first foster care episode.
- Information contained in the two six-month AFCARS submissions indicates there were two separate foster care episodes during the 12-month reporting period. However, the "Date of Latest Removal from Home" (AFCARS Data Element #21) for the second foster care episode occurred before the "Date of Discharge from Foster Care" (AFCARS Data Element #56) identified for the first foster care episode.

## Permanency in 12 Months for Children in Care 12-23 Months, and Permanency in 12 Months for Children in Care 24 Months or More

*Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20)*

See description of this syntax revision described on pages 1-3 of this document.  When a child experiences two foster care episodes during a 12-month reporting period and the end date of the first foster care episode is reported in the second six-month AFCARS submission using

"Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) the child's record is excluded from Permanency in 12 months indicator calculations. The AFCARS reporting structure does not provide a field to report the discharge reason for the initial foster care episode when the discharge date is reported in a subsequent AFCARS submission. Without a discharge reason for the initial foster care episode, a determination cannot be made if the discharge from foster care qualifies as a discharge to permanency.  Previously, the syntax did not use the "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) to identify the initial foster care episode ended. As a result, the child was included in the denominator, and counted as not having achieved permanency.

*Include children who discharged from foster care in first seven days of 12-month reporting period*

Syntax was revised to include children who discharged from foster care in the first seven days of the 12-month reporting period in the indicator calculations. Previously, the syntax incorrectly applied a general rule to exclude all children in foster care less than eight days which did not account for children who were in foster care a minimum of 12-months as of the first day of the 12-month reporting period.

## Placement Stability

*Use of "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20)*

See description of this syntax revision described on pages 1-3 of this document.  There is one difference for this indicator from what is described on pages 1-3 when a child experiences two foster care episodes during a 12-month reporting period and the end date of the initial foster care episode occurred during the second six-month AFCARS submission. The revised syntax calculates the number of days in foster care and corresponding count of placement moves for the initial foster care episode using the last day of the first six-month AFCARS submission. The AFCARS reporting structure does not provide a field to report the number of placement settings for the initial foster care episode when the discharge date occurs in a subsequent AFCARS submission that includes another foster care episode. Therefore only the number of days in

foster care associated with the known number of placement settings is used in indicator calculations.  Previously, for this scenario the number of days in foster care for the first foster care episode was calculated as the difference between "Date of Latest Removal from Home" (AFCARS Data Element #21) reported in the first six-month AFCARS submission and the last day of the 12-month reporting period. This prior methodology resulted in some days in foster care being counted in both foster care episodes which produced inaccurate length of stays that in some cases exceeded 12-months, and foster care days being counted when the associated number of placement moves was unknown.

*Correction to date of discharge for children who turn 18 years old in foster care*

Syntax was revised to use the date of the child's 18th birthday if the "Date of Discharge from Foster Care" (AFCARS Data Element #56) was not before that date. Previously, the syntax used the "Date of Discharge from Foster Care" (AFCARS Data Element #56), even when that date occurred after the child's 18th birthday which produced an inaccurate count of the number of days in foster care, and potentially an over count of placement moves by including moves that occurred after the child's 18th birthday.

*Correction to adjusted number of placement moves*

"Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) by definition includes a child's current placement setting. If a child's foster care episode included a value of "1" for AFCARS Data Element #24, it indicates the child did not experience any placement changes. Calculations for this indicator use the number of placement moves that occurred while the child was in foster care during the 12-month reporting period and under the age of 18 years which requires an adjustment to the number of placement settings reported for AFCARS Data Element #24. The revised syntax corrects the number of adjustments made to the count of placement moves during the 12-month reporting period.  The revised syntax performs the following adjustments:

- Subtracts one placement move for all foster care episodes to not count the initial removal from home (and into foster care) as a placement move.

- Subtracts one placement move when the child's "Date of Placement in Current Foster Care Setting" (AFCARS Data Element #23) is greater than the adjusted date of discharge for children who turned 18 years during the 12-month reporting period and the "Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) is greater than or equal to one.

Previously, the syntax adjusted the total number of placement moves by subtracting one placement move for each of the four scenarios described below, and did not treat these scenarios as mutually exclusive.

1. Child's "Date of Placement in Current Foster Care Setting" (AFCARS Data Element #23) is greater than the adjusted date of discharge and the "Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) is greater than or equal to two.

2. Child's "Date of Placement in Current Foster Care Setting" (AFCARS Data Element #23) is less than or equal to the adjusted date of discharge and the "Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) is greater than or equal to one.

3. Child's AFCARS record is missing "Date of Placement in Current Foster Care Setting" (AFCARS Data Element #23) and the "Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) is greater than or equal to one.

4. Child's AFCARS record identifies the child was still in foster care at end of the 12-month reporting period and the "Number of Previous Placement Settings During This Removal Episode" (AFCARS Data Element #24) is greater than or equal to one.

While scenarios 1-3 above are mutually exclusive (the child's AFCARS record cannot meet more than one of those scenarios), a child's record could meet scenarios 1 or 3, and also 4. Previously, when a child's AFCARS record for the 12-month reporting period met more than one of these scenarios, it resulted in more placement moves being subtracted from the "Number of Previous Placement Settings During This Removal Episode" (AFCARS data element #24) than

intended.  A different error that did not use the child's 18th birthday as the foster care episode discharge date compounded the calculation error described in this syntax change as it increased the number of children who met scenarios 3 and 4.

*Correctly account for leap years*

Revised syntax no longer applies code to overwrite the number of days in foster care greater than the 12-month reporting period to equal 365 days. Syntax revisions described under "Date Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) and "Exclusion of AFCARS records with conflicting information," resolved calculation errors that resulted in length of stays longer than the 12-month reporting period, and therefore, the need for code to overwrite the number of days in foster care to equal 365 days. Previously, children in foster care for the entire 12-month period during a leap year (366 days) were impacted by the prior code and identified as having 365 days in foster care.

*Exclusion of AFCARS records with conflicting information*

Syntax was revised to retain the child's record from the most recent AFCARS submission for the 12-month reporting period (i.e. second six-month AFCARS submission for the 12-month reporting period) and exclude the child's record from the first six-month AFCARS submission when foster care entry dates overlap or foster care episode discharge dates contradict. Previously, the child's records from the first and second six-month AFCARS submissions were retained regardless of having conflicting information. This sometimes resulted in inaccurate calculations for the total number of days in foster care, and double counting the number of placement moves. The following examples are the most common instances of conflicting information identified for the same child in consecutive AFCARS submissions comprising the 12-month reporting period:

- The two six-month AFCARS submissions have different values for the "Date of Latest Removal from Home" (AFCARS Data Element #21), and the first six-month AFCARS submission does not have a "Date of Discharge from Foster Care" (AFCARS Data Element #56), and the second six-month AFCARS submission does not have a "Date

Child Was Discharged from Last Foster Care Episode" (AFCARS Data Element #20) for the first foster care episode.

- Information contained in the two six-month AFCARS submissions indicates there were two separate foster care episodes during the 12-month reporting period. However, the "Date of Latest Removal from Home" (AFCARS Data Element #21) for the second foster care episode occurred before the "Date of Discharge from Foster Care" (AFCARS Data Element #56) identified for the first foster care episode.

## Source Data Creation and Data Quality Syntax Changes

## National Child Abuse and Neglect Data System (NCANDS) Source Data Syntax

In the prior version of the CFSR 3 statewide data indicator syntax, the NCANDS data file preparation and NCANDS DQ checks were embedded within the code for generating performance data on the two safety statewide data indicators. To align the NCANDS preparation and DQ sections of the code with the AFCARS preparation and DQ section of the code, and to improve readability, these sections of the code were removed from the indicator calculation syntax and used to create two new syntax files. The first set of code performs steps required to prepare the data for syntax calculations. The second set of code runs the NCANDS DQ checks and creates the data set needed to calculate performance on the data indicators.

## NCANDS and Adoption and Foster Care Analysis and Reporting System (AFCARS) Data Quality (DQ) Checks

### *Changes to exclude some records with data quality issues from DQ checks*

With the exception of DQ checks specifically designed to identify missing data elements (e.g. Missing age for victims), if a record does not have a valid value for one or more of the variables used in the DQ check, the record is excluded from the check. Previously, the record passed the DQ check despite not having values required to perform the check.

## NCANDS Data Quality (DQ) Checks

*Records that fail a DQ check are excluded from data indicator calculations*

Syntax was changed to exclude records from applicable indicator calculations that fail individual records-level NCANDS DQ checks. Previously, when a record failed a NCANDS DQ check, the record was not removed from the initial population of records used to calculate performance on the safety indicators. This change aligns NCANDS DQ check functionality with the syntax for AFCARS DQ checks which removes records that failed a record-level DQ check from applicable indicator calculations, even if the state did not exceed a DQ limit. This revision only changes the results of the DQ check listed below:

- Child IDs for victims match across years, but dates of birth / age and sex do not match

*Adjustment to NCANDS DQ Check: Child IDs for victims match across years, but dates of birth and sex do not match*

The syntax for this DQ check was modified to separately perform and apply the results of the steps below. Previously, the code for this DQ check performed steps one and two sequentially, and the results of step two inadvertently overrode the results of step one.

1. Determine whether DOB and sex match between the most recent years.
2. Determine whether sex matches between the two most recent records, and whether the age difference between the two most recent records is within an expected range. Note: An age difference that is outside of the expected range occurs when the child's age difference between the two years is less than zero or greater than three years.

## AFCARS Data Quality (DQ) Checks

*DQ checks limited to children under 18 years of age, with the exception of three DQ checks*

DQ checks are now limited to records of children younger than 18 years, with the exception of the following AFCARS DQ checks specifically designed for the 18 and older population:

- Age at discharge greater than 21

- Age at entry greater than 21
- In foster care more than 21 years

Previously, states could fail DQ checks based on data quality issues for the 18 and older population, and if they exceeded the DQ limit were excluded from indicator calculations. Syntax revisions now result in the exclusion of states from data indicator calculations only when the data quality limit is exceeded due to data problems applicable to the population of children used in indicator calculations, with the exception of the three DQ checks identified above.

*Population of children included in denominator changed for five DQ checks to records with children who discharged from foster care*

The denominator for the following DQ checks has been changed to apply only to records of children who discharged from foster care. Previously, these DQ checks were applied to all records included in the six-month AFCARS submission. This change affects the following five DQ checks:

1. Missing discharge reason
2. Age at discharge greater than 21
3. Date of birth after date of exit
4. Enters and exits care the same day
5. Exit date is prior to removal date

*DQ Limit increased for DQ Check: Missing discharge reason*

The DQ limit for "Missing Discharge Reason" was increased from 5 percent to 10 percent. The reduction was made as the syntax revision to limit some DQ checks to records of children who discharged from foster care instead of all records in the six-month AFCARS submission (see description for syntax revision listed before this one) substantially reduced the population of records used in this DQ check.