**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
KANSAS CITY DIVISION**

| | |
|---|---|
| **M.B.** and **S.E.** through their next friend Katharyn McIntyre, **R.M.** through his next friend Allan Hazlett, **C.A.** through his next friend Allan Hazlett, **E.B.** through his next friend Allan Hazlett, **J.P.** through her next friend Allan Hazlett, **Z.Z.** through her next friend Ashley Thorne, and **M.A.** through his next friend Ashley Thorne, for themselves and those similarly situated,<br><br>        **Plaintiffs,**<br><br>v.<br><br>**Laura Howard** in her official capacity as Kansas Department for Children and Families Secretary, **Dr. Lee A. Norman** in his official capacity as Kansas Department of Health and Environment Secretary, and **Laura Howard** in her official capacity as Kansas Department for Aging and Disability Services Secretary,<br><br>        **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 2:18-cv-02617-DDC-GEB<br><br><br><br><br><br><br><br><br>**PLAINTIFFS' SUMMARY OF AND RESPONSES TO SUBMISSIONS RECEIVED IN RESPONSE TO NOTICE OF PROPOSED CLASS ACTION SETTLEMENT** |

Pursuant to paragraph 18 of the Court's September 9, 2020 Order Certifying Settlement Class, Granting Preliminary Approval of Settlement Agreement, Setting Hearing, and Approving Form and Manner of Class Notice, ECF No. 140 ("Order"), and in further support of their Unopposed Motion for Final Approval of Class Action Settlement, ECF No. 150, Plaintiffs M.B. and S.E. through their next friend Katharyn McIntyre, R.M., C.A., E.B., and J.P. through their next friend Allan Hazlett, and Z.Z. and M.A. through their next friend Ashley Thorne ("Plaintiffs") submit their summary of and responses to submissions received in response to the Notice of Proposed Class Action Settlement, ECF No. 139-2 ("Notice").  The submissions

1

Plaintiffs have received are attached to the accompanying Declaration of Leecia Welch ("Welch Decl.").[1]

I.       **Introduction**

As detailed in Plaintiffs' Unopposed Motion for Final Approval, the parties fully complied with the notice requirements and plan ordered by the Court to inform class members and other stakeholders about the parties' proposed settlement agreement, ECF No. 139-1 ("Settlement Agreement").  *See* Affidavit of Compliance of Kristine Wheat, ECF No. 141-1; Affidavit of Compliance of Brian M. Vasquez, ECF No. 141-2; Affidavit of Compliance of Sherry C. Diel, ECF No. 141-3 (all certifying Defendants' compliance with the notice requirements in the Order); Welch Decl. ¶¶ 2-3 (describing Plaintiffs' counsel's compliance with the Order).

In response to the Notice, between October 9, 2020, and the close of the notice period on December 7, 2020,[2] Plaintiffs received thirty written submissions from stakeholders and one additional written submission that a stakeholder sent to Defendants.  Welch Decl. ¶ 4.[3]  Of these

---

[1] Plaintiffs are concurrently filing an unopposed motion to file certain submissions partially under seal.

[2] After the close of the notice period, Plaintiffs received four additional written submissions, which are not included in this summary.  Welch Decl. ¶ 5; Exhibits FF-II.  All concerned individual families and none of them commented substantively on the Settlement Agreement.  *Id.* Two commenters requested to participate in the hearing.  Exhibits FF, II.  The parties agree that, even though these comments were received after the deadline, they should be accepted and considered by the Court.  Welch Decl. ¶ 5.

[3] In addition to these written submissions, thirty-five additional individuals contacted Plaintiffs by email or phone during the notice period concerning issues related to the Settlement Agreement.  Welch Decl. ¶ 6.  Eight requested, and were provided, a copy of the Settlement Agreement.  *Id.*  Eight had questions about the Settlement Agreement.  *Id.*  Twenty-five reached out about individual cases or situations.  *Id.*  (Several people contacted Plaintiffs for more than one of these reasons.  *Id.*)  Plaintiffs' counsel promptly responded to each of these individuals. *Id.*  Three additional individuals have contacted Plaintiffs via phone or social media since the notice period ended, each concerning their individual case or situation and/or seeking information about the Settlement Agreement.  *Id.* ¶ 7.

thirty-one stakeholders, eleven submitted comments in favor of the Settlement Agreement, seventeen were neutral (meaning they expressed neither explicit support for nor disagreement with the Settlement Agreement), and three expressed concerns in some manner about the Settlement Agreement.  *Id.*  Only one, in the neutral category, identified himself as a member of the Class.  *Id.*  Twelve indicated that they would like to speak at the January 22, 2021 hearing.[4]  *Id.*

## II.    Comments Supporting the Settlement Agreement

Plaintiffs received eleven comments supporting the Settlement Agreement from a range of stakeholders, including a former foster youth, foster parents, and mental health providers, as well as Kansas Legal Services and the ACLU of Kansas.  Exhibits A-K.[5]  Two indicated that they would like to speak at the hearing.  Exhibits D, H.

Supporters confirmed the challenges at the heart of this lawsuit – extreme placement instability and lack of access to mental health services for children in Kansas's child welfare system – and explained why they expect the Settlement Agreement to make a meaningful difference for the Class.

For example, one guardian ad litem described "observ[ing] the impact of 66 placements on a child before the child is able to be placed in a [psychiatric residential treatment facility] for stabilization, and the difference that a long-term placement following the stabilization has made in that child's behavior," and expressed that "[t]his is the type of situation the Settlement Agreement addresses with measured results and outcomes."  Exhibit K.

---

[4] In light of Administrative Order 2020-13, continuing all in-person hearings scheduled through February 15, 2021 before any district or magistrate judge in the District of Kansas, Plaintiffs intend to separately contact the Court regarding logistics for the final approval hearing scheduled on January 22, 2021.

[5] All exhibits cited are attached to the Declaration of Leecia Welch.

Similarly, a foster and adoptive parent and social worker explained that, "[w]ith each placement, is more loss – not only of people, but their belongings, and their ability to trust and bond to the next placement."  Exhibit F.  In her opinion, the lawsuit is "vital to the safety of our children's mental and physical health."  *Id.*

A comment submitted by a former foster youth confirms that, speaking from her own experience, "[r]educing the number of placement changes and making sure they receive the proper mental health services is something that can significantly improve the lives of man[y] foster care children. . . .  A step in the right direction is taking measures to make it so that instability across all boards is a rare occurrence rather than a regular incident."  Exhibit H.

A submission from a commenter who has worked in residential psychiatric facilities for sixteen years expressed particular support for the Settlement Agreement's inclusion of "people with familiarity of these struggles, including former children of foster care" in the process of reform, as well as its clearly defined requirements over time.  Exhibit A.

Alongside these individual supporters, Kansas Legal Services, which represents children in the foster care system as a court-appointed guardian ad litem in nine Kansas counties, agreed that "the basics of the settlement . . . meet the most crucial issues facing our clients," that it is "measurable," and that it "will hold the agency accountable."  Exhibit E.  The ACLU stated that the Settlement Agreement is "a win for Kansas children and its requirements are essential for the protection of their civil rights. . . . The agreement provides for measurable outcomes that will ensure Kansas children in the foster care system receive stable, appropriate placements as well as access to trauma and mental health services."  Exhibit B.

Two supporters proposed additional steps that they believe should be taken in conjunction with the Settlement Agreement.  Kansas Legal Services urged the Department of

Children and Families to encourage the use of telemedicine to stabilize the provision of mental health services and to improve practices related to continuity of prescription medications when children change placements, and proposed that the Neutral should create and share a reporting mechanism for judges, guardians ad litem, foster families, and perhaps older foster children. Exhibit E.  One mental health provider expressed his "full agreement with the proposed practice improvements, and outcomes," but believes that deeper, "second order change" is also needed. Exhibit C.

### III.   Comments that are Neutral Regarding the Settlement Agreement

Most comments received expressed neither explicit support for nor disagreement with the Settlement Agreement.  Of these seventeen submissions, sixteen were based on the writers' direct experiences with the foster care system, including as foster youth, foster parents, and parents and extended family members of children who have been placed in foster care.  Exhibits L-AA.  Most of these writers, including the only current member of the Class to submit a comment, Exhibit AA, wrote about their individual cases and situations and did not address the Settlement Agreement directly.  Eight requested to speak at the hearing.  Exhibits N, P, Q, R, S, T, Y, Z.

Several submissions highlighted the challenges addressed by the parties' Settlement Agreement.  For example, one foster parent shared the story of a young man whose therapy services were not transferred when he arrived at her home, leading to his hospitalization and to him running away.  Exhibit O.  She wrote that she "believe[d] without a shadow of a doubt, that he lacked the proper mental healthcare he deserved from day 1, let alone from when he moved in with us," and that "[i]f we had been given clearance to receive therapy services the first day he came to live with us, he would be in our home right now preparing for Halloween with his

friends and our family and not stuck in a hospital away from those who love him." *Id.* One biological parent reported that her son had spent two to three days in an office because of a lack of available placement, and that he had not received needed mental health services. Exhibit N.

Some commenters proposed additional reforms. One foster parent proposed additional training, resources, and support for foster parents, as well as clear pathways to adoption and deadlines for family reunification. Exhibit M. A former foster youth advocated for training for foster parents, increased access to information about children's extended families for case workers, substantially reduced caseloads, delaying the age that older youth "age out" and exit the system from age eighteen to twenty-one, and community education about foster care. Exhibit L.

In the final neutral submission, a group home provider requested to speak at the hearing but did not provide further comments. Exhibit BB.

IV.    **Comments that are Critical of the Settlement Agreement**

Plaintiffs received three comments that are critical of the Settlement Agreement, two from foster parents and one from a guardian ad litem. Exhibits CC-EE. One of these commenters stated that she would like to speak at the hearing. Exhibit EE. None are members of the Class.

One foster parent criticized the lawsuit and settlement because she believes that "the lawsuit offers no solution to the problem that there are not enough foster homes for these kids." Exhibit DD. In her opinion, "[a] suit like this just kills the whole system with no solution of how to care for kids," who need more volunteer foster families. *Id.* She also observed that "[t]urnover of workers now is unbelievable" and argued that social workers should not be blamed. *Id.* A second foster parent agreed that the system does not provide adequate mental health services, but, based on her experience, opined that "[u]nless this settlement requires the

state of Kansas to open a long term facility for children with severe mental health issues, it is lacking what is really needed and these children will continue to suffer as the state continues to fail them." Exhibit EE. Finally, one guardian ad litem agreed with Plaintiffs that Kansas's child welfare system suffers from a lack of access to mental health services, particularly when children relocate, as well as significant problems caused by caseworker turnover. Exhibit CC. However, he believes that the settlement is flawed, including because of its reliance on statistical markers, and because he believes that the "agreement has no teeth," and "[t]he consequences for failure to achieve goals are negligible, if any." *Id.* This guardian ad litem proposes that the settlement should be rejected and that the case should proceed to arbitration or trial. *Id.* He also proposes the explicit incorporation of the best interests of the child standard and the replacement of the parties' agreed upon neutral. *Id.*

Plaintiffs appreciate the perspective of these three commenters based on their experiences with Kansas's child welfare system, but strongly believe the Settlement Agreement is fair, reasonable, and adequate and presents an outstanding result for the Class. Plaintiffs specifically disagree with each commenter's view that the Settlement Agreement will not meet the needs of the Class.

First, Defendants have committed to (1) a set of five concrete practice improvements to redress harmful practices targeted by the lawsuit, including by curbing night-to-night and short-term placements and the housing of children in agency offices and hotels, preventing the use of placements that exceed their licensed capacity, preventing delays in access to mental health services, and ensuring that crisis intervention services are available statewide, *see* Settlement Agreement § 2.5; and (2) a set of five numerical outcomes designed to ensure that children in

foster care have access to the stable placements and mental health services they need, *id.* § 2.9.[6]
The foster parent commenters are correct that the Settlement Agreement does not prescribe each
specific step that Defendants must take to meet the numerical outcome benchmarks – it does not,
for example, mandate specific foster parent recruitment efforts or supports for caseworkers or
include requirements about specific mental health facilities.  This is because the Settlement
Agreement was intentionally designed to afford Defendants some limited flexibility based on
their professional expertise and operational needs – as long as they achieve and sustain improved
outcomes for children based on the concrete and mandatory numerical benchmarks.

   In Plaintiffs' view, the combination of these processes and outcomes is a strength, rather
than a weakness, of the Settlement Agreement.  Critically, Judith Meltzer and the Center for the
Study of Social Policy (CSSP), who bring substantial experience as court-appointed neutrals in
similar cases, will be charged with reviewing, validating, and publicly reporting on Defendants'
performance data to ensure that it accurately and meaningfully measures Defendants' progress.
*Id.* §§ 2.1.3, 2.3, 2.7, 2.9, 3.1-3.7, 3.10.  Plaintiffs acknowledge the suggestion of an alternate
neutral, but are confident that, based on their background and deep experience, Judith Meltzer
and CSSP are highly qualified for this role.

   Plaintiffs also respectfully disagree that the Settlement Agreement lacks teeth.  In sharp
contrast, each practice improvement must be met by clear deadlines and then held for another
twelve-month period to establish durability.  *Id.* §§ 2.2, 2.4.  Each of the outcomes provides clear
performance metrics phased in over three or four twelve-month periods, and, once met, each
final outcome must be sustained for an additional twelve-month period to establish durability.

---

[6] Importantly, the parties also agreed to a set of governing principles, *see* Settlement Agreement
§ 1.31, a process for contract oversight and accountability, *id.* § 2.1.1, and a community
accountability structure, *id.* § 2.1.2.

*Id.* §§ 2.6, 2.8, 2.9.  Performance will be independently validated by the Neutral.  *Id.* §§ 2.3, 2.7,

2.9. 3.1-3.7, 3.10.  Moreover, the Settlement Agreement provides that the Court's order of

dismissal will "incorporate the actual terms of this Settlement Agreement and make the Parties'

compliance with the terms of the Settlement Agreement part of that dismissal order," *id.* at

§ 5.2.2, and that "[t]he Court shall have and shall retain jurisdiction over any enforcement," *id.*

§ 4.6.  The Settlement also includes avenues for Plaintiffs to seek relief in this Court if

Defendants violate the Settlement Agreement, *id.* §§ 4.5, 4.7, along with an alternate dispute

resolution process with a highly qualified jointly selected Mediator to maximize negotiated

solutions, *id.* §§ 4.1-4.4.

Plaintiffs' counsel have assessed the strength of Plaintiffs' claims and weighed the

benefits of the Settlement Agreement to the Class against the risk and delay associated with

continued litigation, and have concluded that this Settlement Agreement is an outstanding result

for the settlement Class, amply meets the requirement that the settlement as a whole is fair,

reasonable, and adequate, and is in the best interests of the children who are members of the

Class.  *See* Fed. R. Civ. P. 23(e)(2); Declaration of Leecia Welch in Support of Preliminary

Approval Motion, ECF No. 139-3, ¶ 14; Declaration of Ira Lustbader, ECF No. 139-4, ¶ 10;

Declaration of Teresa A. Woody, ECF No. 139-5, ¶ 14; Declaration of Loretta Burns-Bucklew,

ECF No. 139-6, ¶ 9; Declaration of Caryn Schechtman, ECF No. 139-7, ¶ 7.  They respectfully

disagree with the opinion that the case should proceed to arbitration or trial.  *See Marcus v. Dep't*

*of Revenue*, 209 F. Supp. 2d 1179, 1183 (D. Kan. 2002) ("Counsels' judgment as to the fairness

of the agreement is entitled to considerable weight.").

V.     **Conclusion**

In response to the parties' comprehensive notice plan, Plaintiffs received thirty-one comments.  Of these, eleven supported the Settlement Agreement; seventeen, including one from the only member of the Class to submit a comment, were neutral; and only three expressed concerns.  Taking all of the comments into account and noting in particular the strong statements submitted in support of the Settlement Agreement, and the significant enforceable benefits that were secured for the Class, Plaintiffs respectfully request that the Court grant Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, ECF No. 150.


 Dated: December 14, 2020

                                        Respectfully submitted,

                                        **KANSAS APPLESEED CENTER FOR LAW
                                        AND JUSTICE, INC.**

                                        */s/ Teresa A. Woody*
                                        Teresa A. Woody
                                        KS Bar ID 16949
                                        Larry R. Rute
                                        KS Bar ID No. 8105
                                        211 East 8th Street, Suite D
                                        Lawrence, KS 66044
                                        P: (785) 856-0917
                                        twoody@kansasappleseed.org
                                        larry@adrmediate.com

                                        **LAW OFFICE OF LORETTA BURNS-
                                        BUCKLEW**
                                        Loretta Burns-Bucklew
                                        MO Bar ID No. 32053
                                        KS District Bar No. 78800
                                        401 West 89th Street
                                        Kansas City, MO 64114
                                        P: (816) 384-1198
                                        loribblawkc@gmail.com

**NATIONAL CENTER FOR YOUTH LAW**
Leecia Welch (admitted *pro hac vice*)
CA Bar ID No. 208741
Poonam Juneja (admitted *pro hac vice*)
CA Bar ID No. 300848
Freya Pitts (admitted *pro hac vice*)
CA Bar ID No. 295878
1212 Broadway, Suite 600
Oakland, CA 94612
P: (510) 835-8098
F: (510) 835-8099
lwelch@youthlaw.org
pjuneja@youthlaw.org
fpitts@youthlaw.org

**CHILDREN'S RIGHTS, INC.**
Ira Lustbader (admitted *pro hac vice*)
NY Bar ID No. 2516946
Marissa C. Nardi (admitted *pro hac vice*)
NY Bar ID No. 5173265
Jonathan M. King (admitted *pro hac vice*)
NY Bar ID No. 5119847
Stephen A. Dixon (admitted *pro hac vice*)
LA Bar ID No. 18185
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
mnardi@childrensrights.org
jking@childrensrights.org
sdixon@childrensrights.org

**DLA PIPER LLP (US)**
Caryn G. Schechtman (admitted *pro hac vice*)
NY Bar ID No. 2910420
Jeffrey Rotenberg (admitted *pro hac vice*)
NY Bar ID No. 3984994
Joshua Kane (admitted *pro hac vice*)
NY Bar ID No. 4973400
1251 Avenue of the Americas
New York, NY 10020
P: (212) 335-4593
F: (212) 884-8593

caryn.schechtman@dlapiper.com
jeffrey.rotenberg@dlapiper.com
joshua.kane@dlapiper.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of the Court on December 14, 2020, to be served by the operation of the Court's CM/ECF electronic filing system upon all parties.

DATED: December 14, 2020

 */s/ Teresa A. Woody*
Teresa A. Woody
**Attorney for Plaintiffs**