## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

M.B. and S.E. through their next friend
Katharyn McIntyre, **et al.,**

                    **Plaintiffs,**

**v.**

**Laura Howard** in her official capacity as Kansas
Department for Children and Families
Secretary, **et al.,**

                    **Defendants.**

Case No. 18-2617-DDC-GEB

## MEMORANDUM AND ORDER

Plaintiffs filed a Motion for Attorneys' Fees and Expenses (Doc. 142).  Defendants filed

a Memorandum in Opposition (Doc. 157) and plaintiffs filed a Reply (Doc. 161).  Plaintiffs

request $3,750,396.50 in fees and $114,802.59 in expenses.  Doc. 161 at 14 n.20.[1]  For the

following reasons, and as explained in this Order, the court grants plaintiffs' motion in part and

denies it in part.

### I.      Background

### A.      Pre-Complaint Investigation

Before filing the initial Complaint, plaintiffs' counsel conducted a year-long investigation

into the Kansas child welfare system.  Doc. 147 at 5 (Burns-Bucklew Decl. ¶ 10).  Plaintiffs

investigated "housing instability and mental health care deficiencies" in the Kansas child welfare

system.  *Id.*  This included attending "community forums in Topeka, Overland Park, and Garden

City to hear concerns from families and service providers around the state."  *Id.*  Their

---

[1]      Plaintiffs corrected their requested fees and expenses after identifying three errors in their original
motion and filings.  Doc. 161 at 14 n.20.

investigation collected and reviewed "a large volume of publicly available information and performance data." Doc. 144 at 10 (Lustbader Decl. ¶ 23). Also, plaintiffs' counsel "researched and analyzed applicable law and identified ten representative Named Plaintiffs and suitable Next Friends." *See* Doc. 143 at 8–9.

**B.    Commencement of Lawsuit**

Plaintiffs filed their Complaint on November 16, 2018, commencing a putative class action seeking relief on behalf of children in the Kansas foster care system. Doc. 1 at 1. The Complaint alleged defendants had violated (1) substantive due process rights arising under the Fourteenth Amendment of children in Kansas's child welfare system, (2) the Medicaid Act by failing to screen and diagnose mental and behavioral health concerns, and (3) the Medicaid Act by failing to provide or otherwise arrange medically necessary behavioral and mental health services. *Id.* at 61–64. Plaintiffs filed an Amended Complaint (Doc. 63) on September 6, 2019. It added new "Named Plaintiffs to the case[,]" Doc. 143 at 9, but asserts the same legal theories of recovery as its predecessor.

**C.    Defendants' Motion for Extension of Time to File Answer**

On December 28, 2018, defendants filed a Motion for Extension of Time to File Answer. Doc. 19. Defendants requested an extension of their January 2, 2019 deadline citing the change in administration after the Kansas Gubernatorial election. *Id.* at 2. Defendants asked for a March 29, 2019 deadline to allow the new administration to determine its litigation strategy and research the Named Plaintiffs. *Id.* at 4–5. Plaintiffs opposed this motion, arguing defendants "offer[ed] no justification for this lengthy extension, effectively a stay of the proceedings, other than the change in administration and the need to retrieve and review Plaintiff records." Doc. 20 at 2. Plaintiffs proposed a January 31, 2019 deadline to file an answer. *Id.* at 7. The court, after

2

conducting a status conference on the motion, found "good cause to grant Defendants' Motion" and ordered defendants to "answer or otherwise respond to the Complaint by 3/29/19."  Doc. 23.

### D.    Plaintiffs' Motions to Proceed Using Pseudonyms

On January 23, 2019, plaintiffs filed an Unopposed Motion to Proceed Using Pseudonyms to protect the privacy interests of the minor plaintiffs.  Doc. 24 at 1–2.  The court granted the motion.  Doc. 25.  By agreement of the parties, the court entered a Stipulated Confidentiality and Protective Order.  Doc. 26 at 1.  Plaintiffs filed a second Unopposed Motion to Proceed Using Pseudonyms, Doc. 57, which the court granted, Doc. 62.

### E.    Defendants' Motion to Dismiss Governor Kelly

On October 25, 2019, defendants filed a Motion to Dismiss Defendant Governor Laura Kelly for lack of subject matter jurisdiction under the Eleventh Amendment.  Doc. 79 at 1. Defendants argued Governor Kelly "plays no direct role in the administration of the programs that Plaintiffs" challenged, so, "principles of sovereign immunity bar this suit against the Governor."  Doc. 80 at 2.  Defendants did not challenge the court's jurisdiction over any other defendant or causes of action asserted in the Complaint.  Plaintiffs filed a Memorandum in Opposition with supporting affidavits and evidence.  *See* Docs. 96, 97.  Defendants filed a Reply. Doc. 102.  The court granted defendants' motion and dismissed Governor Kelly from the suit because plaintiffs had "not alleged sufficient facts, that, if true, could support a finding that Governor Kelly possesses the requisite duty to enforce the statutes and policies placed in issue by the Amended Complaint."  Doc. 118 at 12.

### F.    Discovery Disputes

Plaintiffs contend that they "engaged in significant fact discovery, including by propounding targeted written discovery on Defendants and third parties, taking and preparing for

depositions, and reviewing and analyzing over 78,000 pages across over 12,000 documents."
Doc. 143 at 28.  They assert this "effort included a significant number of hours dedicated to
addressing discovery delays and inadequate responses and productions, and participating in more
than a dozen meet and confer conferences with Defendants to resolve discovery issues." *Id.*
Plaintiffs assert the case files they received:

> lacked custodial information or metadata; often were produced in massive, non-unitized PDF files containing hundreds of pages each; were heavily and inappropriately redacted without explanation as to confidentiality or privilege assertions; presented pages out of order; were missing pages; were poorly scanned and unreadable; did not specify whether the files included documents collected from foster care contractors or other third parties; and lacked information as to the process Defendants used to search for and collect documents.

Doc. 144 at 13 (Lustbader Decl. ¶ 32).  Defendants respond, asserting that "it is noteworthy and
most telling that Plaintiffs filed exactly zero discovery motions in this case."  Doc. 157 at 18
(emphasis omitted).  Defendants contend that "Plaintiffs' time entries reflect no discussion,
research, or drafting of any motion to compel or order for discovery from this Court." *Id.*  And,
they argue, plaintiffs didn't file any such motion "because these Defendants were very
responsive to Plaintiffs' discovery requests and even voluntarily provided additional data and
documents during the mediation to expedite reaching a settlement." *Id.* (emphasis omitted).

### G.    Mediation and Settlement

The parties notified the court of their intent to mediate the dispute on October 24, 2019,
with Kevin M. Ryan from Public Catalyst.  Doc. 55 at 1.  According to the ADR report, the
parties met on two separate occasions—November 12, 2019 and December 15–16, 2019—for
about 20 hours.  Doc. 90-1 at 1.  The parties made progress toward settlement during these
sessions and "exchanged drafts of provisions of a possible settlement agreement." *Id.*  The court
granted a Joint Motion to Stay Discovery for 45 days.  Doc. 91.  It granted a stay in light of the

ongoing mediation efforts by the parties.  Doc. 94.  The parties met in person on February 7, 25, and 26 of 2020.  Doc. 103-1 at 1.  Negotiations reached an impasse on February 26 and the "mediator formally declared an impasse" on February 28.  *Id.*  According to plaintiffs' Unopposed Motion for Settlement, "the parties re-engaged in settlement negotiations, exchanging settlement drafts, and then meeting by videoconference on June 4, 10, 11, and 18, 2020."  Doc. 139 at 5.  On July 8, 2020, the parties filed Notice of Settlement.  Doc. 133.

## II.    Legal Standard for Fee Requests

Plaintiffs request attorneys' fees and expenses under 42 U.S.C. § 1988(b), Fed. R. Civ. P. 23(h), Fed. R. Civ. P. 54(d), and D. Kan. Rule 54.2.  Doc. 142 at 1.  Defendants challenge plaintiffs' fee request, arguing plaintiffs fail to meet the requirements of § 1988(b).  Doc. 157 at 5.  "In any fee request under § 1988(b), a claimant must prove two elements:  (1) that the claimant was the prevailing party in the proceeding; and (2) that the claimant's fee request is reasonable."  *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (internal quotation marks and citation omitted).

### A.  Prevailing Party

Under 42 U.S.C. § 1988(b), a plaintiff prevails "'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'"  *Verlo v. City & Cnty. of Denver*, 789 F. App'x 709, 712 (10th Cir. 2019) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)). "Relief on the merits occurs when plaintiffs 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"  *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

A "material alteration of the parties' legal relationship occurs when there is 'judicial imprimatur on the change.'"  *Id.* (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001)).  "The requisite judicial imprimatur can be in the form of an enforceable judgment on the merits, a court-ordered consent decree, or a judicially enforceable settlement[.]"  *Id.* at 712–13 (internal citations omitted); *see also Farrar*, 506 U.S. at 111 ("The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement.") (citations omitted).

The "'mere involvement [of a court] in the settlement is not enough.  There must be some official judicial approval of the settlement and some level of continuing judicial oversight.'"  *Id.* at 713 (text alteration omitted) (quoting *Bell v. Bd. of Cnty. Comm'rs*, 451 F.3d 1097, 1103 (10th Cir. 2006)).  If the court's order contained "the necessary judicial imprimatur to give [plaintiffs] 'substance they could rely on in enforcing the merits of [their] case,'" then it confers prevailing party status on plaintiff.  *Id.* at 713 (text alteration omitted) (quoting *Biodiversity Conservation All. v. Stem*, 519 F.3d 1226, 1230 (10th Cir. 2008)).

### B.  Reasonable Fee Requests

"'The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'"  *Flitton v. Primary Residential Mortg., Inc*., 614 F.3d 1173, 1176 (10th Cir. 2010) (quoting *Hensley*, 461 U.S. at 433).  The cases refer to this product as the "lodestar amount[.]"  *Robinson*, 160 F.3d at 1281 (defining "lodestar amount" as "the product of the number of attorney hours reasonably expended and a reasonable hourly rate" (internal quotation marks and citation omitted)).  A "claimant is entitled to the presumption that this lodestar amount reflects a reasonable fee."  *Id.*

The inquiry about reasonable number of hours "is controlled by the overriding consideration of whether the attorney's hours were 'necessary' under the circumstances." *Robinson*, 160 F.3d at 1281.  "The prevailing party must make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* (internal quotation marks omitted).  "A district court should approach this reasonableness inquiry much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients[.]" *Id.* (internal quotation marks and citation omitted).  "However, the record ought to assure [the Circuit] that the district court did not eyeball the request and cut it down by an arbitrary percentage[.]" *Id.* (internal quotation marks omitted).

"To determine what constitutes a reasonable rate, the district court considers the prevailing market rate in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (internal quotation marks omitted).  "Plaintiffs must provide evidence of the prevailing market rate for similar services by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant community." *Id.* at 1224–25 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).  "The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation." *Id.* at 1225 (internal quotation marks and citation omitted).

## III.     Analysis

Defendants challenge plaintiffs' fee request because, they argue:  (1) plaintiffs have not shown an entitlement to fees, *i.e.*, whether plaintiffs are the "prevailing party," and (2) the request is unreasonable.  *See* Doc. 157.  The court addresses defendants' two arguments, in turn, below, in Sections A and B.

**A.  Whether Plaintiffs "Prevailed" for Purposes of 42 U.S.C. § 1988(b)**

Plaintiffs assert 42 U.S.C. § 1988(b) entitles them to an award of reasonable attorneys' fees because "they have obtained a favorable, court-enforceable settlement requiring substantial changes on the part of Defendants that will significantly benefit the Class."  Doc. 143 at 17–18. Plaintiffs argue they "have clearly prevailed in this matter by successfully negotiating an extraordinary settlement that addresses the systemic failings alleged in the Amended Complaint[.]"  *Id.* at 19.  Defendants disagree, claiming plaintiffs have failed to meet their burden because "the catalyst to change was not litigation, but Kansas voters' election of a new administration that prioritized the children in DCF custody."  Doc. 157 at 9.  Defendants contend that plaintiffs filed their suit after Governor Laura Kelly won the Kansas Gubernatorial race on which her "campaign had identified improving the Kansas foster care program as one of her top priorities."  *Id.* at 7.  They argue that plaintiffs "are not entitled to recover fees for hooking their cart to a train that had already left the station."  *Id.* at 9.

As the Supreme Court explained, "when a plaintiff secures an 'enforceable judgment on the merits' or a 'court-ordered consent decree,' that plaintiff earns prevailing party status because he has received a 'judicially sanctioned change in the legal relationship of the parties.'"  *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642, 1646 (2016) (quoting *Buckhannon*, 532 U.S. at 604–05).  A settlement is "only capable of conveying prevailing party status onto a litigant if the settlement [bears] the hallmarks of a consent decree[.]"  *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1237 (10th Cir. 2018) (citing *Bell v. Bd. of Cnty. Comm'rs*, 451 F.3d 1097, 1103 (10th Cir. 2006)).  Our Circuit amplified the pragmatic substance on this standard in *Bell*, observing:

> Hence, if a court does not incorporate a private settlement into an order, does not sign or otherwise provide written approval of the settlement's terms, and does not

retain jurisdiction to enforce performance of the obligations assumed by the settling parties, the settlement "does not bear any of the marks of a consent decree" and does not confer prevailing party status on the party whose claims have been compromised.

451 F.3d at 1103.

Here, unlike *Bell*, the court approved the Settlement Agreement after a final approval hearing. *See* Doc. 170. And, the court attached and incorporated the executed Settlement Agreement within its final judgment. *See id.* at 12; Doc. 170-1 (attaching approved Settlement Agreement). This Settlement Agreement bears the hallmarks of a consent decree because the court incorporated the Settlement Agreement in its Order and supplied written approval of the settlement's terms. *See Bell*, 451 F.3d at 1103. The court's Order approving the Settlement Agreement thus created a "judicially sanctioned change in the legal relationship of the parties," and that change renders plaintiffs as prevailing parties for 42 U.S.C. § 1988(b) purposes.[2] *See CRST*, 136 S. Ct. at 1646. Regardless, defendants stipulated that plaintiffs' counsel is entitled to fees and expenses in the Settlement Agreement but reserved the right to dispute the amount.

---

[2]     Both parties cite a bevy of case law relying on the catalyst test to determine the "prevailing party" issue for § 1988(b) purposes. *See* Doc. 143 at 18 (citing *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194 (10th Cir. 1998) (applying the two-part "catalyst test" in *Foremaster v. City of St. George*, 882 F.2d 1485, 1488 (10th Cir. 1989))); *see* Doc. 157 at 6 (discussing "catalyst" test). The problem with this line of authority is that the Supreme Court later rejected the "catalyst test" for determining the "prevailing party" in "fee-shifting statutes[.]" *See Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1236 n.4 (10th Cir. 2018) (citing *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642, 1646 (2016)). When it rejected the catalyst test, the Supreme Court "precluded courts from considering the 'subjective motivations' of a party who voluntarily changed course during litigation when conducting the prevailing party analysis." *Xlear*, 893 F.3d at 1238 n.5 (citing *Buckhannon*, 532 U.S. at 601).

Defendants invoke this authority to make arguments that rest on their subjective intent when they agreed to the Settlement Agreement. *See* Doc. 157 at 10–13. They argue plaintiffs' "lawsuit is not causally linked to securing the relief obtained" because Governor Kelly already had identified improving DCF as a top priority and plaintiffs filed suit after the election. *Id.* at 7. But, defendants apply the incorrect legal standard, arguing plaintiffs are required to show their lawsuit was the "catalyst" to change. So, to the extent defendants' position rests on the claim that plaintiffs really aren't a prevailing party because defendants "were committed to these changes in the [foster care] system" before plaintiffs sued, the court rejects defendants' proposition.

Doc. 170-1 at 3 (approved Settlement Agreement) ("Defendants stipulate that Class Counsel is entitled to Class Counsel Fees and Expenses but reserve the right to dispute the appropriate amount.").

The court concludes that plaintiffs, both by the substance of the proceedings and the parties' agreement, qualify as prevailing parties under § 1988(b).  The court thus turns to the more vexing question—Is plaintiffs' fee request a reasonable one?  And if not, what fee award is a reasonable one?

### B.  Reasonableness of Fee Request

The court must determine if plaintiffs' fee request is reasonable.  Plaintiffs request hourly rates ranging from $240 to $500, and $200 for non-lawyer time.  *See* Docs. 144, 145, 146, 147, 148 (Plaintiffs' Counsels' Declarations).  They also seek a fee award based on 10,057.1 hours of work.  Doc. 143 at 31 (requesting fees for 10,064.1 hours); Doc. 161 at 14 n.20 (noting plaintiffs previously had double counted an attorney's time for mediation producing a duplicative seven hours in fee request).  Plaintiffs request fees totaling $3,750,396.50 and expenses totaling $114,802.59.  Doc. 161 at 14 n.20.  Defendants challenge both plaintiffs' requested hourly rates and the total hours devoted to this litigation.  *See* Doc. 157.

The Tenth Circuit has instructed constituent district courts that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate[,]" the lodestar amount.  *Flitton*, 614 F.3d at 1176 (citations omitted).  The party requesting the award bears the burden to prove the number of hours devoted to the case and the appropriate hourly rates.  *United Phosphorus, Ltd. v. Midland Fumigant, Inc*., 205 F.3d 1219, 1233 (10th Cir. 2000).  If an applicant satisfies this burden, the court presumes the lodestar amount is reasonable.  *Robinson*, 160 F.3d at 1281.

This presumption does not conclude the issue, however.  The court retains discretion to adjust the lodestar figure both up and down, "'to account for the particularities of the suit and its outcome.'"  *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1254 (D. Kan. 2017) (quoting *Zinna v. Congrove*, 680 F.3d 1236, 1242 (10th Cir. 2012)).  This discretion is informed by the factors identified in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).  These considerations, commonly called the *Johnson* factors, weigh:  (1) time and labor required; (2) novelty and difficulty of the questions presented in the case; (3) skill required to perform the legal services properly; (4) preclusion of other employment by the attorneys because they accept engagement in the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Id.* at 717–19.

Although the court may consider each factor, it need not consider those factors "'subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.'"  *Fox*, 258 F. Supp. 3d at 1254 (quoting *Mathiason v. Aquinas Home Health Care, Inc*., 187 F. Supp. 3d 1269, 1281 (D. Kan. 2016)).  This is so because "[t]he lodestar calculation is meant to be the primary consideration when awarding fees rather than the *Johnson* factors."  *Id.* (citing *Anchondo v. Anderson, Crenshaw & Assocs., LLC*, 616 F.3d 1098, 1103 (10th Cir. 2010)).

### 1.   Reasonableness of Hourly Rate

*First*, the court begins by assessing the reasonableness of the hourly rates requested for each timekeeper.  To determine whether the requested hourly rates are reasonable, the court must "determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time."  *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1256 (10th Cir. 1998) (quoting *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983)). "Only if the district court does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate." *Id.* at 1257.  And, the court "should base its hourly rate award on what the evidence shows the market commands for civil rights or analogous litigation." *Id.* at 1256. Similarly, the court should "scrutinize [paralegal and legal assistants'] hours and the suggested rates in the same manner it scrutinizes lawyer time and rates." *Id.* at 1255 (quoting *Ramos*, 713 F.2d at 558–59).

Plaintiffs and defendants propose different hourly rates for the 25 attorneys who worked on the case.  The chart below, organized by seniority, summarizes the parties' competing proposals:

| Plaintiffs' Attorney | JD Class | Plaintiffs' Requested Rate | Defendants' Proposed Rate |
|---|---|---|---|
| Larry Rute | 1973 | $500 | N/A |
| Martha Hodgesmith | 1978 | $345 | N/A |
| Loretta E. Burns-Bucklew | 1984 | $500 | N/A |
| Teresa Woody | 1985 | $500 | N/A |
| Stephen Dixon | 1987 | $410 | N/A |
| David J. Sager | 1991 | $500 | N/A |
| Ira Lustbader | 1992 | $500 | N/A |
| Leecia Welch | 1996 | $500 | $450 |
| Kristin Pacio | 2005 | $410 | $300 |
| Poonam Juneja | 2009 | $395 | N/A |

| | | | |
|---|---|---|---|
| Benet Magnuson | 2009 | $300 | N/A |
| Joshua Kane | 2010 | $410 | $300 |
| William J. Diggs | 2010 | $410 | $300 |
| Marissa Nardi | 2012 | $380 | $300 |
| Jonathan King | 2012 | $345 | $300 |
| Erin McGuinness | 2012 | $240 | $225 |
| Freya Pitts | 2013 | $365 | $300 |
| Jean Strout | 2014 | $325 | $250 |
| Claire Glasspiegel | 2015 | $310 | $250 |
| Nicole Taykhman | 2016 | $290 | $225 |
| Amanda Grill | 2017 | $270 | $200 |
| Jacqueline Stolzenberg | 2018 | $250 | $200 |
| Meg Fowler | 2018 | $240 | $200 |
| Megan Kinney | 2019 | $240 | $200 |
| Olivia Tourgee | 2019 | $240 | $200 |

Also, plaintiffs and defendants propose the following competing rates for seven paralegals, staff, and one law student:

| Name | Plaintiffs' Requested Rate | Defendants' Proposed Rate |
|---|---|---|
| Daniel Adamek | $200 | $125 |
| Clare Connaughton | $200 | $125 |
| Kira Setren | $200 | $125 |
| Lori Johns | $200 | $125 |
| Christina Ostmeyer | $200 | $125 |
| Judy Calderon | $200 | $125 |
| Joshua Nomkin (Law Student) | $200 | $100 |

The rate assessment begins with identifying the relevant legal market. Plaintiffs' litigation challenged the Kansas Foster Care System. The Settlement Class includes:

> All children who are now, or in the future will be, in the protective custody of the Department for Children and Families pursuant to Kan. Stat. Ann. § 38-2242(c)(1).

Doc. 150 at 10. The court concludes that the District of Kansas is the relevant community for determining reasonable market rates. *See Fox*, 258 F. Supp. 3d at 1264 ("The relevant market is the place where the litigation occurs."). But within that broader market rests a subsidiary

question:  Where is "the area [where] the litigation occurred?"  *Case*, 157 F.3d at 1256.  In an increasingly virtual world nested within a Zoom®/Microsoft Teams™-powered pandemic, this question has become more complicated than ever.  This case includes a cast of skilled lawyers who maintain offices in markets as large as New York and as small as Topeka, Kansas.  Plaintiffs' lead counsel keeps her office in Lawrence, Kansas, while lead defense counsel occupy offices in Kansas City, Missouri.  The COVID-19 virus all but closed offices in at least some of those places for much of the case's busiest days.  So, the court's pandemic experiences reveal that individual attorneys likely worked from their homes in cities unknown to the court.  Sometimes, counsel virtually appeared from homes near their offices.  Sometimes, they didn't.  Much of the paper discovery focused on records maintained by a Kansas state agency.  The meet and confer conferences occurred across telephone lines and video conferences, bringing together lawyers in various states.  The mediator's professional residence is in New Jersey.  *See* Doc. 55 at 1 (listing Kevin Ryan's professional contact information).  And just to complicate things once more, plaintiffs designated Kansas City, Kansas, as the place for trial but a Wichita-based Magistrate Judge handled all scheduling and discovery matters.

Balancing all this geography on just one scale, the court concludes that the relevant geographic market includes both the Kansas City Metropolitan area (which includes a limited portion of Missouri) and the northeastern portion of Kansas.  The relevant market does not include, however, other markets where counsel of record maintain their offices.  The court recognizes that this case brought some complexity with it, but it wasn't so complex that attorneys from Kansas and northeast Kansas couldn't handle it proficiently without national counsel's involvement.  Attorneys from outside those areas decided to engage themselves in the matter,

and the court's pro hac vice rules permitted just that. But that doesn't mean that they can transport the hourly rates from those other markets to the fee award analysis.

Also, the court is mindful that plaintiffs' lead counsel, Teresa Woody, opined that "no other firms in Kansas could have taken on this case without partnering with out-of-state co-counsel, especially because of their deep experience in litigating class actions" involving child welfare systems. Doc. 146 at 14–15. Ms. Woody's co-counsel, Loretta Burns-Bucklew, also contacted Children's Rights, Inc., an out-of-state advocacy group, who suggested collaborating with attorneys at the National Center for Youth Law. Doc. 147 at 4. The court does not deny the value of experience or otherwise dismiss the worth of these out-of-state attorneys. But that isn't the issue. The standard requires the court to decide, instead, where did the litigation occur? *Case*, 157 F.3d at 1256. Here, it occurred, in the main, in Northeast Kansas and adjacent Kansas City, Missouri.

The court's experience with its own trial bar reveals that attorneys from those two markets possess the necessary experience, education, and acumen to handle this case's claims. After all, defendants entrusted their entire defense to lawyers from law firms based in Lawrence, Kansas, and Kansas City, Missouri.[3] Nothing suggests those lawyers were overmatched in their efforts to defend the case. And while some consultation with national experts may have proved useful for plaintiffs, they haven't shouldered their burden to demonstrate that this level of utility can justify the rates of several distant markets.

This court's cases assessing this market have found hourly rates between $175 to $625 reasonable based on the attorney's experience for litigation. *See*, *e.g*, *Lawson v. Spirit*

---

[3]     Defendants "engaged two different outside law firms to defend the named Defendants, one following the other." Doc. 157 at 4. The first, Law Offices of Barber Emerson, L.C., is based in Lawrence, Kansas, and the second, Lathrop GPM LLP, is based in Kansas City, Missouri. Doc. 157-1 at 3 (Depew Decl.).

*AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 6343292, at *16 (D. Kan. Oct. 29, 2020) (finding reasonable rates of $625 per hour for partner with 27 years' experience, $425 per hour for counsel with 13 years' experience, and $350 per hour for associate with seven years' experience because they were consistent with top-tier employment litigation rates in Kansas City), *aff'd*, No. 18-1100-EFM, 2020 WL 6939752 (D. Kan. Nov. 24, 2020)[4]; *Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 4000905, at *9 (D. Kan. July 15, 2020) (finding hourly rates between $500, for most experienced attorney, to $250 reasonable); *Fox*, 258 F. Supp. 3d at 1271 (finding hourly rates of $400 and $375 reasonable for attorneys with 17 and 15 years of experience in a Title VII and Title IX case for Kansas City Metropolitan area); *Barbosa v. Nat'l Beef Packing Co., LLC*, No. 12-2311-KHV, 2015 WL 4920292, at *10 (D. Kan. Aug. 18, 2015) (finding hourly rates ranging from $180 to $425 reasonable, depending on each attorneys' level of experience, in an FLSA case for attorneys at a law firm based in Overland Park, Kansas); *Seamands v. Sears Holding Corp.*, No. 09-2054-JWL, 2011 WL 884391, at *14–16 (D. Kan. Mar. 11, 2011) (finding the following hourly rates reasonable in a class action lawsuit involving unpaid sales incentive compensation:  $400 per hour for a lawyer with more than 30 years' experience, $290 per hour for lawyers with more than 20 years' experience, $270 for a partner with 11 years' experience, and $175 for associates with "lesser experience" for attorneys based in Kansas City, Missouri).

Not long ago, a judge in an adjacent district—the United States District Court for the Western District of Missouri—determined reasonable market rates for timekeepers litigating on

---

[4]     Opposing counsel in *Lawson* didn't challenge the reasonableness of these rates and didn't provide evidence contradicting them.  *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 6343292, at *17 (D. Kan. Oct. 29, 2020) (finding proposed rates reasonable "given the lack of evidence to contradict Spirit's record about the reasonableness of its requested rates"), *aff'd*, No. 18-1100-EFM, 2020 WL 6939752 (D. Kan. Nov. 24, 2020).

behalf of children in Missouri's foster care system.  *See M.B. v. Tidball*, No. 2:17-CV-4102-NKL, 2020 WL 1666159, at *1 (W.D. Mo. Apr. 3, 2020).  A number of attorneys involved in this case also were involved in that one.  *Id.* at *10–13 (determining reasonable rates for attorneys from National Center for Youth Law, Children's Rights, Inc., and non-local law firms).  In the Missouri case, Judge Nanette Laughrey found rates between $200 to $500 per hour reasonable "in keeping with Missouri rates[.]"  *See id.* at *10, 10–13; *see also Martin v. Safe Haven Sec. Servs., Inc*., No. 19-CV-00063-ODS, 2020 WL 4816418, at *6 (W.D. Mo. Aug. 19, 2020) (finding rates of $500 for litigators with 13 years' experience and $300 per hour for litigator with four years' experience in employment law reasonable for attorneys in the Kansas City market).

Plaintiffs argue their proposed rates are consistent with attorney fees "awarded in recent, complex cases in Kansas[.]"  Doc. 161 at 11.  In support of their requested rates, plaintiffs attached the *Missouri Lawyers Media*, published August 2019.  Doc. 144-5 at 1–9.  It includes a chart listing "Attorney Rate Ranges" for the Kansas City area.  *Id.* at 4.  This chart lists median rates for partners and associates.  *Id.*  But it doesn't break down the median rate for partners or associates by level of experience.  *See id.*  It also lists attorney billing rates by city, firm, practice area, and title, but provides no information about the experience level of those attorneys or the place of litigation.  *Id.* at 5; *see also id.* at 3 (describing methodology as "gather[ing] hourly rates from fee applications filed with courts within the past 12 months").  Plaintiffs don't compare the experience of counsel with the attorneys listed in the *Missouri Lawyers Media* publication.  They simply attach it to their motion without explaining why it supports any particular attorney's rate.  Plaintiffs do the same with *A Flash Report on the 2017 Economic of Law Practice Survey in*

*Kansas*.  Doc. 144-6 (Pls.' Ex. F).  Plaintiffs argue generally that the rates requested align with

attorneys' rates in the Kansas City market with comparable experience.[5]

Also, plaintiffs submit the declaration of Nick Badgerow, an attorney with decades of

experience in the Kansas City legal market.  Doc. 149.  Though Mr. Badgerow wasn't involved

in this case, he attests that the "maximum rate charged by even the most senior lawyers in this

case was capped at $500 per hour, which is well below the rates charged by experienced senior

lawyers in this community[.]"  *Id.* at 11.  Mr. Badgerow also attests the hourly rate charged by

other attorneys "were well within the range of reasonable rates for the lawyers and other

professionals who provided services to plaintiffs[.]"  *Id.*

After considering all of the available information in light of the court's experience with

fee litigation, the court makes the following finding of reasonable hourly rates.  Where the

requested rate isn't disputed—and several aren't—the court notes as much.  Nonetheless, it has

provided background information about those attorneys because it helped to inform the court's

analysis of those rates that are disputed.  Those attorneys with undisputed rates are noted.

- Larry Rute, from Kansas Appleseed Center for Law and Justice, Inc. ("Kansas
  Appleseed") **(undisputed rate of $500 per hour)**:  Kansas Appleseed is "a statewide
  non-profit advocacy organization devoted to building thriving, inclusive, and just
  communities throughout Kansas."  Doc. 146 at 1.  Mr. Rute graduated law school in 1973
  and received a Master's in Law in 1976.  Doc. 146 at 5.  "He has served as a mediator
  and/or arbitrator in more than 4,500 matters arising in federal and state courts, as well as
  administrative agencies."  *Id.* at 5–6.  Mr. Rute has litigated for over 27 years and focused
  on civil rights, constitutional law, and general civil litigation.  Doc. 146-1 at 6.  Mr. Rute
  is a "member of the Board of Directors and Chair of the Litigation Committee for Kansas
  Appleseed."  Doc. 146 at 5.  The court finds that his extensive litigation experience in
  child advocacy support his requested rate of $500 per hour.  *See Tidball*, 2020 WL

---

[5]      Plaintiffs note that attorneys at Shook, Hardy & Bacon listing a practice area in "public interest
class action" list rates—according to the *Missouri Lawyers Media* survey—of "$770 per hour for an
attorney with about 40 years of experience, $680 per hour for an attorney with 25 years of experience,
$465 per hour for an attorney with nine years of experience, $375 per hour for an attorney with four years
of experience, and $320 per hour for an attorney with three years of experience."  Doc. 143 at 22–23.

1666159, at *13 (finding rate of $500 per hour reasonable for attorneys with 24 years' experience).

- Martha Hodgesmith, from Kansas Appleseed **(undisputed rate of $345 per hour)**:  Ms. Hodgesmith graduated from law school in 1978 and has litigated and advocated extensively for disability rights.  Doc. 146 at 7–8.  She has significant experience with the Kansas health care system and assisted in resolving plaintiffs' Medicaid Act claims for mental health assessment and treatment.  *Id.* at 8.  Given her extensive experience and unchallenged rate, the court finds $345 per hour is reasonable.  *See Tidball*, 2020 WL 1666159, at *13.

- Loretta E. Burns-Bucklew **(undisputed rate of $500 per hour)**:  Ms. Burns-Bucklew graduated from law school in 1984 and has focused her practice on child welfare and family law since 1987.  Doc. 147 at 2.  She became an accredited Child Welfare Law Specialist in 2011 and has "served as class counsel for foster children in two federal civil rights cases in the Western District of Missouri[.]" *Id.* at 3.  The court finds her requested rate is reasonable given her extensive experience in child welfare cases.  *See Tidball*, 2020 WL 1666159, at *13.

- Teresa Woody, Litigation Director with Kansas Appleseed **(undisputed rate of $500 per hour)**:  Ms. Woody worked as a trial lawyer for over 30 years before joining Kansas Appleseed.  Doc. 146 at 3.  She has worked on "complex business and environmental litigation, with cases throughout the county, but primarily in Kansas and Missouri." *Id.* at 3.  She clerked for Judge Ross Roberts in the Western District of Missouri and was a partner and Chair of the Litigation Department at Spencer Fane LLP.  *Id.*  She was also a partner at Stueve, Siegel, Hanson & Woody, and practiced at The Woody Law Firm PC for a decade before joining Kansas Appleseed.  *Id.*  Given Ms. Woody's extensive experience, the court finds her $500 per hour rate is reasonable.  *See Tidball*, 2020 WL 1666159, at *13.

- Stephen Dixon, from Children's Rights, Inc. **(undisputed rate of $410 per hour)**:  Children's Rights, Inc. is "a privately-funded, non-profit organization that advocates on behalf of youth harmed and at risk of harm in child welfare, juvenile justice, education, and healthcare systems in the United States."  Doc. 144 at 2.  Mr. Dixon has litigated public interest and civil rights cases since graduating law school in 1987.  Doc. 144-1 at 12.  In this litigation, Mr. Dixon "principally directed his efforts to identifying factual witnesses supporting [the] claims, client outreach, identification of Plaintiffs and adult Next Friends, regular communication with these stakeholders, and the synthesis of input from stakeholders into the litigation strategy."  Doc. 144 at 21.  Mr. Dixon's extensive experience in litigation, and specifically in child advocacy litigation, make his requested rate of $410 reasonable.[6]

---

[6]      In *Tidball*, the court lowered Mr. Dixon's rate from $375 per hour to $300 per hour because "his work involved more client relations than pure litigation[.]"  2020 WL 1666159, at *11.  No one asserts that he confined his efforts to the same endeavors here.

- David J. Sager, Litigation Partner from DLA Piper LLP ("DLA") **(undisputed rate of $500 per hour)**:  Mr. Sager "has more than 25 years of experience as an attorney" and his practice includes "class-action defense[.]"  Doc. 148 at 6.  He prepared motions and discovery in the litigation.  *Id.*  With Mr. Sager's experience, the court finds his requested rate of $500 per hour is reasonable.

- Ira Lustbader, Litigation Director at Children's Rights, Inc. **(undisputed rate of $500 per hour)**:  Mr. Lustbader has litigated child welfare cases since 1999 with Children's Rights, Inc.  Doc. 144-1 at 2.  Before joining Children's Rights, Inc., he graduated law school in 1992 and litigated at three other law firms in New York City.  *Id.*  His extensive experience in litigation and child welfare cases support his requested $500 hourly rate.  The court finds this rate is reasonable for an attorney with his experience.

- Benet Magnuson, with Kansas Appleseed **(undisputed rate of $300 per hour)**:  Mr. Magnuson graduated from law school in 2009 and has worked for the Texas Criminal Justice Coalition, the Texas Access to Justice Commission, and Appleseed's immigration financial justice project.  Doc. 146 at 8.  He joined Kansas Appleseed and worked as the executive director from August 2013 to October 2019.  *Id.*  He currently serves as Interim Executive Director for the Appleseed Foundation.  Doc. 146-1 at 14.  The court finds $300 per hour reasonable based on Mr. Magnuson's experience in civil rights.

- Leecia Welch, Senior Director of Legal Advocacy and Child Welfare at the National Center for Youth Law ("NCYL"):  Ms. Welch graduated law school in 1996 and has focused on child advocacy litigation since.  Doc. 145-1 at 3.  She worked at CIVITAS Initiative as a Children's Law fellow litigating children's legal issues, litigated for two private law firms on complex cases, and joined NCYL in 2004 as a Senior Attorney.  *Id.* at 2–3.  She earned her current title (Senior Director) in 2016.  *Id.* at 2.  Defendants argue, generally, that plaintiffs have not supported their increased rates from *M.B. v. Tidball.*  Doc. 157 at 24–25.  The court in *Tidball* awarded $450 per hour to Ms. Welch.  2020 WL 1666159, at *13.  Plaintiffs respond that any increase from the rates in *Tidball* is marginal and accounted for by increased experience.  Doc. 161 at 11 n.16.  While Ms. Welch isn't quite as experienced as other attorneys receiving a $500 rate, she now has 25 years' experience, with most of it focusing on matters germane here.  Considering all the factors, the court finds that $500 per hour is reasonable for 25 years' experience in the Kansas City market.

- Kristin Pacio, from DLA:  Ms. Pacio is a senior attorney and has litigated for 15 years.  Doc. 148 at 6.  She graduated from Boston College Law School in 2005 and joined DLA in November 2010.  *Id.*  Ms. Pacio requests an hourly rate of $410 per hour.  *Id.* at 7.  Defendants argue plaintiffs "request hourly rates for several attorneys whose skill and experience does not command the requested rates in the Kansas City market."  Doc. 157 at 21.  They assert Ms. Pacio has the comparable experience of an associate "with no particular experience or specialized knowledge in the children's rights litigation field."  *Id.*  Defendants propose a rate of $300 per hour.  *Id.* at 21–23.  Defendants' argument has some appeal, but Ms. Pacio has 16 years of experience, and 11 of them at a major international law firm.  This profile isn't typical of "an associate."  The court finds a rate

of $410 reasonable for Ms. Pacio's experience. *See Lawson*, 2020 WL 6343292, at *16 (finding $425 per hour reasonable for Of Counsel with 13 years' experience).

- Poonam Juneja, with NCYL: Ms. Juneja graduated law school in 2009 and worked as a Law Fellow for the Southern Poverty Law Center for about two years. Doc. 145-1 at 5. She clerked for United States District Judge Claudia Wilken in the Northern District of California (who presided over a series of high profile class actions and other complex litigation) for two years and then clerked for Judge Marsha Berzon of the Ninth Circuit Court of Appeals for one year. *Id.* She worked for Public Counsel and litigated class actions intended to reform education in the juvenile justice system, and she worked to end the school-to-prison pipeline and lead state legislative and policy reform efforts. *Id.* Ms. Juneja has worked at the NCYL since 2015 as a Senior Staff Attorney. *Id.* Ms. Juneja requests $395 per hour. Doc. 145 at 14. This is $45 per hour more than what the Western District of Missouri awarded Ms. Juneja in April 2020. *See Tidball*, 2020 WL 1666159, at *11 (finding $350 per hour reasonable for Ms. Juneja which, the court noted, was "lower than the court-approved $425 rate she received in another case" in the Western District of Washington). Defendants argue that plaintiffs fail to justify the increase in rates from *M.B. v. Tidball*, decided April 2020. Doc. 157 at 23–24. But defendants don't propose an alternative rate for Ms. Juneja. *See id.* at 24 (listing proposed rate for timekeepers). Plaintiffs respond that any increase in rates from *M.B. v. Tidball* is "marginal." Doc. 161 at 9 n.16. The court finds Ms. Juneja's 12 years' experience litigating, clerking, and focusing on child advocacy supports a $375 per hour rate. *See Tidball*, 2020 WL 1666159, at *11 (finding $350 per hour reasonable for Ms. Juneja's experience compared to the $375 per hour requested); *see also Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1181 (D. Kan. 2018) (finding $335 per hour reasonable for attorney with 13 years' experience).

- Joshua Kane with DLA: Mr. Kane graduated law school in 2010 and joined DLA that following November. Doc. 148 at 5. He worked exclusively on pro bono matters in his first year at DLA and has litigated state and federal class action lawsuits. *Id.* Plaintiffs assert Mr. Kane "helped lead negotiations with Defendants' counsel over protocols for collecting electronic discovery" and "managed third-party discovery and conducted the deposition of Jason Koehn, Defendants' 30(b)(6) witness on the subject of their information-management practices." *Id.* Plaintiffs propose a rate of $410 per hour. Doc. 148 at 8. Defendants argue Mr. Kane has practiced for about ten years and he has "*no particular experience in this field or in this jurisdiction*[.]" Doc. 157 at 21. Defendants propose a rate of $300 per hour. *Id.* While Mr. Kane is an experienced litigator, his proposed rate is higher than the Kansas City market supports. *See Tidball*, 2020 WL 1666159, at *11 (finding $325 per hour reasonable for attorney with about nine years' experience); *see also Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1181 (D. Kan. 2018) (finding $335 per hour reasonable for attorney with 13 years' experience). The court finds a rate of $335 per hour reasonable for Mr. Kane.

- William J. Diggs, with DLA: Mr. Diggs graduated from law school in 2010 and served as an active-duty U.S. Air Force judge advocate from 2011 to 2015 before joining DLA. Doc. 148 at 4. Plaintiffs assert Mr. Diggs "assisted with preparing drafts of Plaintiffs' motion for class certification" and "helped to develop procedures for managing

discovery." *Id.* Plaintiffs' proposed rate for Mr. Diggs is $410 per hour. *Id.* at 8. Defendants argue Mr. Diggs only has five years' private practice experience and no particular experience or specialized knowledge in child advocacy. Doc. 157 at 21. The court recognizes Mr. Diggs is an experienced litigator but his proposed rate is higher than the Kansas City market supports for a litigator with ten years' experience. *See Tidball*, 2020 WL 1666159, at *11 (finding $325 per hour reasonable for attorney with about nine years' experience); *see also Ross*, 325 F. Supp. 3d at 1181 (finding $335 per hour reasonable for attorney with 13 years' experience). The court finds a rate of $335 per hour reasonable for Mr. Diggs.

- Marissa Nardi, Senior Staff Attorney at Children's Rights, Inc.: Ms. Nardi graduated law school in 2012 and worked as a litigation associate at Winston & Strawn for six years before joining Children's Rights, Inc. in 2018. Doc. 144-1 at 6. Plaintiffs propose a rate of $380 per hour. Doc. 144 at 19. Defendants argue the market does not support Ms. Nardi's proposed rate and suggest a rate of $300 per hour. Doc. 157 at 24. The court finds a rate of $335 per hour reasonable for the Kansas City market. *See Lawson*, 2020 WL 6343292, at *17 (finding rate of $350 per hour for associate with seven years' experience commensurate with "top-tier employment litigation rates in the Kansas City metropolitan area" and opposing counsel didn't challenge the reasonableness of rate); *see also Tidball*, 2020 WL 1666159, at *11 (finding $325 per hour reasonable for attorney with about nine years' experience).

- Jonathan King, a staff attorney with Children's Rights, Inc.: Mr. King graduated from law school in 2012 and was an associate at Venable LLP from 2012 to 2017. Doc. 144-1 at 8. Mr. King spent a year teaching in Thailand before joining Children's Rights, Inc. in 2018. *Id.* Plaintiffs propose a reasonable rate for Mr. King is $345 per hour. Doc. 144 at 19. Defendants argue that plaintiffs fail to explain the increase in rates between *Tidball* and this case. Doc. 157 at 23–24. Plaintiffs' request represents "an increase of $50–70 per hour from hourly rates awarded" in *Tidball*. *Id.* Also, defendants point out that the court in *Tidball* found $300 per hour reasonable for Mr. King. *Id.* at 24. So, they propose the court reduce Mr. King's rate to $300 per hour. *Id.* The court finds a rate of $335 per hour reasonable for Mr. King's time. *See Lawson*, 2020 WL 6343292, at *17 (finding rate of $350 per hour for associate with seven years' experience commensurate with "top-tier employment litigation rates in the Kansas City metropolitan area" and opposing counsel didn't challenge the reasonableness of rate); *see also Tidball*, 2020 WL 1666159, at *11 (finding $300 per hour reasonable for Mr. King based on his experience).

- Erin McGuinness, Senior Policy Analyst with Children's Rights, Inc.: Ms. McGuinness graduated law school in 2012 and holds a Master's in Public Administration. Doc. 144 at 21. In this litigation, Ms. McGuinness "collected and analyzed quantitative data, interpreted academic and child welfare policy research, crafted and analyzed potential remedies for Plaintiffs' Medicaid Act claims, and ensured that statistical indicators negotiated and eventually used in the settlement agreement would adequately protect the Plaintiff Class." *Id.* at 8. Ms. Lustbader considered Ms. McGuinness's role in the litigation when she reduced her requested rate to $240 per hour. *Id.* at 21. Defendants counter that plaintiffs fail to support the increased rates from *Tidball* and argue the court

should find $225 per hour reasonable for Ms. McGuinness.  Doc. 157 at 24.  The court finds *Tidball*'s reasoning persuasive and finds $240 per hour reasonable for Ms. McGuinness.  *See Tidball*, 2020 WL 1666159, at *13 (finding Ms. McGuinness's proposed rate of $225 per hour rate reasonable for Ms. McGuinness's work because plaintiffs "already reduced her proposed rate in light of the fact that, although she uses her skills in active litigation, she works principally as a senior policy analyst, and in light of her legal experience").

- Freya Pitts, Senior Attorney with NCYL:  Ms. Pitts graduated from law school in 2013.  Doc. 145-1 at 6.  She clerked for the United States Court of Appeals for the District of Columbia and then clerked in the United States District Court for the Northern District of California.  *Id.*  Ms. Pitts worked at Disability Rights Advocates for about three years, litigating cases focused on youth rights.  *Id.*  Ms. Pitts joined NCYL in August 2018 and was promoted to Senior Attorney in July 2020.  *Id.*  Ms. Pitts "played a primary role in the drafting and filing of the Complaint[,]" "draft[ing] and edit[ing] filings and correspondence" and "worked heavily on discovery[.]"  Doc. 145 at 12.  She "was also a key part of the mediation and settlement negotiations teams[.]"  *Id.*  Plaintiffs propose a rate of $365 per hour.  Doc. 145 at 14.  This represents a $65 increase from the rate awarded Ms. Pitts in *Tidball*.  2020 WL 1666159, at *13 (finding $300 per hour reasonable for Ms. Pitts).  Defendants propose $300 per hour for Mr. Pitts.  Doc. 157 at 24.  The court finds a $345 per hour rate reasonable for Ms. Pitts based on her experience and role in the litigation.  *See Lawson*, 2020 WL 6343292, at *17 (finding rate of $350 per hour for associate with seven years' experience commensurate with "top-tier employment litigation rates in the Kansas City metropolitan area" when opposing counsel didn't challenge the reasonableness of the requested rate).

- Jean Strout, a staff attorney with NCYL:  Ms. Strout graduated from law school in 2014 and worked in child advocacy until her clerkship with the United States District Court for the District of Puerto Rico.  Doc. 145-1 at 8.  After clerking, she joined NCYL in 2020.  *Id.*  Plaintiffs propose $325 per hour for Ms. Strout.  Doc. 145 at 14.  Defendants argue plaintiffs fail to support their requested rates, and they propose a rate of $250 per hour for Ms. Strout.  Doc. 157 at 23–24.  Based on Ms. Strout's experience, the court finds a rate of $310 per hour reasonable.  *See Tidball*, 2020 WL 1666159, at *13 (holding $300 per hour rate reasonable for attorneys with about seven years' experience); *see Lawson*, 2020 WL 6343292, at *17 (holding $350 per hour for seven years' experience consistent with top-tier employment firms in Kansas City market).

- Claire Glasspiegel, with Children's Rights, Inc.:  Ms. Glasspiegel graduated from law school in 2015 and litigated with Skadden, Arps, Slate, Meagher & Flom LLP until June 2019.  Doc. 144-1 at 9.  She joined Children's Rights, Inc. in June 2019 as a staff attorney.  *Id.*  Plaintiffs propose a rate of $310 per hour for Ms. Glasspiegel.  Doc. 144 at 19.  Defendants propose a rate of $250 per hour.  Doc. 157 at 24.  The court finds a rate of $290 per hour reasonable based on Ms. Glasspiegel's experience.  *See Tidball*, 2020 WL 1666159, at *13 (finding rate of $250 per hour reasonable for associate with five years' experience).

- Nicole Taykhman, with Children's Rights, Inc.: Ms. Taykhman graduated law school in 2016, and was an associate at Jenner & Block LLP starting October 2016. Doc. 144-1 at 11. She left Jenner & Block LLP after less than a year to clerk for the United States District Court for the District of Connecticut and then returned to Jenner & Block LLP. *Id.* She joined Children's Rights, Inc. in January 2020. *Id.* Plaintiffs propose a fee of $290 per hour. Doc. 144 at 19. Defendants propose a rate of $225 per hour. Doc. 157 at 24. The court finds a rate of $260 per hour reasonable based on Ms. Taykhman's experience. *See Tidball*, 2020 WL 1666159, at *13 (holding $250 per hour reasonable for attorney with five years' experience); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less and $250 per hour for attorneys with five years' experience).

- Amanda Grill, a staff attorney with NCYL: Ms. Grill graduated law school in 2017. Doc. 145-1 at 11. She worked for NCYL from 2017 to 2018. *Id.* Plaintiffs propose a $270 per hour rate for Ms. Grill. Doc. 145 at 14. Defendants point to the awarded rate in *Tidball* and argue the court should set Ms. Grill's rate to $200 per hour since plaintiffs fail to support their increased rates. Doc. 157 at 23–24. The court finds $220 per hour reasonable for Ms. Grill based on her experience. *See Tidball*, 2020 WL 1666159, at *13 (holding $200 per hour reasonable for Ms. Grill); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less).

- Jacqueline Stolzenberg, with NCYL: Ms. Stolzenberg graduated law school in 2018. Doc. 145-1 at 12. She worked at NCYL from September 2018 to 2019. *Id.* Plaintiffs propose $250 per hour for Ms. Stolzenberg. Doc. 145 at 14. Defendants propose a rate of $200 per hour, based on *Tidball*'s awarded rate for Ms. Stolzenberg. Doc. 157 at 24. The court finds $200 per hour reasonable for Ms. Stolzenberg. *See Tidball*, 2020 WL 1666159, at *13 (holding $200 per hour reasonable for Ms. Stolzenberg); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less).

- Meg Fowler, a former litigation associate at DLA: Ms. Fowler graduated law school in 2018. Doc. 148 at 5. Ms. Fowler left DLA Piper LLP in June 2020. *Id.* For this case, Ms. Fowler "took a primary role in researching and drafting Plaintiffs' motion for class certification." *Id.* Plaintiffs propose a $240 per hour rate for Ms. Fowler. *Id.* at 8. Defendants argue this is "an excessive rate for the Kansas City market [for an attorney] with little to no experience" and propose a rate of $200 per hour. Doc. 157 at 22. The court finds $200 per hour reasonable for Ms. Fowler's work based on her limited experience. *See Tidball*, 2020 WL 1666159, at *13 (holding $200 per hour reasonable for attorney with two years' experience); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less).

- Megan Kinney, a former Krantz Fellow at DLA: Ms. Kinney graduated law school in 2019. Doc. 148 at 5. Krantz Fellows "spend their first year at the firm working exclusively on *pro bono* cases." *Id.* Her primary role in the litigation "has been to assist with reviewing documents produced by Defendants." *Id.* Plaintiffs propose an hourly rate of $240 per hour. *Id.* at 8. Defendants argue this is too high for someone with little experience and propose a $200 per hour rate for Ms. Kinney. Doc. 157 at 22. The court

finds $200 per hour reasonable for Ms. Kinney. *See Tidball*, 2020 WL 1666159, at *13 (holding $200 per hour reasonable for attorney with two years' experience); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less).

- Olivia Tourgee, a junior litigation associate at DLA:  Ms. Tourgee graduated law school in 2019.  Doc. 148 at 6.  During this litigation, she "reviewed documents produced by Defendants, both to help prepare for mediation sessions with Defendants and in support of Plaintiffs' motion for class certification." *Id.*  Plaintiffs propose $240 per hour for Ms. Tourgee.  Doc. 148 at 8.  Defendants argue the Kansas City market does not support $240 per hour for someone with Ms. Tourgee's experience and they propose a rate of $200 per hour.  Doc. 157 at 22.  The court finds $200 per hour reasonable for Ms. Tourgee. *See Tidball*, 2020 WL 1666159, at *13 (holding $200 per hour reasonable for attorney with two years' experience); *see also Ross*, 325 F. Supp. 3d at 1181 (holding $225 per hour reasonable for attorney with four years' experience or less).

In summary form, the following table presents the parties' positions and the court's decision about hourly rates:

## Chart 1:  Hourly Rates Set by Court

| Plaintiffs' Counsel and Firm | JD Class | Plaintiffs' Requested Rate | Reasonable Rate Set by Court |
|---|---|---|---|
| **Larry Rute (Appleseed)[7]** | 1973 | $500 | **$500** |
| **Martha Hodgesmith (Appleseed)** | 1978 | $345 | **$345** |
| **Loretta E. Burns-Bucklew (Burns-Bucklew Law)** | 1984 | $500 | **$500** |
| **Teresa Woody (Appleseed)** | 1985 | $500 | **$500** |
| **Stephen Dixon (CR)** | 1987 | $410 | **$410** |
| **David J. Sager (DLA)** | 1991 | $500 | **$500** |
| **Ira Lustbader (CR)** | 1992 | $500 | **$500** |
| Leecia Welch (NCYL) | 1996 | $500 | **$500** |
| Kristin Pacio (DLA) | 2005 | $410 | **$410** |
| Poonam Juneja (NCYL) | 2009 | $395 | **$375** |
| **Benet Magnuson (Appleseed)** | 2009 | $300 | **$300** |
| Joshua Kane (DLA) | 2010 | $410 | **$335** |
| William J. Diggs (DLA) | 2010 | $410 | **$335** |
| Marissa Nardi (CR) | 2012 | $380 | **$335** |

---

[7]       Undisputed rates are shown in bold.

| Plaintiffs' Counsel and Firm | JD Class | Plaintiffs' Requested Rate | Reasonable Rate Set by Court |
|---|---|---|---|
| Jonathan King (CR) | 2012 | $345 | **$335** |
| Erin McGuinness (CR) | 2012 | $240 | **$240** |
| Freya Pitts (NCYL) | 2013 | $365 | **$345** |
| Jean Strout (NCYL) | 2014 | $325 | **$310** |
| Claire Glasspiegel (CR) | 2015 | $310 | **$290** |
| Nicole Taykhman (CR) | 2016 | $290 | **$260** |
| Amanda Grill (NCYL) | 2017 | $270 | **$220** |
| Jacqueline Stolzenberg (NCYL) | 2018 | $250 | **$200** |
| Meg Fowler (DLA) | 2018 | $240 | **$200** |
| Megan Kinney (DLA) | 2019 | $240 | **$200** |
| Olivia Tourgee (DLA) | 2019 | $240 | **$200** |

These findings leave the hourly rates for paralegals, other support staff, and one law student working on the case. Plaintiffs request an hourly rate of $200 per hour for all non-attorneys billing on the case. Doc. 143 at 21. Defendants argue this represents an excessive rate for the Kansas City market and suggest a rate of $125 per hour for all staff and $100 per hour for the one law student who assisted plaintiffs. Doc. 157 at 25–27. Plaintiffs argue defendants' argument is "meritless" because defendants' proposed rate is lower than what the court in *Tidball* awarded paralegals. Doc. 161 at 13. Plaintiffs argue they "put forth evidence that paralegals at Kansas City firms charged up to $305 per hour, with a median rate of $225 per hour." *Id.* at 13 n.18 (asserting "Plaintiffs provided evidence that Kansas City paralegals charge up to $305 per hour" and "calculated the median of $225 for all paralegals listed in Kansas City in the 2019 Missouri Lawyers' Survey"). Plaintiffs also assert the court in *Tidball* recognized "the 2018 *Missouri Lawyers Weekly* survey concerning billing rates shows that paralegals who work on class action or civil rights cases specifically receive between $215 and $275 an hour[.]" Doc. 161 at 13; *Tidball*, 2020 WL 1666159, at *13. But plaintiffs fail to compare the experience of their staff to the staff listed in the publications they attach to their filings.

26

Recent rulings by our court and the Western District of Missouri will not support a rate of $200 an hour for either paralegals or law students. *Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 4000905, at *9 (D. Kan. July 15, 2020) (finding hourly rate of $125 per hour reasonable for paralegals and law students); *M.B. v. Tidball*, No. 2:17-cv-4102-NKL, 2020 WL 1666159, at *6 (W.D. Mo. Apr. 3, 2020) (holding $150 per hour reasonable for paralegals). The court finds a rate of $150 per hour reasonable for paralegals and staff working the case.

Plaintiffs also request $200 per hour for the law student, Joshua Nomkin, who worked on the case. Doc. 143 at 21. Defendants argue Joshua Nomkin worked on the case during his 1L summer and his "work was solely limited to document review[.]" Doc. 157 at 26. Defendants propose a rate of $100 per hour. *Id.* at 27. Plaintiffs respond that they submitted fees for Mr. Nomkin, "to the exclusion of others who worked on the matter, because he performed necessary work typical of junior attorneys." *Id.* Plaintiffs propose a rate consistent with paralegals on the case even though he performed work consistent with a junior attorney. *Id.* The court accepts plaintiffs' paralegal reference and thus finds $150 per hour reasonable for Mr. Nomkin. *See Animal Legal Def. Fund*, 2020 WL 4000905, at *8 (holding rates of $125 per hour reasonable for paralegals and law students).

### 2.  Reasonable Number of Hours and Expenses

Plaintiffs request fees for 10,057.1 hours of work. Doc. 143 at 31 (requesting fees for 10,064.1 hours); Doc. 161 at 14 n.20 (reducing requested hours after noting plaintiffs had double counted an attorney's time for mediation producing a duplicative seven hours in fee request). Plaintiffs request fees totaling $3,750,396.50 and expenses totaling $114,802.59. Doc. 161 at 14 n.20.[8]

---

[8]      After defendants identified errors in plaintiffs' fee application, plaintiffs conceded three errors in their fee application. Doc. 161 at 14 n.20. *First*, plaintiffs submitted billing records with incorrect rates

27

Defendants argue plaintiffs seek an exorbitant fee award, especially in light of the limited procedural history of this case. *See id.* at 18 ("This is a case in which no trial occurred, and no class certification motion was filed (although Plaintiffs have billed for that). Plaintiffs answered no discovery (but billed for that too), and took a single half-day deposition focused only on DCF's storage of electronically-stored information rather than the substance of the case. Plaintiffs responded to one dispositive motion (which they lost, but billed for, *see infra* at 38) and mediated the case."). Defendants argue plaintiffs' fee request is unreasonable because plaintiffs billed for: (a) an unnecessary number of timekeepers—25 attorneys and 7 staff; (b) unnecessary pre-suit fees and expenses; (c) extensive time spent drafting the Complaint, Amended Complaint, and Motion for Class Certification; (d) excessive mediation expenses and hours; (e) 530 hours for a Motion to Dismiss; (f) hours devoted to meetings; (g) fees and expenses for 13 pro hac vice motions; and (h) COVID-19 related discovery and conferences. *See* Doc. 157. The court first addresses the governing legal standard for the core issue—how to determine which is a reasonable number of hours—and then turns to each of defendants' arguments.

As already discussed, calculating the lodestar requires the court to assess "the number of attorney hours reasonably expended[.]" *Robinson*, 160 F.3d at 1281 (citation and internal quotation marks omitted). This inquiry assesses "whether the attorney's hours were 'necessary' under the circumstances." *Id.* The factors the court considers when deciding if the hours are necessary are: "(1) whether the tasks being billed would normally be billed to a paying client,

---

for timekeepers at Children's Rights, Inc. *See* Doc. 58. *Second*, plaintiffs double-billed for mediation expenses, resulting in an additional $13,673.42 in expenses. *See* Doc. 161 at 14 n.20 ("Plaintiffs agree to deduct $13,673.42 from [their] original expense total of $128,476.01."). *Last*, plaintiffs "inadvertently submitted fees twice for a person's attendance at a single mediation session, which was purely a clerical error." *Id.* Given these concessions, plaintiffs' "corrected total requested award, including corrected expenses ($114,802.59) and corrected fees ($3,750,396.50), is [a total of] $3,865,199.09." *Id.*

(2) the number of hours spent on each task, (3) the complexity of the case, (4) the number of reasonable strategies pursued, (5) the responses necessitated by the maneuvering of the other side, and (6) potential duplication of services by multiple lawyers." *Id.* (citation and internal quotation marks omitted).  A "district court may discount requested attorney hours if the attorney fails to keep meticulous, contemporaneous records that reveal all hours for which compensation is requested and how those hours were allotted to specific tasks." *Id.* (citation and internal quotation marks omitted).  The court assesses "what hours a reasonable attorney would have incurred and billed in the marketplace under similar circumstances." *Id.*  "Plaintiffs' burden in an application for attorneys' fees is to prove and establish the reasonableness of each dollar, each hour, above zero." *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (citation and internal quotation marks omitted) (assessing district court's award for attorneys' fees under § 1988).

When assessing a request to reimburse for expenses, the court considers whether "such expenses are usually billed in addition to the attorney's hourly rate." *Case*, 157 F.3d at 1257. "The attorneys requesting fees bear the burden of establishing the amount of compensable expenses to which they are entitled." *Id.*  The Tenth Circuit provides that "'[i]tems that are normally itemized and billed in addition to the hourly rate should be included in fee allowances in civil rights cases *if reasonable in amount.*'"  *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1208 (10th Cir. 1986) (quoting *Ramos*, 713 F.2d at 559).  "Of course, the burden is on the prevailing plaintiffs to establish the amount of compensable costs and expenses to which they are entitled." *Id.*

Before turning to defendants' arguments, the court notes a fundamental shortcoming of plaintiffs' submissions.  Plaintiffs do not provide their billing records in a digestible fashion.

Instead, plaintiffs submit PDFs of billing records and summarize their fee request in a largely conclusory chart. *See* Doc. 143 at 17 (summarizing legal fees and expenses request by each firm). Instead, it is defendants who have organized hundreds of pages of billing records into consumable charts.

Plaintiffs respond to defendants' summary charts, arguing that the court should ignore them because defendants try "to cluster Plaintiffs' time into arbitrary categories." Doc. 161 at 20; *see also id.* at 20 (arguing defendants' exhibits "are misleading, often inaccurate, and riddled with other problems" because "there is no way to verify the accuracy of these documents, and no one has attested to the process used to create them"). But, plaintiffs notably fail to provide alternative summaries or calculations to counter defendants' arguments that plaintiffs billed for an unreasonable number of hours and expenses. Plaintiffs have needlessly complicated the court's assessment of hundreds of pages of billing records. And plaintiffs never specifically identify—much less quantify—how defendants' charts are wrong-minded. So, the court considers defendants' charts when assessing the reasonableness of the hours and expenses billed.

Plaintiffs also invite the court to shift the burden to defendants. *See, e.g.*, Doc. 161 at 26 (arguing "[u]nsurprisingly, Defendants cite no case law stating it would be unreasonable to prepare for class certification in a class action."); *see also id.* at 22 (arguing defendants have failed to show "that any further reduction of time spent on this litigation prior to the filing of the complaint is warranted"). These arguments have it exactly backwards. Plaintiffs' counsel must discharge the burden, not defendants. *See Robinson*, 160 F.3d at 1281.

This court also notes this case's limited procedural history. Plaintiffs seek fees for 10,057.1 hours for 25 attorneys and seven staff members spread across five organizations— totaling $3,750,396.50 in fees and $114,802.59 in expenses. For comparison, the court considers

the recent litigation in the Western District of Missouri, *M.B. v. Tidball*, which both Children's

Rights, Inc. and National Center for Youth Law litigated.  *See* No. 2:17-cv-4102-NKL, 2020 WL

1666159 (W.D. Mo. Apr. 3, 2020).  In *Tidball*, plaintiffs' counsel requested fees for 11,417.6

hours of work for 20 attorneys and four paralegals—totaling $3,894,975.22 in fees and

$132,907.56 in expenses.  *Id.* at *1.  Defendants in *Tidball*:  (1) filed a motion to dismiss for

failure to state a claim under the federal abstention doctrine (which the court granted in part and

denied in part after full briefing and oral argument); (2) challenged the appropriate parties three

times; (3) challenged class certification; (4) filed, fully briefed, and argued an interlocutory

appeal of the court's order granting class certification; (5) filed, fully briefed, and argued a

motion to compel; and (5) produced 1.5 million pages of documents in difficult to search

formats.  *See* 2020 WL 1666159, at *2–4.  Here, defendants filed one motion to dismiss and

produced 78,000 pages.  In *Tidball*, plaintiffs conducted 15 depositions.  *Id.* at *3.  Here,

plaintiffs conducted one.  *See* Doc. 143 at 12.  Yet, plaintiffs in this case seek fees for 10,057.1

hours while plaintiffs in *Tidball* sought fees for just slightly more time—*i.e.*, 11,417.6 hours of

work.  While cases can present unique challenges which the docket may not always capture,

plaintiffs—as the prevailing party—must show the requested hours are reasonable, *i.e.*,

"necessary under the circumstances."  *See Robinson*, 160 F.3d at 1281 (internal quotations marks

omitted).

      With that background, the court now turns to the eight specific attacks defendants make

on plaintiffs' fee request.

### a.  Overstaffing the Case

      Plaintiffs' counsel consisted of four separate organizations and a local attorney—equaling

25 attorneys and seven staff members—for a total of 32 timekeepers.  While the large number of

timekeepers on the case is not per se unreasonable, the court is wary of potential inefficiencies implicated by such a large number of timekeepers. For example, in *Tidball*, Judge Laughrey reduced plaintiffs' requested hours by 10%, recognizing the inefficiencies inherent in staffing a case with 20 attorneys from four organizations—many of the same attorneys appearing in this case. 2020 WL 1666159, at *15. Judge Laughrey reduced the hours even after plaintiffs had "engaged outside consultant Sterling Analytics, at their own expense, to assess and audit the fees they billed" to submit an application reflecting reasonable hours. *Id.* at *14.

The court recognizes that plaintiffs represent that they have "reduced their hours by more than 25% in order to avoid any appearance of duplication, thus reducing their claim by more than $1 million[.]" Doc. 149 at 12 (Badgerow Decl.); *see also* Doc. 161 at 16 (asserting plaintiffs' counsel reduced their time by "more than 3,300 hours" equating to "more than 25% of Plaintiffs' billable time and over $1.1 million"). Plaintiffs assert they divided the work between the firms to prevent duplicative billing. Doc. 143 at 29 ("For instance, CR and NCYL conducted the vast majority of the pre-filing fact investigation, while DLA took the lead on handling discovery productions and negotiating ESI search terms." And, "Kansas Appleseed and Ms. Burns-Bucklew were critical to defining the substantive remedies in the Settlement and in making major strategic decisions given their deep familiarity with these state systems."). But, even after plaintiffs reduced their hours voluntarily and attempted to divide work between firms, the billing records reflect inefficiencies that are consistent with overstaffing.

For example, plaintiffs' fee request seeks fees for 11 attorneys who participated in a three-hour "Team strategy meeting" on March 20, 2019. *See* Doc. 144-3 at 78, 138 (attorneys Ira Lustbader and Marissa Nardi billed three hours for a co-counsel team meeting on March 20, 2019); Doc. 145-3 at 21, 50 (Leecia Welch and Poonam Juneja billed three hours for team

meeting on March 20, 2019); Doc. 146-2 at 3, 8, 16 (Benet Magnuson, Larry Rute, and Teresa

Woody billed three hours for team meeting on March 20, 2019); Doc. 147-1 at 7 (Loretta Burns-

Bucklew billed three hours for team meeting on March 20, 2019); Doc. 148-1 at 3 (David Sager,

William J. Diggs, and Meg Fowler billed three hours or more for team meeting on March 20,

2019).  For this three hour team meeting, six attorneys billed at $500 per hour.  The other five

attorneys billed at $395 (Ms. Juneja), $300 (Mr. Magnuson), $410 (Mr. Diggs), $380 (Ms.

Nardi), and $240 (Ms. Fowler) per hour.  This produces a total fee request of $14,175 for the

strategy meeting.  While the court recognizes the additive effect of collaboration, this total is not

the kind of bill that "a senior partner in a private law firm" would send to a client. *Robinson*, 160

F.3d at 1281.

Defendants' Motion for Extension of Time to File Answer to plaintiffs' Complaint

provides another example.  Doc. 19.  Ten attorneys billed time to responding or discussing

defendants' extension motion.  *See* Doc. 144-3 at 54, 74, 100, 135, 230 (Erin McGuinness, Ira

Lustbader, Jonathan King, Marissa Nardi, and Stephen Dixon billed time for responding or

discussing defendants' Motion for Extension of Time); Doc. 145-3 at 16, 116 (Leecia Welch and

Freya Pitts billed time for work on opposing defendants' motion); Doc. 146-2 at 6, 13 (Larry

Rute and Martha Hodgesmith billed time discussing and work on responding to defendants'

motion); Doc. 147-1 at 6 (Lori Burns-Bucklew billed time for conference calls to discuss

defendants' requested extension).  And, plaintiffs' counsel billed time reviewing co-counsel's

agreements and time spent getting the different organizations up to speed.  *See* Doc. 144-3 at 9

(Clare Connaughton with Children's Rights, Inc. billed to "[r]eview draft of DLA Piper letter

retainer for Next Friends"); Doc. 145-3 at 3, 6 (Leecia Welch billed to "Review KS background

materials from CR" and "Conversations with co-counsel re case communications"); *see also*

Doc. 146-2 at 2–3 (Benet Magnuson billed to "review co-cou[n]sel agreement[,]" "Kansas co-counsel partnership call[,]" and for "email re. possible interested co-counsel").  Again, this is not the kind of time that is generally billed to a client.  *See Robinson*, 160 F.3d at 1281.

All in all, the court finds that plaintiffs' fee request includes inefficiencies inherent in staffing a case with 25 attorneys and seven staff members spread across five distinct organizations.  Faced with a similar problem in the Missouri case, Judge Laughrey reduced plaintiffs' requested hours by 10% to adjust for inherent inefficiencies.  She did so even though plaintiffs there had engaged Sterling Analytics to audit the hours requested before they submitted their fee request there.  In contrast, plaintiffs provide no information suggesting they conducted a similar pre-submission audit.  To comply with the calculated judgment required by *Robinson* and similar cases, the court finds it must reduce plaintiffs' hours by 20% (after all other reductions) to account for these inherent inefficiencies.

### b.  Plaintiffs' Pre-Suit Fees and Expenses

Plaintiffs request fees and expenses for travel and meetings dating back a year before filing this lawsuit.  *See* Doc. 161 at 22.  Plaintiffs assert they have already reduced their travel time.  *See id.* ("Moreover, as part of Plaintiffs' overall exercise of billing judgment, Plaintiffs have already voluntarily reduced the time expended prior to the complaint's filing, waiving all fees for work performed prior to November 16, 2017.").

"The time that is compensable under § 1988 is that reasonably expended *on the litigation*."  *Webb v. Bd. of Educ. of Dyer Cty., Tenn.*, 471 U.S. 234, 242 (1985).  Compensable pre-suit fees include, "drafting of the initial pleadings and the work associated with the development of the theory of the case."  *Id.* at 243.  "In some instances, such as when the litigation involves particularly difficult questions of standing, mootness, or ripeness, attorneys

may be awarded time necessary to determine who should be the appropriate plaintiffs or whether

the suit may even be brought." *Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan.*, 157 F.3d

1243, 1251 (10th Cir. 1998). "Pre-recruitment time also may be awarded where attorneys have

done pre-recruitment work with an advocacy group representing a class." *Id.* But, "time spent

reading background material designed to familiarize the attorney with the area of law would

normally be absorbed into a firm's overhead," and thus billing for this time "is presumptively

unreasonable." *Id.* at 1253. Here, defendants make three arguments on this subject.

*First*, defendants argue plaintiffs' counsel hold themselves out as experts in the matters

litigated. Doc. 157 at 29. So, defendants argue, "[c]ounsel should be familiar with the

constitutional questions raised, potential standing, and other issues relating to the appropriateness

of class representatives that they spent time researching in the year prior to suit." *Id.* Defendants

compiled plaintiffs' billing records that included time for research before plaintiffs filed their

lawsuit. *See* Doc. 157-4 (Defs.' Ex. D-1) (compiling pre-suit "Background Research").

According to defendants, this totals 105.30 hours. *Id.* at 13. On review of these records, the

court agrees with defendants. The court finds the records vague or generally unbillable to a

client. These entries include multiple entries to review Kansas background material, co-counsel

calls and legal research (with no description of this research), researching the Kansas juvenile

court structure, researching "deliberate indifference," class certification, and researching

requirements for service and filing proof of service in the District of Kansas. *See id.* So, the

court deducts these 105.30 hours.

Defendants also compiled billing records for entries listing Early and Periodic Screening,

Diagnostic and Treatment ("EPSDT") research conducted before plaintiffs filed this lawsuit. *See*

Doc. 157-5 (Defs.' Ex. D-2). Billing records for plaintiffs' EPSDT pre-suit research totals

114.09 hours.  *Id.* at 11.  Plaintiffs argue they conducted prudent and necessary research on potential claims.  Doc. 161 at 24.  Plaintiffs contend "Exhibit D-2 shows only that Plaintiffs' counsel responsibly researched the complex Medicaid Act claims they sought to advance before and during this lawsuit."  *Id.*  On this dispute, the court agrees with plaintiffs.  Plaintiffs' research on EPSDT, Doc. 157-5 (Defs.' Ex. D-2), is targeted, reasonably related to the litigation, and billable generally.  The court does not reduce these hours, compiled in Doc. 157-5 (Defs.' Ex. D-2).

*Second*, defendants assert plaintiffs cannot recover for fees incurred before they recruited the Named Plaintiffs in the case.  Doc. 157 at 30–31.  They argue plaintiffs "have not established that any work was 'discrete' or how it advances this civil rights litigation."  *Id.* at 31.  Defendants assert plaintiffs "do not provide any specific information as to whom they were meeting, or how these parties may relate to the Named Plaintiffs or how the time that they expended advanced the litigation."  *Id.*  Plaintiffs respond that their "entries referring to stakeholder contacts were sufficiently descript[ive] to show their relevance to this litigation."  Doc. 161 at 23.

Plaintiffs may recover pre-recruitment expenses if the case involves difficult questions and is necessary to determine which putative plaintiffs can bring the suit.  *See Case*, 157 F.3d at 1251 (explaining compensable pre-recruitment expenses include time spent on determining the proper plaintiffs and when attorneys have done work with a local advocacy group).  Plaintiffs sufficiently have explained these hours to include the need to investigate issues within the Kansas Foster Care System, identifying proper plaintiffs, and working with a local advocate.  *See* Doc. 161 at 22 (explaining "much of Plaintiffs' pre-filing investigation involved work with local advocates, including Ms. Burns-Bucklew and Kansas Appleseed, to determine the extent of the

problems in Kansas's foster care system").  The court does not reduce this time from plaintiffs' fee application.

*Last*, plaintiffs seek $33,775.19 in pre-litigation travel expenses—expenses incurred before filing the Complaint.  Doc. 157 at 31.  Defendants argue plaintiffs cannot recover for these travel expenses because plaintiffs have failed to explain their necessity to the litigation.  *Id.* at 30–32.  Plaintiffs assert it "was entirely reasonable for in-state attorneys Ms. Burns-Bucklew and Kansas Appleseed to conduct the investigation with on-the-ground assistance from out-of-state counsel."  Doc. 161 at 23.

"[P]revailing parties can recover attorney travel fees that are 'incidental and necessary expenses incurred in furnishing effective and competent representation.'"  *Animal Legal Def. Fund*, 2020 WL 4000905, at *6 (quoting *Brown v. Gray*, 227 F.3d 1278, 1297 (10th Cir. 2000)).  As Judge Vratil explained in *Animal Legal Defense Fund*, "[c]ourts within this Circuit have interpreted this to mean that such fees are recoverable where the case demands particular skill or expertise."  *Id.* at *7 (collecting cases).  "The test is not whether local attorneys are *willing* to take the case, but whether they have the expertise necessary to effectively represent plaintiffs on the particular issues which the case presents."  *Id.* (citing *Brown*, 227 F.3d at 1297).  In *Animal Legal Defense Fund*, Judge Vratil noted that plaintiffs explained the necessity of their travel expenses because the lawyers had "a unique background and expertise on ["Ag-Gag Laws"] across the country."  *Id.* (explaining that plaintiffs "provided several affidavits showing that they comprise a small group that has collectively pursued every legal challenge to so called 'Ag-Gag Laws' across the country" and defendants did "not identify attorneys in the Kansas City area with comparable experience").

But in this case, plaintiffs' records don't adequately explain why out-of-state counsel needed to meet frequently with these contacts in Kansas. Nor do plaintiffs explain why local counsel, which included Kansas Appleseed—who joined the litigation in May 2018—and Loretta Burns-Bucklew, could not conduct most of these investigations. *See* Doc. 146 at 10 (describing Kansas Appleseed's role in litigation); Doc. 147 at 4 (Ms. Burns-Bucklew contacted Children's Rights, Inc. about the issues she had identified in the Kansas foster care system and explaining she did not think her solo practice or Foster Adopt Connect had the resources to initiate the litigation). And plaintiffs fail to explain why attorneys from both Children's Rights, Inc. and National Center for Youth Law needed to travel to Kansas. Children's Rights, Inc. and National Center for Youth Law submitted separate billing for their travel expenses. *See* Doc. 144-4 (Children's Rights, Inc. Expenses); Doc. 145-2 (National Center for Youth Law Travel Expenses). Plaintiffs do not explain the purpose of this trip, beyond describing them as "investigative." And cross-referencing these trips to plaintiffs' billing records does not explain the trip's purpose sufficiently to explain why out-of-state counsel was required to travel to Kansas. *See* Doc. 145-3 at 4 (Leecia Welch, with National Center for Youth Law, includes entries for meetings with "stakeholders" and describes the type but does not include any information about topic of meeting or purpose). And, notably, unlike *Animal Defense Fund*, plaintiffs' counsel explain that local counsel—Kansas Appleseed and Ms. Burns-Bucklew — "were critical to defining the substantive remedies in the Settlement and in making major strategic decisions given their deep familiarity" with Kansas state government and its child welfare and Medicaid delivery systems. Doc. 143 at 29; *see also id.* at 26 ("Kansas Appleseed has extensive involvement in reform efforts across the state, including with regard to foster care" and "Ms. Burns-Bucklew, as an attorney who has directly represented youth and families in the

child welfare system for over 30 years, is deeply engaged in systemic advocacy on behalf of young people in Kansas").

Plaintiffs have failed to meet their burden to show these pre-suit trip expenses were necessary to the litigation, especially since they emphasize the expertise of local counsel throughout their filings.  The court thus reduces plaintiffs' expenses by $33,775.19.  *See* Doc. 157 at 31; *see also* Doc. 157-6 (Defs.' Ex. E) (compiling pre-litigation travel expenses).

      *c.*   *Billing for Drafting Complaint, Amended Complaint, and Motion for Class Certification*

Plaintiffs request 896.64 hours for drafting the initial Complaint.  Doc. 157 at 32; *see also* Doc. 157-7 (Defs.' Ex. F) (compiling plaintiffs' billing records for "Initial Complaint Preparation").  And plaintiffs request nearly 170 hours to prepare the Amended Complaint with the most substantive change requiring replacement of the Named Plaintiffs because some of the original children had aged out.  Doc. 157 at 35; *see also* Doc. 157-8 (Defs.' Ex. G-1) (compiling plaintiffs' billing records for "Amended Complaint Substantive" which totals 70.62 hours); Doc. 157-9 (Defs.' Ex. G-2) (compiling plaintiffs' billing records for "Amended Complaint Other" totaling 99 hours).  Defendants contend this dimension of effort "is unreasonable and excessive" and that "after more than a year of research, interviews and investigations, two preeminent firms that are 'regularly' involved in 'complex class actions' involving children and child welfare needed over 850 hours to prepare the original Complaint in this action" and 170 hours on the Amended Complaint.  Doc. 157 at 34–35.  And, while plaintiffs never filed a Motion for Class Certification, they seek fees for 95.5 hours for work devoted to that effort.  Doc. 157 at 18 n.6; *see also* Doc. 157-15 (Defs.' Ex. M) (compiling "DLA Piper Class Certification Fees").  Defendants argue that plaintiffs billed to prepare a Motion for Class Certification for a year

before the motion was even due and fail to explain the necessity for these hours.  *Id.* at 18.  The court agrees.

The court may assess the number of hours spent on a given task in assessing the number of reasonable hours.  *See Case*, 157 F.3d at 1250 ("the district court should look at the hours expended on each task to determine if they are reasonable" and one factor includes potentially duplicating services).  And, "a general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use."  *Id.* (internal quotation marks and text alteration omitted).

Plaintiffs assert that "drafting a complaint—especially about statewide systemic deficiencies affecting thousands of children—is an iterative process based on legal and factual research conducted as facts change in real-time."  Doc. 161 at 25.  But plaintiffs' argument fails to persuade the court.  To put this Complaint's effort level in context, a busy attorney in private practice might bill about 2,000 hours each year.  This equates to *billing*—as opposed to working—40 hours spread over 50 weeks (leaving two weeks for holidays and vacation).  Plaintiffs' fee request for their Complaint seeks nearly half (44.4%) of that 2,000 hours.  In other words, plaintiffs' request seeks a fee for one busy attorney devoting almost six months' worth of work to drafting the Complaint.  And when combined with the 170 hours devoted to the Amended Complaint, plaintiffs' fee request surpasses the six month figure.  As noted by defendants, plaintiffs already had devoted hundreds of other hours investigating and researching these issues.

Plaintiffs cite the complexity of the case and the number of documents referenced in drafting the Complaint, but they never explain this high number of hours.  On review of plaintiffs' billing records, the sheer number of attorneys working on the Complaint contradicts

plaintiffs' assertions that counsel divided the work among counsel to prevent duplicative or unnecessary billing.  *See* Doc. 157-7 (Defs.' Ex. F) (listing 14 attorneys who billed time working on the initial Complaint); *see Animal Def. Fund*, 2020 WL 4000905, at *5 (noting five attorneys worked on the Complaint for about 75 hours and "it belies plaintiffs' assertions that the attorneys were assigned to allotted roles to maximize efficiency" since many of these attorneys worked on litigation overlapping similar issues).

Plaintiffs also take issue with how defendants compile their charts.  For example, they assert that a "significant portion of the time entries in Ex. G-2 include discussion of other issues besides the amended complaint."  Doc. 161 at 26.  This is so, but it doesn't help plaintiffs.  Their counsel decided how to record their time.  Lumping different things together in one time entry prevents defendants—and the court—from discerning a truer number.  And again, plaintiffs fail to provide an alternative calculation, number, or chart providing a better assessment of these hours and their necessity to the litigation.  Plaintiffs have failed to provide an adequate explanation for why they billed more than 890 hours for the initial Complaint and about 170 hours for the Amended Complaint.  A request of this dimension requires an explanation and plaintiffs have failed to provide it.  The court thus reduces these hours (896.64 + 169.62) by 75% for a total of 266.6 hours of effort on the Complaint and Amended Complaint.

Plaintiffs also contend they "reasonably prepared in advance for an upcoming deadline for filing a class certification motion on June 30, 2020."  Doc. 161 at 26.  They assert their work was "key to informing their strategy on the timing of their motion and to ensuring their discovery efforts were informed by an understanding of what was needed for a successful motion for class certification."  *Id.*  But, again, plaintiffs have touted their experience as class action litigators with experience in child advocacy throughout their application.  On review of plaintiffs' billing

records for the Class Certification Motion, plaintiffs' entries are vague or appear unnecessary.
*See* Doc. 148-1 at 7 (Kristin Pacio billed for "[r]eviewing memorandum regarding class
certification" and to "draft class certification brief" for almost four hours, more than a year
before the motion was due); *see also id.* at 6 (David Sager billing to instruct William Diggs
"regarding class certification"); *see also id.* at 7–10 (Meg Fowler billed for hours to draft the
Motion for Class Certification more than a year before its deadline). The court appreciates
plaintiffs' diligence, but it appears excessive and unnecessary here. The court reduces these 95.5
hours spent on class certification by 75%.

The court finds the high number of hours spent on the initial Complaint and Amended
Complaint unreasonable and reduces the time by 75%. The court also reduces the number of
hours spent on the Motion for Class Certification by 75%.

### d.  Mediation Fees and Expenses

Plaintiffs request 1,276.96 billable hours and $527,026.60 in fees to mediate this case.
Doc. 157 at 36; *see also* Doc. 157-10 (Defs.' Ex. H) (compiling "All Mediation and Travel
Expenses"). Defendants argue plaintiffs' billing records "follow Plaintiffs' trend of unnecessary,
duplicative billing practices," and show that plaintiffs "sent an unnecessary and excessive army
of attorneys to each of the mediation sessions without an explanation as to why this was
justified." Doc. 157 at 36. The court agrees with defendants.

Plaintiffs provide vague and unhelpful reasons for the high number of hours billed for
mediation and the number of attorneys attending each session. *See* Doc. 161 at 26–27. They
assert the parties "exchanged multiple drafts of detailed term sheets and mediation statements,"
and that plaintiffs "prepared settlement proposals and materials to aid discussion, in addition to
spending time analyzing the parties' positions and strategizing on achieving a favorable

resolution." *Id.* at 27; *see also id.* at 27 n.42 (discussing how plaintiffs' counsel divided up tasks between organizations). They also argue defendants' mediation efforts included "[m]ultiple attorneys and other officials employed by the state of Kansas." *Id.* at 26 n.41.

Plaintiffs also take issue—again—with how defendants calculated the total hours devoted to mediation. *Id.* at 27 (arguing "Defendants created [Defs.' Ex. H] by compiling time entries containing the word mediation[,]" but, "many of the entries refer to coordination among co-counsel on a number of subjects."). But they fail to provide an alternative calculation or method for the court to assess the necessity of these hours. By plaintiffs' own reasoning, many of these calculations are inaccurate because plaintiffs discussed mediation and other topics with co-counsel but did not divide their fee records by topic.[9] Still, plaintiffs have not explained the need for at least eight attorneys to bill at each mediation session and the high number of hours devoted to mediation activities. *See* Doc. 157 at 36–37 (listing number of plaintiffs' counsel attending each mediation session). Nor have they explained why so many out-of-state attorneys needed to attend these sessions.

As just one example, the court reviewed the travel and billing entries for a mediation session on November 12, 2019, and plaintiffs fail to explain the necessity for these travel expenses. *See* Doc. 148-2 at 3–4 (attorneys Kristin Pacio and Caryn Schechtman (who did not bill for any time on this case) traveled to Kansas for mediation on November 11, 2019); Doc. 145-2 at 9 (NCYL attorneys Freya Pitts and Leecia Welch traveled to Kansas for mediation for November 11–13, 2019); Doc. 144-4 at 3 (Children's Rights, Inc. attorneys Marissa Nardi and

---

[9] As discussed above, plaintiffs admit an error in their submitted billing records for mediation in a footnote and "agree to deduct $13,673.42 from its original expense total of $128,476.01" because plaintiffs inadvertently included this amount in DLA's total fees for the mediation submitted to the court. Doc. 161 at 14 n.20. Plaintiffs also double-billed for Teresa Woody's time at one of the mediations which resulted in an additional erroneous seven hours. *Id.* Plaintiffs' admitted errors highlight the inherent redundancies and errors in billing across five organizations and with 32 timekeepers.

Ira Lustbader traveled to Kansas for mediation for November 11–13, 2019).  Local attorneys also attended these sessions.  *See* Doc. 146-2 at 9, 14, 27 (Kansas Appleseed's Larry Rute, Martha Hodgesmith, and Teresa Woody attended mediation session on November 12, 2019); Doc. 147-1 at 11 (Ms. Burns-Bucklew attended mediation on November 13, 2019—which possibly is a typo, as it appears no mediation session occurred on November 13, 2019).  While the court recognizes the complexity of this case and the efforts expended by plaintiffs to reach settlement, plaintiffs have failed to show that all of these hours and expenses are necessary to the litigation.  The court reduces plaintiffs' mediation hours and mediation travel expenses by 50%.

### e.  *Plaintiffs' Response to Governor Kelly's 9-Page Motion to Dismiss*

Plaintiffs request 534.15 hours to respond to defendants' only motion to dismiss in this case.  Doc. 157-11 (Defs.' Ex. I) (compiling "Motion to Dismiss References in Fees" totaling 534.15 hours).  This motion was nine pages long and sought dismissal of Governor Kelly from the lawsuit.  Doc. 157 at 38.  Specifically, on October 25, 2019, defendants filed a Motion to Dismiss (Doc. 79) asking the court to dismiss Governor Kelly from this lawsuit for lack of jurisdiction under the Eleventh Amendment.  Defendants did not seek dismissal of any other named defendant nor any other cause of action.  *See* Doc. 80.  "Plaintiffs' counsel at Kansas Appleseed, National Center for Youth Law, and Children's Rights spent considerable time *months before any motion was filed* to research and correspond among themselves about potential motion[s] to dismiss substantive and procedural issues."  Doc. 157 at 40 (citing Defs.' Ex. I).  This time also includes seven attorneys who billed time reviewing the court's Order granting defendants' Motion to Dismiss.  *Id.* at 35.[10]

---

[10]      The court takes no issue with the fact defendants prevailed on this motion.  The court is not "evaluat[ing] the individual claims as though they were discrete and severable" when the prevailing party fails to succeed on all claims.  *Robinson*, 160 F.3d at 1283.  The court does not reduce these hours because plaintiffs didn't succeed on defendants' Motion to Dismiss.  Rather, the court reduces these hours

Plaintiffs seek hundreds of hours responding to defendants' motion—including additional time spent investigating the structure of the Kansas welfare system—after plaintiffs had already devoted hundreds of hours investigating the Kansas foster care system structure.  Plaintiffs argue they "exercised due diligence in vigorously opposing Defendants' Motion to Dismiss; the research was not excessive."  Doc. 161 at 28.  This conclusory assertion and failure to provide any adequate calculation of the time spent on responding to the Motion to Dismiss fails to meet plaintiffs' burden to show they reasonably expended this time on the litigation or its necessity.

In sum, plaintiffs ask the court to award 534 hours—more than a quarter year's worth of work for a reasonably busy attorney—on a limited motion to dismiss that didn't alter the case's dynamics.  The court finds the lion's share of the time devoted to this motion was unnecessary. It thus reduces this aspect of plaintiffs' fee request by 75%.

### f.   Time Billed for Meetings

Plaintiffs request 570 hours for meet and confer sessions and weekly team meetings— including prep time and discussion of those meetings.  Doc. 157 at 46; *see also* Doc. 157-12 (Defs.' Ex. J) (compiling plaintiffs' billing records for "All Meet and Confers and Team Calls/Meetings" totaling 573.7 hours).  Plaintiffs assert they have "gone to great effort to remove duplicative entries in the exercise of billing judgment."  Doc. 161 at 29; *see also* Doc. 143 at 30 (plaintiffs reduced their hours by limiting "the number of billing attorneys for regular co-counsel strategy meetings, depositions, stakeholder meetings, court hearings, and conferences with Defendants, eliminating from this application time spent by many attorneys and any paralegals who also attended").  While the court does not necessarily take issue with plaintiffs' use of team meetings to develop case strategy, it does highlight inherent inefficiencies when a large number

---

because plaintiffs fail to explain the necessity for the sheer number of hours opposing a relatively simple motion that the court decided in a 14-page Order (Doc. 118).

of timekeepers work one case.  Plaintiffs started weekly team meetings, according to billing

records, on December 21, 2017.  Doc. 157-12 at 2 (Defs.' Ex. J) (Poonam Juneja billed for "team

co-counsel call re investigation").  And they stopped billing for team meetings on July 1, 2020.

*Id.* at 105–06 (nine attorneys across all five organizations billed for a team meeting).  This

accounts for about 131 weeks.

Nonetheless, the court declines to impose any reduction linked directly to these meetings.

The court already has imposed a 20% reduction to offset inefficiencies.  And defendant has

failed to demonstrate that any additional reduction is warranted.  They likewise have failed to

establish that the hours devoted to these regular meetings was unnecessary.

### g.   *Pro Hac Vice Motions*

Plaintiffs seek fees for 44.5 hours (more than $12,000) and $525.08 in expenses for 13

pro hac vice motions to the court.  Doc. 157 at 46; *see also* Doc. 157-13 (Defs.' Ex. K)

(compiling plaintiffs' billing records for "Pro Hac Vice Fees").  Our court has found time

devoted to preparing pro hac vice motions is compensable, but only at a paralegal rate.  *See*

*Animal Def. Fund*, 2020 WL 4000905, at *5; *see also Ellison v. GAB Robins, Inc.*, No. CV 02-

127 MV/LFG, 2006 WL 8444544, at *15 (D.N.M. Jan. 26, 2006) (In applying § 1988(b)'s

framework for awarding attorneys' fees in Title VII case, the court noted pro hac vice motions

are "a standard, straightforward pleading. . . . [and] the preliminary draft is likely part of any

lawyer's 'boilerplate' forms, or is generally prepared by a paralegal.").  The court agrees with

this approach and awards plaintiffs' fees for preparing their pro hac vice motions but at a

paralegal rate—$150 per hour.  The court finds no reason to reduce the expenses associated with

these motions, however, and awards plaintiffs' expenses in filing these motions totaling $525.08.

### h.   Time Billed for COVID-19

Plaintiffs request 94.15 hours, totaling $35,301.50, in fees incurred for "COVID-19 discovery[.]"  Doc. 157 at 48; *see also* Doc. 157-14 (Defs.' Ex. L) (compiling plaintiffs' billing records for "COVID References in Fees").  Defendants argue plaintiffs used the COVID-19 pandemic "to take a detour from the merits of their claims to send demands to and to serve discovery (with expedited response times) requesting detailed accounts of Defendants' response to the pandemic."  Doc. 157 at 48.  The court agrees.

"The time that is compensable under § 1988 is that reasonably expended on the litigation."  *Webb*, 471 U.S. at 235 (internal quotation marks and text alteration omitted).  Plaintiffs argue the court should award these fees because counsel "had reason to be concerned about whether the thousands of youth in DCF custody continued to be moved from placement to placement, including unsafe placements like agency offices, while the rest of the world was instructed to quarantine and socially distance."  Doc. 161 at 31.  The COVID-19 pandemic, plaintiffs contend, "made the issues in this case only more urgent, contributing to Plaintiffs' counsel's push to obtain a successful resolution to the case as efficiently as possible."  *Id.*

The court does not criticize the concerns that counsel displayed for their clients, vulnerable youth in the Kansas Foster Care System.  But, it is unpersuaded by plaintiffs' vague assertions that these additional discovery requests for COVID-19 were "reasonably expended on the litigation."  *Webb*, 471 U.S. at 235.  The court deducts these 94.15 hours from plaintiffs' request.

### i.   Conclusion

In sum, plaintiffs' billing records reveal that counsel devoted more hours than necessary to several tasks.  This conclusion isn't intended to suggest that counsel had bad motives.  Nor

does the court criticize plaintiffs' counsel for having high standards and striving to meet them. Instead, the court merely concludes that that they applied more effort to some tasks than defendants should have to bear and, in some cases, didn't optimize the efficiency of their efforts. These conclusions are faithful to governing legal standards, which require the court to review plaintiffs' statements as an experienced senior partner might before submitting a bill to a client. *See Robinson*, 160 F.3d at 1281.

The billing records reveal inefficiencies consistent with overstaffing. Those records also use vague and uninformative descriptions which complicates the court's ability to assess the reasonableness of the hours billed. In sum, plaintiffs have failed to meet their burden to show the necessity of these hours to the litigation. Corresponding to the court's analysis above, the court reduces plaintiffs' fees and expenses, as follows:

(a) **Inefficient Staffing of the Case:** The court reduces plaintiffs' total hours by 20%—after the deductions to plaintiffs' hours described in paragraphs (b)–(h), below—to account for inefficiencies inherent in staffing a case with 25 attorneys and seven support staff. Chart 3, after calculating all other deductions, reduces each timekeepers' total billable hours by 20%. Chart 3, Column (a) reflects this reduction.

(b) **Plaintiffs' Pre-Suit Fees and Expenses:** The court reduces plaintiffs' fee request by 105.30 hours to account for hours billed for background research, as compiled by defendants in Exhibit D-1. *See* Doc. 157-4 (Defs.' Ex. D-1) (compiling plaintiffs' billed hours for "Background Research"). Chart 2, Column (b) reflects this reduction. The court also eliminates plaintiffs' pre-suit travel expenses, compiled by defendants in Exhibit E, totaling $33,775.19. *See* Doc. 157-6 (Defs.' Ex. E) (compiling "Pre-

48

Litigation Expenses Submitted by Plaintiffs").  Chart 4, Column (b) reflects this

reduction.

(c) **Drafting Complaint, Amended Complaint, and Motion for Class Certification:**

The court reduces plaintiffs' fee request for preparing the Complaint, Amended

Complaint, and Motion for Class Certification by 75%.  Defendants compiled the

total hours expended on each task.  *See* Doc. 157-7 (Defs.' Ex. F) (compiling

plaintiffs' billing records for "Initial Complaint Preparation" which total 896.64

hours); Doc. 157-8 (Defs.' Ex. G-1) (compiling plaintiffs' billing records for

"Amended Complaint Substantive" which total 70.62); Doc. 157-9 (Defs.' Ex. G-2)

(compiling plaintiffs' billing records for "Amended Complaint Other" which total 99

hours); Doc. 157-15 (Defs.' Ex. M) (compiling "DLA Piper Class Certification Fees"

which total 95.5 hours).  The court compiled the hours each timekeeper billed for

each task—totaling 1,161.76 hours—and reduced these hours by 75%.  The court thus

deducts 871.32 hours from plaintiffs' total hours.  Chart 2, Column (c) reflects this

reduction.

(d) **Mediation Fees and Expenses:**  The court reduces plaintiffs' fee request for

mediation hours by 50%.  Defendants compiled the total hours plaintiffs billed for

mediation in Exhibit H, which totaled 1,276.95 hours.  *See* Doc. 157-10 (Defs.' Ex.

H) (compiling plaintiffs' billing records for "All Mediation and Travel Expenses").

But plaintiffs acknowledge they double-counted an attorney's hours at a mediation

session resulting by an additional seven hours.  *See* Doc. 161 at 14 n.20.  So,

plaintiffs seek 1,269.95 hours for mediation.  The court reduces these hours by 50%

and thus deducts 634.98 hours from plaintiffs' fee request, as shown in Chart 2 Column (d), below.

The court also reduces plaintiffs' mediation expenses—exempting fees paid to the mediator—by 50%. Defendants compiled plaintiffs' total expenses for mediation in Exhibit H, totaling $57,890.54. *See* Doc. 157-10 (Defs.' Ex. H) (compiling plaintiffs' billing records for "All Mediation and Travel Expenses"). But defendants omitted a $9,263.54 fee that DLA paid the mediator on February 14, 2020. *Compare* Doc. 157-10 (Defs.' Ex. H) (compiling plaintiffs' billing records for "All Mediation and Travel Expenses"); Doc. 148-2 (DLA listing requested expenses and costs). So, after adding this $9,263.54 fee to plaintiffs' submitted expenses, plaintiffs request $67,154.08, which includes the mediator fees. The court only reduces plaintiffs' travel and miscellaneous expenses associated with mediation, not the fees paid to the mediator. So, the court deducts the $36,036.16 in mediation fees paid to the mediator and the additional $13,673.42 that plaintiffs inadvertently added to their expense request. *See* Doc. 161 at 14 n.20. After exempting these mediator fees, plaintiffs request $17,444.50 in mediation expenses. The court deducts 50% of this amount— $8,722.25—from plaintiffs' expense request, shown in Chart 4, Column (d).

(e) **Plaintiffs' Response to Governor Kelly's 9-Page Motion to Dismiss:** The court reduces plaintiffs' hours billed to respond to defendants' Motion to Dismiss by 75%. Defendants compiled the total hours that plaintiffs billed for "Motion to Dismiss" in Exhibit I, totaling 534.15 hours. *See* Doc. 157-11 (Defs.' Ex. I) (compiling "Motion to Dismiss References in Fees"). The court deducts 75% of these hours—totaling

400.61 hours—from plaintiffs' fee request.  Chart 2, Column (e) reflects this
reduction.

(f) **Time Billed for Meetings:**  The court does not reduce plaintiffs' hours billed for
meetings, which defendants compiled in Exhibit J, totaling 573.7 hours.  *See* Doc.
157-12 (Defs.' Ex. J) (compiling time entries for "All Meet and Confers and Team
Calls/Meetings").  The court declines to impose any further reduction for the number
of meetings that plaintiffs' counsel billed because the court already imposed a 20%
reduction to account for inefficiencies intrinsic in spreading a case this size among so
many attorneys and organizations, as described in paragraph (a) above.

(g) **Pro Hac Vice Motions:**  The court reduces the hourly rate that plaintiffs' attorneys
billed for preparing pro hac vice motions to the non-attorney hourly rate, *i.e.*, $150
per hour.  Defendants compiled the time billed for preparing pro hac vice motions in
Exhibit K.  *See* Doc. 157-13 (Defs.' Ex. K) (compiling time for "Pro Hac Vice
Fees").  Chart 2, Column (g) subtracts attorneys' time spent on pro hac vice motions.
The court then calculates the billable hours for each timekeeper and multiplies these
hours by the rate set by the court in Section III.B.1., above.  After calculating this
total, then the court adds any attorneys' time spent on pro hac vice motions—reduced
by 20% and multiplied by $150—to their fees, resulting in their total fee award.
Chart 3's "Total Fee Award" column reflects this amount.

(h) **Time Billed for COVID-19:**  The court eliminates time billed for "COVID-19" from
plaintiffs' award, totaling 94.15 hours.  Defendants compiled this time in Exhibit L.
*See* Doc. 157-14 (Defs.' Ex. L) (compiling plaintiffs' billing records for "COVID
References in Fees").  Chart 2, Column (h) reflects this reduction.

Chart 2, below, captures the reductions described in paragraphs (b)–(h) to plaintiffs'
submitted hours.  Then, Chart 3, calculates an additional 20% reduction and calculates each
timekeepers' fee award by multiplying these hours by the rate set by the court in Section III.B.1.,
above.  Chart 4 calculates the expense award for each organization, reducing plaintiffs'
submitted expenses for the reasons described in paragraphs (b) and (d).

## C. Calculating Plaintiffs' Fee and Expenses Award

Below, the court calculates the total hours for each timekeeper with the deductions described in paragraphs (b)–(h).

### Chart 2:  Plaintiffs' Submitted Hours Minus Described Deductions[11]
*Chart Continues on Following Pages*

| Timekeeper | JD Year | Total Hours Submitted | (b) Pre-Suit Fees | (c) 75% * (Drafting Compl., Am. Compl., and Class Cert.) | (d) 50% * (Mediation Hours) | (e) 75% * (Response to Motion to Dismiss) | (g) Pro Hac Vice Motions | (h) Time Billed for COVID-19 | Total Hours After Deductions[12] |
|---|---|---|---|---|---|---|---|---|---|
| Larry Rute (Appleseed) | 1973 | 184.50 | – | -23.10 | -25.80 | -2.33 | -1.00 | – | **132.28** |
| Martha J. Hodgesmith (Appleseed) | 1978 | 129.70 | – | -3.38 | -39.40 | -0.98 | – | -2.40 | **83.55** |
| Loretta Burns-Bucklew | 1984 | 231.10 | -1.10 | -12.42 | -38.06 | -2.72 | – | -1.63 | **175.18** |
| Teresa Woody (Appleseed) | 1985 | 622.40[13] | – | -15.38 | -59.70 | -12.68 | – | -11.70 | **522.95** |
| Stephen Dixon (CR) | 1987 | 354.30 | – | -17.18 | -1.45 | -1.19 | – | – | **334.48** |
| David J. Sager (DLA) | 1991 | 42.90 | – | -2.78 | -0.45 | – | – | – | **39.68** |
| Ira Lustbader (CR) | 1992 | 968.62 | -12.84 | -134.69 | -90.60 | -16.25 | – | -3.49 | **710.75** |
| Leecia Welch (NCYL) | 1996 | 951.10 | -8.90 | -81.00 | -82.00 | -9.30 | -1.40 | -5.50 | **763.00** |
| Kristin Pacio (DLA) | 2005 | 74.90 | – | -16.35 | -15.00 | -1.65 | – | – | **41.90** |

---

[11]    The columns correspond to paragraphs (b)–(h), above, which describe the court's method for calculating the reduction to plaintiffs' hours.

[12]    After calculating the totals in an Excel spreadsheet, the court truncated the decimals to two places which resulted in some of the totals rounding up .01 hours.

[13]    Plaintiffs admit to double-counting Ms. Woody's hours at a mediation session which resulted in an additional seven hours submitted in plaintiffs' fee request. *See* Doc. 161 at 14 n. 20.  The court deducted this seven hours from Mr. Woody's total submitted hours and from the hours she billed for mediation, before calculating the 50% reduction to mediation fees.

| Timekeeper | JD Year | Total Hours Submitted | (b) Pre-Suit Fees | (c) 75% * (Drafting Compl., Am. Compl., and Class Cert.) | (d) 50% * (Mediation Hours) | (e) 75% * (Response to Motion to Dismiss) | (g) Pro Hac Vice Motions | (h) Time Billed for COVID-19 | Total Hours After Deductions[12] |
|---|---|---|---|---|---|---|---|---|---|
| Benet Magnuson (Appleseed) | 2009 | 42.00 | -3.50 | -4.73 | – | – | -1.50 | – | **32.28** |
| Poonam Juneja (NCYL) | 2009 | 729.50 | -8.40 | -29.10 | -24.95 | -14.70 | -2.40 | -7.70 | **642.25** |
| Joshua Kane (DLA) | 2010 | 108.80 | – | – | -5.50 | -2.63 | -1.00 | | **99.68** |
| William J. Diggs (DLA) | 2010 | 73.10 | – | -35.18 | -0.70 | -0.15 | -0.80 | – | **36.28** |
| Marissa Nardi (CR) | 2012 | 1211.02 | -9.00 | -113.14 | -81.99 | -147.75 | -2.07 | -12.23 | **844.84** |
| Jonathan King (CR) | 2012 | 702.83 | -14.63 | -58.10 | -21.95 | -117.84 | -0.98 | -17.60 | **471.73** |
| Erin McGuinness (CR) | 2012 | 408.87 | -5.23 | -64.06 | -2.17 | -0.05 | – | – | **337.36** |
| Freya Pitts (NCYL) | 2013 | 750.50 | -1.10 | -91.13 | -65.05 | -12.98 | -5.90 | -3.90 | **570.45** |
| Jean Strout (NCYL) | 2014 | 88.90 | – | – | – | – | – | – | **88.90** |
| Claire Glasspiegel (CR) | 2015 | 238.65 | – | – | -7.72 | – | – | -19.42 | **211.51** |
| Nicole Taykhman (CR) | 2016 | 196.43 | – | – | -0.27 | -6.77 | -0.08 | -1.21 | **188.11** |
| Amanda Grill (NCYL) | 2017 | 123.00 | -19.20 | -0.38 | – | – | – | – | **103.43** |
| Meg Fowler (DLA) | 2018 | 100.50 | – | -42.53 | -0.90 | -0.98 | – | – | **56.10** |
| Jacqueline Stolzenberg (NCYL) | 2018 | 264.70 | -21.40 | -32.25 | -0.20 | – | – | – | **210.85** |
| Megan Kinney (DLA) | 2019 | 133.30 | – | – | -13.15 | -2.03 | – | -0.80 | **117.33** |
| Olivia Tourgee (DLA) | 2019 | 97.00 | – | -1.88 | -6.15 | -0.83 | -4.20 | -6.30 | **77.65** |
| Daniel Adamek (CR) | NA | 634.92 | – | -85.63 | -28.91 | -40.45 | – | -0.27 | **479.67** |

| Timekeeper | JD Year | Total Hours Submitted | (b) Pre-Suit Fees | (c) 75% * (Drafting Compl., Am. Compl., and Class Cert.) | (d) 50% * (Mediation Hours) | (e) 75% * (Response to Motion to Dismiss) | (g) Pro Hac Vice Motions | (h) Time Billed for COVID-19 | Total Hours After Deductions[12] |
|---|---|---|---|---|---|---|---|---|---|
| *Clare Connaughton (CR)* | NA | 239.37 | – | – | -17.27 | -6.41 | – | – | **215.69** |
| *Judy Calderon (DLA)* | NA | 8.70 | – | – | – | – | – | – | **8.70** |
| *Lori Johns (Appleseed)* | NA | 70.90 | – | – | – | – | – | | **70.90** |
| *Christina Ostmeyer (Appleseed)* | NA | 46.60 | – | – | -0.50 | | – | – | **46.10** |
| *Kira Setren (NCYL)* | NA | 95.80 | – | -6.98 | -5.15 | – | | – | **83.68** |
| *Joshua Nomkin (NCYL)* | Student | 132.20 | – | – | – | – | – | – | **132.20** |
| *Totals* | | **10057.11** | **-105.30** | **-871.32** | **-634.98** | **-400.61** | **-21.33** | **-94.15** | **7929.42** |

Next, the court calculates the total fee award for each timekeeper in Chart 3. First, the court reduces the total hours for each timekeeper—calculated in Chart 2—by 20%. Then it multiplies this total by the rate set for each timekeeper by the court, discussed in Section III.B.1., above.

### Chart 3:  Total Fee Award Calculation
#### *Chart Continues on Following Pages*

| Timekeeper | Total Hours (Chart 2) | (a) Total Hours Less 20% Reduction | Hourly Rate Set by Court | Hours * Rate | Total Fee Award[14] |
|---|---|---|---|---|---|
| Larry Rute (Appleseed) | 132.28 | 105.82 | $500.00 | $52,910.00 | $53,030.00* |
| Martha J. Hodgesmith (Appleseed) | 83.55 | 66.84 | $345.00 | $23,059.80 | $23,059.80 |
| Loretta Burns-Buckley | 175.18 | 140.14 | $500.00 | $70,072.00 | $70,072.00 |
| Teresa Woody (Appleseed) | 522.95 | 418.36 | $500.00 | $209,180.00 | $209,180.00 |
| Stephen Dixon (CR) | 334.48 | 267.59 | $410.00 | $109,710.26 | $109,710.26 |
| David J. Sager (DLA) | 39.68 | 31.74 | $500.00 | $15,870.00 | $15,870.00 |
| Ira Lustbader (CR) | 710.75 | 568.60 | $500.00 | $284,301.00 | $284,301.00 |
| Leecia Welch (NCYL) | 763.00 | 610.40 | $500.00 | $305,200.00 | $305,368.00 |
| Kristin Pacio (DLA) | 41.90 | 33.52 | $410.00 | $13,743.20 | $13,743.20 |
| Benet Magnuson (Appleseed) | 32.28 | 25.82 | $300.00 | $7,746.00 | $7,926.00* |
| Poonam Juneja (NCYL) | 642.25 | 513.80 | $375.00 | $192,675.00 | $192,963.00 |
| Joshua Kane (DLA) | 99.68 | 79.74 | $335.00 | $26,712.90 | $26,832.90* |
| William J. Diggs (DLA) | 36.28 | 29.02 | $335.00 | $9,721.70 | $9,817.70* |
| Marissa Nardi (CR) | 844.84 | 675.87 | $335.00 | $226,417.79 | $226,666.19* |
| Jonathan King (CR) | 471.73 | 377.38 | $335.00 | $126,422.97 | $126,540.57* |
| Erin McGuinness (CR) | 337.36 | 269.89 | $240.00 | $64,773.12 | $64,773.12 |
| Freya Pitts (NCYL) | 570.45 | 456.36 | $345.00 | $157,444.20 | $158,152.20* |

---

[14]     The court added back the time spent on pro hac vice motions by attorneys, listed in Chart 2 Column (g), onto each attorneys' fee award but at the reduced rate explained in paragraph (g) above.  The court calculated this total by reducing the time an attorney spent on pro hac vice motions, reducing this time by 20%, and then multiplying it by the hourly rate set for non-attorneys, *i.e.*, $150 per hour.  This total was then added to the attorney's fee award.  Asterisks mark which attorneys were awarded time at the reduced rate for time spent on pro hac vice motions.

| Timekeeper | Total Hours (Chart 2) | (a) Total Hours Less 20% Reduction | Hourly Rate Set by Court | Hours * Rate | Total Fee Award[14] |
|---|---|---|---|---|---|
| Jean Strout (NCYL) | 88.90 | 71.12 | $310.00 | $22,047.20 | **$22,047.20** |
| Claire Glasspiegel (CR) | 211.51 | 169.21 | $290.00 | $49,070.32 | **$49,070.32** |
| Nicole Taykhman (CR) | 188.11 | 150.49 | $260.00 | $39,126.88 | **$39,136.48*** |
| Amanda Grill (NCYL) | 103.43 | 82.74 | $220.00 | $18,202.80 | **$18,202.80** |
| Meg Fowler (DLA) | 56.10 | 44.88 | $200.00 | $8,976.00 | **$8,976.00** |
| Jacqueline Stolzenberg (NCYL) | 210.85 | 168.68 | $200.00 | $33,736.00 | **$33,736.00** |
| Megan Kinney (DLA) | 117.33 | 93.86 | $200.00 | $18,772.00 | **$18,772.00** |
| Olivia Tourgee (DLA) | 77.65 | 62.12 | $200.00 | $12,424.00 | **$12,928.00*** |
| Daniel Adamek (CR) | 479.67 | 383.73 | $150.00 | $57,559.80 | **$57,559.80** |
| Clare Connaughton (CR) | 215.69 | 172.55 | $150.00 | $25,883.10 | **$25,883.10** |
| Judy Calderon (DLA) | 8.70 | 6.96 | $150.00 | $1,044.00 | **$1,044.00** |
| Lori Johns (Appleseed) | 70.90 | 56.72 | $150.00 | $8,508.00 | **$8,508.00** |
| Christina Ostmeyer (Appleseed) | 46.10 | 36.88 | $150.00 | $5,532.00 | **$5,532.00** |
| Kira Setren (NCYL) | 83.68 | 66.94 | $150.00 | $10,041.00 | **$10,041.00** |
| Joshua Nomkin (NCYL) | 132.20 | 105.76 | $150.00 | $15,864.00 | **$15,864.00** |
| | | | | | |
| Totals | 7929.42 | 6343.54 | | $2,222,747.04 | **$2,225,306.64** |

The court thus awards plaintiffs' counsel $2,225,306.64 in attorneys' fees.  Next, the court

calculates plaintiffs' expense award.

**Chart 4:  Expenses Calculation**

| Organization | Expenses Submitted by Plaintiffs | (b) Pre-Suit Expenses | (d) 50% (Mediation Expenses) | Total Expense Award |
|---|---|---|---|---|
| *Kansas Appleseed* | $0.00 | - | - | **$0.00** |
| *Loretta E. Burns-Bucklew* | $0.00 | - | - | **$0.00** |
| *National Children's Youth Law* | $34,292.69 | $10,923.51 | $3,910.67 | **$19,458.52** |
| *Children's Rights, Inc.* | $50,118.62 | $22,851.68 | $3,840.06 | **$23,426.88** |
| *DLA Piper* | $30,391.28 | - | $971.54 | **$29,419.74** |
| | | | | |
| *Total* | $114,802.59 | $33,775.19 | $8,722.25 | **$72,305.15** |

In sum, the court grants plaintiffs' Motion for Attorney Fees and Expenses (Doc. 142) in part and denies it in part.  The court awards plaintiffs' counsel $2,225,306.64 in fees and $72,305.15 in expenses.

**IT IS THEREFORE ORDERED THAT** plaintiffs' Motion for Attorneys' Fees and Expenses (Doc. 142) is granted in part and denied in part for a total award of $2,225,306.64 in fees and $72,305.15 in expenses.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to enter judgment for the awarded amount in attorneys' fees and expenses.

**IT IS SO ORDERED.**

**This 19th day of August, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**